## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

**Plaintiff,**

**v.**

Case No.:

**SURESCRIPTS, LLC**
2800 Crystal Drive
Arlington, VA 22202

**Defendant.**

### Complaint for Injunctive and Other Equitable Relief

Plaintiff Federal Trade Commission ("FTC"), by its designated attorneys, petitions this Court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for a permanent injunction and other equitable relief, including equitable monetary relief, against Defendant Surescripts, LLC ("Surescripts") to prevent unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### I.      NATURE OF THE CASE

1.      Surescripts, a health information technology company, has engaged in a long-running anticompetitive scheme to maintain its monopolies over two separate, complementary markets: electronic prescription routing ("routing") and eligibility, which are often collectively referred to as "e-prescribing." Routing is the transmission of prescription and prescription-related information from a prescriber (via the prescriber's electronic health record ("EHR") system) to a pharmacy. Eligibility is the transmission of a patient's formulary and benefit information from a payer (usually the patient's pharmacy benefit manager ("PBM")) to a prescriber's EHR.

2.      In 2009, Surescripts had monopolies over routing and eligibility. With both of these markets poised to experience explosive growth due to federal incentives for e-prescribing, Surescripts feared that other health information technology companies could threaten its dominant positions. To neutralize these competitive threats, Surescripts took a series of anticompetitive actions to protect and maintain its monopolies. This multifaceted anticompetitive scheme has been remarkably successful: Despite a massive increase in e-prescribing over the past decade, Surescripts has prevented any meaningful competition, maintaining at least a 95% share (by transaction volume) in each market.

3.      First, Surescripts changed its pricing policies to require long-term exclusivity from nearly all of its routing and eligibility customers. Surescripts designed its new pricing to ensure that its customers would pay a higher price on all of Surescripts's transactions unless they were "loyal" to Surescripts, i.e., used Surescripts exclusively. With its 95%-plus share in both markets, Surescripts knew that no competitor could ever offer customers enough savings to compensate customers for the skyrocketing costs the customers would face by paying Surescripts's higher "non-loyal" price on their remaining Surescripts transactions. Surescripts's web of loyalty contracts prevented competitors from attaining the critical mass necessary to be a viable competitor in either routing or eligibility. Those effectively exclusive contracts foreclosed at least 70% of each market, eliminating multiple competitive attempts from other companies, such as Emdeon, that offered lower prices and greater innovation. All of this was done intentionally, as one Surescripts vice president gloated about how Surescripts's loyalty contracts scheme excluded a competitor, Emdeon: "It[']s nice when a plan comes together."

4.      Second, Surescripts has engaged in a long-running campaign of threats and other non-merits based competition to ensure that no other competitor could get a toehold in either

market. As one example, when Allscripts, a large EHR customer of Surescripts, attempted to enter into a non-exclusive agreement with Surescripts in 2014 so Allscripts could use Emdeon, Surescripts launched a series of threats—what senior Surescripts executives called their "nuclear missiles." These threats were intended to secure Allscripts's continued exclusive use of Surescripts and quash the threat from Emdeon.

5.    Third, Surescripts eliminated the competitive risk posed by RelayHealth, a subsidiary of McKesson Corporation, in routing. Surescripts feared that RelayHealth—with its extensive connections to many of the same customers Surescripts wanted to lock up via its loyalty scheme—had a "natural ability to capture 15-20% of transaction volume." Surescripts understood that competition from RelayHealth would have "dropped the price [for routing] down to ███████ at any time." To eliminate this competitive risk, in 2010, Surescripts entered into an agreement that prohibited RelayHealth from competing in the routing market for six years. Although this agreement facially preserved the existing "value-added reseller" relationship between the two companies, Surescripts executives have repeatedly stated that, from Surescripts's perspective, the sole benefit of that ongoing relationship is that it sidelines RelayHealth as a competitor. Although the formal non-compete is no longer in the agreement, strict contract provisions continue to prevent RelayHealth from competing against Surescripts in routing, ensuring that the routing market suffers from the effects of that non-compete today.

6.    Due to Surescripts's ongoing conduct, there is no meaningful competition in the markets for routing or eligibility. The decade-long monopolies in these markets have produced predictable effects: higher prices, reduced quality, stifled innovation, suppressed output, and stymied alternative business models.

## II.    JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1337(a), and 1345.

8.      This Court has personal jurisdiction over Surescripts because Surescripts has the

requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

9.      Surescripts sells e-prescribing services to customers located in this district.

Surescripts has entered into e-prescribing contracts with businesses and healthcare providers

located in this district.

10.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c),

and 15 U.S.C. § 53(b). Surescripts resides, transacts business, committed an illegal or tortious

act, or is found in this district.

11.     Surescripts's general business practices, and the unfair methods of competition

alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act,

15 U.S.C. § 45.

12.     Surescripts is, and at all relevant times has been, a corporation, as the term

"corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## III.    THE PARTIES

13.     Plaintiff FTC is an administrative agency of the United States Government,

established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its

principal offices in the District of Columbia. The FTC is vested with authority and responsibility

for enforcing, among other things, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized

under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin

violations of any law the FTC enforces.

14.     Defendant Surescripts is a for-profit Delaware limited liability company, with its principal place of business at 2800 Crystal Drive, Arlington, VA 22202. Except where otherwise specified, "Surescripts" refers to Surescripts, LLC and all corporate predecessors, subsidiaries, successors, and affiliates.

15.     Surescripts is engaged in the business of selling e-prescribing services, including routing and eligibility. In 2016, Surescripts generated over ███████ in annual revenue, of which over ███████ came from routing and eligibility.

## IV.     BACKGROUND

### A.     Electronic prescribing consists of two transactions.

16.     E-prescribing is the electronic transmission of prescription or prescription-related information between a prescriber (through the prescriber's EHR), a pharmacy, and a payer (usually a PBM), either directly or through an intermediary.

17.     E-prescribing developed as a safer, more accurate, efficient, and lower-cost means for prescribers (via their EHRs), pharmacies, and PBMs to communicate and process patient prescriptions. The benefits of e-prescribing include fewer medical errors due to poor handwriting, greater awareness of potential adverse drug interactions, more effective communication of a patient's insurance coverage and generic alternatives, and increased adherence (the likelihood that a patient will pick up a prescription at a pharmacy after leaving the prescriber's office).

18.     The core e-prescribing services are routing and eligibility. Although these two services are usually provided to prescribers together in the same prescribing workflow, each transaction serves a different purpose, delivers different information, and occurs between different customers.

19.     Routing is the transmission of prescription and prescription-related information between the prescriber's EHR and a pharmacy. Routing transactions also include the transmission of a pharmacy's request to a prescriber's EHR for a refill of a prescription.

20.     Eligibility is the transmission of a patient's formulary and benefit information from a PBM to a prescriber's EHR prior to the patient's appointment. This information allows a prescriber to know, for example, which drugs are covered by the patient's drug benefit plan, the location of covered drugs on a patient's health insurance company's formulary, and what copay (if any) a patient will have to pay to obtain a prescribed drug. Eligibility also informs the prescriber of lower-cost alternatives, such as generic drugs.

21.     Each of the routing and eligibility transactions is governed by its own industry-wide standard created by the National Council for Prescription Drug Programs ("NCPDP"). There is no patent or other intellectual property protection for either the routing or the eligibility transactions.

**B.      Routing and eligibility are two-sided networks with a "chicken-and-egg problem."**

22.     Providing routing requires building a two-sided network (or platform) linking EHRs to pharmacies. Providing eligibility requires building a two-sided network (or platform) linking EHRs to PBMs.

23.     Two-sided platforms experience what economists refer to as "indirect network effects." That means that the value to participants on one side increases when there are more participants on the other side.

24.     Both routing and eligibility have significant indirect network effects. For routing, pharmacies get more value from a network that connects to more EHRs because there is a greater supply of prescribers that can send patients to those pharmacies to purchase the patients'

prescribed drugs. And EHRs get more value from a network that connects to more pharmacies because prescribers can send prescriptions to more pharmacies, which increases the likelihood that patients will be able to use their preferred pharmacy.

25.     Similarly, for eligibility, PBMs get more value from a network that connects more EHRs, as the increased distribution of a PBM's formulary and benefit information helps more prescribers prescribe on-formulary drugs and thereby saves PBMs more money. And the EHRs get more value from a network that connects to more PBMs because EHRs are able to obtain more complete insurance benefit information, such as for those patients who have multiple insurers.

26.     Another feature of many two-sided networks is that customers on one side of the network will not join the network unless they are confident that they will be able to access enough customers on the other side and thereby derive enough value from using the network. Neither side will join unless they believe the other side will. This gives rise to what economists refer to as the "chicken-and-egg problem." Solving this coordination problem is key to developing a viable platform.

27.     Routing and eligibility both face the chicken-and-egg problem, as the industry itself has observed. For routing, a network is unlikely to persuade EHRs to join the network, and incur the costs associated with connecting, unless those EHRs believe they will be able to access a substantial number of pharmacies on that network. And a routing network is unlikely to convince pharmacies to join the network, and incur the costs associated with connecting, unless those pharmacies believe they will be able to access a substantial number of EHRs participating in that network.

28.     For eligibility, a network is unlikely to persuade EHRs to join the network, and incur the costs associated with connecting, unless those EHRs believe they will be able to access a substantial number of PBMs on that network. And an eligibility network is unlikely to convince PBMs to join the network, and incur the costs associated with connecting, unless those PBMs believe they will be able to access a substantial number of EHRs participating in that network.

29.     Creating viable routing and eligibility networks requires solving the chicken-and-egg problem and providing sufficient value to both sides of these platforms. Economists recognize that to solve the chicken-and-egg problem networks must get a "critical mass" of customers on both sides to sign up. If a network cannot get a critical mass on both sides, then it is unlikely to be able to operate a viable platform.

30.     In its submissions to the FTC, Surescripts has acknowledged that the chicken-and-egg problem exists as a barrier to entry in each of the markets for routing and eligibility.

31.     When a new platform starts, it can achieve critical mass either by getting customers who have not signed on to any platform or by getting customers from an existing platform. Customers of an existing platform face less cost and risk when they can use both their current platform and the new platform. Economists refer to the use of more than one platform simultaneously as "multihoming." Multihoming is common and new platforms routinely rely on multihoming to enter and compete with existing platforms.

32.     Nearly all routing and eligibility customers use Surescripts's platform, so competitors in general must compete for customers already using Surescripts's routing and eligibility platforms. Because customers often prefer to avoid the cost and risk of a complete switch to an entrant, the entrant is most likely to win business through multihoming. Customers

want to multihome because it encourages price competition and innovation in e-prescribing, and a small handful do multihome. As alleged below, Surescripts intentionally set out to substantially increase all routing and eligibility customers' costs to multihome, significantly elevating the critical mass a Surescripts competitor would need to become a viable network in either routing or eligibility. Absent Surescripts's conduct, entrants in routing and/or eligibility would have used multihoming to overcome the chicken-and-egg entry barrier through normal, market-based competition.

**C.   Due to federal policies and incentives, the e-prescribing industry has experienced extraordinary growth.**

33.   In 2008, there had been limited adoption of e-prescribing by prescribers. Congress thus acted twice to encourage expansion of e-prescribing and its many benefits.

34.   First, on July 15, 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"). MIPPA, through regulations implemented by the Centers for Medicare and Medicaid Services ("CMS"), adopted a carrot-and-stick approach to encourage prescribers to e-prescribe. As the carrot, MIPPA provided financial incentives to prescribers equivalent to a reimbursement bonus based on the prescriber's total charges for professional services to Medicare and Medicaid. As the stick, MIPPA established penalties in the form of reduced Medicare and Medicaid reimbursements to prescribers if a prescriber was not a "successful electronic prescriber." To be considered a successful electronic prescriber under MIPPA, a prescriber must use an EHR that, among other things, allows the prescriber to obtain eligibility information and "electronically transmit prescriptions" for a specified fraction of total prescriptions.

35.   Second, on February 17, 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), which further expanded the

regulatory regime CMS implemented to grow e-prescribing. The HITECH Act encourages the "meaningful use" of EHRs throughout the United States. It does so by authorizing carrot-and-stick financial incentives and payment reductions to prescribers depending on whether they "meaningfully used" EHR technology. Through today, CMS has paid out over $38 billion in meaningful use financial incentives, which does not account for the effect of the potential penalties.

36.     One meaningful use objective is the ability to "[g]enerate and transmit . . . prescriptions electronically."

37.     To prescribe electronically—and thus obtain the financial incentives and later avoid penalties described above—prescribers (via their EHRs) need to connect to pharmacies and PBMs.

38.     From 2008 to 2016, the number of routing and eligibility transactions grew over 23-fold, from 147 million to ███████, and the percentage of U.S. physicians e-prescribing grew to nearly 70%. In 2017, 77% of all prescriptions were delivered electronically.

39.     This growth was primarily driven by MIPPA and the HITECH Act. Surescripts agrees, writing in 2014, "[w]e believe the dramatic growth in adoption and use [of e-prescribing] is a function of the combined forces of federal financial incentives and an aggressive response by the technology sector." As Surescripts's former CEO Harry Totonis testified, "meaningful use totally helped e-prescribing happen."

**D.      Surescripts was well positioned to capitalize on e-prescribing's explosive growth.**

40.     Surescripts, LLC was formed on May 9, 2008, through a cashless merger of two companies: RxHub LLC ("RxHub") and SureScripts Systems, Inc. ("SureScripts Systems"). The

merger was not reportable under the Hart-Scott-Rodino Act and neither the U.S. Department of

Justice nor the FTC reviewed the merger.

41.     RxHub was the first major eligibility network. It was formed by three PBMs in

February 2001.

42.     Six months later, in response to RxHub's formation, two pharmacy trade groups

formed SureScripts Systems. SureScripts Systems primarily focused on routing.

43.     As a result of the merger, Surescripts possessed at least 95% of the routing market

(by transaction volume) and at least 95% of the eligibility market (by transaction volume).

44.     Surescripts is currently owned by CVS Health ("CVS") (17%) (a pharmacy and

PBM), Express Scripts (33%) (a PBM), the National Association of Chain Drug Stores (25%) (a

trade association), and the National Community Pharmacists Association (25%) (a trade

association).

45.     No EHR or prescriber has an ownership interest in Surescripts.

46.     No pharmacy or PBM, other than CVS and Express Scripts, has a direct

ownership interest in Surescripts.

47.     No pharmacy, PBM, or EHR has a controlling interest in Surescripts.

48.     Surescripts provides connections between EHRs, pharmacies, and PBMs for

routing and eligibility.

49.     Surescripts charges pharmacies (either directly or indirectly via a reseller or other

third-party intermediary, such as a pharmacy technology vendor ("PTV")) a fee for each routing

transaction and charges PBMs a fee for each eligibility transaction.

50.     In 2016, Surescripts received nearly ▄▄▄▄▄▄ in routing and eligibility fees

from pharmacies, PBMs, and intermediaries, which accounted for over ▄▄▄ of its total revenue.

51.     Surescripts pays EHRs a fee for each routing and eligibility transaction, but only if the EHR uses Surescripts exclusively. The industry commonly refers to these disbursements as "incentive payments."

52.     In 2016, Surescripts paid over ███████ in incentive payments to EHRs.

53.     Surescripts follows the NCPDP standards for routing and eligibility transactions.

54.     Surescripts creates and manages its own certification processes for its network, which means that customers (i.e., EHRs, pharmacies, PBMs, and intermediaries) must obtain certification from Surescripts and sign a contract before they can use Surescripts's network.

## V.     ANTICOMPETITIVE CONDUCT

55.     In 2009, Surescripts, with its extensive connectivity to e-prescribing stakeholders, was well positioned to benefit from enormous growth in routing and eligibility, which was catalyzed by MIPPA, the HITECH Act, CMS regulations, and a broader movement towards computerizing health records. Surescripts foresaw a vast, open, and untapped market. However, other companies saw the same potential.

56.     Surescripts faced substantial competitive threats to its routing and eligibility monopolies and was concerned that competition would drive the "commoditization" of routing and eligibility, reduce prices for each, and "devastate" Surescripts's cash flow.

57.     In late September 2009, Surescripts's management explained to its board of directors that these "competitive pressures require precipitous price drops, down near or below our average unit costs (~5c)" and that, should Surescripts "lose 2-3 midsize pharmacy customers or a large PBM" to a competitor, "Surescripts would not be financially viable."

58.     To prevent lower prices from competition, Surescripts substantially raised nearly all its customers' costs to multihome, rendering the chicken-and-egg problem insoluble for a

competitor. The result has been the total exclusion of all meaningful competition in routing and eligibility, higher prices, reduced innovation, lower output, and no customer choice.

        **A.**      **Surescripts learns of an emerging threat to its monopolies.**

       59.     On July 1, 2009, a health information technology company called Emdeon (n/k/a eRx Network) acquired eRx Network, a competing routing network. Although eRx Network only transmitted approximately 5% of routing market transactions at that time, it was well positioned for significant growth as eRx Network maintained connectivity with Allscripts, a large EHR, and PDX, a PTV providing routing connectivity that marketed primarily to medium-to-large sized retail pharmacy chains.

       60.     Surescripts recognized that competition from Emdeon would "drive lower prices."

       61.     On July 22, 2009, Surescripts's Chief Strategy Officer, Scott Barclay, explained that with "lower prices and further capabilities, the new Emdeon could significantly compete" with Surescripts.

       62.     If Emdeon could provide lower prices to pharmacies, higher incentives to EHRs, or both, Emdeon could attract enough customers to its routing network and solve the chicken-and-egg problem. Surescripts understood that if additional customers were to multihome with Emdeon, "[t]hen it becomes a price game at pharmacy and an incentive game at the POC [point of care, i.e., prescribers/EHRs]. . . . [E]ach network fights for itself and the market share game becomes paramount quickly."

       63.     Surescripts thus acted to eliminate the outbreak of competition—an outcome where one set of customers (pharmacies and PBMs) would pay lower prices, another set of customers (EHRs) would receive higher incentive payments, but Surescripts would lose its supracompetitive profits.

**B.    Surescripts responds to competition by devising and implementing an anticompetitive web of exclusive contracts.**

64.    In response to the threat from Emdeon and other competitors, Surescripts, with its 95%-plus established share in both markets, sought to eliminate all competition by significantly raising its customers' costs to multihome, thereby dramatically increasing the critical mass necessary for a Surescripts competitor to become viable. Surescripts did so by blanketing the markets for routing and eligibility with loyalty pricing and exclusivity contracts.

65.    Beginning in mid-2009, Surescripts devised a scheme to include "loyalty" provisions in contracts with customers on both sides of the routing and eligibility markets, which conditioned discounts or payments on actual or de facto exclusivity. Loyalty discounts apply to Surescripts's pharmacy, PTV, and PBM customers. Loyalty payments apply to Surescripts's EHR customers.

**1.    The structure of Surescripts's pharmacy, PTV, and PBM contracts.**

66.    For pharmacies and PTVs to receive a loyalty discount, a customer must be exclusive to Surescripts. To be considered exclusive, Surescripts requires that a pharmacy and PTV customer route 100% of its transactions "through and only through the Surescripts network." This requirement only applies to Surescripts-connected entities. Because Surescripts maintains connectivity to nearly all EHRs, this provision effectively requires 100% exclusivity from pharmacies and PTVs. Surescripts generally refers to these exclusive customers as "loyal" customers and those that are not exclusive as "non-loyal."

67.    The same structure exists for PBMs in eligibility.

68.    Under these loyalty provisions, because pharmacies, PTVs, and PBMs must use Surescripts for all or nearly all of their transactions, becoming non-exclusive and losing the loyalty discounts results in a significant cost increase. Surescripts's loyalty pricing scheme

therefore substantially increases the cost of multihoming through a second network for nearly all pharmacies, PTVs, and PBMs. Though the difference in the per-transaction price between a loyal and non-loyal transaction is often a few pennies, many pharmacy chains and PBMs send millions of transactions across the Surescripts network and a difference of a few pennies results in hundreds of thousands or even millions of dollars in cost increases.

69.     These non-loyal per-transaction prices (which are additional costs to customers) are not justified by any increased costs faced by Surescripts in transmitting routing or eligibility information. Rather they exist only to act both as penalties to those customers that may consider being non-loyal to Surescripts and as an exclusionary tactic against any competitor in routing or eligibility, thus reinforcing and maintaining Surescripts's monopolies in routing and eligibility.

70.     For routing, Surescripts's per-transaction price to non-loyal pharmacies and PTVs varies by volume but can be as high as ███ more than the price to loyal pharmacies or PTVs.

71.     For eligibility, Surescripts's per-transaction price to non-loyal PBMs varies by volume but can reach ███ more than the price to loyal PBMs.

72.     In many contracts, Surescripts also requires customers to pay the price differential between the loyal and non-loyal price for historical transaction volume retroactive over the term of the contract. For many customers, these additional clawback obligations total millions of dollars and substantially strengthen the lock-up effect of the contracts.

73.     Surescripts refers to these clawback provisions as the "teeth" of its loyalty contracts.

74.     Exhibit Two (A) of Surescripts's September 28, 2010 contract with PTV customer ████████████ provides an illustrative example of the "teeth" of Surescripts's contracts:

> If, during the Loyalty Term, Aggregator [i.e., ████████████] ceases to route all of its electronic Prescription Routing messages to Prescribing Participants

through, and only through, the Surescripts network and fails to cure within the applicable cure period, then Surescripts shall immediately cease calculating the Loyalty Discount and Aggregator agrees to pay Surescripts the amount of the Loyalty Discount received by Aggregator during the Loyalty Term.

75.     Similarly, Surescripts's June 2, 2010 contract with PBM customer █████

provides:

If, during the Loyalty Term, PBM ceases to route all of its electronic Prescription History and Benefit (Ambulatory) messages to Participants through, and only through, the Surescripts network, then Surescripts shall immediately cease applying the Loyalty Eligibility Transaction Fee price and PBM agrees to pay Surescripts the difference in the amount of Transaction Fees PBM would incur had PBM paid the [non-loyal price] versus the [loyal price] as of the Amendment Effective Date.

## 2. The structure of Surescripts's EHR contracts.

76.     Surescripts imposes the same loyalty scheme on EHRs, except in reverse by conditioning any incentive payments on an EHR's exclusivity to Surescripts for routing, eligibility, or both.

77.     Under the EHR loyalty program as implemented for most EHRs, if an EHR agrees to be exclusive only in routing, Surescripts pays the EHR an incentive fee of ███ of the routing fee paid by pharmacy customers to Surescripts for each routing transaction. If an EHR agrees to be exclusive only in eligibility, Surescripts pays the EHR an incentive fee of ███ of the eligibility fee paid by PBM customers to Surescripts. If the EHR agrees to be exclusive in both routing and eligibility, Surescripts pays the EHR a higher ███ incentive fee on both transactions. Nearly all EHRs participating in the loyalty program agree to exclusivity on both transactions.

78.     If an EHR decides to multihome and use Surescripts for less than 100% of its transactions, Surescripts terminates incentive fees to that EHR. In other words, Surescripts raises the EHR's price by reducing the EHR's incentive fees to zero. As with the penalty price

Surescripts charges non-loyal pharmacies, PTVs, and PBMs, there are no legitimate competitive

reasons (e.g., increased costs) for Surescripts to raise its EHR price to zero for non-loyal EHRs.

79.     As with its clawback provisions to pharmacies, PTVs, and PBMs, Surescripts also

requires the EHR to pay back the incentive fees for historical transaction volume if the EHR

violates the exclusivity commitment. Some contracts require repayment on transactions over the

full term of the contract. For example, Surescripts's April 14, 2010 contract with EHR

████████████ provides:

> If, during the Loyalty Term, Surescripts determines that Aggregator [i.e.,
> ████████████] has failed to comply with the loyalty requirements . . .
> Aggregator shall promptly pay back to Surescripts the amount of Incentive Fees
> paid by Surescripts to Aggregator during the Loyalty Term, and Aggregator shall
> no longer receive the Incentive Fees.

80.     Surescripts locked up one leading EHR, ████, through a unique contracting

strategy intended to address the nature of ████ business model. Unlike most EHRs, ████ does

not aggregate connectivity to Surescripts on behalf of its customers, which are typically large

health systems or hospital networks. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

81.     Under Surescripts's contract with ████, to receive incentive fees, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████, depriving that EHR customer of e-prescribing access to nearly all

pharmacies and PBMs. While the terms of its loyalty incentive contract with ████ differed from

other EHRs, Surescripts considered ████ to be loyal, writing in September 2010 that ████ is loyal

"for all appropriate purposes."

82.     Surescripts's contracts with nearly all individual ▮▮ customers also contain express exclusivity requirements that require the health system to maintain exclusivity to Surescripts for the term of the contract. ▮▮ clients recognized these provisions prevented multihoming: "In effect . . . by contracting with Surescripts, [the ▮▮ customer] would not be able to use other e-prescribing networks."

### 3. Surescripts structured the contracts to lock up the routing and eligibility markets.

83.     Surescripts implemented loyalty pricing and exclusivity requirements to make the chicken-and-egg problem insurmountable for any competitor in either routing or eligibility (or both). Specifically, Surescripts's loyalty program substantially raises its customers' costs to multihome, significantly elevating the critical mass a competing platform would need to become viable, rendering the chicken-and-egg problem insoluble. As Surescripts explained in a presentation to its board, the new loyalty strategy would "[p]rotect [Surescripts's] most critical asset—[its] network—by addressing competitive market pressures and locking-in key customers."

84.     Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility have an initial term of ▮▮ years or more. With some larger customers, the terms are as long as five years.

85.     Surescripts prefers to employ long-term contracts because they enable Surescripts to lock up its customers, preventing them from using a competitor's network. As Surescripts's then-Vice President of Account Management explained in a February 2010 email to the company's then-CEO, "[o]ur 3 year commitments keep[] our competition out of those customers."

86.     Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility automatically renew for one year unless either party gives notice.

87.     In early 2010, as demand for routing and eligibility was growing and inviting entry, Surescripts began executing loyalty pricing with nearly all of its e-prescribing customers. Most of these contracts had an effective date retroactive back to January 1, 2010.

**C.     Surescripts uses RelayHealth to extend the reach of its exclusive contracts and solidify its monopolies.**

88.     While Surescripts was able to push its loyalty pricing and exclusive contracts onto its direct customers, Surescripts was only able to lock up customers with whom Surescripts had a direct contract. But Surescripts was also concerned about a large subset of customers that it did not have direct contracts with (and thus did not have exclusivity commitments from)—namely those customers that connected to Surescripts through RelayHealth.

89.     RelayHealth is a health information technology company that is a subsidiary of McKesson. Since 2003, RelayHealth has contracted with Surescripts to resell the routing transaction to a subset of pharmacy and PTV end-customers. RelayHealth contracts with these pharmacies and PTVs, but Surescripts does not. RelayHealth also provided Surescripts's routing connectivity to some EHRs until 2015, but it no longer does so except for EHRs associated with McKesson.

90.     Surescripts sells the routing transaction to RelayHealth at a "wholesale" rate. RelayHealth then resells the transaction to a subset of pharmacies and PTVs at a higher "retail" rate. RelayHealth profits from the margin between the retail rate pharmacies and PTVs pay RelayHealth and the lower wholesale rate RelayHealth pays to Surescripts. All else equal, the lower Surescripts's wholesale rate to RelayHealth, the higher RelayHealth's margin.

91.     Through two contracts, one executed in 2010 and a second executed in 2015, Surescripts provided RelayHealth with contractual and monetary incentives to convince RelayHealth's routing customers to be loyal to the Surescripts routing network.[1]

92.     In the February 25, 2010 contract ("the 2010 contract") between Surescripts and RelayHealth, RelayHealth was required to use "commercially reasonable efforts to offer terms to incent exclusive use of the Surescripts network" by pharmacies, PTVs, and EHRs and to assist Surescripts in clawing back any incentive fees from EHRs.

93.     Under the 2010 contract, if a RelayHealth customer maintained at least █████ exclusivity to Surescripts, Surescripts discounted its wholesale price to RelayHealth for that customer by ████. Pursuant to the 2010 contract, RelayHealth entered into contracts with its pharmacies and PTVs for routing through the Surescripts network. Nearly all of these contracts went beyond the ████ Surescripts requirement and mandated that these customers ████ ████████████████████████████████████████████. Because RelayHealth was exclusive to Surescripts, this provision resulted in nearly all of RelayHealth's pharmacy and PTV customers routing all of their transactions through Surescripts. As an October 2012 RelayHealth presentation put it, RelayHealth's strategy was to "[m]ove non-exclusive customers to exclusive wherever possible."

94.     RelayHealth also provided Surescripts with feedback as to RelayHealth's customers' exclusivity status. For example, in 2012, Surescripts instructed RelayHealth to inquire into the loyalty status of a routing customer called Transaction Data Systems d/b/a Rx30 ("Rx30"). RelayHealth did so and informed Surescripts that Rx30 was not loyal.

---

[1] As alleged below in paragraphs 137-156, Surescripts also feared entry by RelayHealth in routing. Due to these concerns, Surescripts took additional actions in these agreements to eliminate the risk of competition from RelayHealth.

95.     Under the 2010 contract, RelayHealth also entered into contracts with EHRs for routing through the Surescripts network. These contracts were typically for a length of two years or more, contained express exclusivity requirements to RelayHealth, and provided incentive payments to EHRs only if an EHR was ███████ exclusive to the Surescripts network. Again, because Surescripts was the only routing network to which RelayHealth provided access, this provision resulted in nearly all of RelayHealth's EHR customers routing all of their transactions through Surescripts. For each exclusive routing transaction, Surescripts paid RelayHealth an incentive payment. RelayHealth then passed a portion (typically ████) of those incentives on to its EHRs, but only if they met RelayHealth's exclusivity requirements.

96.     RelayHealth's contracts with EHRs also required repayment of all incentive fees paid to the EHR if the EHR failed to comply with RelayHealth's exclusivity requirement.

97.     In the next contract, signed on January 16, 2015 ("the 2015 contract"), Surescripts renewed its 2010 contract with RelayHealth with modifications. The contract provided RelayHealth with a ████ higher wholesale discount for exclusive transactions; increased the loyalty threshold from ██████████; and, instead of determining loyalty on a customer-by-customer basis, determined loyalty on a platform-wide basis (i.e., in order to receive the discount, RelayHealth had to route ████ of its total, platform-wide routing transactions through Surescripts).

98.     As explained in more detail in paragraphs 151-155 below, the 2015 contract also required RelayHealth to transfer its EHR connections to Surescripts. RelayHealth therefore no longer provides routing connectivity to EHRs, except for EHRs associated with McKesson.

99.     Under the 2015 contract, RelayHealth has not changed its contracts with its end-user pharmacy and PTV customers to resell Surescripts's routing connectivity. Thus,

RelayHealth's contracts for Surescripts's routing network continue to require 100% exclusivity through today.

**D.      Surescripts locks up a critical EHR and engages in a campaign of threats to enforce its exclusivity provisions.**

100.    While implementing this web of loyalty and exclusive contracts, Surescripts devoted special attention and resources to locking up a critical EHR: Allscripts. In 2009, Allscripts represented approximately ▇ of Surescripts's routing and eligibility transactions, making it a significant customer for any e-prescribing network. Allscripts's EHR technology relied on a centralized "hub" infrastructure for all of its customers, meaning that if Allscripts multihomed with an additional e-prescribing network, the added e-prescribing network could quickly route e-prescriptions to and from Allscripts's entire e-prescribing customer base. Allscripts's exclusivity was critical to Surescripts two reasons: (1) Allscripts was one of the few EHRs that was multihoming, using Emdeon as an alternative routing network to Surescripts, which made Emdeon a more viable threat to Surescripts; and (2) Allscripts had implemented a new business model in eligibility that cut out Surescripts as the middleman.

101.    First, Allscripts had contracted with Emdeon for routing since 2007. This connection allowed Allscripts to route prescriptions to Emdeon's pharmacy customers without utilizing the Surescripts network. Emdeon paid Allscripts a routing transaction incentive fee that was at least ▇ higher than what Surescripts paid Allscripts.

102.    Surescripts recognized that Allscripts was crucial to Emdeon gaining scale in routing, overcoming the chicken-and-egg problem, and offering increased competition and lower prices. Access to Allscripts's routing transaction volume (through its prescribers) made Emdeon more attractive to potential pharmacy customers. In a November 17, 2009 email, a senior Surescripts executive wrote that in order to prevent Emdeon from solving the chicken-and-egg

22

problem, "[t]he key to Emdeon is Allscripts[] (i.e., the key to fighting eRx networks [Emdeon] is containing their access to POC [point of care, i.e., prescribers])."

103.    Second, in September 2009, before Surescripts implemented its loyalty and exclusive contracts, Surescripts learned that Allscripts was transmitting eligibility requests around Surescripts's network directly to a PBM called SXC Health Solutions. This practice of developing "direct connections" for eligibility with PBMs represented a different means for Allscripts to receive eligibility information from PBMs and, more broadly, a different model for e-prescribing, one that cut out Surescripts as a middleman. From Surescripts's perspective, Allscripts's development of direct connections to PBMs made Allscripts "a major competitor and our largest current risk" in eligibility.

104.    By May 2010, Allscripts sold or was attempting to sell direct connections to its prescriber network to at least six PBMs, often at prices below Surescripts's.

105.    For example, Allscripts charged at least one PBM a per-transaction price ██ lower than what that same PBM was paying to Surescripts for the same eligibility transaction.

106.    PBMs hoped their relationships with EHRs would create a more competitive, innovative market that would exert pressure on Surescripts to innovate. Many customers have complained that Surescripts's eligibility transaction is "not a reliable process" because it provides only static, non-patient specific formulary information.

107.    Surescripts realized that Allscripts's direct eligibility connections were "a long-term potential threat[] coming true."

### 1. Surescripts locks up Allscripts in 2010.

108.    Facing these threats, Surescripts implemented a "full combat strategy" to "lock up . . . Allscripts" through an exclusive contract with Allscripts, which Allscripts and Surescripts signed on May 31, 2010.

109.     As the preamble to that contract states, "the purpose of this [agreement] is to enter into a long term arrangement for [Allscripts] to utilize Surescripts exclusively" for both routing and eligibility.

110.     The 2010 contract had a term of four years and included several provisions tailored specifically to Allscripts to ensure exclusivity from Allscripts for both routing and eligibility.

111.     First, Surescripts required Allscripts to terminate its routing connection to the Emdeon network at the expiration of Allscripts's contract with Emdeon in June 2013. Allscripts, despite its objections, agreed to this requirement to avoid losing access to Surescripts's network. Surescripts's network is a "must-have" for nearly all EHRs because EHRs must connect to pharmacies and PBMs to e-prescribe. Allscripts terminated its relationship with Emdeon on June 20, 2013.

112.     Second, Surescripts grandfathered in Allscripts's current direct connections with PBMs but prohibited Allscripts from renewing its eligibility contracts with those PBMs and from proactively marketing or entering into new eligibility agreements with PBMs. Surescripts also required Allscripts to ███████████████████████████████████████ ██████████. Again, ███████████████████████████████████████ ███████████████████████████.

113.     Third, Surescripts imposed a "right of first refusal" procedure on Allscripts's e-prescribing business: If any third party sought to do business with Allscripts in either routing or eligibility, Allscripts was required to set up a meeting with Surescripts and that third party "to facilitate a connection between such [third party] and Surescripts." Only if the third party did not

want to do business with Surescripts after this meeting could Allscripts engage in business

discussions with the third party for routing or eligibility.

114.     Fourth, Surescripts required Allscripts to remind its sales and business

development personnel annually of the above terms, and Surescripts maintained the right to

"review and comment" on such annual reminders.

115.     Allscripts lamented that it had "no choice" but to enter into this agreement as

Surescripts was a "must-have" connectivity vendor, and without a contract, Allscripts would be

unable to connect to pharmacies and PBMs and thus be unable to e-prescribe.

116.     Surescripts realized that Allscripts was key to crushing Emdeon's ability to

expand and quashing any alternative e-prescribing business model via Allscripts's direct

connections to PBMs. Surescripts thus provided Allscripts with "enhanced" or "relatively more

attractive revenue sharing." Specifically, Surescripts paid Allscripts an incentive of ███ of the

routing and eligibility fees paid by pharmacy and PBM customers for each transaction,

substantially more than similarly situated EHRs. One slide from an internal Surescripts

presentation, reproduced below, described an early version of its 2010 deal with Allscripts by

including a picture of the movie poster from the 2009 film "The Proposal," which included the

slogan "HERE COMES THE BRIBE."



117.    In the five years following the execution of the contract, Surescripts paid

Allscripts approximately ███████ in incentives for routing and eligibility.

**2.  Surescripts locks up Allscripts again in 2015.**

118.    In 2014, though Surescripts had successfully forced Allscripts to sever its routing

connection with Emdeon, Surescripts still worried that Allscripts would restart multihoming,

using Emdeon as an alternative, which would, in the words of Greg Hansen, Surescripts's then-

Executive Vice President and Chief Customer Officer, "create what is essentially a bidding war

for [Allscripts's prescribers'] transactions or access to their physician community."

119.    That same executive feared that Allscripts "intend[ed] to monetize access to their physician community," and Surescripts's CEO wrote that Allscripts "[is] counting on defection from our owners to shift the balance of economic power from Pharmacies/PBMs to Physicians."

120.    To stifle this "bidding war" and maintain this "balance of economic power," Surescripts engaged in a renewed campaign to force Allscripts into exclusivity.

121.    In the second half of 2014, Surescripts threatened to withhold Allscripts's access to Surescripts's "must-have" e-prescribing network for routing and eligibility. Allscripts in turn feared ██████████████████████ if Allscripts did not sign a new exclusive agreement with Surescripts.

122.    During the same time period, to secure Allscripts's exclusivity, Surescripts also threatened (1) to bar Allscripts from using eligibility information obtained from Surescripts's network for Allscripts's electronic prior authorization transactions, which increases efficiency between prescribers and pharmacies by reducing the time it takes to receive pre-approval for certain prescription drugs from a patient's insurer; (2) to cut Allscripts off from Surescripts's pharmacy directory, which is necessary to allow a prescriber to locate a patient's preferred pharmacy; and (3) to sever Allscripts's access to a separate service called medication history, which Allscripts's prescribers used in both acute and ambulatory settings.

123.    Surescripts also sought to impose a penalty on Allscripts by making Allscripts pay millions of dollars if Allscripts did not enter into an exclusive agreement. For example, Surescripts sent Allscripts an approximately ██████████ retroactive invoice for Allscripts's use of what was supposed to be a separate free service offered by Surescripts if Allscripts did not agree to the exclusivity terms Surescripts had proposed. Surescripts also withheld over ████ ████ in loyalty incentive payments to Allscripts until Allscripts signed the contract.

27

124.     Surescripts referred to these tactics as "nuclear missile[s]" and admitted they were designed to ensure that Allscripts would continue to use Surescripts exclusively. Both Surescripts and Allscripts understood that these tactics were meant to "exert leverage" over Allscripts to force it to sign an exclusive agreement for routing and eligibility.

125.     During this same period, Emdeon again attempted to sign Allscripts up as a customer by, for example, offering Allscripts increasingly large up-front payments and profit-sharing arrangements to compensate Allscripts for losing Surescripts's incentive fees.

126.     Despite Emdeon's efforts, Surescripts's tactics with Allscripts were successful. On January 31, 2015, Allscripts signed a new amendment with Surescripts, extending the term of the underlying exclusive contract for five years.

127.     On June 29, 2018, after Allscripts and Surescripts became aware that the FTC was investigating their conduct, Allscripts and Surescripts entered into a new amendment that deleted some of the more restrictive provisions contained in the 2010 Allscripts-Surescripts agreement and the 2015 amendment. That 2018 amendment, however, did not alter the fact that Allscripts was still required ██████████████████████████████████████████████████████ ██████ .

**E.     Surescripts's scheme has succeeded in excluding all meaningful competition from both routing and eligibility.**

128.     Over the last 10 years, Emdeon attempted unsuccessfully to expand its presence in the routing market and, later, in the eligibility market. Beginning in 2009, Emdeon attempted to convince pharmacies and EHRs to use its network to route transactions, circumventing the Surescripts network. Doing so would require these pharmacies and EHRs to become non-loyal to Surescripts or RelayHealth and pay back the discounts or incentive payments pharmacies and EHRs already received. In many cases, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

129.    However, Emdeon was not successful. Many pharmacies and EHRs refused to connect to Emdeon, since doing so would trigger the massive penalty provisions in their contracts with Surescripts or RelayHealth and cost routing customers millions of dollars through increased prices or, for EHRs, decreased incentive payments. █████████████████

████████████████████████████████████████████████████████

to make up for the huge penalties inflicted on any pharmacy or EHR that chose to become non-loyal to Surescripts. ████████████████████████████████

██████████████████████████████████████████████

130.    Surescripts executives knew that its loyalty scheme was working as intended. They repeatedly admitted that Surescripts's web of exclusive contracts quashed any competitive threat. As Surescripts explained to a RelayHealth pharmacy end customer, Rite Aid, in early 2010, because of the loyalty scheme there was no price Emdeon could offer that would reduce Rite Aid's total routing costs:

## Clarifying the Issues



### eRx/Emdeon cannot save Rite Aid money in e-prescription routing by splitting traffic:

- While eRx/Emdeon may offer a low introductory price, they can only do so for a subset of your transactions
- Rite Aid would still need to route the great majority of transactions through Surescripts and RelayHealth
- The lowest transaction pricing from RelayHealth for Surescripts connectivity is only available when routing 100% of your transactions through us
- The total cost to Rite Aid to split traffic would therefore be higher than if you continue to route 100% through RelayHealth and Surescripts

Surescripts®                          Confidential and Proprietary

131.    In the above slide, Surescripts explained to Rite Aid how its loyalty scheme

disrupted the price-setting mechanism of the routing market.

132.    In September 2010, Surescripts articulated how its exclusive contracts restricted

Emdeon's expansion and reduced its potential to reach critical mass:

> Surescripts's efforts to lock in our customers through Loyalty programs have
> likely had a strong impact to Emdeon's initial strategy. With most top Prescriber
> Vendors signed to Loyalty Incentive plans, and, a significant portion of the
> Pharmacy industry signed to Loyalty pricing plans (direct and via [RelayHealth]),
> Emdeon's ability to expand their direct connection to prescribers and pharmacies
> has been greatly reduced. Emdeon's ability to rapidly become a full national
> alternative to Surescripts is diminished.

133.    In October 2010, a Surescripts vice president wrote "the loyalty/incentive strategy

and execution made a very effective counter to the Emdeon/eRX acquisition. It[']s nice when a

plan comes together."

134.    In that same month, Surescripts described how its loyalty program foreclosed Emdeon from the market by disabling Emdeon's ability to compete on price: "eRx/Emdeon can undercut Surescripts on price, but only on a margin of volume . . . and Surescripts pricing differential on pharmacy side and loyalty incentive program on POC side are worth more than eRx / Emdeon's proposition on <10% of scripts."

135.    When Emdeon's initial efforts to expand failed, Emdeon attempted a new strategy designed to work around Surescripts's massive financial penalty provisions. Emdeon resells the Surescripts routing transaction to a group of pharmacies that use a PTV called PDX. ███████

███████████████████████████████████████████████████████████████

███████████████████  With the PDX pharmacies disconnected from the Surescripts network, EHRs would be free to route directly to Emdeon without incurring Surescripts's penalties for being non-loyal. This is because under Surescripts's contracts with EHRs, EHRs would not be penalized for routing to a pharmacy that could not be reached using the Surescripts network. Despite an organized campaign to attempt to sign up EHRs to contingent contracts (where the EHR would agree to route through Emdeon only if Emdeon disconnected its pharmacies from the Surescripts network), ████████████████████████████████████████████████

██████████████████████████████████████████████  In the midst of this campaign, Allscripts severed its connection with Emdeon, as required by Allscripts's 2010 agreement with Surescripts, a move Emdeon described as █████████████, and one that pushed Emdeon almost completely out of the market.

136.    In late 2013, Emdeon again attempted to compete with Surescripts, this time in eligibility. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████

**F.      Surescripts ensures that RelayHealth does not compete in the routing market.**

137.     In 2003, Surescripts and RelayHealth signed an agreement in which RelayHealth expressly agreed not to compete with Surescripts in routing, meaning that while RelayHealth could resell Surescripts's routing services to certain customers, it could not compete with Surescripts by standing up its own routing network. As Surescripts was formulating its plan to push its exclusive contracts into the markets, Surescripts executives knew that its most recent agreement with RelayHealth was scheduled to expire on April 10, 2010, and along with it RelayHealth's contractual obligation not to compete against Surescripts in routing.

**1.      Surescripts recognizes the threat of competition in routing from RelayHealth.**

138.     In an August 2008 strategic risk analysis memorandum, Surescripts executives recognized that RelayHealth and its corporate parent, McKesson, presented a "significant threat in the near to longer term," particularly the threat that "RelayHealth will create a competitive [routing] network to [Surescripts]." Such competition from RelayHealth would cause Surescripts to lose transaction volume but would produce consumer benefits in the form of lower prices, increased innovation, and more choice.

139.     McKesson sells pharmaceutical and medical products as well as business services to pharmacies, hospitals, and health systems throughout North America and internationally. McKesson has sold and currently sells pharmacy management software to pharmacies. McKesson has also sold EHRs to hospitals and other health systems. In fiscal year 2008,

McKesson generated nearly $102 billion in total revenue and was ranked 15th on the Fortune 500 list.

140.    In a January 2009 Surescripts presentation titled "McKesson Strategy," Surescripts executives worried that failure to renew a contract with RelayHealth containing the routing non-compete would mean that the "[r]isk of RelayHealth becoming a competitor remains," leaving RelayHealth free to use its business relationships with pharmacies, PBMs, and EHRs to stand up its own routing network and go head-to-head with Surescripts. In the same presentation, Surescripts recognized that it "[m]ay not be able to compete on transaction fees due to lack of products/services to bundle pricing."

141.    Surescripts executives understood that McKesson's ownership of RelayHealth "presents an additional threat to [Surescripts]." They recognized that McKesson was a "Fortune 15 Company" with "[$]1.4 billion in cash" and "[d]iverse product offerings that span many healthcare markets serving many key stakeholders in healthcare."

142.    McKesson also provided RelayHealth with an immediate customer base, as McKesson had its own EHR and PTV offerings. In 2010, for example, McKesson owned and operated several EHR software platforms, including McKesson Horizon Clinicals, Practice Partner, and RelayHealth Consumer. McKesson also provided technology to pharmacies that included routing capabilities, including its PharmacyRx pharmacy management system.

143.    Surescripts realized that RelayHealth had a "natural ability to capture 15-20% of transaction volume" if RelayHealth started connecting just McKesson's own pharmacy and prescriber products, to say nothing about what gains RelayHealth would make if it started competing in routing more broadly.

144.    Surescripts executives also knew that RelayHealth had experience in a closely related market, claims adjudication, a service that allows pharmacies to bill a patient's insurer for a prescription, usually via the PBM contracted with the patient's insurer. Executives from both RelayHealth and Surescripts often referred to claims adjudication as an "adjacent" market to routing and eligibility. RelayHealth's experience provided it with a distinct advantage to standing up a routing network. RelayHealth already contracted with many pharmacies, PTVs, and PBMs for claims adjudication. RelayHealth's claims adjudication business and Surescripts's routing and eligibility business shared many of the same customers. In January 2009, Surescripts wrote that RelayHealth "plays in the same space as S[urescripts] (i.e. offering connectivity services to same customers)."

145.    Critically, RelayHealth also already had numerous contracts with both pharmacies and EHRs due to its reseller relationship with Surescripts. In 2009, RelayHealth connected approximately 50% of pharmacy routing transactions to the Surescripts network—including large pharmacies like Walgreens and Rite Aid—and approximately 40% of EHR routing transactions to the Surescripts network, including the large EHR Allscripts. RelayHealth thus enjoyed an advantage held by no other competitor: It had already partially solved the chicken-and-egg problem by having relationships with customers on both sides of the routing network.

146.    Surescripts was concerned not only that RelayHealth would enter routing, but also that RelayHealth would offer a lower price that Surescripts would be unable to match. Surescripts executives believed in 2009 that the unit costs for claims adjudication were between one and two cents and that RelayHealth could bring its e-prescribing costs down to that price given its scale and McKesson's funding. At that time, Surescripts's e-prescribing unit costs were approximately 600% higher and its net price to customers approximately 10 times higher.

147.    Surescripts understood that, if RelayHealth "dropped the price down to █████

████ . . . they would have been able to take the business away from us." Surescripts's former

Chief Strategy Officer also testified that he believed RelayHealth would be able to enter at a

lower price than Surescripts could offer:

> I assumed Relay and Emdeon would consider offering e-prescribing for what I
> estimated to be their marginal costs that they wanted to be ████████ or they might
> just try to undersell that and lose ████████████████████
> to put us out of business and then combine and bundle that with their other fixed
> cost infrastructures on the adjudication side.

### 2.    Surescripts eliminates the RelayHealth threat in 2010.

148.    These fears dominated Surescripts's negotiations with RelayHealth. As a result,

Surescripts's primary goal during negotiations was to "[m]aintain current status where

RelayHealth does not become a competitor" or, as the same presentation explained, use a

strategy where Surescripts would "keep friends close but enemies closer." RelayHealth's own

internal documents show that since 2003, "[t]he dominant contracting strategy . . . [was] to

prevent [RelayHealth] from competing [with Surescripts]."

149.    Surescripts achieved this goal. In its February 25, 2010 contract with

RelayHealth, Surescripts obtained RelayHealth's renewed promise not to compete in routing for

an additional six years. Surescripts has repeatedly admitted that the sole value of this 2010

contract is that it prevents RelayHealth from competing against Surescripts in routing. One 2012

memo, circulated to senior Surescripts executives, explicitly stated, "[o]ur VAR contract

prevents them from competing against us for core e-prescribing Routing. This was a substantial

concern when we were founded [in 2008], and should still be a consideration today due to

R[elay]H[ealth]'s vast market share in the Pharmacy financial Claims Processing part of our

industry."

150.    As early as December 2008, Surescripts's own documents characterized its relationship with RelayHealth as adding very little, if any, value to e-prescribing and described RelayHealth as a "value subtract," writing that "the only real value that we are getting out of the RelayHealth relationship at this point is the exclusivity." In 2013, Surescripts executives stated the only benefit it received from the 2010 contract with RelayHealth was that the contract "help[ed] keep market share." In March 2014—four years into the five-year term of the 2010 contract—Surescripts executives were still asking themselves in a presentation entitled "RelayHealth Partnership Assessment," "How does Surescripts + RelayHealth = more value than Sur[e]scripts alone?" Surescripts's then-Chief Customer Officer described RelayHealth as "sh[*]tty, non-value added partners but at least they're one of our biggest competitive threats."

### 3.  Surescripts eliminates the RelayHealth threat again in 2015.

151.    In 2015, as Surescripts's agreement with RelayHealth was nearing expiration, Surescripts's fears of entry by RelayHealth persisted, and so it took renewed action to neutralize RelayHealth. On January 16, 2015, Surescripts and RelayHealth executed a three-year contract that automatically renewed each year unless either party terminated it and is still in place today. This contract (1) tightened RelayHealth's loyalty requirements; and (2) exchanged the explicit routing non-compete provision for an implicit one, requiring RelayHealth to transition its EHR routing relationships to Surescripts directly.

152.    First, Surescripts provided additional financial incentives to RelayHealth to remain exclusive in routing, including by changing the definition of RelayHealth's "loyalty" to Surescripts from a customer-by-customer basis to a platform-wide basis. *See* paragraph 97.

153.    Second, Surescripts forced RelayHealth to terminate its routing relationships with EHRs. RelayHealth, through its reseller arrangement with Surescripts, had connections to both the pharmacy and the EHR sides of the routing network. Surescripts executives knew that EHRs

were the "gatekeepers" to prescribers. A link to the EHR side is necessary to operate a two-sided routing network, meaning that this termination would prevent RelayHealth from being a competitive threat in routing. In exchange for removing the explicit non-compete provision from the contract, Surescripts required RelayHealth to terminate its EHR connections for routing and transition those relationships directly to Surescripts. RelayHealth agreed, hoping that removing Surescripts's control over its relationship with these customers would allow RelayHealth to collaborate directly with EHRs on innovative value-added services.

154.    Surescripts executives understood that the 2015 contract continued to prevent RelayHealth from entering the routing market despite the removal of the explicit non-compete provision. On February 4, 2015, shortly after the 2015 contract was executed, Surescripts's Chief Quality Officer emailed Surescripts's Vice President of Customer Accounts: "[C]ongratulations. This is a hugely important deal for us, cementing our position for at least several more years. I would not want to have Relay out there competing directly against us."

155.    An internal Surescripts competition analysis from that time characterized RelayHealth as a "Core Systemic [Competitor]," a "Direct Competitor to Core E-Prescribing Network," and a company that is "[a]lways one to watch since they have the assets and know-how to be a threat." However, that same document continued, "[Surescripts] has done an exceptional job removing them as EHR aggregator" when assessing the competitive threat RelayHealth posed to Surescripts in routing.

156.    As of today, RelayHealth has not entered the routing market.

## VI.  SURESCRIPTS POSSESSES MONOPOLY POWER IN EACH RELEVANT MARKET

### A.  The relevant markets.

157.    There are two relevant product markets: (1) routing transactions; and (2) eligibility transactions.

158.    Other means of transmitting routing and eligibility information (e.g., paper, phone, fax) are not reasonably interchangeable with electronic prescribing because of safety concerns and greater efficiencies associated with electronic prescriptions, as well as the requirements of MIPPA, the HITECH Act, and HHS regulations.

159.    The relevant geographic market is the United States. Large pharmacy chains, EHRs, and PBMs that make up nearly all of routing and eligibility transactions have nationwide reach. Surescripts's customers enter into contracts with nationwide reach, and prices and contract terms are set at a national level. Federal laws and regulations that govern e-prescribing i.e., MIPPA, HITECH, and associated CMS regulations, operate on a national level, further supporting a national geographic market.

160.    Thus, the relevant markets in which to evaluate Surescripts's conduct are (1) routing transactions in the United States; and (2) eligibility transactions in the United States.

### B.  Surescripts possesses monopoly power in the relevant markets.

161.    Surescripts possesses durable monopoly power in each relevant market.

162.    Surescripts has possessed monopoly power in each relevant market from 2009 to present.

163.    There is substantial direct evidence that Surescripts possesses monopoly power.

164.    Direct evidence of Surescripts's monopoly power includes its demonstrated ability to control price in each relevant market.

38

165. Surescripts has the ability to price substantially higher than its competitors in the routing market without losing customers. This includes both prices to pharmacies and incentives to EHRs.

166. Surescripts has the ability to price substantially higher than its competitors in the eligibility market without losing customers. This includes pricing to PBMs and incentives to EHRs.

167. Other direct evidence of Surescripts's market power includes the lack of any meaningful competition in either routing or eligibility from 2009 to the present. For example, when Surescripts refused to do business with a customer called PrescribersConnection in 2015, that customer was left with nowhere else to turn and as a result has had its e-prescribing functionality permanently disabled—a situation that persists today. Surescripts's customers agree that there are "no 1-1 alternatives to Surescripts," that Surescripts is a "must-have" network and a "monopolist for a key service."

168. There is substantial indirect evidence that Surescripts possesses monopoly power.

169. Surescripts possesses extremely high market shares in both relevant markets. Surescripts possesses at least 95% market share in the market for routing (by transaction volume). Surescripts possesses at least 95% market share in the market for eligibility (by transaction volume). As one Surescripts vice president put it in 2015: "We are a Monopoly when it comes [to] Prescription Routing." Even if routing and eligibility were to be considered part of the same market, Surescripts's own then-Executive Vice President and Chief Customer Officer testified that Surescripts's market share in both products is "[l]ikely north of 90 percent."

170. The markets for routing and eligibility are characterized by barriers to entry in the form of the chicken-and-egg problem, which Surescripts's conduct has rendered unsolvable.

## VII.   SURESCRIPTS'S ANTICOMPETITIVE COURSE OF CONDUCT HARMED COMPETITION AND CONSUMERS

171.    Surescripts's anticompetitive course of conduct has resulted in the total exclusion of any meaningful competition in e-prescribing, repeated threats to customers to force exclusivity, higher prices, reduced innovation, and lower output.

### A.   Surescripts's conduct forecloses each market from all meaningful competition, eliminating consumer choice.

172.    Surescripts, whether directly or indirectly via RelayHealth, successfully imposed loyalty requirements on nearly all of its pharmacy and PTV customers. By January 2011, Surescripts had loyalty contracts with at least 78% of the pharmacy side of the routing market (by transaction volume), including contracts with major pharmacies such as CVS, Walgreens, Walmart, and Rite Aid. Nearly all of the loyalty contracts with these pharmacies have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts, whether directly or indirectly via RelayHealth, has loyalty contracts with at least 79% of pharmacy routing transaction volume. These contracts therefore foreclose nearly 80% of the pharmacy side of the routing network from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for Surescripts's competitors.

173.    Surescripts also imposed loyalty requirements on nearly all of its PBM customers. By October 2011, Surescripts had exclusivity contracts with at least 74% of the PBM side of the eligibility market (by transaction volume), including contracts with major PBMs such as Express Scripts, CVS, and Medco. Nearly all of the loyalty contracts with these PBMs have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts has exclusivity contracts with at least 78% of PBM eligibility transaction volume. These contracts therefore foreclose nearly 80% of the PBM side of the eligibility network from

potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for competitors.

174.    Surescripts, whether directly or indirectly via RelayHealth, also imposed loyalty requirements on nearly all of its EHR customers. By November 2010, Surescripts had exclusivity contracts with at least 81% of the EHR routing market and at least 78% of the EHR eligibility market (both measured by transaction volume), including contracts with major EHRs such as Allscripts, Epic, and eClinicalWorks. Nearly all of the loyalty contracts with these entities have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts—which in 2015 took direct control over nearly all of RelayHealth's routing contracts with EHRs—has loyalty contracts with at least 87% of EHR routing and eligibility transaction volume. These contracts therefore foreclose well over 80% of the EHR sides of the routing and eligibility networks from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for competitors.

175.    The foreclosure percentages in paragraphs 172-174 likely understate the foreclosure effects of Surescripts's conduct, which is based on contracts for Surescripts's largest routing and eligibility customers. There is a "long tail" of smaller Surescripts customers that are also foreclosed by the same loyalty contracts described above, which only further increases the percentage of each side of each market that Surescripts has been able to foreclose.

176.    Surescripts's loyalty contracts disrupt competition in routing and eligibility. Because Surescripts has foreclosed at least 70-80% of each of the routing and eligibility markets, even when a competitor offers lower per-transaction prices, no customer will do business with that competitor because that competitor cannot lower the customer's total e-prescribing cost.

Because of Surescripts's conduct, no competitor can gain enough scale to solve the chicken-and-egg problem and compete with Surescripts. Customers, including PBMs, EHRs, and pharmacies, are all harmed by not having any choice of routing or eligibility provider.

177.    A pharmacy would sign up with a Surescripts competitor—and thus incur non-loyalty penalties via higher prices or clawbacks—only if the competitor can route enough prescriptions from EHRs that are priced low enough to create sufficient savings to offset the pharmacy's losses from the foregone Surescripts discounts. Likewise, an EHR will sign up with a Surescripts competitor—and thus incur non-loyalty penalties via eliminated incentive payments or clawbacks—only if the competitor can pay the EHR high enough incentives on a sufficient number of transactions to offset the EHR's losses from the foregone Surescripts payments. This same logic applies to PBMs and EHRs for eligibility.

178.    Surescripts's loyalty regime ensures that no customer could ever attain a lower *total* cost by multihoming, even if Emdeon or some other competitor offered that customer, in the words of one of Surescripts's former vice presidents, "some phenomenally low amount" on the transactions sent through Emdeon's network.

179.    Pharmacies and PBMs receive discounts from Surescripts in exchange for agreeing to exclusivity. A competing platform that sought to convince a pharmacy or PBM to multihome would need to offer a lower price to compensate that customer for losing its loyalty discount with Surescripts. Due to the limited connections to EHRs that a competing platform could offer, the compensating price would have to be *negative*, meaning the competing platform would have to *pay* pharmacies and PBMs for each routing and eligibility transaction.

180.    Similarly, EHRs receive incentive fees from Surescripts in exchange for agreeing to exclusivity. A competing platform that sought to convince an EHR to multihome would need

to offer higher incentive fees to compensate that customer for losing its incentive fees from Surescripts. Due to the limited connections to pharmacies and PBMs that a competing platform could offer, the compensating incentive fees would be unprofitable for an equally efficient competitor.

181.    By foreclosing approximately 80% of both markets and making the chicken-and-egg problem insoluble, Surescripts has ensured that no other competitor can be or remain viable in either routing or eligibility, or both.

**B.    Surescripts forces its routing and eligibility customers into exclusivity.**

182.    Many pharmacy, PBM, and EHR customers that have entered into loyalty contracts with Surescripts would prefer the option of having a competing network for routing and eligibility. However, because these pharmacies, PBMs, and EHRs compete with other pharmacies, PBMs, and EHRs, they cannot absorb higher e-prescribing costs and remain competitive. Thus, Surescripts's customers lack the realistic ability to refuse Surescripts's loyalty requirements or pricing.

183.    As one Surescripts EHR customer explained, despite "strongly object[ing] to the . . . exclusivity provisions" in Surescripts's contract, it had no choice but to agree to Surescripts's exclusivity provision "[b]ecause there were no alternative providers that could meet all of its needs." Though the customer recognized "that the inclusion of the exclusivity provisions provided Surescripts with the ability to protect its dominance in the e-prescribing market place," the EHR customer had "to enter into a contract that included those provisions if [the EHR] wanted to enter into e-prescribing."

184.    Another Surescripts customer similarly feared that "Surescripts would have cut us off" if that customer did not sign an exclusive agreement with Surescripts.

185.    Surescripts today thus no longer competes on the merits, but instead relies on its size, its ability to force customers into exclusivity, and the success of its loyalty program to maintain its monopolies.

**C.    Surescripts's conduct has led to higher net prices for routing and eligibility.**

186.    As Surescripts's then-Vice President of Corporate Strategy testified: "[P]ricing isn't dictated by competition at Surescripts."

187.    But for Surescripts's anticompetitive course of conduct, the net price (taking into account both sides of the network) of the routing transaction would be lower. Similarly, without Surescripts's loyalty contracts, the net price (taking into account both sides of the network) of the eligibility transaction would be lower.

188.    The handful of instances where a single customer uses both the Surescripts network and the Emdeon network shows that Emdeon is able to provide lower per-transaction prices or higher per-transaction incentives.

189.    For example, Kroger is one of the last companies that uses both Emdeon and Surescripts via RelayHealth for routing. Emdeon charges Kroger pharmacies per-transaction prices that are at least ███████ lower than Surescripts's prices. Similarly, Emdeon has sold the routing transaction to one PTV customer, Rx30, at a per-transaction price 25% lower than Surescripts's per-transaction price, and has offered to sell to another PTV customer, QS/1, at a per-transaction price 6-34% lower than Surescripts's.

190.    For eligibility, Emdeon offered prices ███████ lower than Surescripts's. A Surescripts PBM sales employee noted on May 20, 2015 that "competitors are under-pricing us such as Em[]deon with Eligibility. We are hearing that Emdeon is committing to promising half of our rate (███████) compared to our ███████. We are starting to hear a significant amount of concern that our price is too high . . . . Emdeon is making an aggressive [effort] now towards

MedImpact. They are about [to] launch a pilot together in a ███████ transaction rate." Yet there is no evidence that Surescripts attempted to match Emdeon's price for eligibility. Additionally, Allscripts charged at least one PBM (a PBM that had a direct connection with Allscripts) a price ███ lower than what that same PBM was currently paying to Surescripts for the same eligibility transaction.

191.    On the EHR side, Surescripts understood and acknowledged its ability to price above the competitive level. In an email exchange concerning EHR eClinicalWorks's attempts to negotiate for higher incentive payments, one Surescripts executive explained to another that "[eClinicalWorks's] position in negotiating for more and more $$ only seems relevant when there are at least 5 more 'Surescripts' from which to choose. Today there is just one Surescripts."

192.    Emdeon was willing to pay ██████████████████. For example, in 2010 Emdeon paid Allscripts incentives that were ████ higher than what Surescripts and RelayHealth paid Allscripts. And Emdeon continued to pay Allscripts incentives that were ██████ higher than Surescripts's until Allscripts was forced to disconnect from Emdeon in June 2013. Emdeon has also offered to pay ██████████████████████████.

193.    Because the loyalty contracts limited competitors' expansion, and thereby reduced pharmacies', PBMs', and EHRs' leverage with Surescripts, the contracts have enabled Surescripts, free from competitive discipline, to continue to demand higher prices from customers.

194.    For example, in April 2012, Surescripts increased transaction prices (by decreasing incentive payments) on all EHRs for both routing and eligibility. In contemporaneous documents, Surescripts recognized that it was able to use its monopoly power to take money away from EHRs by decreasing these incentive payments. Indeed, no EHR was able to avoid

these incentive payment reductions. No EHR moved its business to a Surescripts competitor or refused to do business with Surescripts as a result of this price increase.

195.    As another example, in July 2013, Surescripts analyzed the impact of Allscripts's June 20, 2013 termination of its relationship with Emdeon, which Surescripts required Allscripts to do in the 2010 Surescripts-Allscripts agreement. In a presentation that was circulated and commented on by senior Surescripts executives, Surescripts concluded that, because Allscripts had to stop using the cheaper Emdeon network and now had to route its volume through the more expensive Surescripts network, those few pharmacy customers that were not loyal to Surescripts were "feeling economic pain" and "paying 'more at the pump.'" This same presentation calculated exactly how much "economic pain" its pharmacy customers such as Kroger were experiencing: Because Kroger no longer got its Allscripts prescriptions at Emdeon's ███ per-transaction rate, but now had to pay Surescripts's ███ per transaction rate—a ███ increase—Surescripts estimated that Kroger was paying an extra ███ in increased routing costs per year. Kroger documented that the result of being forced to pay Surescripts's higher prices meant that its routing costs "increased significantly," by approximately ███.

**D.    Surescripts's conduct has reduced innovation in routing and eligibility.**

196.    Surescripts's dominance over routing and eligibility has allowed it to control the rate of innovation, or lack thereof. A lack of competitive discipline and customers' inability to change e-prescribing vendors has led to reduced innovation in e-prescribing. As one RelayHealth senior executive testified: "I can tell that in general that the industry wants e-prescribing to evolve, and it's not."

197.    Surescripts agrees. As Surescripts's former Chief Strategy Officer testified, from the time he joined Surescripts until when he left in 2012, that he "saw a bloated organization that wasn't lowering cost, not delivering where people would feel like they were true customers." A

January 2013 Surescripts presentation forwarded to Surescripts's Executive Vice President and Chief Customer Officer summarized the issue aptly: "There's a 'we've got such a dominant market position in e-prescriptions, who's going to come in and threaten us?' attitude."

198.    Surescripts's agreements with RelayHealth provide examples of how, in RelayHealth's words, "[t]he current [RelayHealth] relationship with [Surescripts] . . . inhibits innovation."

199.    Significantly, this innovation would have occurred in not just the routing market, but also in the eligibility market. Because of Surescripts's conduct, however, consumers have had to wait many years to receive the benefits of such innovation, if consumers ever received those benefits at all.

200.    For example, the 2010 Surescripts-RelayHealth contract called for the two companies to co-develop an initial list of 27 different value-added services, including Adherence Monitoring, Prescription History to Hospitals, Print @ Patient Cell Phone, Rx Claim Pre-Adjudication, Real-Time Benefit Check, electronic Prior Authentication, and REMS-related services such as prohibiting the prescribing/dispensing of medications with Risk Evaluation and Mitigation Strategies.

201.    Not one joint Surescripts-RelayHealth value-added product or service resulted from the 2010 contract.

202.    Similarly, not one joint Surescripts-RelayHealth product or service has resulted from the 2015 contract.

203.    As alleged above, *see* paragraphs 137-156, Surescripts repeatedly described the sole value of its agreements with RelayHealth as keeping RelayHealth's customers exclusive to Surescripts and preventing RelayHealth from competing against Surescripts in routing.

204.    On numerous occasions, RelayHealth unsuccessfully attempted to collaborate with Surescripts to develop these value-added services. One RelayHealth executive testified that Surescripts proved to be "not very innovative or cooperative when it comes to value-added services" and that Surescripts's "words were much rosier than their actions, and [RelayHealth] presented many solutions from a value-add perspective, and they seemed to fall on deaf ears, and they were not pursued." The failure of Surescripts and RelayHealth to collaborate "wasn't for a lack of trying on [RelayHealth's] part." Surescripts never provided an explanation to RelayHealth as to why Surescripts chose not to collaborate with RelayHealth on any value-added services listed in the 2010 contract.

205.    For example, the 2010 contract called for Surescripts and RelayHealth to co-develop a real-time benefit check service that would represent a significant improvement over Surescripts's existing eligibility service. Unlike Surescripts's eligibility offering, which relied on non-patient-specific, static formulary information, real-time benefit check allows a PBM to transmit patient-specific, real-time formulary information to physicians. Surescripts has known how to transmit such real-time formulary information since 2005, and RelayHealth expected to co-develop this service after the signing of the 2010 contract. Indeed, RelayHealth brought up this and other value-added services proposals at quarterly business meetings with Surescripts from 2012 to 2014. Surescripts never engaged with RelayHealth in developing real-time benefit check. Surescripts never shared any confidential or proprietary data, information, or technology with RelayHealth concerning real-time benefit check or other value-added services.

206.    Only once RelayHealth understood that Surescripts had no intention to collaborate did RelayHealth develop value-added services such as real-time benefit check on its own. As early as 2013, RelayHealth began efforts to develop a real-time benefit check solution by itself,

which RelayHealth brought to market in 2017. At that point, facing competition from RelayHealth, Surescripts finally brought its own real-time benefit check service to market.

207.    The harms from Surescripts's conduct with respect to RelayHealth continue through today. The 2015 Surescripts-RelayHealth agreement, which is currently in effect, contains an implicit non-compete, *see* paragraphs 151-156, that prevents RelayHealth from competing against Surescripts in routing.

208.    Had Surescripts not completely excluded all competition from the relevant markets—whether it was Emdeon, RelayHealth, Allscripts, or otherwise—competitive forces would have spurred Surescripts to innovate faster, bringing (or trying to bring) services such as real-time benefit check to the market earlier. Consumers were harmed as a result of these significant innovation delays.

**E.    Surescripts's conduct has reduced quality in routing and eligibility.**

209.    Similarly, because Surescripts faces no competition, it also has no incentive to improve its services, resulting in reduced quality to its customers. Again, Surescripts agrees: In 2015, Surescripts wrote, "[b]ecause we didn't grow up in a competitive environment and we grew up as a monopoly, we don't have the best way of dealing with customers."

210.    Customers agree. They have echoed these critiques, complaining that Surescripts has poor customer service, is slow to innovate, impedes EHRs' ability to innovate due to stringent certification requirements, and uses opaque pricing strategies. Surescripts's own executives report that customers use the following words to describe Surescripts: "monopoly," "entrenched," "slow," "difficult," "misleading," "challenging," "inconsistent," and "dictates."

211.    To take one example, as early as January 2011 Surescripts knew that many of its pharmacy customers were dissatisfied with Surescripts's service surrounding a specific type of routing transaction called "Denied, NewRx to Follow" or "DNTF," which small, independent

pharmacies believed—correctly—caused Surescripts to double-bill the pharmacies for a single transaction. In October 2012, Surescripts calculated that it was making "█████████ a year in DNTF transaction charges" despite knowing that this was "a hot issue for independent pharmacies." Surescripts, however, did not change its practices on DNTF until April 2013, 27 months after Surescripts's senior executives knew that Surescripts was double-billing its routing customers.

212.    Had Surescripts's anticompetitive conduct not allowed it to maintain its monopoly status, consumers would have been able to choose other options that could have provided better customer service, or at least provided a competitive threat to spur Surescripts to improve the quality of its own services. But because Surescripts has unlawfully maintained its monopolies through its exclusive dealing and other anticompetitive arrangements with RelayHealth and Allscripts, consumers have been denied the quality improvements that competition brings.

###    F.    Surescripts's conduct has reduced quality-adjusted output and overall transaction output.

213.    Surescripts's conduct has reduced innovation and thus has also reduced quality-adjusted output. But for Surescripts's conduct, there would be more and faster innovation in the routing and eligibility markets.

214.    In addition to quality-adjusted output, Surescripts's conduct has also reduced output as measured by transaction volume. As of 2017, 69% of doctors were utilizing e-prescribing. But for Surescripts's conduct, competition for prescribers (via their EHRs) would likely result in higher incentive payments to EHRs, which would in turn provide incentives to EHRs to increase its doctors' utilization of e-prescribing. At least one EHR welcomed the idea of higher incentives tied to growth: "[W]e would welcome an additional 'target' level whereby the incentive would increase . . . as the volume grows." And ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Surescripts, however, rejected these options in favor of contractual language that implemented its loyalty scheme.

215.    Additionally, Surescripts's stringent certification requirements have delayed adoption and utilization of e-prescribing. Absent the restraints, increased price, innovation, and quality competition among networks for EHR volume would likely further incentivize or enable EHRs to increase the utilization of e-prescribing among doctors.

**G.    There is no legitimate procompetitive business justification for Surescripts's conduct.**

216.    As the Senior Vice President of one of Surescripts's large hospital system customers wrote in a March 2, 2011 letter to Surescripts's CEO expressing his "deep concern" about Surescripts's exclusivity requirements: "There is no conceivable justification for this policy other than Surescripts' desire to maintain an e-prescribing monopoly."

217.    Surescripts's exclusivity requirements do not serve any legitimate procompetitive business purpose. Increases in adoption and utilization were largely driven by incentives under MIPPA, the HITECH Act, and a broader movement towards computerized health records generally. *See* paragraphs 33-39. While incentive payments to EHRs may increase output, the exclusivity provisions to which those incentives are tied do not enhance or otherwise further the adoption or utilization of e-prescribing.

218.    Surescripts's exclusivity requirements were not reasonably necessary to reduce prices. Moreover, Surescripts could have accomplished this objective through less restrictive alternatives, primarily through discounts based on volume, not loyalty.

219.     Surescripts is not a natural monopoly. E-prescribing customers treat Surescripts like any other vendor, seeking out alternatives to Surescripts for routing and eligibility. A small number of customers use multiple networks. At least one smaller-scale competitor, Emdeon, has offered lower pricing and higher incentive payments.

220.     There is no legitimate procompetitive justification for the features in Surescripts's contracts with Allscripts discussed in paragraphs 100-127 above. Indeed, though it was only after Surescripts and Allscripts became aware of the FTC's investigation, Surescripts and Allscripts dropped many of these provisions, yet Surescripts is still able to provide routing and eligibility services to Allscripts today.

221.     There is no legitimate procompetitive justification for Surescripts's routing non-compete with RelayHealth. Other provisions in the 2010 contract provided strong protections for any of Surescripts's proprietary information. Any proprietary information disclosed by either party to the other in connection with the agreement was protected by the recipient party from disclosure to others. Any documentation provided by Surescripts under the 2010 contract was designated proprietary to Surescripts, and RelayHealth could not copy or use that documentation in any way other than as specifically authorized by the agreement.

## VIII.   VIOLATIONS OF SECTION 5 OF THE FTC ACT

## COUNT I

### Monopolization of Routing Arising under Section 2 of the Sherman Act

222.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-221 above.

223.     At all relevant times, Surescripts has had monopoly power in the United States with respect to routing.

224.     Surescripts has willfully maintained its monopoly power through its course of anticompetitive conduct, including its exclusive or de facto exclusive agreements with pharmacies, PTVs, and EHRs, requiring those entities to use the Surescripts network exclusively or nearly exclusively for routing, as well as the non-compete provisions in its contracts with RelayHealth. Collectively, Surescripts's contracts substantially foreclose the routing market from actual and potential competition. Through its course of conduct, Surescripts has excluded competition and willfully maintained its monopoly in routing by not competing on the merits.

225.     There is no valid procompetitive justification for Surescripts's exclusionary conduct in the routing market.

226.     Surescripts's anticompetitive acts violate Section 2 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

**Monopolization of Eligibility Arising under Section 2 of the Sherman Act**

227.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-221 above.

228.     At all relevant times, Surescripts has had monopoly power in the United States with respect to eligibility.

229.     Surescripts has willfully maintained its monopoly power through its course of anticompetitive conduct, including its exclusive or de facto exclusive agreements with PBMs and EHRs, requiring those entities to use the Surescripts network exclusively or nearly exclusively for eligibility. Surescripts has also maintained its monopoly power by entering into an especially restrictive agreement for eligibility with Allscripts. Collectively, Surescripts's contracts substantially foreclose the eligibility market from potential competition. Through its course of

conduct, Surescripts has excluded competition and willfully maintained its monopoly in eligibility by not competing on the merits.

230.     There is no valid procompetitive justification for Surescripts's exclusionary conduct in the eligibility market.

231.     Surescripts's anticompetitive acts violate Section 2 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## IX.    PRAYER FOR RELIEF

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act; therefore, the FTC requests that this Court, as authorized by 15 U.S.C. § 53(b), 15 U.S.C. § 26, and its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

1.     That Surescripts's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2.     That Defendant is permanently enjoined from engaging in similar and related conduct in the future; and

3.     That the Court grant other such equitable relief, including equitable monetary relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as alleged herein.

Respectfully submitted,

_____
D. Bruce Hoffman (D.C. Bar 495385)
Director
Bureau of Competition

Dated: April 17, 2019

Ian Conner (D.C. Bar 979696)
Deputy Director
Bureau of Competition

Daniel Francis (D.C. Bar 1004918)
Associate Director
Bureau of Competition

Alden Abbott
General Counsel

Markus H. Meier (D.C. Bar 459715)
Lead Counsel
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
202-326-3759
mmeier@ftc.gov

Bradley S. Albert
David B. Schwartz
Daniel S. Bradley
D. Patrick Huyett
Joseph P. Mathias
Tanya O'Neil (D.C. Bar 1021933)

*Attorneys for Plaintiff*
*Federal Trade Commission*