# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SURESCRIPTS, LLC,**<br><br>**Defendant.** |

**Case No.: 19-cv-1080 (JDB)**

**REDACTED**

## SURESCRIPTS, LLC'S MOTION TO DISMISS COMPLAINT

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Surescripts, LLC ("Surescripts") hereby moves this Court for an order dismissing with prejudice the Federal Trade Commission's ("FTC") Complaint for Injunctive and Other Equitable Relief (ECF No. 1) for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

As set forth more fully in the accompanying memorandum of law, the grounds for this motion are as follows:

1.      The FTC does not, and cannot, establish that this Court has subject matter jurisdiction over the FTC's request for a permanent injunction against Surescripts because the FTC cannot establish that this is a "proper case" as required by Section 13(b) of the FTC Act.

2.      The FTC's assertion that the optional loyalty pricing provisions offered by Surescripts to its customers violated Section 2 of Sherman Act fails to state a claim upon which relief can be granted because the FTC does not allege, as it must, that the prices offered by Surescripts were predatory.

3.      The FTC's claims also fail under the rule of reason because the FTC does not plead

sufficient facts to allege that Surescripts' contracts caused anticompetitive effects, and foreclosed

a substantial amount of competition, in each of the routing and eligibility markets as a whole.

Surescripts requests an oral hearing on the Motion.


Dated: July 12, 2019                              Respectfully submitted,

                                                  */s/ Amanda P. Reeves*
                                                  Amanda P. Reeves (D.C. Bar 496338)
                                                  Allyson M. Maltas (D.C. Bar 494566)
                                                  Latham & Watkins LLP
                                                  555 Eleventh Street, NW, Suite 1000
                                                  Washington, DC  20004-1304
                                                  Telephone:  (202) 637-2183
                                                  Facsimile:  (202) 637-2201
                                                  Email: amanda.reeves@lw.com
                                                  Email: allyson.maltas@lw.com

                                                  Alfred C. Pfeiffer, Jr. (*appearing pro hac vice*)
                                                  Alexander E. Reicher (*appearing pro hac vice*)
                                                  Latham & Watkins LLP
                                                  505 Montgomery Street, Suite 2000
                                                  San Francisco, CA  94111-6538
                                                  Telephone:  (415) 391-0600
                                                  Facsimile:  (415) 395-8095
                                                  Email: al.pfeiffer@lw.com
                                                  Email: alexander.reicher@lw.com

                                                  *Attorneys for Defendant Surescripts, LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Case No.: 19-cv-1080 (JDB)** |
| **SURESCRIPTS, LLC,** | **REDACTED** |
| **Defendant.** | |

**MEMORANDUM IN SUPPORT OF SURESCRIPTS, LLC'S MOTION TO DISMISS COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

RELEVANT FACTS AND PROCEDURAL HISTORY ...............................................6

I.      SURESCRIPTS AND THE DEVELOPMENT OF E-PRESCRIBING............................6

II.     SURESCRIPTS' CONTRACTS WITH ITS CUSTOMERS .............................................7

   A.      EHRs .................................................................................................8

   B.      Pharmacies and PTVs .....................................................................11

   C.      PBMs...............................................................................................12

III.    THE FTC'S INVESTIGATION AND INITIATION OF THIS LAWSUIT....................12

ARGUMENT ..............................................................................................................13

I.      THE FTC DOES NOT AND CANNOT PLEAD FACTS NECESSARY TO
        INVOKE FEDERAL COURT JURISDICTION OVER THIS CASE............................13

   A.      Section 13(b) Authorizes the FTC To Bypass Its Administrative Process
                And Seek A Permanent Injunction Only In A "Proper Case" ...............15

   B.      A "Proper Case" Is A Routine, Straightforward Claim That Does Not
                Require The FTC's Specialized Expertise In The First Instance...........17

   C.      The Complaint Pleads A Complex And Novel Antitrust Theory, Not A
                Routine "Proper Case" ......................................................................24

II.     THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 2 OF THE
        SHERMAN ACT ..................................................................................................29

   A.      The FTC's Monopolization Claim Based On "Loyalty Pricing" Fails
                Because The FTC Does Not Allege That Surescripts Engaged In Predatory
                Pricing .............................................................................................30

      1.      The FTC's Characterization Of Surescripts' Loyalty Pricing
                        Provisions As "Exclusive Dealing" Is Not Supported By The
                        Allegations And Is Wrong As A Matter Of Law ........................30

      2.      The FTC Does Not Allege That Surescripts Engaged In Predatory
                        Pricing ...............................................................................33

   B.      The FTC's Monopolization Claims Also Fail Under The Rule of Reason............34

      1.      The FTC Does Not Allege That Surescripts' Contracts Caused
                        Anticompetitive Effects In The Routing And Eligibility Markets As
                        A Whole .............................................................................35

a.    Plaintiffs Challenging a Two-Sided Platform Must Allege Net-Anticompetitive Effects Across the Entire Market.................35

b.    The Complaint Does Not Allege Any Facts To Support Its Summary Conclusion That Surescripts' Contractual Provisions Caused "Net" Higher Pricing In The Eligibility And Routing Markets....................................................................38

c.    Allegations Of Reduced Innovation And Quality Cannot Save The FTC's Complaint ...........................................................40

2.    The FTC's Complaint Does Not Sufficiently Allege Foreclosure In Any Market .................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).................................................................................................38

*Astoria Fed. Savings & Loan Ass'n v. Solimino,*
501 U.S. 104 (1991).................................................................................................17

*Atl. Refining Co. v. FTC,*
381 U.S. 357 (1965).................................................................................................15

*\*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007).........................................................................................5, 38, 44

*\*Brooke Group v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993).................................................................................1, 25, 32, 34

*Browning v. Clinton,*
292 F.3d 235 (D.C. Cir. 2002) ................................................................................38

*Cascade Health Solutions v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) ..................................................................................33

*Concord Boat Corp. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ................................................................................31

*Esai, Inc. v. Sanofi Aventis U.S., LLC,*
821 F.3d 394 (3d Cir. 2016).........................................................................33, 42, 43

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs,*
873 F. Supp. 2d 363 (D.D.C. 2012) ........................................................................14

*FTC v. 1263523 Ontario, Inc.,*
205 F. Supp. 2d 205 (S.D.N.Y. 2002)......................................................................17

*\*FTC v. Abbott Laboratories,*
No. Civ. A. No. 92-1364, 1992 WL 335442 (D.D.C. Oct. 13, 1992)............................. *passim*

*FTC v. AMG Capital Mgmt., LLC,*
910 F.3d 417 (9th Cir. 2018) ..................................................................................21

*FTC v. Cement Inst.,*
333 U.S. 683 (1948)................................................................................................16

*FTC v. Church & Dwight Co., Inc.*,
  665 F.3d 1312 (D.C. Cir. 2011) ........................................................................25, 33

*FTC v. Evans Prod. Co.*,
  775 F.2d 1084 (9th Cir. 1985) .........................................................................17, 21

*FTC v. Ewing*,
  No. 2:14-cv-00683, 2017 WL 4797516 (D. Nev. Oct. 24, 2017) .............................20

*FTC v. H. N. Singer, Inc.*,
  668 F.2d 1107 (9th Cir. 1982) ................................................................................20

*FTC v. Int'l Diamond Corp.*,
  No. C-82-0878 WAI (JSB), 1983 WL 1911 (N.D. Cal. Nov. 8, 1983) ....................20

*FTC v. Invest. Devs., Inc.*,
  Civ. A. No. 89-642, 1989 WL 62564 (E.D. La. June 8, 1989) ...............................21

*FTC v. Med. Billers Network, Inc.*,
  543 F. Supp. 2d 283 (S.D.N.Y. 2008) .....................................................................17

*FTC v. Motion Picture Advert. Serv. Co.*,
  344 U.S. 392 (1953) .................................................................................................15

*FTC v. Mylan Labs., Inc.*,
  62 F. Supp. 2d 25 (D.D.C. 1999), *on reconsideration in part sub nom.* 99 F.
  Supp. 2d 1 (D.D.C. 1999) .................................................................................17, 21

*FTC v. World Travel Vacation Brokers, Inc.*,
  861 F.2d 1020 (7th Cir. 1988) ..........................................................2, 14, 19, 20

*Ginzburg v. Mem'l Healthcare Sys., Inc.*,
  993 F. Supp. 998 (S.D. Tex. 1997) ..........................................................................41

*Heater v. FTC*,
  503 F.2d 321 (9th Cir. 1974) .............................................................................3, 23

*Holloway v. Bristol-Myers Corp.*,
  485 F.2d 986 (D.C. Cir. 1973) ................................................................................15

*I Mark Mktg. Servs., LLC v. Geoplast S.p.A.*,
  753 F. Supp. 2d 141 (D.D.C. 2010) ...........................................................................9

*Itel Containers Int'l Corp. v. Huddleston*,
  507 U.S. 60 (1993) ....................................................................................................17

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ................................................................................44

*Kokesh v. SEC,*
    ___ U.S. ___, 137 S. Ct. 1635 (2017) ............................................................3, 24

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ...............................................................................13

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ..............................................................5, 25, 33

*Macharia v. United States,*
    334 F.3d 61 (D.C. Cir. 2003) ..................................................................14

*Maggio v. Wis. Ave. Psychiatric Ctr., Inc.,*
    795 F.3d 57 (D.C. Cir. 2015) ....................................................................8

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.,*
    859 F.3d 408 (7th Cir. 2017) ..................................................................34

*NicSand v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007) ..................................................................32

*Ohio v. American Express Co.,*
    585 U.S. ___, 138 S. Ct. 2274 (2018) ................................................. *passim*

*Omega Envt'l v. Gilbarco, Inc.,*
    127 F.3d 1157 (9th Cir. 1997) ................................................................42

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009)..........................................................................31, 32

*Powell v. Internal Revenue Serv.,*
    317 F. Supp. 3d 266 (D.D.C. 2018) ...........................................................24

*Roland Mach. Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984) ..................................................................42

*Search v. Uber Techs., Inc.,*
    128 F. Supp. 3d 222 (D.D.C. 2015) .......................................................39, 40

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ..................................................................39

*Tampa Electric Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961)........................................................................5, 35, 45

*United States v. Dish Network LLC,*
    256 F. Supp. 3d 810 (C.D. Ill. 2017) .........................................................20

*United States v. Microsoft*,
    253 F.3d. 34 (D.C. Cir. 2001) ................................................................... *passim*

*Valassis Communc'ns, Inc. v. News Corp*,
    No. 17-cv-7378, 2019 U.S. Dist. LEXIS 27770 (S.D.N.Y. Feb. 21, 2019)............................32

*ZF Meritor, LLC v. Eaton Corp*.,
    696 F.3d 254 (3d Cir. 2012)................................................................................33

## STATUTES

15 U.S.C. § 53(b) ...............................................................................................17

15 U.S.C. § 57b..................................................................................................3, 24

21st Century Cures Act, Pub. L. 114-255, 130 Stat. 1033 (2016) ...............................29

FTC Act § 5 .............................................................................................. *passim*

*FTC Act § 13(b) ....................................................................................... *passim*

FTC Act § 13(b)(1) ...........................................................................................17, 21

FTC Act § 13(b)(2) .........................................................................................2, 17, 21

FTC Act § 19 ...............................................................................................3, 4, 24

Sherman Act § 1................................................................................................1, 27, 44

Sherman Act § 2................................................................................................ *passim*

## RULES

*Fed. R. Civ P. 12(b)(1)........................................................................................14

*Fed. R. Civ. P. 12(b)(6).....................................................................................29, 32

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *The FTC as an Antitrust Enforcement Agency: Its
    Structure, Powers and Procedures*, vol. I (Alan H. Silberman ed. 1981) ..............................15

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure:
    Civil § 1350*, 159 (3d ed. 2004) .........................................................................14

D. Bruce Hoffman & M. Sean Royall, *Administrative Litigation at the FTC: Past,
    Present, and Future*,  71 ANTITRUST L.J. 319 (2003)................................................23

FTC, Antitrust Modernization Commission, *Public Hr'g: Panel I: Antitrust and the New Economy* 22 (Nov. 8, 2005) ........................................................................28

FTC, *FTC Policy Statement on Monetary Equitable Remedies in Competition Cases*, 68 Fed. Reg. 45820 (Aug. 4, 2003) .................................................................3

FTC, *Withdrawal of the Commission Policy Statement on Monetary Equitable Remedies in Competition Cases*, 77 Fed. Reg. 47,070 (July 31, 2012) ....................................3

H.R. Rep. No. 63-1142 (1914) ..............................................................................15

Herbert Hovenkamp, *Platforms and the Rule of Reason: The American Express Case*, 2019 COLUM. BUS. L. REV. 35 (2019) ..........................................................26

Hillary Greene, *Non-Per Se Treatment of Buyer Price-Fixing in Intellectual Property Settings*, 2011 DUKE L. & TECH. REV. 4, ¶ 85 (2011) ..............................................28

J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act*, 79 ANTITRUST L.J. 1 (2013) .......................................22

John H. Carley, *Recent Legislative and Judicial Developments Affecting the Federal Trade Commission*, 51 ANTITRUST L.J. 661 (1982) ...................................................22

Joseph J. Simons, *FTC, The 51st Annual ABA Antitrust Section Spring Meeting: Report from the Bureau of Competition* (Apr. 4, 2003) ..........................................................23

Joshua Sisco, *FTC's Surescripts case closely tracks SCOTUS Amex decision*, MLEX (May 22, 2019) ..................................................................................13, 27

Justin Bernick & Dan Graulich, *American Express and two-sided antitrust markets: Coming to a network near you*, Hogan Lovells (June 26, 2018) ..............................26

Miles W. Kirkpatrick, et al., *Report of the American Bar Association Special Committee to Study the Role of the Federal Trade Commission*, 58 ANTITRUST L.J. 43 (1989) ...................................................................................................23

*Oversight of the Federal Trade Commission: Strengthening Protections for Americans' Privacy and Data Security: Hr'g Before the H. Comm. on Energy & Commerce, Subcommittee on Consumer Prot. and Commerce*, 116th Cong. 3 (May 8, 2018) ...................................................................................................27

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 651 (3rd and 4th eds., 2019 Cum. Supp. 2010–18) ................................................................................................28

Robert Pitofsky, Former Chairman, FTC, *An Overview of FTC Antitrust Enforcement: Hearing Before the H. Comm. on the Judiciary* (Prepared testimony of the Federal Trade Commission) (Nov. 5, 1997) ..................................................23

S. Rep. No. 63-597 (1914) ............................................................................................15

S. Rep. No. 93-151 (1973) ............................................................................................18

Stephen Calkins, *The Legal Foundation of the Commission's Use of Section 5 to
    Challenge Invitations to Collude is Secure*, 14 ANTITRUST 69 (Spring 2000) ......................22

Ted Tatos, *Relevant Market Definition and Multi-Sided Platforms After* Ohio v.
    American Express: *Evidence from Recent NCAA Antitrust Litigation*, 10
    HARV. J. SPORTS & ENT. L. 147 (2019) ................................................................................26

## INTRODUCTION

Surescripts is an innovator. It pioneered e-prescribing as a service to link physicians, payors, and pharmacies by providing consumers with a safer, more accurate, efficient and lower-cost method to process prescriptions. It made the substantial investments needed to make e-prescribing a commercial reality, including convincing numerous state and federal agencies to legalize e-prescribing. And it did all of this while fostering an environment where e-prescription prices have substantially and steadily fallen over the past 10 years. The Federal Trade Commission ("FTC") marshals no facts to support any claim that Surescripts' alleged dominance resulted in lower quality and reduced innovation. In fact, if this case proceeds past this motion, the record will be rife with these and other facts that show exactly the opposite.

The FTC chooses this context to bring a permanent injunction action that would make new antitrust law based on two novel theories. First, the FTC seeks to evade the Supreme Court's decision in *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993), by alleging that Surescripts' low (but not predatory) pricing violates Section 2 of the Sherman Act. In so doing, Surescripts asks this this Court to craft a new standard under which to judge a strategy of offering unbundled low prices and discounts. Second, in attempting to impose Section 2 antitrust liability for Surescripts' conduct in a two-sided market, the FTC's case raises questions of first impression regarding the proper application of the Supreme Court's decision in *Ohio v. American Express Co.*, 585 U.S. ___, 138 S. Ct. 2274 (2018) ("*Amex*"). *Amex* addressed the standard for proving anticompetitive effects in a two-sided market in the context of a Sherman Act Section 1 claim; by applying *Amex* in the Section 2 context, the FTC wades into a morass of open legal questions. Compounding these core legal obstacles, the FTC's Complaint contains fatal pleading errors and omissions that defeat both its pricing and two-sided market theories at this initial stage.

This is all very interesting, but as a threshold matter the novel nature of these claims means that Congress did not authorize the FTC to bring this case in federal court and this Court therefore lacks jurisdiction to resolve it.  Section 13(b) of the FTC Act provides the sum total of the FTC's potential authority to proceed here.  And while the FTC has broad authority under Section 13(b)(2) to seek *preliminary injunctive* relief pending an FTC administrative trial on the merits, the FTC's jurisdiction to seek *permanent injunctions* (and therefore avoid its administrative litigation process altogether) is more constrained.  Section 13(b)(2) of the FTC Act only authorizes the FTC to seek a permanent injunction in "proper cases."  Remarkably, the FTC ignores this threshold question and does not even attempt to plead that this is in fact a "proper case."  And with good reason—it isn't.

Section 13(b)(2)'s text, the broader statutory framework governing the circumstances when the FTC can come to federal court, the legislative history, and this Court's opinion in *FTC v. Abbott Laboratories*, No. Civ. A. No. 92-1364, 1992 WL 335442, at *2 (D.D.C. Oct. 13, 1992), all confirm that this is not a "proper case" in which the FTC may seek a permanent injunction because this case does not "'halt a straightforward violation of section 5.'"  *Id.* (quoting *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988)).  The FTC's Complaint raises novel antitrust questions that are anything but straightforward and that the FTC has not previously opined on through its administrative litigation process.[1]  Indeed, allowing the FTC to duplicate the DOJ Antitrust Division's ability to come straight to federal court would ignore the FTC's entire

---

[1]    The legality of Surescripts' alleged behavior under Section 2 should be resolved by a straightforward application of *Brooke Group*'s predatory pricing standard.  The FTC, however, plainly disagrees with Surescripts' position because the Complaint contains no allegations whatsoever that Surescripts engaged in predatory pricing.  As such, the FTC inherently wants to make new law under the theory that the conduct that is lawful under *Brooke Group* should be unlawful under some other new standard.  If the FTC intends to make that law, it should do so through its administrative process in the first instance as Congress intended.

reason for being, as explained below.  If the FTC wants a permanent injunction here, it must pursue

its administrative litigation process where the Commission normally addresses novel or complex

issues through a written decision in the first instance.  That path is open to it.  It is the one that

Congress intended.  And for most of the last century, it is the path that the FTC has followed.

Why then is this case in this Court and why is the FTC seeking permanent injunctive relief?

There are two apparent reasons.  First, the FTC needs to pretend that this is a "proper case" so that

it can seek equitable monetary relief in the form of disgorgement.[2]  For a number of reasons, the

FTC is not entitled to monetary relief in this case, but that is a matter for another day if the Court

retains jurisdiction and the case survives on the merits.  The FTC's interest in obtaining monetary

relief in the form of disgorgement is, however, relevant here to understand *why* the FTC wants this

to be a proper case:  if the FTC returns to its home administrative court, it does not have a colorable

argument that it can secure monetary relief under Section 19 of the FTC Act, which is the only

statute that provides for such relief.  *See* 15 U.S.C. § 57b (allowing the FTC to obtain consumer

redress in defined circumstances involving violations of rules or cease and desist orders *prohibiting*

---

[2]      Critically, when Congress created the FTC, it did not envision that the FTC would seek monetary relief in antitrust cases at all because, as a policy matter, it assumed that when the FTC was pursuing new and novel theories under Section 5 (just as it attempts to do so here), it would be establishing new law through the case at hand and, as such, monetary relief was not good policy. *See generally Heater v. FTC*, 503 F.2d 321, 324 (9th Cir. 1974) (summarizing legislative history and noting that Congress did not provide the FTC with explicit authority to pursue monetary relief because doing so was inconsistent with the fact that the FTC would be identifying conduct that violated Section 5 on a case-by-case basis).  The FTC largely followed that expectation until 2012, when the FTC retracted its policy of limiting pursuit of disgorgement only to situations where clear violations of antitrust law existed.  *See* FTC Policy Statement on Monetary Equitable Remedies in Competition Cases, FTC, 68 Fed. Reg. 45820, 45821 (Aug. 4, 2003), https://www.gpo.gov/fdsys/pkg/FR-2003-08-04/pdf/03-19722.pdf; *see also* Withdrawal of the Commission Policy Statement on Monetary Equitable Remedies in Competition Cases, 77 Fed. Reg. 47,070 (July 31, 2012).  That policy change launched a new effort by the FTC to seek disgorgement in federal antitrust cases in the first instance and the FTC presumably lacks that power after the Supreme Court's decision in *Kokesh v. SEC*, ___ U.S. ___, 137 S. Ct. 1635, 1642 n.3 (2017).

*unfair or deceptive acts or practices*).  Likely recognizing that Section 19 does not give it authority to seek monetary relief in cases, like this one, which allege *unfair methods of competition*, the FTC comes here in hopes that this Court will ignore the "proper case" requirement so that it can pursue its newly crafted "federal disgorgement" path.  That is not the system that Congress intended for the FTC to use at all, and certainly not in cases that rely on untested and unsettled legal theories like the ones posited here.

Second, the FTC demands a permanent injunction because it would not be able to make a compelling case for a preliminary injunction.  The injunction that the FTC seeks, on the face of the Complaint, would not be a request to maintain the *status quo*.  Instead it would mandate wholesale changes to thriving, innovative and successful markets, and to a massive array of contracts between Surescripts and third parties.  And it would impose market disarray and uncertainty based on, at best, novel antitrust theories and mischaracterizations of Surescripts' actual contracts, as described in more detail below.

So the FTC eschews its own administrative process and asks the Court to entertain a direct proceeding for a permanent injunction in a complex, novel, and unsettled Sherman Act setting, rather than a "straightforward" claim of business fraud or *per se* price fixing.  No court has approved of the use of Section 13(b) in such a setting.  This Court should not be the first.

Even if the Court ultimately concludes that it has jurisdiction to consider this permanent injunction proceeding, the Court should dismiss it because the FTC has not pled a violation of Section 2 of the Sherman Act.  The FTC fails to plead a Section 2 violation in two respects.  First, the FTC begins by applying the wrong legal standard, treating this as an exclusive dealing claim that in all respects must be reviewed under the rule of reason.  Yet the Complaint makes clear that the FTC's complaints about Surescripts' loyalty pricing provisions are grounded in Surescripts'

4

low pricing strategy, and low pricing is almost always a good thing under the antitrust laws.  Unless and until the FTC alleges that Surescripts' low prices amount to "predatory pricing" under *Brooke Group*, the FTC cannot meet its burden under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The FTC does not allege predatory pricing, and cannot because none exists.  Instead, the FTC's allegations can only be characterized as an attempt to shoehorn itself into a contorted extension of the Third Circuit's decision in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003).  In *LePage's*, the Third Circuit held that the rule of reason (and not the Supreme Court's settled predatory pricing test) would apply to an assessment of bundled rebates offered by a monopolist. 324 F.3d at 147-52.  The D.C. Circuit has not adopted *LePage's,* but it could not apply here anyway because the FTC does not allege multi-product bundling.

Second, even if the exclusive dealing test applied, the FTC's Complaint would fail.  The Supreme Court's *Amex* decision is not only new and so far rarely applied, but its holding that the FTC must allege that Surescripts' alleged exclusive dealing provisions caused anticompetitive effects in the routing and eligibility markets *as a whole* is fatal here because the FTC pleads no facts to support any such claim.  The FTC's conclusory claim that Surescripts' contracts with customers caused "substantial foreclosure" similarly fails.  The FTC does not allege, as it clearly must under *Amex* and *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961), that Surescripts' alleged exclusive dealing provisions caused market-wide foreclosure.  And, the FTC's own allegations and the terms of the very contracts on which the FTC relies in the Complaint disprove the FTC's claim that they are "exclusive" at all, and demonstrate that the FTC has not in any way pled substantial foreclosure as required to maintain its claims.

## RELEVANT FACTS AND PROCEDURAL HISTORY

### I.   SURESCRIPTS AND THE DEVELOPMENT OF E-PRESCRIBING

Surescripts is a health information technology company that provides e-prescribing services, including "routing" and "eligibility."   Complaint for Injunctive and Other Equitable Relief ("Compl.") ¶ 1, ECF No. 1.[3]   Routing is the transmission of prescription and prescription-related information *from a doctor* (including requests for refills), who prescribes the necessary medication, *to a pharmacy*. *Id.* ¶ 19.   In many cases, prescribers contract with an electronic health record ("EHR") system to handle the transmission of the prescriptions and related information. *Id.* Eligibility is the transmission of a patient's formulary and benefit information *from a payer* (usually the patient's pharmacy benefit manager ("PBM")) *to the prescriber's EHR*. *Id.* ¶ 20.   This eligibility information allows a prescriber to know which drugs are covered by the patient's drug benefit plan, the location of covered drugs on a patient's health insurance company's formulary, and what copay (if any) a patient will have to pay to obtain a prescribed drug. *Id.*

Surescripts was formed on May 9, 2008 through the merger of SureScripts Systems, Inc. ("SureScripts Systems") and RxHub LLC ("RxHub"). *Id.* ¶¶ 40–42.[4]   RxHub was the first major eligibility network and, at the time, SureScripts Systems focused mainly on routing. *Id.*   RxHub and SureScripts Systems separately, and then together as Surescripts, developed and grew the e-prescribing process, benefitting prescribers, pharmacies, PBMs, and, in the process, patients. *Id.* ¶ 17.

---

[3]   Surescripts accepts for the purposes of this motion the market definitions proposed by the FTC.   Surescripts reserves the right to challenge those definitions should this case proceed past this motion.

[4]   Surescripts is owned by CVS Health (a pharmacy and PBM), Express Scripts (a PBM), and two pharmacy trade associations—the National Association of Chain Drug Stores and the National Community Pharmacists Association.   Compl. ¶ 44.   None of these entities has a controlling interest in Surescripts. *Id.*

The FTC agrees that these e-prescribing services are a good thing, observing that they are a "safer, more accurate, efficient, and lower cost" way to handle prescriptions. *Id.* (noting that the benefits of e-prescribing include fewer medical errors due to poor handwriting, greater awareness of potential adverse drug reactions, more effective communication of a patient's insurance coverage and alternatives, and increased likelihood that a patient will actually pick up the prescription at the pharmacist). Over the past decade, e-prescribing has exploded in popularity. "From 2008 to 2016, the number of routing and eligibility transactions grew over 23-fold, from 147 million to 3.5 billion." *Id.* ¶ 38. "In 2017, 77% of all prescriptions were delivered electronically." *Id.* This percentage has only continued to grow as more and more states have mandated e-prescribing in order to provide these benefits to their residents.

Surescripts was at the forefront of developing this advantageous approach to prescriptions and its innovation led it to become the nation's leading e-prescription routing and eligibility provider as of 2008-09. *Id.* ¶¶ 2, 43. To achieve this success, Surescripts had to make significant investments to build network platforms capable of handling two-sided routing and eligibility transactions. *Id.* ¶ 22.

## II.   SURESCRIPTS' CONTRACTS WITH ITS CUSTOMERS

This case presents, to say the least, a highly unusual set of economic market conditions. The FTC concedes that both routing and eligibility are true "two-sided" networks that allow the simultaneous transmission of information from one side of the market to the other. *Id.* ¶ 22. The FTC further admits that both routing and eligibility experience "indirect network effects" common in two-sided markets. *Id.* ¶¶ 23–25. And the FTC also acknowledges that both routing and eligibility are fully cross-subsidized markets. EHRs do not pay any fees to Surescripts for accessing the Surescripts network for either routing or eligibility. *Id.* ¶¶ 51, 78 (EHR price without loyalty payments is "zero"). Instead, EHRs have the opportunity to earn "incentive payments"

from Surescripts.   These incentive payments are directly subsidized by the PBMs and pharmacies/Pharmacy Technology Vendors ("PTVs") on the other side of each market through the fees those customers pay Surescripts in order to access the network.  Indeed, the FTC alleges that the EHR payments are actual percentages of those fees.  *Id*. ¶ 77 (stating that for each transaction, Surescripts pays the EHR an incentive of ▮▮▮ of the price that the PBM or pharmacy customers pay to Surescripts).  Thus, any assessment of alleged competitive effects in these two markets has to take into account their interrelated, cross-subsidizing cash flows.

## A.   EHRs

EHRs are the subsidized part of both two-sided markets, both the routing and eligibility platforms.  On the routing platform, EHRs provide the prescription information from prescribers that then is sent to pharmacies.  On the eligibility platform, EHRs receive a patient's formulary and benefit information from PBMs.  As the Complaint admits, EHRs do not pay Surescripts; they receive compensation from Surescripts.

The FTC acknowledges that by their nature, these markets give Surescripts a rational economic justification to price in a way that encourages greater utilization of its two-sided platform.  That is the very nature of a true two-sided market, in which "network effects" will encourage more participation by one side (e.g., pharmacies) if there is greater participation on the other side (e.g., EHRs), and vice versa.  *Id*. ¶ 23.  In early 2010, Surescripts began its "Reserve Program" that provides EHRs the opportunity to earn incentive payments from Surescripts if they meet certain requirements.  *See id*. ¶ 87; *see also*, *e.g.*, Apr. 14, 2010 ▮▮▮▮▮▮▮ Amendment No. 2, attached as Ex. 1.[5]  It is clear from the face of the Complaint that access to the Surescripts

---

[5]    While a court ruling on a motion to dismiss must ordinarily accept all well-pled facts as true and may rely only on the complaint and its proper attachments, the Court is free to consider documents incorporated into the complaint by reference, such as contracts, in assessing whether the FTC has met its burden.  *See Maggio v. Wis. Ave. Psychiatric Ctr., Inc*., 795 F.3d 57, 62 (D.C.

network is not at issue in this case.  The FTC never alleges that EHRs are required to join the Reserve Program or that they must meet any loyalty or exclusivity requirements in order to connect to the Surescripts network.  The FTC instead focuses, as it must, on the amount of incentive payments EHRs may receive.  That Reserve Program determines the amount of incentive payments paid to those who participate in it.  EHRs, if they choose, can participate in the Program in three different ways: 1) earn an incentive fee of ▮ of the routing fee paid by pharmacy customers for each routing transaction if they join the Program for routing only; 2)  earn an incentive fee of ▮ of the eligibility fee paid by PBM customers for each eligibility transaction if they join the Program for eligibility only; or 3) earn a ▮ incentive fee if they join the Program for both routing and eligibility.  Compl. ¶ 77; ▮ Amendment No. 2 at 4–5.  In 2016 alone, Surescripts paid over $40 million in incentive payments to EHRs.  Compl. ¶ 52.

Importantly, the optional Reserve Program allows an EHR to receive incentive fees so long as it agrees to route those of its electronic messages to pharmacies and PBMs *that are connected to the Surescripts network*.  *Id.* ¶¶ 77, 135; *see also* ▮ Amendment No. 2 at 3.  The FTC admits that any EHR can earn Surescripts incentive fees for routing over the Surescripts network even if it uses a different network for other routings to pharmacies that are not part of the Surescripts network.  Compl. ¶ 135; *see also* ▮ Amendment No. 2 at 3 ("[N]othing in the Surescripts Reserve Program shall limit a Participating Aggregator's ability to send electronic messages for prescription information and prescribing transactions via another network or system to pharmacies, pharmacy aggregators, value-added resellers, pharmacy benefit managers, health plans who do not participate in the Surescripts Network.").  Surescripts'

_____

Cir. 2015); *I Mark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 148-49 (D.C. Cir. 2010).  The FTC incorporates the ▮ contract by reference.  Compl. ¶ 79.

competitor Emdeon also understood that the terms of the program mean that EHRs are actually not required to be exclusive to Surescripts, and instituted an "organized campaign" to sign up EHRs on contingent contracts (where the EHRs would agree to route through Emdeon only if Emdeon disconnected its pharmacies from the Surescripts network).  Compl. ¶ 135.

The FTC overstates the nature and impact of the Reserve Program, in ways that matter to its claims.  The Complaint asserts that "[n]early all of Surescripts' loyalty pricing and exclusive contracts in both routing and eligibility have an initial term of three years or more."  *Id*. ¶ 84.  The reality is different.  While the Reserve Program term is typically three years, an EHR can unilaterally terminate its participation in the Program with 6 months' notice.  *See, e.g.,* ███████████ Amendment No. 2 at 3.  Accordingly, the relevant term of the EHR contracts is actually 6 months, *not* three years.  The FTC has not factored this reality into any of its analysis of alleged market power or anticompetitive effects.[6]

The FTC admits that not all EHRs have agreed to join the Reserve Program and that not all EHRs have loyalty provisions.  The FTC alleges that one "leading" EHR, ███, is able to earn incentive fees only ██████████████████████████████████████████████ ██████ Compl. ¶ 81.  Even if this allegation were true (it is not),[7] this requirement would not

---

[6]    The FTC makes much of the so-called "clawback" provisions in these agreements, which it characterizes as requiring an EHR that opts to multihome or switch networks during the loyalty term to repay the loyalty incentives that it previously earned.  *See* Compl. ¶ 79.  But the termination provision robs it of any such *in terrorem* effect.  If an EHR gives notice of termination of its participation in the Reserve Program, it will terminate six months later, and the EHR will not have to repay any incentives earned during the pendency of the loyalty agreement.  *See* ████████ Amendment No. 2 at 3.  Accordingly, an EHR can quit the loyalty program with only six months-notice and retain all of the incentives that it earned while it participated.

[7]    The ████ /Surescripts' contract contains no such requirement; instead it focuses on communications about *interoperability*.  Specifically, the contract provides that Epic will earn incentives if it explains to its customers ███████████████████████████████████████ ████████████████████████████████████████████████████████████████

10

mean (in practice or "in effect") that ▬ clients must be loyal to Surescripts or not connect at all. *Id*. ▬ contract also does not have any provision allowing a "clawback" of already paid incentive fees; breach by ▬ allows Surescripts the power to ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ in the future, but only after ▬▬▬▬▬▬ ▬▬▬ July 12, 2012 ▬▬▬▬▬▬▬ Agreement at 15. Additionally, the FTC's allegation that "Surescripts' contracts with nearly all ▬ customers also contain express exclusivity requirements that require the health system to maintain exclusivity to Surescripts for the term of the contract," Compl. ¶ 82, is flatly wrong, as the referenced contracts show.[8]

### B.      Pharmacies and PTVs

Fees charged for each routing transaction enable Surescripts to fund infrastructure and EHR incentive payments that in turn generate prescription traffic to pharmacies. It is in their financial interest to do so, to generate prescription traffic from prescribers to themselves. Pharmacies participate in the routing market by receiving prescription information sent by prescribers and their EHRs, and by transmitting refill requests to a prescriber's EHR. *Id*. ¶ 19. Pharmacies can also be represented in the transactions by a PTV. *Id*. ¶ 49. Because Surescripts funds the infrastructure and EHR incentive payments, it charges pharmacies, either directly or

---

▬▬▬▬▬▬ July 12, 2012 ▬▬▬▬▬▬▬▬ Agreement at 14, attached as Ex. 2. The FTC incorporates this contract by reference. Compl. ¶¶ 80–81.

[8]       The FTC seems to be referring to a selection of contracts that Surescripts entered into prior to 2011, which include "loyalty" language similar to that included in the Reserve Program contracts. Of course, as previously explained, that language does not require "exclusivity" as the FTC claims, because it allows the customer to earn Surescripts incentive fees even if it uses a different network to route to pharmacies that are not part of the Surescripts network. Moreover, the vast majority of contracts signed after 2011 do not include any loyalty language at all. *See, e.g.,* ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ These contracts were incorporated by reference in the Complaint, *see* Compl. ¶ 82, and are attached as Exs. 3 - 5.

through a PTV, a fee for each routing transaction.  *Id.*  Pharmacies and PTVs have the opportunity to earn discounts on these fees by agreeing to route 100% of their transactions through the Surescripts network.  *Id.* ¶ 66.  The FTC does not allege that any pharmacy or PTV must participate in the loyalty discount program to gain access to Surescripts' network.  *See, e.g.*, *id.* ¶ 68.  In fact, the FTC concedes that some Surescripts pharmacy customers access Surescripts' network while multihoming with Emdeon.  *See id.* ¶ 189 (describing multihoming by Kroger and Rx30).  Those customers can and do connect freely to Surescripts, without participating in the Surescripts loyalty discount program.  *Id.* ¶ 68.

### C.     PBMs

PBMs participate in the eligibility market by transmitting a patient's formulary and benefit information to a prescriber's EHR prior to the patient's appointment so that the prescriber has the benefit of that information at the time of the appointment.  Compl. ¶ 20.  Surescripts charges PBMs a fee for each eligibility transaction that uses the Surescripts network.  *Id.* ¶ 49.  PBMs have the opportunity to earn discounts on these fees by agreeing to route 100% of their transactions through the Surescripts network.  *Id.* ¶ 66–67.  The FTC does not allege that PBMs that opt not to engage in the loyalty discount program are denied access to Surescripts' network.  *See, e.g.*, *id.* ¶ 68.  Those customers can connect to the Surescripts network but do not earn discounts.  *Id.*

## III.    THE FTC'S INVESTIGATION AND INITIATION OF THIS LAWSUIT

The FTC began its investigation into Surescripts in October 2015.  *See* Declaration of Paul L. Uhrig ("Uhrig Decl."), ¶ 3, attached as Ex. 6.  In response, Surescripts produced over 375,000 pages of documents to the agency.  *Id.* ¶ 5.  The FTC also conducted investigational hearings with 7 Surescripts employees or former employees, and met with company officials twice.  *Id.* ¶ 6.  The investigation continued through April 2019, when the FTC filed the Complaint in this action— more than three-and-a-half years after the FTC initiated its investigation into Surescripts.  *Id.* ¶ 7.

In the months since the FTC filed the Complaint, it has acknowledged that novel and complex antitrust concepts are central to this case. At a hearing before the House Committee on Energy and Commerce Subcommittee on Consumer Protection and Commerce, FTC Commissioner Noah Joshua Phillips said that this case is about "vertical and horizontal restraints" that involve "two 'e-prescri[ption]' markets."[9] Commissioner Phillips said "this case addresses important competition issues like two-sided markets, network effects, and innovation harms." Further, Bruce Hoffman, the FTC's Director of the Bureau of Competition, said at a conference in May that this case "involves two-sided transactional platform markets," and has a similar "structure" to the Supreme Court's decision in *Amex*. Joshua Sisco, *FTC's Surescripts case closely tracks SCOTUS Amex decision*, MLex (May 22, 2019).

## ARGUMENT

### I.   THE FTC DOES NOT AND CANNOT PLEAD FACTS NECESSARY TO INVOKE FEDERAL COURT JURISDICTION OVER THIS CASE

This Court should dismiss the FTC's Complaint for lack of subject matter jurisdiction over this case. The FTC, like all plaintiffs, bears the burden of establishing this Court's jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (internal citations omitted). The FTC's ability to bring cases in federal court, as opposed to its own administrative court, is expressly limited by Section 13(b) of the FTC Act. That provision only

---

[9]      Hearing Before the H. Comm. on Energy & Commerce, Subcommittee on Consumer Prot. and Commerce (116th Cong.), "Oversight of the Federal Trade Commission: Strengthening Protections for Americans' Privacy and Data Security" 3 (May 8, 2018) (Prepared Oral Statement of Commn'r Noah Joshua Phillips), https://www.ftc.gov/system/files/documents/ public_statements/1519310/phillips_-_njp_oversight_statement_5-8-19.pdf.

allows the FTC to request a *permanent* injunction, as it does here, in a "proper case[]" that would "'halt a straightforward violation of section 5'" of the FTC Act and "'require[s] no application of the FTC's expertise to a novel regulatory issue through administrative proceedings.'" *Abbott Laboratories*, 1992 WL 335442, at *2 (quoting *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988)).

The FTC has failed to plead sufficient facts to show that this is a "proper case," nor can it. The FTC's case follows an elaborate three-and-a-half year investigation and, for it to prevail, it must make new law regarding (1) what is and is not predatory pricing, and (2) the application of *Amex* in a Sherman Act Section 2 case. On top of this, it has the potential to affect highly regulated and evolving healthcare technology markets. Quite simply, *there is nothing "straightforward" about the FTC's case*. If the FTC should proceed at all, it should be through the agency's own administrative court, which is the only forum with jurisdiction to grant permanent injunctive relief based on the facts and theories alleged.

In bringing this motion, Surescripts is permitted to make a factual attack on the Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), in addition to a facial attack based solely on the Complaint. *See Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003). "When the movant's purpose is to challenge the substance of the jurisdictional allegations, he may use affidavits and other additional matter to support the motion." *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1350, 159–98 (3d ed. 2004)). "Once a factual attack is made on the federal court's subject matter jurisdiction, the district judge is not obliged to accept the plaintiff's allegations as true and may examine the evidence to the contrary and reach his or her own conclusion on the matter." *Id*.

14

**A.      Section 13(b) Authorizes the FTC To Bypass Its Administrative Process And Seek A Permanent Injunction Only In A "Proper Case"**

When Congress enacted the FTC Act in 1914 and authorized the FTC through Section 5 of that Act to prohibit "unfair methods of competition," it "intentionally left development of the term 'unfair' *to the Commission* rather than attempting to define 'the many and variable unfair practices which prevail in commerce.'" *Atl. Refining Co. v. FTC*, 381 U.S. 357, 367 (1965) (emphasis added); *see also FTC v. Motion Picture Advert. Serv. Co.,* 344 U.S. 392, 396 (1953) ("The precise impact of a particular practice on the trade is for the Commission, not the courts, to determine."). As the D.C. Circuit has previously observed, the FTC Act's enforcement scheme gives the FTC, "as a quasi-judicial tribunal, . . . the ability to provide for the centralized and orderly development of precedent applying the regulatory statute to a diversity of fact situations." *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 998 (D.C. Cir. 1973).  "While the FTC's special expertise may not be raised as a barrier inhibiting [appellate review], *it does and should inhibit the notion that a court may be injected into the pertinent subject-matter directly, without the benefit of FTC consideration*."  *Id.*  (emphasis added).

The legislative history of Section 5 of the FTC Act confirms this point.  The Senate Report states that the lawmaking process of determining what constitutes a violation of Section 5 in the first instance should be "le[ft] . . . to the Commission."  S. Rep. No. 63-597 at 13 (1914).  The House Conference Report likewise states that unfair competition should be prevented by an "administrative body" able to apply the general "rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations."  H.R. Rep. No. 63-1142 at 19 (1914) (Conf. Rep.); *see also* ABA Section of Antitrust Law, *The FTC as an Antitrust Enforcement Agency: Its Structure, Powers and Procedures*, vol. I at 25 (Alan H. Silberman ed. 1981) ("The enactment of Section 5 of the FTC Act was thus an

15

expression of the prevailing faith in the administrative process as the best vehicle for developing standards under which categories of improper competitive conduct could be defined."). The FTC's Section 5 powers must be viewed against a backdrop where the Department of Justice Antitrust Division retains the right to enforce the Sherman Act: simply put, the agencies have different mandates. As the Supreme Court has observed, "on the whole the [FTC] Act's legislative history shows a strong congressional purpose not only to continue enforcement of the Sherman Act by the Department of Justice and the Federal District Courts *but also to supplement that enforcement through the administrative process of the new Trade Commission.*" *FTC v. Cement Inst.*, 333 U.S. 683, 692 (1948) (emphasis added).

In 1973, Congress augmented the FTC's powers by authorizing it to seek injunctive relief in federal court in certain defined circumstances articulated in Section 13(b) of the FTC Act. Section 13(b), the sole authority that the FTC relies on here, provides in relevant part:

> Whenever the Commission has reason to believe--
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public--
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond.
>
> *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary

injunction, the order or injunction shall be dissolved by the court
and be of no further force and effect: *Provided Further,* That in
proper cases the Commission may seek, and after proper proof, the
court may issue, a permanent injunction.

15 U.S.C. § 53(b).   Consistent with the scheme articulated above, the statute provides the

Commission with a mechanism for *temporarily* enjoining conduct violating "any provision of law

enforced by the Federal Trade Commission."   And that makes sense:   when the FTC needs

preliminary injunctive relief *pending an administrative trial on the merits*, it can come to federal

court to obtain that temporary relief while it proceed with its administrative process.

Relevant here, the statute also provides that in "proper cases," the FTC may also seek a

*permanent* injunction in federal court, without first proceeding through its administrative court.

*Id*.   The FTC therefore can only bring this case if it demonstrates that it is "proper" under Section

13(b)(2).   As we detail below, the FTC has not pled—nor can it plead—that this is a "proper case"

under Section 13(b).

### B.   A "Proper Case" Is A Routine, Straightforward Claim That Does Not Require The FTC's Specialized Expertise In The First Instance

To ascertain what is a "proper case," this Court's analysis "must begin, as always, with the

text," *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 65 (1993), and should construe the

statute "so as to avoid rendering superfluous any parts thereof," *Astoria Fed. Savings & Loan Ass'n

v. Solimino*, 501 U.S. 104, 112 (1991).   Some courts have held—and we expect the FTC will argue

here—that a "proper case" means "all cases" in which the FTC asserts a violation of the laws it

enforces.[10]   That conclusion cannot be right, however, because it would render Section 13(b)(1)

superfluous.   Section 13(b)(1) already expressly limits the FTC's authority to seek any injunctive

---

[10]     *See, e.g.*, *FTC v. Evans Prod. Co.*, 775 F.2d 1084, 1086–87 (9th Cir. 1985); *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008); *FTC v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 205, 209 (S.D.N.Y. 2002); *FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25, 36 (D.D.C. 1999), on reconsideration in part sub nom. 99 F. Supp. 2d 1 (D.D.C. 1999).

relief (preliminary or permanent) to a violation of "any provision of law enforced by the Federal Trade Commission."  Against this backdrop, reading the term "proper cases" to mean "all cases" in which the FTC asserts a violation of the laws that it enforces would render the "proper cases" requirement meaningless.  If that is what Congress intended, it would have omitted the "in proper cases" qualifier and simply said that "*Provided Further,* the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  But it didn't.

Section 13(b)'s legislative history explains why.  The intent behind Section 13(b) was discussed in the Senate Report, which reveals that Section 13(b)'s permanent injunction authority was designed to address two circumstances.  The first are instances "when a court is reluctant to grant a temporary injunction because it cannot be assured of a [sic] early hearing on the merits." Senate Committee on Commerce, Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, S. Rep. No. 93-151, at 31 (1973).  Second, "the Commission will have the ability, *in the routine fraud case, to merely seek a permanent injunction* in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order.  Commission resources will be better utilized, and cases can be disposed of more efficiently."  *Id* (emphasis added) (noting that "[t]he purpose of section [13(b)] is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest.").  In short, Congress authorized the FTC to pursue permanent injunctions where there was an urgent and immediate need for relief, where the case was routine, and where it did not make sense to waste Commission resources on adjudicating the case through the administrative process.

Consistent with this legislative history, courts that have considered the meaning of "proper cases" (including this one) have correctly held that "proper cases" are routine cases that do not

require the agency's expertise in order to resolve them.  *Abbott Laboratories*, 1992 WL 335442, at *2 (holding that the amount of agency expertise required to decide the case was a critical factor when analyzing whether a case is "proper."). Thus, in *Abbott Laboratories*, this court allowed the FTC to proceed in an action for a permanent injunction in a *per se* bid-rigging and price fixing case. *Id*. at *1-2. The court emphasized the settled and straightforward nature of the claim, explaining that "[s]urely a *per se* price fixing conspiracy such as that alleged has long been recognized as anti-competitive conduct affecting consumers and no further exercise of the Commission's expertise is required" to decide the case. *Id*. at *2. The court continued that federal courts have "shied away from accepting direct court actions" in "more murky contexts" where "the offending conduct interjects the court into areas of Commission expertise involving the creation and monitoring of new concepts of unfair competitive trade practice." *Id*. Reciting the proposition that "it is quite clear that Congress at least expected that the FTC could rely on this proviso when it sought to halt a straightforward violation of Section 5 that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings," the court permitted the price-fixing and bid-rigging action to go forward and denied a motion to dismiss. *Id*. (quoting *World Travel*, 861 F.2d at 1028).

The Seventh Circuit's decision in *World Travel*, which *Abbott Laboratories* relies upon, is also instructive. In that case, the FTC alleged that a group of defendants engaged in deceptive advertising and sought a permanent injunction. *World Travel*, 861 F.2d at 1022. Analyzing Section 13(b)'s legislative history, the Seventh Circuit observed that "Congress' purpose in enacting section 13(b) was to protect the American consumer" from "the 'routine fraud' case, where the nature of the deceptive practice required no extensive administrative elaboration." *Id*. at 1028. Thus, the court held that a "proper case" is "a straightforward violation of section 5 [of

19

the FTC Act] *that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings*." *Id*. at 1028 (emphasis added).

*Abbott Laboratories*, *World Travel*, and a number of other courts presented with the question of what "proper case" means have interpreted the language and legislative history to mean "routine" claims.  These routine claims might be price-fixing (as in *Abbott Laboratories*) or they may be practices already defined as "deceptive" through a trade-regulation rule (as in *World Travel*).  *See e.g., FTC v. H. N. Singer, Inc*., 668 F.2d 1107, 1110-11 (9th Cir. 1982) (concluding that the legislative history of 13(b) "explained" Congress' "intent of the final clause of § 13(b)," including affording the FTC "the ability, in the routine fraud case, to merely seek a permanent injunction," thus "a routine fraud case is a proper case."); *FTC v. Ewing*, No. 2:14-cv-00683, 2017 WL 4797516, at *10 (D. Nev. Oct. 24, 2017) (applying *Singer* to a "routine fraud case"); *FTC v. Int'l Diamond Corp.*, No. C-82-0878 WAI (JSB), 1983 WL 1911, at *2 (N.D. Cal. Nov. 8, 1983) (quoting the Senate Report in concluding that "[t]he legislative history . . . [indicates] that Congress intended Section 13(b) to be limited to garden variety fraudulent acts and practices"); *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 984 (C.D. Ill. 2017) ("A proper case is a straightforward violation of section 5 [of the FTC Act] that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings." (internal quotation omitted)).  The common thread in these cases is that in each of them the FTC's administrative process was not needed because of the routine nature—*and settled law*—surrounding the FTC's legal theory.

To be sure, there are several cases that the FTC will cite to argue that Congress authorized its proposed course of action here.  With one exception, however, these are all straightforward consumer protection cases that did not require the FTC's special expertise in the first instance (and

therefore were "proper") and, for the most part, do not analyze the topic beyond summarily concluding that the case was "proper."[11]   Indeed, only two courts have analyzed whether *an antitrust case* is a "proper case" for a permanent injunction:  *Abbott Laboratories*, as discussed above, and *FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999), on reconsideration in part sub nom. 99 F. Supp. 2d 1 (D.D.C. 1999).

The FTC will no doubt rely on *Mylan Laboratories*, but *Mylan Laboratories* plainly misconstrued *Abbott Laboratories* as holding that the "permanent injunction proviso" allows the FTC to proceed in federal court so long as its FTC's case is pursuant "to 'any provision of law'" enforced by the Commission."  62 F. Supp. 2d at 36.  As discussed above, *Abbott Laboratories* did not so hold.  Instead, it applied the *World Travel* standard and noted that "[s]urely a per se price fixing conspiracy such as that alleged has long been recognized as anti-competitive conduct affecting consumers and no further exercise of the Commission's expertise is required a bid-rigging case."  1992 WL 335442, at *2.  *Mylan Laboratories*' interpretation is inconsistent with the plain meaning of Section 13(b)(2) because it would render the term "proper cases" meaningless, given that Section 13(b)(1) already explicitly limits the FTC's authority to bring cases pursuant to "any provision of law enforced by the Federal Trade Commission."

Regardless, apart from the fact that *Mylan Laboratories* is inconsistent with the statute's text, *Abbott Laboratories* and *World Travel* (which reflect the deepest consideration of these

---

[11]    *See, e.g., FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 428 (9th Cir. 2018) (summarily concluding that the FTC brought a "proper case" where the defendant was alleged to have engaged in deceptive lending practices); *FTC v. Invest. Devs., Inc.*, Civ. A. No. 89-642, 1989 WL 62564 (E.D. La. June 8, 1989) (summarily concluding that the FTC brought a "proper case" for violations of the FTC's Franchise Rule); *FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) (finding that the FTC brought a "proper case" based on allegations that the defendants engaged in misrepresentations and false advertising, but then rejecting that 13(b) applied because the defendant's conduct was not likely to recur).

issues), and 13(b)'s legislative history, the decision is also undercut by observations from numerous secondary authorities that have considered this point.  In particular, multiple former FTC officials have stated that *only straightforward cases* are "proper cases."  Consistent with the plain meaning of the statute, Former Chairman of the FTC, Timothy Muris, and former Director of the FTC's Bureau of Consumer Protection, J. Howard Beales, noted that "[t]he very inclusion of the phrase 'in proper cases' suggests that there are some *improper cases* in which the FTC should not be seeking a permanent injunction in the courts" and that "[o]ne way to determine whether a case qualifies under this ['proper case'] standard might be to consider, as did the courts in *Abbott* [*Laboratories*] and *World Travel Vacation Brokers*…whether the case presents a straightforward violation of Section 5 such that the FTC's expertise is not necessary."  J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act*, 79 ANTITRUST L.J. 1, 28, 32 (2013) (emphasis in original).  Former General Counsel of the FTC, John H. Carley, is in accord, noting that the Commission's position, "drawing on legislative history," should be that:

> . . . a "proper case" is any case involving a fairly clear and undisputed violation of Section 5, in which little purpose is served by an administrative definition of the law.  The class of "proper cases," I believe, includes more than "simple fraud," but something less than the full range of Section 5 violations which can be addressed by administrative proceedings.

John H. Carley, *Recent Legislative and Judicial Developments Affecting the Federal Trade Commission*, 51 ANTITRUST L.J. 661, 663 (1982); *see also* Stephen Calkins, *The Legal Foundation of the Commission's Use of Section 5 to Challenge Invitations to Collude is Secure*, 14 ANTITRUST 69, 79 (Spring 2000) (noting that "as a matter of policy if not law, it is the novel cases that should be challenged through administrative adjudication").  This interpretation makes all the more sense when one returns to fact that, as the FTC's current Director of the Bureau of Competition has

written, when Congress created the FTC, it "anticipated that the FTC, *acting as an adjudicator*, would facilitate the development of antitrust policy."  D. Bruce Hoffman & M. Sean Royall, *Administrative Litigation at the FTC: Past, Present, and* Future,  71 ANTITRUST L.J. 319, 319 (2003) (emphasis added);[12] *see also* Miles W. Kirkpatrick, et al., *Report of the American Bar Association Special Committee to Study the Role of the Federal Trade Commission*, 58 ANTITRUST L.J. 43, 62–64 (1989) (observing that non-merger conduct cases are especially well suited to the FTC's administrative expertise provided they fall within eight factors, including that the case involves (1) application of the rule of reason (as opposed to per se violations), and (2) the development and application of uncertain legal theories).  That is precisely what should happen here.

Indeed, any doubt on that score is resolved by considering the FTC's demand for monetary remedies in the context of Section 5 and Section 13(b)'s "proper case" limitation.  Critically, and central to Congress' expectation that *the FTC would develop substantive principles of law through an administrative process on a forward-looking basis*, Congress did not explicitly grant the FTC power to seek monetary penalties for antitrust law violations because defendants would not be on notice that their conduct violated federal antitrust law until they were found liable by the Commission.  *Heater v. FTC*, 503 F.2d 321, 324 (9th Cir. 1974) (noting that "[t]he power to attach

---

[12]     Past and present FTC chairmen have likewise emphasized the importance of this role that Congress intended for the agency's own administrative court.  Joseph J. Simons, Former Dir., Bureau of Competition (now Chairman, FTC), FTC, The 51st Annual ABA Antitrust Section Spring Meeting: Report from the Bureau of Competition (Apr. 4, 2003) (noting that the FTC's administrative adjudication "is an instrument for developing the law" and that "'the FTC was created because Congress believed that it would be helpful to have the assistance of an agency with specialized expertise in analyzing complex business transactions to resolve the difficult competition issues that may arise.'") (quoting Robert Pitofsky, Former Chairman, FTC, *An Overview of FTC Antitrust Enforcement: Hearing Before the H. Comm. on the Judiciary* (Prepared testimony of the Federal Trade Commission) (Nov. 5, 1997)).

consequences to prior conduct was thought inconsistent with the Commission's contemplated quasi-legislative and educational function").  Congress therefore expressly denied the FTC the ability to seek monetary relief in antitrust cases that proceed through its administrative process: the agency's lone vehicle to return to federal court for such relief following administrative proceedings is Section 19 of the FTC Act, which only applies to consumer protection cases.  15 U.S.C. § 57b.[13]  Allowing the FTC to end-run this entire statutory scheme is not what Congress intended and, as detailed below, it is precluded by Section 13(b)'s limitation that the FTC can only seek federal injunctive relief in "proper cases."  This is not such a case.

### C.  The Complaint Pleads A Complex And Novel Antitrust Theory, Not A Routine "Proper Case"

The FTC's Complaint never even mentions the "proper case" standard, nor does it offer even conclusory allegations to support that jurisdictional requirement.  This Court should dismiss the Complaint on that basis alone for failing to meet the burden of establishing this Court's jurisdiction.  *Powell v. Internal Revenue Serv.*, 317 F. Supp. 3d 266, 272 (D.D.C. 2018).  The Complaint's allegations make clear, however, that this is not a run-of-the-mill case that falls within the "straightforward" category of antitrust cases this Court considered in *Abbott Laboratories*. Instead, it is a wholly *im*proper case for adjudication in federal district court under the Second Proviso of Section 13(b).

---

[13]      As the FTC may argue, it has obtained disgorgement in a handful of antitrust cases in federal court.  The Supreme Court has correctly called into question the appropriateness of such relief where, as in those Sherman Act cases, courts have interpreted a grant of injunctive relief to broadly include all equitable relief.  *Kokesh*, 137 S. Ct. at 1642 n.3.  The question noted by *Kokesh* is especially relevant here where the FTC Act's legislative history and Supreme Court precedent make clear that awarding monetary relief is actually inconsistent with the idea that the FTC would develop law on a case-by-case basis and, as such, antitrust defendants would not be on notice that their conduct violated antitrust laws.

First, the FTC's case raises the issue of whether discounted pricing such as loyalty discounts (a) remains subject to the cost-based predation standard in *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993) (as multiple courts have held), or (b) should be, in certain circumstances, subject to the common law exclusive dealing standard (as the Third Circuit held in a line of cases beginning with *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)).  The D.C. Circuit has not adopted *LePage's* and has suggested that the D.C. Circuit may "reach a different resolution of the issue." *FTC v. Church & Dwight Co., Inc.*, 665 F.3d 1312, 1317 (D.C. Cir. 2011); *see also United States v. Microsoft*, 253 F.3d 34, 68 (D.C. Cir. 2001) (reiterating the *Brooke Group* admonition that "the rare case of price predation aside, the antitrust laws do not condemn even a monopolist for offering its product at an attractive price").  Following *Microsoft*, in this Circuit, low pricing—even when offered by a monopolist—is unlawful *only when it is predatory*.  Although the Complaint makes clear that the operative conduct is discounted pricing, Compl. ¶ 65, and therefore subject to the *Microsoft/Brooke Group* standard, the FTC presumably seeks to revise the governing law in this case, repeatedly describing Surescripts' contracting provisions as unlawful "exclusive dealing" subject to the rule of reason. *Id.* ¶¶ 212, 222–31 (discussing allegations of anticompetitive effect, procompetitive justifications and foreclosure).  Without delving into the inherent flaws in the FTC's position, which we reserve for Part II.A., the point is that there is nothing run-of-the-mill or straightforward about the core Section 2 claims.  To the contrary, one would think that this complex and evolving area of law would be precisely the type of case that the Commission would want to opine on in the first instance (apart from the fact that, legally, it is the correct course).  For whatever reason, the Commission has chosen not to, but that decision to bypass its adjudicative process does not automatically make this a "proper case" for the district court to address in the first instance.

25

Second, and as detailed throughout the Complaint, the FTC recognizes that this case requires an analysis of two separate "two-sided" e-prescription markets: routing and eligibility. *See* Compl. ¶¶ 22-32 (detailing complex, two-sided network markets, which requires the evaluation of "significant indirect network effects," "chicken-and-egg" barriers to entry, and feasibility of entry through multihoming). There is hardly a more novel or cutting edge antitrust issue than this. The Supreme Court first addressed the proper standard for evaluating the legality of constraints in two-sided markets just one year ago in *Amex*. In dissent, Justice Breyer noted that this was a "novel" opinion. *Amex*, 138 S. Ct. at 2299 (Breyer, J., dissenting) (stating the majority took a "novel" approach to market definition). And legal commentators have agreed that the decision is groundbreaking and the full implications are not yet understood.[14]

Moreover, the federal courts have barely weighed in on the contours and application of *Amex* in subsequent two-sided market cases. In fact, the only substantive applications of *Amex* have primarily been in cases also assessing the credit card market (the same market at issue in *Amex*). In contrast, courts have not yet analyzed *Amex*'s application in new and unanalyzed markets such as those presented in this case. This case would thus call for first-of-its-kind interpretations of *Amex* in multiple respects—including chiefly the application of *Amex* outside

---

[14]     Justin Bernick & Dan Graulich, *American Express and two-sided antitrust markets: Coming to a network near you*, at 1, Hogan Lovells (June 26, 2018) (calling *Amex* "a groundbreaking decision"); Herbert Hovenkamp, *Platforms and the Rule of Reason: The American Express Case*, 2019 COLUM. BUS. L. REV. 35, 81 (2019) (saying majority's opinion in *Amex* "leaves important questions about the scope of the decision's holding"); Ted Tatos, *Relevant Market Definition and Multi-Sided Platforms After* Ohio v. American Express: *Evidence from Recent NCAA Antitrust Litigation*, 10 HARV. J. SPORTS & ENT. L. 147, 147 (2019) ("The potential implications of the Supreme Court's recent decision have garnered interest from legal scholars, litigators, and economists alike, particularly those actively involved in antitrust issues.").

the vertical restraint context of Sherman Act Section 1, because the FTC pleads a Section 2 monopolization case here.[15]

The FTC itself recognizes the novelty of this two-sided market case and has highlighted the ways that these complicated and developing antitrust concepts are central to this case. Bruce Hoffman, the FTC's Director of the Bureau of Competition, admits that this case involves a novel application of *Amex*: "[F]or those of you who paid attention to the *Amex* case, this is that. It is very closely related in terms of this structure of a transactional platform" but the two cases involve "totally different industries, totally different markets, [and have] lots of different facts." Joshua Sisco, *FTC's Surescripts case closely tracks SCOTUS Amex decision*, MLEX (May 22, 2019). FTC Commissioner Phillips also testified about this case before Congress, calling it a "case [that] addresses important competition issues like two-sided markets, network effects, and innovation harms." *Oversight of the Federal Trade Commission: Strengthening Protections for Americans' Privacy and Data Security: Hr'g Before the H. Comm. on Energy & Commerce, Subcommittee on Consumer Prot. and Commerce*, 116th Cong. 3 (May 8, 2018) (Prepared Oral Statement of Commn'r Noah Joshua Philips), https://www.ftc.gov/system/files/documents/public_statements/1519310/phillips_-_njp_oversight_statement_5-8-19.pdf.

These are two novel aspects of the FTC's case, but there are others that underscore that this matter should squarely be in the Commission's wheelhouse in the first instance. For example, the FTC alleges that Surescripts' alleged monopolization conduct has "stifled," "reduced" or "inhibit[ed]" innovation." Compl. ¶¶ 6, 58, 138, 171, 196–208. This is a significant part of the

---

[15]     This motion raises just such a novel issue, in the event that the Court determines that "proper case" jurisdiction exists:  the application of *Amex's* evidentiary requirements for two-sided markets to the foreclosure element of the exclusive dealing test, which was not presented in *Amex*. *See infra* § II.B.

FTC's theory, to which the agency devotes several pages of its Complaint.  Yet the FTC's theory rests on an entirely unsettled area of antitrust economics concerning the relationship between concentration and innovation.  As a two-time former chief economist of the Department of Justice has observed, "debate continues among economists as to whether there is correlation between concentration and innovation."  *See, e.g.*, FTC, Antitrust Modernization Commission, *Public Hr'g: Panel I:  Antitrust and the New Economy* 22 (Nov. 8, 2005) (Testimony of Carl Shapiro); *see also* Hillary Greene, *Non-Per Se Treatment of Buyer Price-Fixing in Intellectual Property Settings*, 2011 DUKE L. & TECH. REV. 4, ¶ 85 (2011) ("It is extremely difficult to establish the final link between reduced incentive to innovate and innovation harm.").  The leading antitrust treatise is in accord, noting that "even a dominant firm cannot be required to expand or innovate at its peril" because "[s]ome innovations both harm rivals and fail to benefit consumers" and "the consequences of innovation are difficult to predict."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 651 (3rd and 4th eds., 2019 Cum. Supp. 2010–18).

Additionally, the FTC's claims also necessarily implicate multiple federal healthcare policies, incentives, and regulations—including the Medicare Improvements for Providers Act, the Health Information Technology for Economic and Clinical Health Act, and regulations implemented by the Centers for Medicare and Medicaid Services and U.S. Department of Health and Human Services.  These policies have altered the markets at issue, which must be accounted for in any analysis of the competition in those markets.  Compl. ¶¶ 33-39, 158.  Government regulation can influence the market power analysis in different ways depending on the context.  Areeda & Hovenkamp, *supra*, at ¶ 572 ("Government regulation can either give firms market power or deprive them of it.").  And here, that regulation is itself evolving; more legislation is

under consideration that could add significantly to the regulatory overlay, including the multiple regulations proposed pursuant to the 21st Century Cures Act, Pub. L. 114-255, 130 Stat. 1033 (2016).

All told, it is clear that this is precisely the type of case that would "interject[] th[is] court into areas of Commission expertise involving the creation and monitoring of new concepts of unfair competitive trade practice." *Abbott Laboratories*, 1992 WL 335442 at *2. Put another way, this case sits at the opposite end of the spectrum from routine cases like *Abbott Laboratories* and *World Travel*. The courts in those cases did not have to define the precise parameters of what constitutes a "proper case[]" because the facts were so clearly routine that the analysis did not approach the line. This case does not require any fine line-drawing either because it is so clearly novel and complicated that it is far beyond the "proper" line.

## II.   THE COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

Should this Court determine that it has jurisdiction under Section 13(b) to consider the merits of the FTC's Complaint, it should still dismiss the Complaint for failure to state a Sherman Act Section 2 violation, pursuant to Federal Rule of Civil Procedure 12(b)(6). A firm violates Section 2 only when it acquires or maintains (or attempts to acquire or maintain) a monopoly by engaging in exclusionary conduct as distinguished from competitive acts. *Microsoft*, 253 F.3d at 50 (citing 15 U.S.C. § 2). The conduct in question "must harm the competitive process, and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *Id.* at 58 (emphasis omitted).

The FTC's Complaint fails to plead monopolization as a matter of law for several reasons. First, the FTC's assertion that Surescripts' loyalty pricing provisions are "exclusive dealing" subject to analysis under the rule of reason is flatly wrong: Optional low pricing such as that

offered by Surescripts is only illegal if predatory, and the FTC does not allege predatory pricing. Even crediting the FTC's view that Surescripts' conduct presumably should be judged as "exclusive dealing" under the rule of reason, the Complaint also fails under that standard because the FTC fails to plead *facts* supporting its claim that Surescripts' contractual provisions caused anticompetitive effects in the markets of routing and eligibility as a whole.  Similarly, the FTC does not allege, as it clearly must under *Amex* and *Tampa Electric*, that Surescripts' alleged exclusive dealing provisions foreclosed a substantial amount of the routing and eligibility markets as a whole.

> **A.    The FTC's Monopolization Claim Based On "Loyalty Pricing" Fails Because The FTC Does Not Allege That Surescripts Engaged In Predatory Pricing**
>
> > **1.    The FTC's Characterization Of Surescripts' Loyalty Pricing Provisions As "Exclusive Dealing" Is Not Supported By The Allegations And Is Wrong As A Matter Of Law**

The FTC alleges that Surescripts monopolized the routing and eligibility markets by entering into contracts with optional "loyalty" provisions with its EHR, pharmacy, PTV, and PBM customers, including Allscripts and RelayHealth.  These contracts allow customers the opportunity to earn greater incentive payments (for EHRs) or discounts (for PBMs, pharmacies and PTVs) if the customers meet certain requirements that the FTC describes as "exclusive or *de facto* exclusive." *See e.g.*, Compl. ¶ 224.  The FTC describes Surescripts' contracts as increasing its customers' "costs" if the customers were not loyal to Surescripts. *See, e.g.*, *id*. ¶ 3.  But all this means is that Surescripts offered lower prices or increased incentive payments to customers who met its "loyalty" requirements.  The crux of the FTC's claim is that Surescripts' low pricing injured competition because one of Surescripts' competitors, Emdeon, was unwilling or unable to offer low enough prices to inspire Surescripts' customers to switch to Emdeon or "multihome" with

Emdeon and Surescripts.  *See, e.g.*, *id.* ¶¶ 3, 130 ("[B]ecause of the loyalty scheme there was no price Emdeon could offer that would reduce Rite Aid's total routing costs.").

Although the FTC focuses its Complaint on the pricing provisions offered by Surescripts, it mistakenly characterizes Surescripts' conduct as "exclusive dealing," and assumes that its monopolization claims should be judged under the exclusive dealing test (the traditional application of the rule of reason plus a showing of "substantial foreclosure").  *Id.* ¶¶ 212, 222–31 (discussing allegations of anticompetitive effect, procompetitive justifications and foreclosure).  That is not correct as a matter of fact or law.  First, as a matter of pleading, the FTC does not allege that Surescripts engaged in true exclusive dealing at all.  The FTC does not allege, as it must, that Surescripts required any customer to be exclusive to Surescripts in order to deal with it, or that Surescripts prevented any customer from connecting to Surescripts' networks if the customer did not choose to participate in the loyalty programs.  In fact, the contrary is true by admission—the FTC admits that some customers, such as Kroger, actively multihome with Surescripts and Emdeon.  *Id.* ¶¶ 189.  Each of Surescripts' loyalty programs was purely optional—customers have the opportunity to earn lower prices by meeting loyalty but no one, ever, had to sign an exclusive contract or agree to loyalty provisions in order to use the Surescripts network.

Optional low pricing is not "exclusive dealing" under the law.  Instead, low prices such as those offered by Surescripts are only unlawful when they constitute "predatory" pricing.  *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009); *see also Microsoft*, 253 F.3d at 68 (explaining that "offering a customer an attractive deal is the hallmark of competition" unless that price is "predatory").  In *Microsoft*, the D.C. Circuit overturned the district court's holding that Microsoft's low prices and free products were exclusionary because there was no evidence that the prices were predatory.  253 F.3d at 68–69, 75; *accord Concord Boat Corp. v. Brunswick Corp.,*

207 F.3d 1039, 1061-62 (8th Cir. 2000) (holding that defendant's market share discounts to customers were not anticompetitive because plaintiffs presented no evidence of predation); *NicSand v. 3M Co.*, 507 F.3d 442, 451–52 (6th Cir. 2007) (affirming Rule 12(b)(6) dismissal of monopolization claim because plaintiff failed to allege that incentive payments to customers were predatory); *Valassis Communc'ns, Inc. v. News Corp*, No. 17-cv-7378, 2019 U.S. Dist. LEXIS 27770, at *17–18 (S.D.N.Y. Feb. 21, 2019) (granting summary judgment on monopolization claims based on awarding "cash guarantees" to retailers designed to prevent them from awarding contracts to a competitor because the pricing was not predatorily low).

Prices are predatory only when "(1) the prices complained of are below an appropriate measure of its rival's costs; and (2) there is a dangerous probability that the defendant will be able to recoup its investment in below-cost prices." *LinkLine*, 555 U.S. at 451 (internal quotation omitted). As the Supreme Court has explained, finding antitrust liability for non-predatory low pricing would, "in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993); *see also id.* at 224 (price cutting is generally pro-competitive and a "boon to consumers."). "[C]utting prices in order to increase business often is the very essence of competition." *LinkLine*, 555 U.S. at 451. Thus, "the rare case of price predation aside, the antitrust laws do not condemn even a monopolist for offering its product at an attractive price[.]" *Microsoft*, 253 F.3d at 68 (finding "no warrant to condemn" Microsoft for offering a product for free or even at a negative price).

As noted above, the FTC may be seeking to extend to this Court the Third Circuit's rulings in a line of cases beginning with *LePage's*. *LePage's* held that the rule of reason and not the

predatory pricing test would apply to an assessment of bundled rebates offered by a monopolist.[16] 324 F.3d at 147-52.  That case does not apply here.  First, the D.C. Circuit has never adopted *LePage's* and, indeed, noted that it "is of course not the law of this circuit, and it has been roundly criticized."  *Church & Dwight*, 665 F.3d at 1316-17 (citing several academic papers condemning *LePage's* and suggesting that the D.C. Circuit may "reach a different resolution of the issue").  Moreover, even in the Third Circuit, the limited holding of *LePage's* does not apply where, as with Surescripts' loyalty pricing here, price is the "predominant mechanism of exclusion."  *Esai, Inc. v. Sanofi Aventus U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012) ("When price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects.").  Price predominates "when a firm uses a single-product loyalty discount or rebate to compete with similar products."  *Esai*, 821 F.3d at 409.  In those situations, courts must assess whether the proffered pricing is predatory.  *Id*.  Unlike *LePage's*, the FTC is not claiming bundling (nor could it).

### 2.    The FTC Does Not Allege That Surescripts Engaged In Predatory Pricing

The FTC's Complaint utterly fails to plead predatory pricing.  As to the first element of predatory pricing, the FTC does not allege that Surescripts' prices were below any appropriate measure of its costs—the Complaint, in multiple instances, alleges that Surescripts' prices were too high.  *See* Compl. ¶¶ 187–95.  Indeed, the FTC alleges that an increase in competitive pressures

---

[16]    "Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately."  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

might require reductions in price "down near or below average unit costs" thus at least tacitly admitting that it claims that prices are above that level now. *Id.* ¶ 57. The FTC's failure to allege pricing below a reasonable calculation of Surescripts' costs is fatal.

The FTC also fails to allege the second element, never claiming that Surescripts had "a dangerous probability[] of recouping its investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 224. This second step is a pleading essential because "[r]ecoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers." *Id.* Because the FTC does not allege a dangerous probability of recoupment, its claims fail.

### B.    The FTC's Monopolization Claims Also Fail Under The Rule of Reason

The FTC's claims would fail even viewed as exclusive dealing under the rule of reason.[17] Exclusive dealing is not *per se* unlawful and can often be pro-competitive. *See Microsoft*, 253 F.3d at 71. As *Microsoft* explained, "imposing upon a firm with market power the risk of an antitrust suit every time it enters into [an exclusive] contract, no matter how small the effect, would create an unacceptable and unjustified burden upon any such firm." *Id.* at 70; *see also Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) (noting that

---

[17]    The only alleged anticompetitive acts asserted by the FTC that is not based on "loyalty" payments are the alleged and expired "non-compete" provisions in the contracts between Surescripts and RelayHealth, which contracts with customers to connect them to Surescripts' network. The FTC's failure to plead anticompetitive effects and foreclosure in the two-sided markets as required by *Amex* (*see infra* § II.B.) is fatal to the FTC's claim that the agreements with RelayHealth enabled Surescripts to maintain its monopolies in the routing and eligibility markets.

perfectly legal requirements contracts "obligate a buyer to purchase all or a substantial portion" of its good or service requirements from one supplier).

Thus, under the rule of reason, the FTC bears the burden of demonstrating that Surescripts' alleged contractual provisions have an anticompetitive effect on competition. *Microsoft*, 253 F.3d at 58.[18]  In pleading exclusive dealing, a plaintiff must also demonstrate that the probable effect of the exclusive contract is to "foreclose competition in a substantial share of the line of commerce affected." *Id*. at 69 (quoting *Tampa Elec.,* 365 U.S. at 327).  The "lines of commerce" at issue here are the routing and eligibility markets.  Compl. ¶ 157.  Because the FTC concedes that routing and eligibility are two-sided markets, *id*. ¶¶ 22-24 (and heading IV.B, conceding that "[r]outing and eligibility are two-sided networks"), the FTC must plausibly plead foreclosure of a substantial share of each of those markets as a whole.  The FTC's Complaint must be dismissed because, taking into account the allegations of the Complaint and the documents it incorporates, the FTC fails to allege either anticompetitive effects or foreclosure.

<ol>
<li><strong>The FTC Does Not Allege That Surescripts' Contracts Caused Anticompetitive Effects In The Routing And Eligibility Markets As A Whole</strong></li>
</ol>

<blockquote>
a.  <strong>Plaintiffs Challenging a Two-Sided Platform Must Allege Net-Anticompetitive Effects Across the Entire Market</strong>
</blockquote>

As the FTC has anticipated in its Complaint and public statements regarding this case (*see supra* § I.C.), its burden to plead anticompetitive effects in the relevant market(s) takes on a different and new dimension given that both the routing and eligibility markets are each "two-sided markets."  In *Amex*, the Supreme Court recognized that courts must analyze effects in two-

---

[18]     If the plaintiff meets its burden, the defendant may then proffer "pro-competitive justifications" for its conduct and the burden shifts back to the plaintiff to rebut that claim or demonstrate that the anticompetitive harm outweighs the pro-competitive benefit.  *Microsoft*, 253 F.3d at 59.

sided markets as a whole and that plaintiffs have the burden of showing anticompetitive effects across the entire market—that is, on both sides of the platform.  Providers of two-sided platforms are selling one single service:  the transaction.  138 S.Ct. at 2286.  Thus, courts examining effects on competition cannot examine "one side of the platform in isolation."  *Id*. at 2287.  By failing to demonstrate net output restrictions or price increases across the entire transaction, the *Amex* plaintiffs improperly focused on just one side of the market and failed to show that challenged contractual provisions had "stifled competition."  *Id.*

In *Amex*, the United States and several states alleged that Amex's anti-steering provisions violated the Sherman Act.  *Id*. at 2283.  Credit card companies like Amex provide services to cardholders and merchants via a two-sided platform, a type of market in which an intermediary provides products or services to two different groups.  *Id*. at 2280.  Transactions between the groups are carried out simultaneously such that the credit card company makes a sale to the cardholder at the same time it transacts with the merchant.  *Id*.  Amex's business model focuses on increasing cardholder spending, making its cardholders more valuable to merchants.  *Id*. at 2282.  Consequently, Amex charges merchants higher fees than do competitor credit card companies and places anti-steering clauses in its contracts with merchants that prohibit merchants from steering cardholders from using their Amex cards.  *Id*. at 2282-83.

The Supreme Court expressed particular concern for so-called "indirect network effects," a feature inherent in two-sided markets.  With two-sided platforms, "the value of the services . . . increases as the number of participants on both sides of the platform increases."  *Id*. at 2281.  To control the indirect network effects, providers of two-sided platforms must find the right balance of pricing charged to each side of the transaction or they risk "a feedback loop of declining demand."  *Id*.  Indirect network effects can dictate that the platform provider must charge higher

prices to the side of a transaction with the more elastic demand such that the optimal price might be below costs or even negative.  *Id*.  Credit card companies, for instance, frequently charge merchants more than cardholders because cardholders are more price sensitive.  *Id*.  This means that increased pricing on one side of a two-sided market does not necessarily demonstrate "market power or anticompetitive pricing," but rather reflects the market reality that the two sides have differing demand elasticity.  *Id*. at 2286.  Because of these indirect network effects, the Court held that proper market definition must include both sides of the platform where they "facilitate a single, simultaneous transaction between participants."  *Id*.

Having defined the relevant market as the market for credit-card transactions, the Court turned to whether plaintiffs had adequately pled anticompetitive effects in that market.  *Id*. at 2287.  In cases involving two-sided markets, plaintiffs must show anticompetitive effects in the market as a whole and cannot focus only on the effects on one side.  *Id*.  Thus, the *Amex* plaintiffs needed to prove that the anti-steering provisions at issue "increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market."  *Id*.  But the Court found that plaintiffs had not offered "any reliable measure of Amex's transaction price or profit margins."  *Id*. at 2288.  Instead, plaintiffs only showed that Amex raised merchant fees, which reflected the increasing value of Amex's services and the cost of transactions rather than the "ability to charge above a competitive price," as evidenced by the fact Amex "has historically charged higher merchant fees than [its] competitors" pursuant to its business model.  *Id*.  Moreover, the evidence showed increased output in credit-card transactions and improved quality, and competition among credit-card networks "constrained Amex's ability to raise [merchant] fees."  *Id*. at 2288-89.  Thus, by focusing on only

37

one side of the two-sided market, plaintiffs failed to meet their burden of showing anticompetitive effects. *Id.* at 2290.

Those teachings from *Amex* provide a vivid demonstration of the FTC's pleading failures in this case.

> **b.**    **The Complaint Does Not Allege Any Facts To Support Its Summary Conclusion That Surescripts' Contractual Provisions Caused "Net" Higher Pricing In The Eligibility And Routing Markets**

The FTC's public statements demonstrate that it fully understands that under *Amex* it has the burden to plead anticompetitive effects in each of the routing and eligibility markets.  But the FTC's inclusion of the word "net" twice in its Complaint is not sufficient to meet its pleading burden under *Amex*.  Comp. ¶ 187 ("[b]ut for Surescripts' anticompetitive course of conduct, the net price (taking into account both sides of the network) of the routing transaction would be lower…without Surescripts' loyalty contracts, the net price (taking into account both sides of the network) of the eligibility transaction would be lower.").  The FTC fails to allege any *facts* to support these assertions of legal conclusions.

To survive dismissal, plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   Bare legal conclusions unsupported by fact are insufficient to meet an antitrust plaintiff's pleading burden.  *Twombly*, 550 U.S. at 555 (noting that plaintiffs' pleading obligations in an antitrust case "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (noting that inferences "unsupported by the facts set out in the complaint" or "legal conclusions cast in the form of factual allegations" are insufficient to state a claim).  Otherwise, "a plaintiff might merely invoke the

magic words . . . and thereby subject a defendant to costly and potentially meritless litigation." *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 231 (D.D.C. 2015).

The FTC's only specific allegations about "per-transaction prices" or "per-transaction incentives" are all limited to *one side* of the two-sided markets at issue—precisely the type of allegations the *Amex* Court found lacking.  For example, in the routing market, the FTC states that Emdeon charges Kroger pharmacies lower prices than does Surescripts.  Compl. ¶ 189.  But pharmacies like Kroger occupy only one end of the routing market, and the FTC does not make any allegations concerning EHRs' incentive payments from Surescripts or Emdeon for those Kroger routing transactions.  Similarly, the FTC argues that in the eligibility market, Allscripts charged one PBM a price lower than Surescripts did.  *Id*. at ¶ 190.  Yet again, this allegation pertains only to the PBM side of the eligibility market, and the FTC does not allege facts showing higher net-transaction prices across that market as a whole.  Finally, the FTC asserts that Emdeon paid higher incentives to Allscripts than Surescripts did, and that Surescripts decreased incentive payments to EHRs for both routing and eligibility in April 2012.  *Id*. ¶¶ 192, 194.  Yet the FTC did not take the next step, as required under *Amex*, of showing that Surescripts' lower incentives coincided with increased prices for pharmacies or PBMs.

Moreover, the facts as pled in the Complaint demonstrate the implausibility of any claim that Surescripts' contractual provisions could cause higher "net" prices in the eligibility and routing markets.  *See Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (dismissal is warranted where "contradictory market facts alleged in [the] complaint" render a plaintiff's theory "implausible").  As the FTC admits, EHR payments are enabled through the fees paid by pharmacies, PTVs and PBMs.  Indeed, the EHR payments are actual percentages of those fees. Compl. ¶ 77 (stating that for each transaction, Surescripts pays the EHR an incentive fee of ██

of the price that the PBM or pharmacy customers pay to Surescripts). Therefore, EHRs benefit from higher fees charged on the other side of the market because EHRs receive higher incentive payments in return. Lowering fees to PBMs, pharmacies and PTVs, as the FTC asserts would occur in a "competitive" market, would actually lower payments to EHRs and injure them. These are exactly the indirect network effects at the very heart of the Supreme Court's decision in *Amex*, and exactly the situation that would "decrease the value of the platform" to the EHRs (for both routing and eligibility) and result in a "feedback loop of declining demand." *Amex*, 138 S. Ct. at 2281. The FTC cannot assume that money would magically have appeared from somewhere, such that those funding the subsidy could pay less, while those receiving the subsidy would be paid more. The FTC must but does not explain how Surescripts could plausibly raise the prices charged to its PBM and pharmacy customers while simultaneously decreasing incentive payments to EHRs. Absent that, the FTC is left with mere one-sided pricing allegations, and one-sided pricing falls precisely into the paradigm of conduct that risks a "feedback loop of declining demand." *Id*.

"Net prices" and "per-transaction prices" are not "magic words" that shield the FTC from its pleading burden. *Uber Techs.*, 128 F. Supp. 3d at 230–31. The Court should dismiss the Complaint because the FTC has failed to allege facts plausibly showing net-anticompetitive effects across the entire routing market or the entire eligibility market.

### c. Allegations Of Reduced Innovation And Quality Cannot Save The FTC's Complaint

The FTC alleges that Surescripts' "dominance over routing and eligibility" has led to reduced innovation and reduced quality in the routing and eligibility markets. But none of these allegations amounts to an anticompetitive effect sufficient to state a claim for relief. First, as to innovation, the FTC does not plead any facts to support its claims that Surescripts' contractual provisions impacted innovation at all. The Complaint alleges that the contract entered into

between Surescripts and RelayHealth in 2010 called for the co-development of a "real-time benefit check service" and seeks to blame Surescripts for not developing the service.  Compl. ¶ 205.  But at the same time, the FTC admits that RelayHealth began developing the benefit check on its own in 2013 and both companies introduced the service in 2017.  *Id.* ¶ 206.  This story in no way alleges a reduction of innovation in the market—instead, it confirms that companies were fully able to bring new products and services to market during the very time that Surescripts was allegedly maintaining its monopolies over the routing and eligibility markets.  *Id.*

The FTC also asserts that "Surescripts faces no competition" and so "has no incentive to improve its services, resulting in reduced quality to its customers."  *Id.* ¶ 209.  But incentives are not effects.  The only factual support the FTC claims for supposed effects is that some Surescripts customers have allegedly complained about Surescripts' customer service, innovation, and pricing practices.  *Id.* ¶ 210.  The FTC does not allege that such complaints are anything more than ordinary comments received in the normal course of business.  The FTC's unsupported argument here seems to be that any monopolist that ever receives a customer complaint has necessarily improperly exercised market power to reduce quality.  That is not the law.  Nor does the FTC plead facts to support the bare assertions that but for Surescripts' conduct, "consumers would have been able to choose other options that could have provided better customer service."  *Id.* ¶ 212.  The Complaint contains no allegations that, for instance, any competitor empirically has (or is even perceived by customers to have) better customer service or that it receives fewer customer complaints.  *See, e.g., Ginzburg v. Mem'l Healthcare Sys.*, Inc., 993 F. Supp. 998, 1018 (S.D. Tex. 1997) (refusing to find a "differential in quality of care caused solely by [plaintiff physician's] effective exclusion from patient treatment at [defendant hospital]" because plaintiff failed to elicit

"comparative information").  Such unsupported legal conclusions cannot substitute for the factual matter the FTC must plead under *Twombly*.[19]

<h3>2.    The FTC's Complaint Does Not Sufficiently Allege Foreclosure In Any Market</h3>

The Complaint also fails to plead "substantial" foreclosure as required to state a claim of exclusive dealing.  In all cases alleging exclusive dealing, "the plaintiff must both define the relevant market and prove the degree of foreclosure."  *Microsoft*, 253 F.3d at 69.  There is no set percentage that constitutes "substantial" but this Circuit has noted that in a monopolization case, it could be roughly 40-50% share, or less in certain circumstances.  *Id.* at 70.  In analyzing whether a contract forecloses competition, the critical issue is to determine "which products are reasonably available" to a purchaser.  *Esai*, 821 F.3d at 403.  "[I]f customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share."  *Id*.  Moreover, the existence of facially exclusive contracts is not, by itself, necessarily noteworthy – exclusive contracts with short terms are unlikely to result in foreclosure:  "short duration and easy terminability of [] agreements negate substantially their potential to foreclose competition."  *Omega Envt'l v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (holding that "[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful.").

The FTC claims that Surescripts' contractual provisions foreclosed 78% of the "pharmacy side of the routing market," 74% of the "PBM side of the eligibility market," 81% of the "EHR routing market," and 78% of the "EHR eligibility" market.  Compl. ¶¶ 172–74.  These allegations

---

[19]    The FTC's half-hearted claim that Surescripts' conduct resulted in "reduced output" (Compl. ¶¶ 213-15) borders on the specious given the FTC's admission that eligibility and routing transactions increased 23-fold from 2008 to 2016 (Compl. ¶ 38).

are insufficient to plead foreclosure because the FTC simply assumes in tallying up the numbers that each and every Surescripts contract with loyalty pricing is an "exclusive" contract that forecloses competition.  That assumption is demonstrably wrong.  It is contradicted by the express allegations in the Complaint and the terms of the contracts incorporated by reference, which show that in many cases the agreements between Surescripts and its customers do not in any way reduce customers' ability to switch to other networks or to multihome.

The FTC's pleading failure is most stark with regard to EHR contracts.  Although the FTC describes the contract between Surescripts and a leading EHR, █████ as "exclusive," it does not actually plead any facts to support that claim.  The only facts that the FTC alleges is that ████████ ████████████████████████████████████████████ *Id.* ¶ 81.  This a recommendation; not exclusivity; the actual terms show no exclusivity.  *See* pp. 10-11, *supra*.  With regard to EHRs in the Reserve Program, the FTC explicitly pleads that EHRs can be considered loyal, and continue to earn loyalty payments, even if they route to pharmacies that are connected to other networks (like Emdeon) if that pharmacy is not linked to the Surescripts network.  *Id.* ¶ 135.  In short, the EHRs were completely free to multihome without losing their incentive payments from Surescripts.  *Id.*  The FTC actually elaborated on these allegations by explaining that Emdeon was well aware that the Suresripts contracts did not limit EHRs' ability to mutlihome and sought to sign up EHRs using contingent contracts.  *Id.*  While the FTC alleges that Emdeon's efforts failed, it tellingly does not even attempt to plead facts showing that Surescripts is to blame for this failure. *Id.*  The FTC cannot plead foreclosure merely by claiming that customers were free to switch but chose not to.  *Esai*, 821 F.3d at 403.

Not only are these EHR contracts not exclusive, as the FTC claims, but the FTC ignored the termination provisions of the contracts' loyalty provisions, which are 6 months, not three years.

*Compare* Compl. ¶ 83 *with* ███████████ Amendment No. 2 at 1 ("If, during the Loyalty Term, Aggregator determines that it will cease to be a Participating Aggregator, then Aggregator shall provide Surescripts with six (6) months written notice of its intent to terminate its participation in the Surescripts Reserve Program."). This is exactly the sort of short term and easy terminability that leads to a presumption of legality and lack for foreclosure.

Accordingly, the FTC's pled "foreclosure" numbers are deeply flawed. The FTC does not provide sufficient detail of which contracts are included in the tallies, but it is clear that they include the ████ and ██████████ contracts and others that do not have exclusivity provisions and others that contain such short terms that they do not foreclosure any commerce. *E.g.,* Compl. ¶ 174. The FTC does not account for any of this in its assertion that Surescripts has foreclosed 78% and 81% of the EHR contracts in the two markets, and did not provide any means to assess their numbers in light of these facts. The Court should not accept allegations that are contrary to the documents incorporated by reference in the Complaint. *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."). The FTC's allegations cannot be credited, and there is an absence of pleading on this necessary element of exclusive dealing. *Twombly*, 550 U.S. at 570,

But even if this Court was willing to credit these "foreclosure" numbers, the FTC has still fully shirked its burden of alleging foreclosure in each two-sided market as required by *Amex*. As noted above, *Amex* was a vertical restraint case brought Section 1 of the Sherman Act and judged under the rule of reason. Accordingly, the element of "foreclosure" was not an element of plaintiffs' claims in that case, and the court did not consider it. But *Amex*'s requirement that a plaintiff define the relevant market with reference to, and plead anticompetitive effects in, the two-

sided market as a whole must apply with equal force to the requirement from *Tampa Electric* that a plaintiff demonstrate substantial foreclosure in the "market affected." *Tampa Elec.*, 365 U.S. at 327; *see also Microsoft*, 253 F.3d at 69 ("[I]n all cases the plaintiff must both define the relevant market and prove the degree of foreclosure"). Here, the markets are two-sided markets for "eligibility" or "routing." Compl. ¶¶ 22–24, 157. Tellingly, the FTC pleads no facts as to foreclosure in either of these markets as a whole. Each allegation only details the percentage foreclosed on each "side" of each market. *Id*. ¶¶ 172–74. This is fatal under *Amex*.

## CONCLUSION

For all the reasons stated above, Surescripts respectfully requests that this Court dismiss the FTC's Complaint for Injunctive and Other Equitable Relief in its entirety, with prejudice.

Dated: July 12, 2019                            Respectfully submitted,

                                                */s/ Amanda P. Reeves*
                                                Amanda P. Reeves (D.C. Bar 496338)
                                                Allyson M. Maltas (D.C. Bar 494566)
                                                LATHAM & WATKINS LLP
                                                555 Eleventh Street, NW, Suite 1000
                                                Washington, DC 20004-1304
                                                Telephone: (202) 637-2183
                                                Facsimile: (202) 637-2201
                                                Email: amanda.reeves@lw.com
                                                Email: allyson.maltas@lw.com

                                                Alfred C. Pfeiffer, Jr. (*appearing pro hac vice*)
                                                Alexander E. Reicher (*appearing pro hac vice*)
                                                LATHAM & WATKINS LLP
                                                505 Montgomery Street, Suite 2000
                                                San Francisco, CA  94111-6538
                                                Telephone: (415) 391-0600
                                                Facsimile: (415) 395-8095
                                                Email: al.pfeiffer@lw.com
                                                Email: alexander.reicher@lw.com

                                                *Attorneys for Defendant Surescripts, LLC*