# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

           Plaintiff,

           v.

SURESCRIPTS, LLC,

           Defendant.

**Case No.: 19-cv-1080 (JDB)**

**REDACTED**

**Plaintiff Federal Trade Commission's Memorandum of Law in Opposition to Defendant Surescripts, LLC's Motion to Dismiss Complaint**

## Table of Contents

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 8

I.   This Case Is Properly in Federal Court ...................................................................... 8

    A.   This Court has subject-matter jurisdiction ....................................................... 10

    B.   This is a "proper case" under Section 13(b) of the FTC Act ........................... 12

        1.   The text of Section 13(b) does not limit FTC permanent injunction suits to "routine" cases ................................................................................. 13

        2.   The legislative history of Section 13(b) does not show that Congress intended to limit FTC permanent injunction suits to "routine" cases ........................................ 15

        3.   The case law is well-settled that Section 13(b) does not limit the FTC's authority to bring permanent injunction suits to challenge only "routine" cases ....... 17

        4.   Surescripts's "proper case" argument fails as a matter of policy .............................. 20

II.  The FTC's Complaint States Valid Claims of Monopolization ............................................. 21

    A.   The FTC plausibly alleges that Surescripts monopolized the routing and eligibility markets by conditioning lower prices on exclusivity, among other anticompetitive actions .................................................................................................. 22

    B.   Surescripts's challenges to the FTC's Complaint are legally and factually wrong .......... 26

        1.   Surescripts's agreements are exclusive or *de facto* exclusive .................................... 26

        2.   Surescripts's agreements are long-term and not easily terminable ........................... 30

        3.   Surescripts's conduct harmed competition ................................................................. 32

            a)   Under *Microsoft*, a monopolist's substantial foreclosure of rivals' opportunities to compete establishes anticompetitive effects .............................. 33

            b)   Surescripts's agreements substantially foreclose the routing and eligibility markets ................................................................................................ 35

            c)   Surescripts's exclusionary conduct resulted in increased net prices, reduced innovation, and decreased output ............................................................ 37

        4.   Surescripts's attempt to frame the FTC's Complaint as alleging predatory pricing is wrong as a matter of law and economics ................................................... 40

    CONCLUSION .................................................................................................................. 43

## Table of Authorities

<u>**Cases**</u>

*Abbott Labs. v. Mead Johnson & Co.*,
  971 F.2d 6 (7th Cir. 1992) ................................................................... 32

*Am. Tobacco Co. v. Patterson*,
  456 U.S. 63 (1982) ............................................................................... 16

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ............................................................................. 11

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) ......................................................................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................... 22, 30

*Astoria Fed. Sav. and Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) ............................................................................. 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................. 22

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ....................................................................... 40, 42

*Brown v. Corr. Corp. of Am.*,
  603 F. Supp. 2d 73 (D.D.C. 2009) ...................................................... 39

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998) ........................................................... 22

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
  851 F.2d 478 (1st Cir. 1988) ................................................................ 33

*Concord Boat Corp.. v. Brunswick Co.*,
  207 F.3d 1039 (8th Cir. 2000) ............................................................. 43

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ............................................................................. 23

*D.C. Nurses Ass'n v. Brown*,
  153 F. Supp. 3d 1 (D.D.C. 2016) ........................................................ 11

*Diamond v. Chakrabarty*,
  447 U.S. 303 (1980) ............................................................................. 16

*Edge Inv., LLC v. District of Columbia*,
  927 F.3d 549 (D.C. Cir. 2019) ............................................................. 21

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016) ............................................................. 23, 40, 42, 43

*Fort Bend Cty. v. Davis*,
   139 S. Ct. 1843 (2019) ....................................................................................... 11

*FTC v. Abbott Labs.*,
   No. 92-cv-1364, 1992 WL 335442 (D.D.C. Oct. 13, 1992) ........................... 11, 19

*FTC v. AbbVie Inc.*,
   329 F. Supp. 3d 98 (E.D. Pa. 2018) ................................................................... 18

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013) ........................................................................................... 18

*FTC v. Ameridebt, Inc.*,
   373 F. Supp. 2d 558 (D. Md. 2005) ....................................................... 10, 12, 17

*FTC v. AT&T Mobility LLC*,
   883 F.3d 848 (9th Cir. 2018) (en banc) ............................................................. 10

*FTC v. Cantkier*,
   767 F. Supp. 2d 147 (D.D.C. 2011) ................................................................... 13

*FTC v. Cephalon, Inc.*,
   No. 08-cv-2141, 2019 WL 2111253 (E.D. Pa. Feb. 21, 2019) ........................... 18

*FTC v. Certified Merch. Servs., Ltd.*,
   No. 4:02-cv-44 (E.D. Tex. Feb. 2002) ............................................................... 18

*FTC v. Cornerstone & Co., LLC*,
   No. 14-cv-01479 (D.D.C. Aug. 2014) ............................................................... 18

*FTC v. D Squared Sols., LLC*,
   No. 03-cv-3018 (D. Md. Oct. 2003) ................................................................... 18

*FTC v. Evans Prods. Co.*,
   775 F.2d 1084 (9th Cir. 1985) ..................................................................... 12, 17

*FTC v. H.N. Singer, Inc.*,
   668 F.2d 1107 (9th Cir. 1982) ....................................................................... 9, 12

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) ............................................................................................. 8

*FTC v. Mallett*,
   818 F. Supp. 2d 142 (D.D.C. 2011) ................................................................... 10

*FTC v. Mylan Labs., Inc.*,
   62 F. Supp. 2d 25 (D.D.C. 1999) ................................................................. 12, 18

*FTC v. Qualcomm Inc.*,
    No. 17-cv-00220, 2019 WL 2206013 (N.D. Cal. May 21, 2019) ......................................... 18

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019) .......................................................................................... 11

*FTC v. Va. Homes Mfg. Corp.*,
    509 F. Supp. 51 (D. Md.), *aff'd mem.*, 661 F.2d 920 (4th Cir. 1981).................................. 12

*FTC v. World Travel Vacation Brokers, Inc.*,
    861 F.2d 1020 (7th Cir. 1988) ................................................................................. 10, 19

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015) .......................................................................................... 10

*Graham Cty. Soil & Water Cons. Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010)........................................................................................................ 16

*Gundy v. United States*,
    139 S. Ct. 2116 (2019).................................................................................................... 14

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428 (2011)........................................................................................................ 11

*Hughes v. Abell*,
    634 F. Supp. 2d 110 (D.D.C. 2009)............................................................... 22, 28, 30, 38

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*,
    No. 12-cv-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) .................................................... 29

*In re EpiPen (Epinephrine Injection, USP) Mkt., Sales Practices and Antitrust Litig.*,
    No. 17-md-2785-DDC-TJJ, 2017 WL 6524839 (D. Kan. Dec. 21, 2017) .......... 23, 27, 31, 42

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    No. 17-56119, 2019 WL 3788253 (9th Cir. Aug. 13, 2019) ................................................ 23

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) .......................................................................................... 42

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
    No. CV 02-4770 MRP, 2006 WL 1236666 (C.D. Cal. Mar. 22, 2006) ................................ 31

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ...................................................................... 31, 32, 35, 40

*Mitchell v. Robert DeMario Jewelry, Inc.*,
    361 U.S. 288 (1960)........................................................................................................ 13

*Montes v. Janitorial Partners, Inc.*,
    859 F.3d 1079 (D.C. Cir. 2017)...................................................................................... 11

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ...................................................................... 22

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ......................................................................... 43

*Nilavar v. Mercy Health Sys. W. Ohio*,
    142 F. Supp. 2d 859 (S.D. Ohio 2000) ........................................................ 31

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)....................................................................... 33, 35, 38

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ...................................................................... 31

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009)....................................................................................... 42

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)....................................................................................... 16

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946)....................................................................................... 13

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    No. SACV 12-2102-JLS (ANx), 2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ................... 31

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010)....................................................................................... 11

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ........................................................................ 31

*Ross v. United States*,
    460 F. Supp. 2d 139 (D.D.C. 2006).............................................................. 11

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013)....................................................................................... 11

*Sebelius v. Cloer*,
    569 U.S. 369 (2013)....................................................................................... 13

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994).......................................................................... 33

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)........................................................................ 23, 26, 29, 31

*Unistrip Techs., LLC v. Lifescan, Inc.*,
    153 F. Supp. 3d 728 (E.D. Pa. 2015)................................................... 24, 27, 42

*United States v. Atl. Research Corp.*,
  551 U.S. 128 (2007) ................................................................................... 15

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ......................................................... 22, 29, 31, 32

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) .................................................................................... 21

*United States v. JS & A Grp., Inc.*,
  716 F.2d 451 (7th Cir. 1983) ...................................................................... 9, 14

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc) .................................................. passim

*Valassis Commc'ns, Inc. v. News Corp.*,
  17-cv-7378 (PKC), 2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ....................... 42

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ..................................................................... passim

*ZF Meritor, LLC v. Eaton Corp.*,
  769 F. Supp. 2d 684 (D. Del. 2011) ............................................................... 28

**Statutes**

15 U.S.C. § 45(a) ............................................................................................. 8

15 U.S.C. § 53(b) ........................................................................................ 9, 12

28 U.S.C. 1331 ............................................................................................. 10

28 U.S.C. 1337(a) ......................................................................................... 10

28 U.S.C. 1345 ............................................................................................. 10

28 U.S.C. 1605(c) ......................................................................................... 13

48 U.S.C. § 872 ............................................................................................ 13

9 U.S.C. § 7 ................................................................................................. 13

Children's Online Privacy Protection Act, 15 U.S.C. § 6501 ............................... 14

Fair Credit Reporting Act, 15 U.S.C. § 1681 ..................................................... 14

Federal Trade Commission Act Amendments of 1994, Pub. L. No. 103-312,
  108 Stat. 1691 (1994) ................................................................................. 18

Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 ........ 14

The Magnuson-Moss Warranty–Federal Trade Commission Improvement Act,
  15 U.S.C. § 2301 ........................................................................................ 14

Trans-Alaska Pipeline Act, Pub. L. No. 93-153, 87 Stat. 592 (1973) .......................................... 15

Wheeler-Lea Act, Pub. L. No. 75-447, 52 Stat. 111 (1938) ......................................................... 14

**<u>Other Authorities</u>**

119 Cong. Rec. 21,443-44 (June 28, 1973) ........................................................................ 15, 17

119 Cong. Rec. 36,610 (Nov. 12, 1973) ..................................................................................... 17

*American Heritage Dictionary of the English Language* (3d ed. 1992)....................................... 13

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
   (2012)............................................................................................................................................ 15

David C. Vladeck, *Time to Stop Digging: Failed Attacks on FTC Authority to Obtain*
   *Consumer Redress*, 31 Antitrust 89 (Fall 2016) .................................................................... 20

David S. Evans, *Economics of Vertical Restraints for Multi-Sided Platforms* (2013) ................. 36

Derek W. Moore & Joshua D. Wright, *Conditional Discounts and the Law of*
   *Exclusive Dealing*, 22 Geo. Mason L. Rev. 1205 (2015) ....................................................... 42

J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance: Redress under*
   *Section 13(b) of the FTC Act*, 79 Antitrust L.J. 1 (2013) ....................................................... 20

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
   (3d & 4th eds., Supp. 2019) ................................................................................. 24, 26, 32, 39

S. Rep. No. 93-151....................................................................................................................... 16, 17

Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional*
   *Pricing Practices, and the Flawed Incremental Price-Cost Test*,
   81 Antitrust L.J. 371 (2017) ................................................................................................... 42

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(1)..................................................................................................................... 10

# INTRODUCTION

Surescripts is a monopolist that has engaged in a decade's worth of exclusionary conduct to maintain its more than 95% market share in two separate, complementary health information technology markets: (1) the *routing* of electronic prescriptions and (2) the transmission of patient insurance *eligibility* information. Despite billions of dollars in federal incentives causing explosive growth in both markets, Surescripts has ensured that no competitor could gain a toehold in either. The cornerstone of Surescripts's unlawful monopolization is a web of exclusive contracts imposed on nearly all of its customers, resulting in near-total foreclosure of competition. As a Surescripts executive testified under oath, "pricing isn't dictated by competition at Surescripts." That is because Surescripts's exclusionary conduct ensures that customers remain with Surescripts, even if a competitor were to offer "some phenomenally low" price. The results are a "bloated" monopolist that inflicts "economic pain" on non-exclusive customers while being consistently unresponsive to customer complaints. The FTC's 55-page Complaint amply details Surescripts's anticompetitive conduct and its deleterious effects.

In its motion to dismiss, Surescripts does not challenge the relevant markets or contest that it is a monopolist in each. Relying instead on a flawed reading of Section 13(b) of the FTC Act, Surescripts seeks to prevent the FTC from seeking monetary relief for customers harmed by Surescripts's illegal conduct. But Surescripts errs at the threshold, overlooking more than a decade of Supreme Court jurisprudence on subject-matter jurisdiction that makes clear that Section 13(b) does not affect the Court's power to hear this case.

Nor is there any merit to Surescripts's suggestion that a "proper case" under Section 13(b) is limited to "routine" or "straightforward" violations of law. In the more than four decades since Congress enacted the relevant portion of Section 13(b), no court has ever dismissed an FTC action for not being a "proper case." Examining the text and structure of the statute readily

explains why. A "proper case" means just that—a case the Commission has found "appropriate" or "suitable" to file in federal court to seek a permanent injunction and other equitable relief, as the bipartisan and unanimous Commission has here.

In any event, Surescripts's test is nonsensical: Surescripts's erroneous reading of Section 13(b) would bar the FTC from seeking relief for consumers in federal court so long as a defense lawyer could point to, for example, a debate among economists about antitrust issues or a recent Supreme Court antitrust decision. Whatever misgivings Surescripts may have about a federal court adjudicating the legality of its conduct, the law is clear that this Court may do so.

Surescripts also asserts that the FTC has not pleaded sufficient facts to state claims of monopolization under the antitrust rule of reason. But the FTC has plausibly alleged facts supporting the essential elements of two monopolization claims: Surescripts is a monopolist in two markets; Surescripts's contracts are actually or *de facto* exclusive; Surescripts's contracts are long term and not easily terminable; and Surescripts's contracts foreclose at least 70-80% of each market. And though not necessary to state a claim, the Complaint also alleges facts to show that Surescripts's exclusionary conduct has inflated net prices, squelched innovation, and diminished output. Surescripts's arguments to the contrary raise factual issues inappropriate for resolution on a motion to dismiss, ignore the FTC's allegations, or misapprehend Supreme Court precedent.

Faced with well-pleaded claims of monopolization via exclusive dealing, Surescripts also asks the Court to dismiss the Complaint because it does not allege predatory pricing claims. This is nothing more than asking the Court to dismiss an apple for not being an orange. In a predatory pricing case, the *low* price is the method of exclusion. But as alleged here, it is Surescripts's widespread exclusivity requirements, enforced through *higher* prices for non-exclusive customers, that ensure that no competitor—no matter the price or service that it offers—can win

business. Case law and economic logic both dictate that exclusive dealing is the correct framework for the Court to apply here. The Court should therefore deny Surescripts's motion to dismiss and set an expeditious discovery schedule so that the FTC may promptly bring this case to trial.

## BACKGROUND

Surescripts is a monopolist in two complementary health information technology markets: routing and eligibility, often referred to collectively as "e-prescribing." Compl. ¶¶ 1-2, 18. Routing is the transmission of a prescription between a prescriber's electronic health record system (EHR) and a pharmacy. *Id.* ¶ 19. Eligibility is the transmission of a patient's insurance formulary and benefit information from a pharmacy benefit manager (PBM) to a prescriber's EHR. *Id.* ¶ 20. Surescripts charges pharmacies and PBMs for each routing and eligibility transaction, respectively, and either pays EHRs or charges EHRs nothing for each transaction. *Id.* ¶¶ 49-52, 77-78.

Routing and eligibility are separate two-sided networks that exhibit "indirect network effects," meaning the value to participants on one side increases as the number of participants on the other side increases. Compl. ¶¶ 22-23. In routing, for example, EHRs gain more value from a network where there are more pharmacies connected because that increases the likelihood that patients will be able to fill their prescription at their preferred pharmacy. And pharmacies gain more value from a network where there are more EHRs connected because there is a greater supply of prescribers to send patients to a specific pharmacy to purchase the patients' drugs. *Id.* ¶ 24; *see also id.* ¶ 25 (similar indirect network effects for PBMs and EHRs in eligibility).

Two-sided networks experience what is commonly referred to as the "chicken-and-egg" problem for new entrants: Customers on one side of the network will not join unless they are confident that they will be able to access enough customers on the other side of the network, and

vice-versa. Compl. ¶ 28. To overcome the chicken-and-egg problem, a new competing platform must reach "critical mass," either by convincing a sufficient number of customers to switch platforms completely or to use multiple platforms simultaneously, i.e., to "multihome." *Id*. ¶¶ 29, 31. Convincing customers to multihome is usually a more effective entry strategy for new platforms because customers of an existing platform face less cost and risk by multihoming, as opposed to making a complete switch away from the incumbent platform. *Id*. ¶ 31.

In 2008 and 2009, the federal government began what would become a $38 billion incentive program to fuel the growth of e-prescribing, among other health information technology services. Compl. ¶¶ 34-39. Surescripts, the established platform at the time with at least 95% market share in both markets, faced imminent threats from competitors seeking to capitalize on the growing use of e-prescribing. *Id*. ¶¶ 55-63 (Emdeon), 100-07 (Allscripts), 138-47 (RelayHealth). Surescripts feared this competition, telling its board of directors that "competitive pressures require precipitous price drops" down to marginal cost, which could put Surescripts out of business. *Id*. ¶ 57.

Facing this existential threat, Surescripts embarked on a multifaceted scheme to maintain its monopolies. Compl. ¶¶ 2, 63. The centerpiece of Surescripts's successful scheme was to blanket the routing and eligibility markets with actual or *de facto* exclusive contracts. *Id*. ¶ 64. Some of Surescripts's contracts with key customers contain explicit exclusivity provisions. *Id*. ¶¶ 109, 126 (exclusive contracts locking in Allscripts, a top EHR, from 2010 to 2020); *id*. ¶ 82 (exclusive contracts with nearly all customers of the leading EHR, ██ ); *id*. ¶ 95 (exclusive contracts imposed by Surescripts's eventual partner, RelayHealth).

Other Surescripts contracts achieve exclusivity indirectly—but just as effectively—via so-called "loyalty" provisions. These loyalty contracts penalize a customer with higher per-

4

transaction prices unless the customer uses Surescripts exclusively. Compl. ¶¶ 66-71 (describing how pharmacies and PBMs pay higher prices if they are not exclusive to Surescripts); *id.* ¶¶ 76-78 (describing how EHRs pay a higher "negative" price by receiving no incentive payments if they are not exclusive to Surescripts). Nearly all pharmacies, PBMs, and EHRs are locked into these loyalty contracts. *Id.* ¶¶ 172-75. In many cases, Surescripts claws back previously paid discounts or incentives if a customer breaks exclusivity. *Id.* ¶¶ 72-75, 79.

This expansive web of exclusive contracts has made the chicken-and-egg problem insoluble for any competitor trying to break into routing or eligibility. Compl. ¶ 83. Without Surescripts's exclusive contracts, a competitor could offer lower prices and higher incentives than Surescripts, expand, and eventually achieve critical mass. *Id.* ¶¶ 83, 176-78. But because Surescripts's contracts substantially raise a customer's costs to multihome, a competing platform would have to compensate a customer for Surescripts's penalties on the vast majority of a customer's transactions. *Id.* ¶¶ 32, 58. Due to Surescripts's monopolies, the competing platform would need to pay pharmacies and PBMs, while simultaneously paying higher incentives to EHRs, to offset Surescripts's penalties. *Id.* ¶¶ 179-80.

Surescripts is well aware of how its scheme blocked competition. For example, Surescripts explained to a customer, Rite Aid, that Rite Aid's total cost to split routing traffic with another platform, Emdeon, would be higher than using Surescripts exclusively, even if Emdeon offers a "low introductory price":



**Clarifying the Issues**

**eRx/Emdeon cannot save Rite Aid money in e-prescription routing by splitting traffic:**

- While eRx/Emdeon may offer a low introductory price, they can only do so for a subset of your transactions
- Rite Aid would still need to route the great majority of transactions through Surescripts and RelayHealth
- The lowest transaction pricing from RelayHealth for Surescripts connectivity is only available when routing 100% of your transactions through us
- The total cost to Rite Aid to split traffic would therefore be higher than if you continue to route 100% through RelayHealth and Surescripts

Surescripts®                 Confidential and Proprietary

Compl. ¶ 130. Another internal Surescripts memo explains that Surescripts's loyalty contracts on all sides of its routing network stunted Emdeon's growth by preventing Emdeon from attaining critical mass:

> Surescripts's efforts to lock in our customers through Loyalty programs have likely had a strong impact [on] Emdeon's initial strategy. With most top Prescriber Vendors signed to Loyalty Incentive plans, and, a significant portion of the Pharmacy industry signed to Loyalty pricing plans (direct and via [RelayHealth]), Emdeon's ability to expand their direct connection to prescribers and pharmacies has been greatly reduced. Emdeon's ability to rapidly become a full national alternative to Surescripts is diminished.

*Id*. ¶ 132 (second alteration in original). Another memo explains the economic logic: "eRx/Emdeon can undercut Surescripts on price, but only on a margin of volume … and Surescripts['s] pricing differential on [the] pharmacy side and loyalty incentive program on [the EHR] side are worth more than eRx / Emdeon's proposition on <10% of scripts." *Id*. ¶ 134 (ellipsis in original). And an internal Surescripts email concludes: "[T]he loyalty/incentive

strategy and execution made a very effective counter to the Emdeon/eRX acquisition. It[']s nice when a plan comes together." *Id.* ¶ 133 (second alteration in original).

To cement its 95%+ share of both markets, Surescripts engaged in additional anticompetitive conduct. For example, Surescripts launched a series of threats—what Surescripts termed "nuclear missile[s]"—to ensure Allscripts, a critical EHR customer, continued its exclusive use of Surescripts. Compl. ¶¶ 4, 121-24. Surescripts also successfully pressured Allscripts to phase out its direct connections with PBMs for eligibility, stymying an alternative business model that could have eliminated Surescripts as a middleman. *Id.* ¶¶ 103-07, 112. And Surescripts eliminated the risk of competition posed by its closest possible competitor, RelayHealth, by entering into a pretextual "value added reseller" agreement that prohibited RelayHealth from competing in routing for six years. *Id.* ¶¶ 138-49. Surescripts's own documents characterized RelayHealth as a "value subtract," writing that "the only real value that we are getting out of the RelayHealth relationship at this point is the exclusivity." *Id.* ¶ 150. Surescripts's then-Chief Customer Officer described RelayHealth as "sh[*]tty, non-value added partners but at least they're one of our biggest competitive threats." *Id.* (alteration in original).

Surescripts's exclusionary conduct has allowed it to maintain its monopolies in routing and eligibility, resulting in widespread foreclosure, excluded competitors, higher prices, reduced quality, stifled innovation, and suppressed output. Compl. ¶¶ 171-215. Surescripts's monopolies are insulated from price competition, with one executive stating that "pricing isn't dictated by competition at Surescripts." *Id.* ¶ 186; *see also id.* ¶¶ 187-90 (describing Surescripts's ability to price above competitors). Surescripts also understands its monopolies' financial effects, acknowledging that an EHR customer's "position in negotiating for more and more $$ only seems relevant when there are at least 5 more 'Surescripts' from which to choose. Today there is

just one Surescripts." *Id.* ¶ 191. Surescripts's monopolies have also given it a "'we've got such a

dominant market position in e-prescriptions, who's going to come in and threaten us?' attitude,"

leading to stagnant routing and eligibility markets with limited innovation. *Id.* ¶¶ 196-97.

Another Surescripts internal memo admits that "[b]ecause we didn't grow up in a competitive

environment and we grew up as a monopoly, we don't have the best way of dealing with

customers." *Id.* ¶ 209.

## ARGUMENT

### I.      This Case Is Properly in Federal Court

The FTC is empowered to enforce Section 5 of the FTC Act, which prohibits "[u]nfair

methods of competition," 15 U.S.C. § 45(a), and encompasses violations of the Sherman Act.[1]

Before 1973, the FTC could enforce the FTC Act only through internal administrative

adjudicative proceedings. In 1973, Congress concluded that additional enforcement mechanisms

were necessary and enacted Section 13(b), which currently reads:

> Whenever the Commission has reason to believe–
>
> (1)  that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2)  that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public--
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or preliminary injunction may be granted without bond: *Provided, however*, That if a

---

[1] A violation of the FTC Act "encompass[es] … practices that violate the Sherman Act." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: ***Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction**. Any suit may be brought where such person, partnership, or corporation resides or transacts business, or wherever venue is proper under section 1391 of Title 28. In addition, the court may, if the court determines that the interests of justice require that any other person, partnership, or corporation should be a party in such suit, cause such other person, partnership, or corporation to be added as a party without regard to whether venue is otherwise proper in the district in which the suit is brought. In any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found.

15 U.S.C. § 53(b) (emphasis added).

Section 13(b) contains two distinct grants of authority. First, it authorizes the FTC to seek a *preliminary* injunction or temporary restraining order in federal court to stop ongoing or threatened conduct while the FTC conducts its own administrative trial. The Commission frequently uses this authority to enjoin proposed mergers that may lessen competition so that the agency can complete its administrative adjudication.

Second, Section 13(b) contains a proviso (bolded above) that authorizes the FTC, in "proper cases," to seek, and a federal court to issue, a *permanent* injunction. This permanent injunction proviso allows the Commission to litigate its entire case in federal court, rather than under the Commission's administrative process, when the Commission finds it to be a more effective way to protect consumers. *See United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110-11 (9th Cir. 1982). The FTC brings this case, like the majority of its Section 13(b) cases, under this second authorization.

Surescripts argues that the phrase "proper cases" in the permanent injunction proviso limits this Court's subject-matter jurisdiction to hear FTC permanent injunction cases to those suits involving "routine" or "straightforward" violations of the antitrust laws. Surescripts's

Motion to Dismiss Complaint (Mot.) 13-29. This is wrong for two reasons. First, under black-letter Supreme Court precedent, Section 13(b) is not a jurisdictional provision and thus does not limit the Court's power to hear this case. Second, Section 13(b)'s text, legislative history and purpose, case law, and public policy all show that this is a "proper case" for the Court to resolve.

### A.   This Court has subject-matter jurisdiction

The Complaint alleges that the Court has subject-matter jurisdiction over this action under three separate provisions of the U.S. Code. Compl. ¶ 7. The Court has subject-matter jurisdiction under: (1) 28 U.S.C. § 1331, because this action arises under federal law; (2) 28 U.S.C. § 1337(a), because this action arises under statutes "regulating commerce or protecting trade and commerce against restraints and monopolies"; and (3) 28 U.S.C. § 1345, because this is a "civil action[] commenced by … an[] agency" of the United States. Each of these independent sources of subject-matter jurisdiction is well established for FTC suits under Section 13(b).[2] Yet Surescripts does not address any of them.

Surescripts instead asserts that Section 13(b) of the FTC Act limits the Court's subject-matter jurisdiction. Mot. 13-14. To be sure, some older lower court decisions have improperly treated whether an action was a "proper case" as a question of subject-matter jurisdiction. *See FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 563 (D. Md. 2005); *FTC v. Abbott Labs.*, No. 92-

---

[2] *See, e.g.*, *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 853 (9th Cir. 2018) (en banc) ("AT&T's characterization of its motion [as challenging the court's subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1)] is incorrect. Although AT&T disputes the FTC's regulatory jurisdiction, the district court had federal question jurisdiction because the dispute was one 'arising under' federal law. 28 U.S.C. § 1331."); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015) (holding that the district court had "subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 1345"); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1022 n.1 (7th Cir. 1988) (similar); *FTC v. Mallett*, 818 F. Supp. 2d 142, 147 (D.D.C. 2011) ("Subject matter jurisdiction is a simple matter; the Court plainly has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1337(a), and 1345.").

cv-1364, 1992 WL 335442, at *2 (D.D.C. Oct. 13, 1992). Beginning in 2006, however, the

Supreme Court brought "some discipline to the use of the term 'jurisdiction.'" *Sebelius v.*

*Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (quotation mark omitted). The central case,

*Arbaugh v. Y&H Corp.*, sets out a "readily administrable bright line" to assess whether a

statutory provision actually governs the Court's "authority to adjudicate the claim in suit." 546

U.S. 500, 511, 516 (2006).[3] Under the controlling test, a statutory provision is jurisdictional only

if Congress has "clearly state[d]" so. *Id.* at 515. If not, the provision must be treated "as

nonjurisdictional in character." *Id.* at 516. Surescripts fails to acknowledge *Arbaugh* and its

progeny, let alone apply the required test to Section 13(b).

Under the Supreme Court's test, Section 13(b) is not jurisdictional. Section 13(b) grants

the FTC authority to sue in federal district court; it does not "purport to limit the *court*'s power"

to hear the claim. *See Montes v. Janitorial Partners, Inc.*, 859 F.3d 1079, 1084 (D.C. Cir. 2017)

(emphasis in original); *Ross v. United States*, 460 F. Supp. 2d 139, 146 (D.D.C. 2006) (Bates, J.)

(holding that a statutory provision was not jurisdictional because it was not "phrased in terms of

… the power of the court to hear the claim"). Because Section 13(b) "speak[s] more to the rights

of the parties than to the Court's authority," Congress has not clearly stated that it is

jurisdictional. *See D.C. Nurses Ass'n v. Brown*, 153 F. Supp. 3d 1, 3 (D.D.C. 2016) (Bates, J.).

The Third Circuit recently so held in *FTC v. Shire ViroPharma, Inc.*, reasoning "Section 13(b)

includes no indicia that Congress intended to 'rank a statutory limitation as jurisdictional.'" 917

F.3d 147, 154 (3d Cir. 2019) (cleaned up) (quoting *Arbaugh*, 546 U.S. at 516). The same result

___

[3] *See also Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1848 (2019); *Sebelius*, 568 U.S. at 153; *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160-62 (2010).

holds here. In short, this Court has subject-matter jurisdiction over this action under 28 U.S.C.

§§ 1331, 1337(a), and 1345. Section 13(b) does not limit that jurisdiction.

### B.    This is a "proper case" under Section 13(b) of the FTC Act

Surescripts contends that Congress included the words "proper cases" in the permanent

injunction proviso to implicitly confine the FTC's authority to only those cases alleging

"routine," "straightforward," and "run-of-the-mill" violations. Mot. 17-24. The statutory text of

Section 13(b), however, empowers the FTC to seek injunctive relief in federal district court to

remedy violations of "any provision of law enforced by the Federal Trade Commission." 15

U.S.C. § 53(b).[4] If Congress had meant to restrict that authority to "routine" cases, it would have

expressly said so, rather than hiding such a limitation behind the ordinary phrase "proper cases."

Surescripts's atextual "routine" violation requirement is also irreconcilable with the

legislative history and purpose of Section 13(b) and four decades of case law. In addition, such a

limitation would be unworkable in practice. It would engender threshold debates about whether

the FTC's legal theory is "novel" or the alleged violation sufficiently "straightforward," long

before any evidence is presented. Such an unadministrable rule would waste judicial resources

and hinder effective law enforcement.

---

[4] *See, e.g.*, *FTC v. Evans Prods. Co*., 775 F.2d 1084, 1086-87 (9th Cir. 1985); *H.N. Singer*, 668 F.2d at 1113; *Ameridebt*, 373 F. Supp. 2d at 562-63; *FTC v. Mylan Labs., Inc*., 62 F. Supp. 2d 25, 36 (D.D.C. 1999); *FTC v. Va. Homes Mfg. Corp*., 509 F. Supp. 51, 54 (D. Md.), *aff'd mem*., 661 F.2d 920 (4th Cir. 1981).

### 1. The text of Section 13(b) does not limit FTC permanent injunction suits to "routine" cases

The FTC Act does not define the term "proper cases." Nor is the phrase a term of art.[5]

Absent some indication to the contrary, words in statutes are to be given their ordinary meaning.

*Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The word "proper," which appears five times in

Section 13(b), means "appropriate" or "suitable." *American Heritage Dictionary of the English

Language*, at 1452 (3d ed. 1992). Thus, a proper case is any case in which a permanent

injunction would be "appropriate," i.e., any case in which a law enforced by the FTC has been

violated and equitable remedies are needed to make harmed consumers whole.[6]

Surescripts's contention that the term "proper cases" necessarily limits the FTC's

authority to routine cases relies on two unpersuasive textual arguments. First, Surescripts points

to Congress's creation of the FTC in 1914 and claims that bringing non-routine permanent

---

[5] By contrast, Section 13(b)'s authorization of a "permanent injunction" does invoke a term of art. For it is well established that, when an agency of the United States prosecutes a civil enforcement action in the public interest, an unqualified grant of authority to a court to enter a permanent injunction carries with it authority to use "all the inherent equitable powers" of the district court "for the proper and complete exercise of that jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92 (1960) ("When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes.").

Surescripts's motion makes incorrect claims about the Court's equitable authority to award monetary relief under Section 13(b). Mot. 3-4, 23-24. But as Surescripts concedes, the question of appropriate remedies for a proven violation is "a matter for another day" (Mot. 3). *See FTC v. Cantkier*, 767 F. Supp. 2d 147, 160 (D.D.C. 2011) ("The relief available for Plaintiff's claims is a question best addressed once an entitlement to relief is proven.").

[6] Other federal statutes' use of "proper case" also indicates that Congress uses the term to mean an "appropriate" case, that is, a case in which the ordinary elements of a claim or remedy are present. *See, e.g.*, 28 U.S.C. § 1605(c) ("Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien …."); 9 U.S.C. § 7 (arbitrator may "in a proper case" require production of documentary evidence); 48 U.S.C. § 872 (district courts in Puerto Rico "may grant writs of mandamus in all proper cases").

injunction cases in federal court would be inconsistent with the agency's core mission. Mot. 15-16. But that argument ignores Congress's actions over the last century to expand the FTC's responsibilities and enforcement tools to adapt to an evolving marketplace.[7]

Second, Surescripts asserts that "proper cases" must be interpreted as a limit on the FTC's express authority to bring suit for violations of "any provision of law enforced by the [FTC]," or else the words "proper cases" are rendered "meaningless." Mot. 17-18. To be sure, courts "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991). But here, the term "proper cases" is not superfluous: it means any case the Commission determines is appropriate to file directly in federal court to prosecute a violation of a law the FTC enforces.[8]

Surescripts also ignores the context of the "proper cases" language. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (quotation marks omitted). In the context of Section 13(b) as a whole, the "proper cases" language, in addition to the "provided further" cue, help signal the shift from the first grant of authority—to seek a *preliminary* injunction in aid of an administrative adjudication—to the second "entirely different" authorization,[9] namely suits for *permanent* injunctive relief. The reference to "proper cases" serves a function, just not one of limitation as Surescripts insists.

---

[7] *See, e.g.*, Wheeler-Lea Act, Pub. L. No. 75-447, 52 Stat. 111 (1938); Fair Credit Reporting Act, 15 U.S.C. § 1681; The Magnuson-Moss Warranty–Federal Trade Commission Improvement Act, 15 U.S.C. § 2301; Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101; Children's Online Privacy Protection Act, 15 U.S.C. § 6501.

[8] *See supra* n.4; *infra*, Part I.B.3.

[9] *JS & A Grp.*, 716 F.2d at 456.

Moreover, Surescripts misunderstands the interpretive principle against superfluous statutory language. It is a maxim to aid in statutory construction, not an unyielding legal rule. As Justice Scalia's treatise on statutory interpretation cautions, "like all other canons, this one must be applied with judgment and discretion, and with careful regard for context." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012).[10] For example, the Supreme Court's unanimous decision in *United States v. Atlantic Research Corp.* explained that "[i]t is appropriate to tolerate a degree of surplusage" where, as here, statutory language performs a "clarifying" function. 551 U.S. 128, 137 (2007). Justice Scalia likewise observes: "[A] court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage." Scalia & Garner, *supra*. Here, the ordinary meaning is the right one: a proper case is one that is suitable or appropriate for the FTC to seek a permanent injunction.

> ### 2. The legislative history of Section 13(b) does not show that Congress intended to limit FTC permanent injunction suits to "routine" cases

Surescripts's legislative history argument rests solely on a passage in a Senate committee report (Mot. 18 (citing S. Rep. No. 93-151, at 30-31 (1973))) that addressed an earlier version of Section 13(b), before it was expanded to cover "any provision of law enforced by the Federal Trade Commission," including antitrust cases.[11] Courts are wary of relying on snippets of legislative history to engraft limitations onto statutory text not present in the text itself. *See, e.g.*,

---

[10] *See also id.* at 154 ("[T]he rule that a proviso introduces a condition has become a feeble presumption. One now often finds *provided that* introducing not a condition to an authorization or imposition, but an exception to it or indeed even an addition to it.").

[11] The May 1973 committee report cited by Surescripts addressed a provision that would have granted the FTC authority to proceed in federal court only to enjoin "unfair or deceptive" practices. On June 26, 1973, Senator Jackson introduced Senate Bill 2074 to amend the FTC Act, which expanded the proposed 13(b) provision to violations of "any provision of law enforced by the Federal Trade Commission." 119 Cong. Rec. 21,443-44 (June 28, 1973). This version of Section 13(b) was enacted as part of the Trans-Alaska Pipeline Act, Pub. L. No. 93-153, § 408, 87 Stat. 592 (1973).

*Graham Cty. Soil & Water Cons. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 291-92

(2010); *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982). That principle applies here: the

Senate committee report does not define the term "proper cases," nor does it describe the term as

a limitation on the FTC's authority. The report merely identifies two examples of when the FTC

might choose to proceed directly in federal court. One example is "the routine fraud case … in

which [the FTC] does not desire to further expand upon the prohibitions of the Federal Trade

Commission Act through the issuance of a cease-and-desist order." S. Rep. No. 93-151, at 31.[12]

Whatever the committee report meant by "routine" fraud, it does not purport to constrain the

FTC's prosecutorial discretion to choose the forum that will best allow effective use of the

Commission's law enforcement resources. Had Congress contemplated such a limitation, it

would have said so in the statutory text.

Moreover, the Supreme Court has made clear that "the language of a statute—particularly

language expressly granting an agency broad authority—is not to be regarded as modified by

examples set forth in the legislative history." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496

U.S. 633, 649 (1990); *see also Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) ("This Court

frequently has observed that a statute is not to be confined to the 'particular application[s] …

contemplated by the legislators.'") (quoting *Barr v. United States*, 324 U.S. 83, 90 (1945)).

Indeed, the same committee report Surescripts cites confirms Congress's intent to establish

"expanded powers for a revitalized Federal Trade Commission, to enable it to protect consumers

… effectively." S. Rep. No. 93-151, at 9. The report states that the bill "would permit the

Commission to obtain either a preliminary or permanent injunction … against *any* act or practice

---

[12] The other example is where the court might be reluctant to grant preliminary relief pending administrative adjudication "because it cannot be assured of an early hearing on the merits." S. Rep. No. 93-151, at 30-31.

which is unfair or deceptive to a consumer." *Id.* at 30 (emphasis added).[13] Surescripts's

suggestion that one committee's reference to "routine fraud" cases was meant to modify the

ordinary meaning of "proper cases" and limit the authority granted by the broader statutory text

has no basis in either text or legislative history.

> **3.   The case law is well-settled that Section 13(b) does not limit the FTC's authority to bring permanent injunction suits to challenge only "routine" cases**

Since Section 13(b) was enacted over 40 years ago, no court has ever dismissed an FTC

suit for failing to allege that it is a "proper case." To the contrary, courts have repeatedly held

that a "proper case" is any case the Commission chooses to bring in federal court to remedy a

violation of "any provision of law" enforced by the FTC.[14] In *Evans Products*, for example, the

Ninth Circuit emphasized that the "attempt[] to limit § 13(b) to cases of 'routine fraud' or

violations of previously established FTC rules" rested on a misreading of both the legislative

history and the court's earlier decision in *Singer*. 775 F.2d at 1087.[15] In *Ameridebt*, the court

found "proper" a case presenting "novel and difficult legal issues" in which the Commission

alleged violations of Section 5 in the marketing of debt management services against a purported

non-profit entity. 373 F. Supp. 2d at 562-63. And in *Mylan*, Judge Thomas F. Hogan rejected an

argument that Section 13(b) could not be used to challenge a non-routine monopolization case

---

[13] Other legislative history also reflects an intent to provide the FTC with discretion to sue for permanent injunctive relief. *See, e.g.*, 119 Cong. Rec. 21,443 (June 28, 1973) (sponsor Senator Jackson stating that his amendment to the FTC Act granted "major new statutory authority" for a "full range of powers and legal authority" the FTC needed to prevent unfair methods of competition); 119 Cong. Rec. 36,610 (Nov. 12, 1973) (House floor manager stating that the authorization of preliminary and permanent injunctions "would provide the Commission with comparable authority to that already possessed by the Attorney General in antitrust cases").

[14] *See supra* n.4.

[15] Surescripts commits the same error when it argues that *Singer*'s statement that a "routine fraud case is a proper case" was a holding that "'proper case' … mean[s] 'routine' claims." Mot. 20.

involving vertical restraints between a manufacturer and its supplier: "Although the permanent injunction proviso speaks of 'proper cases,' there is nothing in the statute, regulations, or case law restricting the statutory term 'proper cases' to *per se* violations of the antitrust laws." 62 F. Supp. 2d at 36.[16]

Though Surescripts asserts that the FTC cannot invoke the permanent injunction proviso "in a complex, novel, and unsettled Sherman Act setting" (Mot. 4), the meaning of "proper case" has become such settled law that it is rarely raised. This is so even though the FTC has invoked its authority under Section 13(b) in a wide variety of non-"routine" antitrust[17] and consumer protection[18] cases. Indeed, under Surescripts's theory, *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)—which required consideration of the interplay between antitrust and patent law in the context of the complex statutory framework governing branded and generic drugs—should never have been heard by the federal district court, let alone decided by the Supreme Court.

---

[16] Congress has not amended Section 13(b) to override these unanimous precedents, though it has repeatedly amended the FTC Act over the four decades since Section 13(b) was enacted. *See, e.g.*, Federal Trade Commission Act Amendments of 1994, Pub. L. No. 103-312, § 10, 108 Stat. 1691, 1695 (1994).

[17] *See, e.g.*, *FTC v. Qualcomm Inc.*, No. 17-cv-00220, 2019 WL 2206013 (N.D. Cal. May 21, 2019) (challenging patent license terms as unlawful monopolization); *FTC v. Cephalon, Inc.*, No. 08-cv-2141, 2019 WL 2111253 (E.D. Pa. Feb. 21, 2019) (challenging reverse-payment patent settlements); *FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98 (E.D. Pa. 2018) (challenging two patent infringement suits as sham litigation).

[18] *See, e.g.*, *FTC v. Cornerstone & Co., LLC*, No. 14-cv-01479 (D.D.C. Aug. 2014) (first Commission challenge to debt broker's failure to take adequate measures to prevent disclosure of consumers' sensitive personal information without consent as an unfair practice); *FTC v. D Squared Sols., LLC*, No. 03-cv-3018 (D. Md. Oct. 2003) (first Commission challenge alleging unfair practice to use a computer program to barrage consumers with pop-up ads); *FTC v. Certified Merch. Servs., Ltd.*, No. 4:02-cv-44 (E.D. Tex. Feb. 2002) (first Commission challenge alleging unfairness against a payment processor that debited customer accounts without authorization).

Unable to identify a single example of a court dismissing a case for not being "proper," Surescripts points to the Seventh Circuit's decision in *World Travel* and the decision by another court in this district in *Abbott Laboratories*. Mot. 18-20. Surescripts misreads both.

Far from limiting the permanent injunction proviso, *World Travel* held that proviso "at least" encompasses routine violations. 861 F.2d at 1028 (finding it "quite clear that Congress at least expected" that "a straightforward violation of section 5" fell within the proviso). Indeed, the Seventh Circuit expressly declined to define any outer boundaries of "proper cases." *Id*. It acknowledged the "substantial argument" supporting the consensus of "several other courts" that the statute "permits the FTC to proceed under the last proviso of section 13(b) for any violation of a statute administered by the FTC." *Id.* The court found it unnecessary to rule on that argument, however, because the case before it was "proper" even under a narrow reading of Section 13(b). *Id.* Thus, unlike Surescripts, *World Travel* did not violate the Supreme Court's admonition that examples in legislative history do not limit statutory text. *See supra*, Part I.B.2.

*Abbott Laboratories* took the same approach. In a three-page decision, the court held the alleged *per se* price-fixing conspiracy was a "proper case" within the meaning of the permanent injunction proviso. 1992 WL 335442, at *2. *Abbott Laboratories*, however, did not hold that Section 13(b) limited the FTC to bringing only those antitrust cases alleging price fixing or other similarly "straightforward" violations. In fact, the court also allowed a decidedly non-routine count of the FTC's complaint—an allegation of unilateral price-sharing conduct—to proceed so long as there was no pending administrative hearing. *Id*.

There is thus no merit to Surescripts's contention that *Abbott Laboratories* conflicts with *Mylan* (Mot. 21), the only other decision to address the meaning of "proper cases" in an antitrust suit. In both, the courts allowed the FTC's claims to proceed. This Court should do the same.

19

Finally, Surescripts goes even further astray when it asks this Court to consider "secondary authorities" (in the form of statements by current and former FTC officials) that purportedly undermine *Mylan*'s holding. *See* Mot. 22-23. Even if they were pertinent, these statements provide scant support for Surescripts's theory.[19]

### 4. Surescripts's "proper case" argument fails as a matter of policy

In addition to misreading the statutory text, legislative history and purpose, and case law, Surescripts proposes a judicially unadministrable standard to define "proper cases" under Section 13(b).[20] Under Surescripts's theory, the FTC cannot bring enforcement suits in federal court if: there is something not "run-of-the-mill" about the FTC's legal theory (Mot. 25); the FTC's case involves a "novel or cutting edge" economic concept (Mot. 26); the Supreme Court has recently weighed in on one area implicated by the suit (Mot. 26-27); "debate continues among economists" (Mot. 28 (quotation mark omitted)); the FTC's claims implicate other federal laws (Mot. 28); or "more legislation is under consideration" that may affect the relevant market (Mot. 28-29). There is no apparent limit to the scope of Surescripts's test.

Surescripts's misguided reading of Section 13(b) would also trigger wasteful threshold litigation about whether an alleged violation is sufficiently "routine" or "straightforward" to

---

[19] For example, two former FTC officials merely state that the words "proper case" in Section 13(b) "suggests" that some cases—primarily consumer protection "advertising substantiation" suits—are not proper and that "one way" to determine when a case is proper "might be to consider … whether the case presents a straightforward violation of Section 5." J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance: Redress under Section 13(b) of the FTC Act*, 79 Antitrust L.J. 1, 28, 32-33 (2013) (quoted in Mot. 22). Moreover, an article by another former FTC official rejects this view, pointing to case law holding "that a 'proper case' under Section 13(b) is one that involves a violation of 'any of the laws enforced by the Commission.'" *See* David C. Vladeck, *Time to Stop Digging: Failed Attacks on FTC Authority to Obtain Consumer Redress*, 31 Antitrust 89, 93 (Fall 2016).

[20] *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) (pointing to the "judicially unadministrable nature" of a statutory requirement governing state Medicaid programs as a reason to vest authority for its enforcement in a federal agency alone).

challenge in a stand-alone federal court suit. This would require courts to second-guess the

FTC's exercise of its prosecutorial discretion without any meaningful standard to apply, long

before any evidence is presented. It would thereby threaten to impede a substantial portion of the

FTC's antitrust and consumer protection enforcement program. That is neither what the statute

requires nor what Congress could have intended.

Surescripts's arguments thus provide no reason for this Court to depart from "the

virtually unflagging obligation of the federal courts to exercise the jurisdiction given them."

*Edge Inv., LLC v. District of Columbia*, 927 F.3d 549, 552 (D.C. Cir. 2019) (quotation marks

omitted). Federal district courts regularly decide monopolization cases, and this Court is well-

equipped to address the monopolization claims here. Governing precedent in this Circuit, the

seminal en banc decision in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en

banc), provides a roadmap for assessing monopolization claims involving exclusive contracts,

technology, and network effects.

In sum, Section 13(b)'s text, legislative history and purpose, and case law all refute

Surescripts's argument that Congress conditioned the availability of permanent injunction suits

on a threshold determination of whether the violation alleged is "routine." Such an impractical

approach under a standardless test fails as a matter of law, policy, and common sense.

## II.     The FTC's Complaint States Valid Claims of Monopolization

Surescripts's second argument is that the FTC has not stated a valid claim for

monopolization of the routing and eligibility markets. The offense of monopolization requires

two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a

consequence of a superior product, business acumen, or historic accident." *United States v.

Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Surescripts's motion does not dispute the

monopoly power element. *See* Mot. 6 n.3, 29-30. Surescripts instead challenges only the second element: that Surescripts has illegally maintained its monopolies through exclusionary conduct.

Surescripts's burden is a heavy one. A motion to dismiss can be granted only if the FTC's Complaint does not allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of exclusionary conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A court "should assume the[] veracity" of well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), which "should be liberally construed in [the plaintiff's] favor" and drawing "every favorable inference … from the allegations of fact," *Hughes v. Abell*, 634 F. Supp. 2d 110, 113 (D.D.C. 2009) (Bates, J.). Under these settled standards, the FTC has plausibly alleged that Surescripts maintained its monopolies through exclusionary conduct.

### A. The FTC plausibly alleges that Surescripts monopolized the routing and eligibility markets by conditioning lower prices on exclusivity, among other anticompetitive actions

The second element of monopolization requires exclusionary or predatory acts that prevent or exclude competition. *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) (citing *Microsoft*, 253 F.3d at 58). Exclusionary conduct "can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998). It is settled, however, that a monopolist's conduct is exclusionary if, "through something other than competition on the merits, [it] has the effect of significantly reducing usage of rivals' products and hence protecting its own … monopoly." *Microsoft*, 253 F.3d at 65. Conduct that might be permissible in a competitive market, moreover, "may be impermissibly exclusionary when practiced by a monopolist." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005); *see also Microsoft*, 253 F.3d at 70 (noting that exclusive dealing by a monopolist "may give rise to a § 2 violation even though the contracts foreclose less

than the … share usually required" for non-monopolists). Where the complaint alleges various

exclusionary acts, a court is "required to take a holistic look at how the interlocking agreements

actually impact competition" by "considering the totality of the nature or character of the

contracts." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. 17-56119, 2019 WL

3788253, at *9 (9th Cir. Aug. 13, 2019) (internal quotation marks omitted); *see also Cont'l Ore*

*Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[Antitrust] plaintiffs should

be given the full benefit of their proof without tightly compartmentalizing the various factual

components and wiping the slate clean after scrutiny of each.").

The FTC's Complaint alleges that Surescripts unlawfully maintained its monopolies by

engaging in a course of exclusionary conduct that has prevented meaningful competition for the

last decade. The cornerstone of Surescripts's unlawful monopolization is a web of loyalty

contracts with nearly all of its customers that condition discounts on exclusivity. Compl. ¶ 64.

Such loyalty contracts "drive[] out [competitors] not because they cannot compete on a price

basis, but because they are never given an opportunity to compete." *ZF Meritor, LLC v. Eaton*

*Corp.*, 696 F.3d 254, 281 (3d Cir. 2012). Because the "practical effect" of loyalty contracts is to

prevent a customer from using the goods of a competitor, courts routinely analyze them under

the "exclusive dealing" framework. *See, e.g.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S.

320, 326 (1961) (holding that an exclusive deal does not require "specific agreements not to use

the (goods) of a competitor[] if the practical effect is to prevent such use" (internal quotation

marks omitted)).[21]

---

[21] *See also ZF Meritor*, 696 F.3d at 281 (analyzing loyalty pricing contracts as exclusive
dealing); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016) (same); *In re*
*EpiPen (Epinephrine Injection, USP) Mkt., Sales Practices and Antitrust Litig.*, No. 17-md-
(Continued…)

The controlling decision for analyzing monopolization via exclusive dealing is *Microsoft*. The en banc D.C. Circuit explained that a monopolist's use of exclusive contracts can be exclusionary when those contracts impair the ability of rivals to achieve the scale necessary to efficiently compete. 253 F.3d at 70-71. When a monopolist denies potential rivals the opportunity to become effective competitors, the monopolist can maintain monopoly prices and thereby harm consumers. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1802c (3d & 4th eds., Supp. 2019) (explaining that when a dominant incumbent imposes a "set of strategically planned exclusive-dealing contracts" that "slow the rival's expansion," "[c]onsumer injury results from the delay that the dominant firm imposes on the smaller rival's growth"). Applying this standard, the D.C. Circuit held that Microsoft's exclusive dealing arrangements with the top Internet Access Providers (IAPs) were exclusionary because they substantially foreclosed a potential rival (Netscape) from obtaining a critical mass of users: "By ensuring that the 'majority' of all IAP subscribers are offered [Microsoft's Internet Explorer] either as the default browser or as the only browser, Microsoft's deals with the IAPs … help keep usage of [Netscape's] Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly." 253 F.3d at 71. Such a showing met the government's prima facie case of "demonstrat[ing] a harm to competition." *Id.*

Under *Microsoft*, the FTC's detailed Complaint amply alleges exclusionary conduct to illegally maintain two monopolies, primarily through loyalty contracts. These contracts—with virtually all of Surescripts's customers on both sides of each of the routing and eligibility markets—condition discounts or payments on loyalty, i.e., using Surescripts exclusively. Compl.

---

2785-DDC-TJJ, 2017 WL 6524839, at *6-7 (D. Kan. Dec. 21, 2017) (same); *Unistrip Techs., LLC v. Lifescan, Inc.*, 153 F. Supp. 3d 728, 736-38 (E.D. Pa. 2015) (same).

¶¶ 65-67. To be considered exclusive, Surescripts requires that its customers on both sides send all or nearly all of their transactions through the Surescripts network. *Id.* ¶¶ 66-68. If a pharmacy or PBM does not maintain exclusivity, it pays a higher per-transaction price or, in the case of EHRs, receives no per-transaction incentive payment. *Id.* ¶¶ 68, 78. The non-loyal price can be close to ▮▮ higher than the loyal price. *Id.* ¶¶ 70-71. In many contracts, Surescripts imposes clawback provisions that require retroactive repayment of discounts or incentives for breaking exclusivity. *Id.* ¶¶ 72-75, 79. Because many customers send millions of transactions across the Surescripts network, paying the higher non-loyal price would result in hundreds of thousands or even millions of dollars in cost increases. *Id.* ¶ 68. In addition to its loyalty contracts, Surescripts has maintained its monopolies by entering into pretextual agreements to sideline a major possible competitor and by coercing key customers to remain exclusive. *Id.* ¶¶ 88-99, 100-27, 137-56.

This expansive web of loyalty contracts and other anticompetitive conduct—much of it imposed right as the market was ripe for competitor entry in 2009—has made it impossible for any competitor to obtain the critical mass necessary to break into routing or eligibility. Compl. ¶¶ 65, 83. As the Complaint alleges, Surescripts itself has recognized that because of its dominant share of both markets, no competitor can offer a low enough price on a high enough volume of transactions to make up for the huge penalties Surescripts's contracts inflict on any customer that becomes non-loyal. *See, e.g.*, *id.* ¶ 134 ("eRx/Emdeon can undercut Surescripts on price, but only on a margin of volume … and Surescripts pricing differential on pharmacy side and loyalty incentive program on [EHR] side are worth more than eRx / Emdeon's proposition on <10% of scripts."); *id.* ¶ 132 ("Surescripts's efforts to lock in our customers through Loyalty programs have likely had a strong impact to Emdeon's initial strategy" and the contracts have "diminished" "Emdeon's ability to rapidly become a full national alternative to Surescripts.").

25

By locking up at least 70% of each side of each market, Surescripts has made the

chicken-and-egg problem insurmountable for competitors, resulting in near-total foreclosure.

Compl. ¶¶ 172-76; *cf. Microsoft*, 253 F.3d at 70 (noting that a monopolist's use of exclusive

contracts foreclosing less than 40-50% of the market may give rise to Section 2 liability). And by

preventing potential rivals from becoming meaningful competitors, Surescripts's exclusionary

course of conduct harms competition, maintains monopoly pricing, reduces innovation, and

lowers output—all to the detriment of consumers. *Id.* ¶¶ 171-215.

      **B.**    **Surescripts's challenges to the FTC's Complaint are legally and factually wrong**

Surescripts raises four primary disputes with the FTC's well-pleaded exclusive dealing

allegations: (1) Surescripts's contracts are not exclusive; (2) Surescripts's contracts are short-

term; (3) the FTC has not properly alleged harm to competition; and (4) the FTC must show that

Surescripts is pricing below cost. All of these arguments are wrong on the law, the facts, or both.

        **1.**    **Surescripts's agreements are exclusive or *de facto* exclusive**

Surescripts disputes the allegation that its loyalty contracts are "exclusive," insisting that

it is merely offering "[o]ptional low pricing." Mot. 31. But the fact that Surescripts's contracts

condition discounts or payments on exclusivity, rather than explicitly prohibiting using a

competitor's product, makes no difference as a matter of law. "[A]ntitrust policy should not

differentiate between the manufacturer of widgets that explicitly imposes exclusive dealing on its

dealers and the manufacturer that gives such dealers a discount or rebate for dealing exclusively

in the manufacturer's widgets." Areeda & Hovenkamp, *supra*, ¶ 1807b1. The relevant issue is

whether the "practical effect" of the conduct is to "prevent" use of the competitor's product, not

whether the contract "contain[s] specific agreements not to use the (goods) of a competitor."

*Tampa Elec.*, 365 U.S. at 326 (cleaned up); *see also Microsoft*, 253 F.3d at 75 (affirming district

court's finding that "although not literally exclusive, the deals were exclusive in practice"); *ZF Meritor*, 696 F.3d at 270 ("An express exclusivity requirement, however, is not necessary because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world." (cleaned up)). Where loyalty discounts have the "practical effect" of excluding rivals, they can constitute unlawful *de facto* exclusive dealing. *See ZF Meritor*, 696 F.3d at 282-83.[22]

That is what the FTC alleges here. Contrary to Surescripts's contention, it is not "purely optional" to do business with Surescripts exclusively. Mot. 31. Indeed, many of Surescripts's contracts—as well as those contracts imposed by its partner, RelayHealth—explicitly require key customers to agree to exclusivity. Compl. ¶¶ 82, 93, 109. For the vast majority of the rest, Surescripts's loyalty scheme makes it economically impractical to avoid doing business with Surescripts exclusively. *Id.* ¶¶ 68, 78, 176-79. As Surescripts explained to a large pharmacy customer: "eRx/Emdeon cannot save Rite Aid money in e-prescription routing by splitting traffic: While eRX may offer a low introductory price, they can only do so for a subset of your transactions [and] Rite Aid would still need to route the great majority of transactions through Surescripts and RelayHealth." *Id.* ¶ 130. Because of Surescripts's loyalty scheme, there is no price that a competitor can offer to win business that would lower a customer's total routing costs. *Id.* ¶¶ 130-35. Surescripts's exclusive contracts eliminate the ability of any customer to multihome, thereby foreclosing the most efficient means for any competitor to break into routing and eligibility. *See Microsoft*, 253 F.3d at 64 (holding Microsoft liable for monopolization

---

[22] *See also In re EpiPen*, 2017 WL 6524839, at *7 (finding loyalty pricing contracts *de facto* exclusive); *Unistrip*, 153 F. Supp. 3d at 737-38 (same).

because "although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones").

Surescripts offers various reasons why its contracts are "optional." These arguments wrongly ask the Court to disregard the Complaint's detailed factual allegations, which must be accepted as true and "liberally construed in [the FTC's] favor." *Hughes*, 634 F. Supp. 2d at 113.

First, Surescripts disputes the FTC's allegations, arguing that its contracts are not exclusive because they allow EHRs to transact with pharmacies Surescripts cannot reach. Mot. 43. The Complaint, however, shows that this "exception" is meaningless, as there are practically no pharmacies that Surescripts cannot reach. Compl. ¶ 32 ("Nearly all routing and eligibility customers use Surescripts's platform."). That Surescripts's contracts may allow an EHR to use a Surescripts competitor for transactions to the imaginary pharmacies that cannot be reached by Surescripts does not mean that customers are "free to multihome" (Mot. 43). *See ZF Meritor, LLC v. Eaton Corp.*, 769 F. Supp. 2d 684, 689 (D. Del. 2011) (upholding the jury's finding that the defendant's exclusive contracts violated antitrust laws despite "a 'competitive' clause that allowed [a customer] to purchase transmissions from another supplier if said supplier offered [a customer] a lower price, the [customer] notified defendant of the price, and the price could not be met after good faith negotiations"), *aff'd*, 696 F.3d 254.

Second, Surescripts argues that it has not engaged in "true exclusive dealing" because a few pharmacy-side customers, such as Kroger and Rx30, have at some point multihomed without being disconnected from the Surescripts network. Mot. 12, 31. As *Microsoft* makes clear, however, a monopolist's anticompetitive exclusion of a rival can be unlawful even if the rival is not "completely blocked from distributing its products." 253 F.3d at 64. "The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely

28

restrict the market's ambit." *Dentsply*, 399 F.3d at 191; s*ee also ZF Meritor*, 696 F.3d at 287

("[T]he mere existence of potential alternative avenues of distribution, without an assessment of

their overall significance to the market, is insufficient to demonstrate that … opportunities to

compete were not foreclosed." (internal quotations omitted)). As the FTC alleges, at least 70-

80% of pharmacy, EHR, and PBM volume is exclusive to Surescripts. Compl. ¶¶ 172-74. That

the vast majority of customers cannot accept the significant "economic pain" associated with

higher non-loyal prices (*id*. ¶ 195) confirms that the "practical effect" of Surescripts's contracts

is exclusivity. *Tampa Elec.*, 365 U.S. at 326.

    Third, Surescripts argues that the FTC does not allege enough supporting facts to show

that ▮▮ and ▮▮▮ health system customers are required to be exclusive. Mot. 43. Even

assuming ▮▮ and its health system customers are not required to be exclusive, "[t]he question

of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line

of commerce is a merits question not proper for the pleading stage." *In re Ductile Iron Pipe*

*Fittings Direct Purchaser Antitrust Litig.*, No. 12-cv-711, 2013 WL 812143, at *19 (D.N.J. Mar.

5, 2013). And Surescripts's argument is again based on asserted facts that contradict the

allegations in the Complaint. For example, while Surescripts argues that ▮▮ (the EHR) has no

exclusivity provision itself (Mot. 43), Surescripts ignores the allegation—based on internal

Surescripts documents—that "▮▮ is loyal 'for all appropriate purposes.'" Compl. ¶ 81.

Surescripts likewise admits that at least some contracts with ▮▮ customers included

exclusivity language after 2011. Mot. 11 n.8. But Surescripts asks the Court to reject the FTC's

allegation that "Surescripts's contracts with nearly all individual ▮▮ customers also contain

express exclusivity requirements" (Compl. ¶ 82) because Surescripts says that the allegation is

"flatly wrong" (Mot. 11). That is the opposite of the governing standard for a motion to dismiss.

*See Hughes*, 634 F. Supp. 2d at 113. Surescripts's erroneous arguments thus do not alter the Complaint's plausible allegations that Surescripts's contracts are actually or *de facto* exclusive.

### 2. Surescripts's agreements are long-term and not easily terminable

Surescripts also argues that the Complaint fails to adequately allege unlawful exclusive dealing because the contracts' loyalty provisions are short-term and easily terminable, pointing to one example that is limited to one side of each network that has a six-month termination clause. Mot. 10 & n.6, 43-44.[23] Even crediting Surescripts's lone cherry-picked example, the FTC's Complaint contains numerous plausible allegations that Surescripts's contracts are long-term[24] and not easily terminable.[25] Surescripts's own documents show that it understood customers were locked into long-term contracts. *E.g.*, Compl. ¶ 85 ("Our 3 year commitments keep[] our competition out of those customers."). Surescripts's factual dispute with these allegations cannot be resolved on a motion to dismiss. *See Iqbal*, 556 U.S. at 679.

In any event, Surescripts's contention that facially short-term and easily terminable contracts "lead[] to a presumption of legality" and lack of foreclosure (Mot. 44) is wrong on the

---

[23] Surescripts also notes that the termination provision in the ▮▮▮▮▮▮ contract "robs it" of any effect from the clawback provisions. Mot. 10 n.6. This is a factual dispute involving just one EHR contract, and the FTC has plausibly alleged that clawbacks (1) were substantial (Compl. ¶¶ 72, 79 (totaling "millions of dollars" and requiring repayment "over the full term of the contract")); (2) intended to force exclusivity (*id.* ¶¶ 73-74 (characterizing clawbacks as the "teeth" of the contracts)); and (3) created substantial lock-in effects (*id.* ¶¶ 177-78). And the Complaint alleges clawbacks in not just EHR contracts, but also pharmacy and PBM contracts. *Id.* ¶¶ 74-75.

[24] Compl. ¶ 84 (vast majority of Surescripts's e-prescribing contracts are three years or more); *id.* ¶ 110 (2010 Allscripts contract is four years); *id.* ¶ 126 (2015 Allscripts contract is five years); *id.* ¶ 150 (2010 RelayHealth contract is five years); *id.* ¶ 151 (2015 RelayHealth contract is three years and still in place today).

[25] Compl. ¶¶ 4, 100-27 (detailing series of threats toward crucial customer and customer's credible fear that "Surescripts would have cut us off" if it did not sign five-year exclusive agreement); *id.* ¶ 167 (alleging that Surescripts is a "must-have" for e-prescribing and there is "no 1-1 alternative[]").

law. As discussed, the correct focus is not on the facial terms of the contract, but on the

contract's "probable effect" on competition. *Tampa Elec.*, 365 U.S. at 329. Thus, an exclusive

dealing program can harm competition even if the contracts are "nonbinding … short-term and

voluntary,"[26] "terminable on short notice on their face,"[27] or even if there is no contract at all[28]—

so long as the "practical effect" of the conduct is to foreclose rivals from competing.[29]

      The two cases Surescripts cites (Mot. 42) are not to the contrary. Those exclusive dealing

claims failed because the evidentiary record showed that the challenged conduct did not

sufficiently foreclose the market, consumers had the ability to switch to competitors, and those

competitors had significant sales. *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-

65 (9th Cir. 1997) (reversing district court's post-trial denial of judgment as a matter of law);

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394-96 (7th Cir. 1984) (reversing grant

of preliminary injunction). Here, by contrast, the FTC's Complaint plausibly alleges that

Surescripts's pricing structure and dominance over the relevant markets have not materially

---

[26] *McWane, Inc. v. FTC*, 783 F.3d 814, 833-835, 840 (11th Cir. 2015) (holding that exclusive dealing program harmed competition despite being "nonbinding … short-term and voluntary," and stating "these characteristics do not render the program presumptively lawful").

[27] *Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02-4770 MRP, 2006 WL 1236666, at *6 (C.D. Cal. Mar. 22, 2006) (contracts that are "terminable on short notice on their face" may not be terminable "in practice" and thus can be "de facto exclusive").

[28] *Dentsply*, 399 F.3d at 193 (explaining that non-contractual exclusivity mandates can constitute unlawful monopoly maintenance if "the economic elements involved" in the arrangements make them "as effective as those in written contracts").

[29] *In re EpiPen*, 2017 WL 6524839, at *17 (rejecting motion to dismiss argument that contracts of one to two years cannot harm competition because plaintiff had sufficiently alleged that defendant's rebates conditioned on exclusivity had blocked new entrant from the market); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JLS (ANx), 2013 WL 6229141, at *6-8 (C.D. Cal. Dec. 2, 2013) (concluding plaintiff had sufficiently alleged *de facto* exclusive dealing despite short "short duration" and "short notice" contracts); *Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d 859, 877-78 (S.D. Ohio 2000) (concluding plaintiff's complaint sufficiently alleged antitrust injury even where contract was short term because "the term of the exclusive contract does not render the contract reasonable" in light of other factors).

changed in a decade (*see* Compl. ¶¶ 6, 87), leaving customers with the same "all-or-nothing"

choice to do business with Surescripts exclusively or face prohibitive financial penalties. In sum,

the "practical effect" of Surescripts's scheme is to "break the competitive mechanism and

deprive customers of the ability to make a meaningful choice." *ZF Meritor*, 696 F.3d at 285.

### 3. Surescripts's conduct harmed competition

Surescripts next disputes that the FTC has plausibly alleged that Surescripts's

exclusionary conduct has harmed competition. Mot. 35-44. But Surescripts misunderstands the

harm that must be proven to establish a monopolization violation. Monopolies "carry substantial

social costs, including higher prices, lower output, and a reduced incentive to engage in product

innovation beneficial to consumers." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th

Cir. 1992); *see also* Areeda & Hovenkamp, *supra*, ¶ 403b ("Monopoly thus impairs efficient

resource allocation. When one market is monopolized, resources are diverted from it to other

markets where their contribution to consumer welfare is less."). As *Microsoft* explains, when a

monopolist's "conduct, through something other than competition on the merits, has the effect of

significantly reducing usage of rivals' products and hence protecting its own … monopoly, it is

anticompetitive." 253 F.3d at 65.[30]

The Complaint alleges that Surescripts's conduct has this effect by protecting

Surescripts's monopolies even if a rival were to offer customers a "phenomenally low" price.

---

[30] *See also McWane*, 783 F.3d at 840 ("[I]t is still perfectly plausible to conclude on this record
that [a rival's] growth was meaningfully (and deliberately) slowed and its development into a
rival that could constrain McWane's monopoly power was stunted." (citing *Microsoft*, 253 F.3d
at 71)); *ZF Meritor*, 696 F.3d at 271 ("A set of strategically planned exclusive-dealing contracts
may slow the rival's expansion …. Consumer injury results from the delay that the dominant
firm imposes on the smaller rival's growth." (quoting Areeda & Hovenkamp, *supra*, ¶ 1802c));
*Dentsply*, 399 F.3d at 191 (License restriction called "Dealer Criterion 6" "helps keep sales of
competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's
market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition.").

Compl. ¶ 178. Surescripts, however, looks to *Ohio v. American Express Co.*, 138 S. Ct. 2274

(2018) (hereinafter "*Amex*"), rather than *Microsoft.* But *Amex*—which did not involve claims of

monopolization—does not undermine the analytical framework set forth in *Microsoft.* Moreover,

even if the FTC were required to allege marketwide effects on price, innovation, and output, the

Complaint sufficiently does so.

### a) Under *Microsoft*, a monopolist's substantial foreclosure of rivals' opportunities to compete establishes anticompetitive effects

The FTC meets its burden of pleading a prima facie case of anticompetitive effects by

alleging exclusionary conduct that "reasonably appears capable of making a significant

contribution to maintaining monopoly power." *Microsoft*, 253 F.3d at 79 (cleaned up). A

plaintiff need not plead or prove the conduct caused higher prices or lower output (although the

FTC's Complaint plausibly alleges such effects, *see infra* Part II.B.3.c). *Amex*, 138 S. Ct. at 2284

(stating that plaintiffs can prove anticompetitive effects through indirect evidence, i.e., "proof of

market power plus some evidence that the challenged restraint harms competition"). Antitrust

law protects consumers by protecting the competitive process. It "assesses both harms and

benefits in light of the [Sherman] Act's basic objectives, the protection of a competitive process

that brings to consumers the benefits of lower prices, better products, and more efficient

production methods." *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir.

1988) (Breyer, J.). Protecting the role of "overall consumer preferences in setting output and

prices is more important than higher prices and lower output, *per se*." *Sullivan v. Nat'l Football

League*, 34 F.3d 1091, 1101 (1st Cir. 1994) (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468

U.S. 85, 107 (1984)).

*Microsoft* exemplifies this settled law. The en banc D.C. Circuit held, over and over, that

the "plaintiffs have made a *prima facie* showing that [Microsoft's exclusive] deals have an

anticompetitive effect" by demonstrating, for example, that Microsoft's exclusive deals "ke[pt] rival browsers from gaining widespread distribution," such that "the deals have a substantial effect in preserving Microsoft's monopoly." 253 F.3d at 72.[31] The D.C. Circuit did not require the government to offer as part of its prima face case proof of the ultimate price and output effects that can be expected to flow from the harm to the competitive process.

The Supreme Court's recent *Amex* decision is fully consistent with this broadly accepted law. *Amex* recognized that an antitrust plaintiff can demonstrate its prima facie case in two ways:

> The plaintiffs can make this showing directly or indirectly. Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.

---

[31] *See also id.* at 61 ("[T]he license restriction prevents many OEMs from pre-installing a rival browser and, therefore, protects Microsoft's monopoly from the competition that middleware might otherwise present."); *id.* at 62 (Microsoft's "prohibition on modifying the boot sequence … prevent[s] OEMs from promoting rivals' browsers. Because this prohibition has a substantial effect in protecting Microsoft's market power … it is anticompetitive."); *id.* ("By preventing the OEMs from [promoting rival browsers], this type of license restriction … is anticompetitive: Microsoft reduced rival browsers' usage share not by improving its own product but, rather, by preventing OEMs from taking actions that could increase rivals' share of usage."); *id.* at 65 ("Because Microsoft's conduct … has the effect of significantly reducing usage of rivals' products … it is anticompetitive."); *id.* at 67 ("Plaintiffs plainly made out a *prima facie* case of harm to competition in the operating system market by demonstrating that Microsoft's actions increased its browser usage share …."); *id.* at 71 ("Plaintiffs hav[e] demonstrated a harm to competition" by showing that "[b]y ensuring that the 'majority' of all IAP subscribers are offered I[nternet] E[xplorer] either as the default browser or as the only browser, Microsoft's deals with the IAPs clearly have a significant effect in preserving Microsoft's monopoly; they help keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly."); *id.* at 73-74 ("Because Microsoft's exclusive contract with Apple has a substantial effect in restricting distribution of rival browsers, and because … reducing usage share of rival browsers serves to protect Microsoft's monopoly, its deal with Apple must be regarded as anticompetitive."); *id.* at 76 ("Because Microsoft's agreements foreclosed a substantial portion of the field for JVM distribution and because, in so doing, they protected Microsoft's monopoly from a middleware threat, they are anticompetitive.").

*Amex*, 138 S. Ct. at 2284 (cleaned up). In *Amex*, the Supreme Court had no occasion to discuss the indirect method of showing anticompetitive harm, because there "the plaintiffs rel[ied] exclusively on direct evidence." *Id.*[32] Rather than undermining *Microsoft*, *Amex* reaffirms that a plaintiff may demonstrate anticompetitive effects from a monopolist's exclusive dealing through "indirect evidence, such as the degree of rivals' exclusion." *See McWane*, 783 F.3d at 835.

Surescripts's lengthy discussion of *Amex* (Mot. 35-38) is, therefore, beside the point. Surescripts never acknowledges that a plaintiff may show anticompetitive effects indirectly, and Surescripts ignores that *Amex* was not a monopolization case. Surescripts spends pages recounting the Supreme Court's discussion of the definition of a two-sided transaction market (Mot. 36-37), but then does not contest the FTC's definition of the relevant markets (Mot. 6 n.3). Surescripts fails to point to anything in *Amex* that undermines the settled legal principle that a monopolist harms competition when it stunts rivals' growth by means of exclusive agreements.

### b) Surescripts's agreements substantially foreclose the routing and eligibility markets

The FTC's Complaint more than adequately alleges that Surescripts harmed competition by substantially foreclosing both of the markets at issue. Exclusivity provisions covering around 40% (or less) of the market have been found to "substantially foreclose" competition. *Microsoft*, 253 F.3d at 70 (noting that a monopolist's use of exclusive contracts, even those foreclosing less than 40-50% of the market, may give rise to § 2 liability). Surescripts's foreclosure rates are double that: By foreclosing at least 70-80% of each of the routing and eligibility markets with exclusive or *de facto* exclusive contracts (Compl. ¶¶ 172-76), Surescripts has rendered potential

---

[32] *See also id.* at 2285 n.6 ("Although the plaintiffs relied on indirect evidence below, they have abandoned that argument in this Court."); *id.* at 2287 ("The plaintiffs stake their entire case on proving that Amex's agreements increase merchant fees.").

rivals unable "to rapidly become a full national alternative to Surescripts" (*id.* ¶ 132). Surescripts is thus engaging in a classic case of monopolization via exclusive dealing.

Surescripts erroneously argues that these allegations are insufficient because "the FTC pleads no facts as to foreclosure in either … market[] as a whole" and that "[e]ach allegation only details the percentage foreclosed on each 'side' of each market." Mot. 45. In fact, in three separates instances the FTC's Complaint alleges that the substantial foreclosure percentages are at least 70% in each market as a whole. Compl. ¶ 3 (Surescripts's contracts "foreclosed at least 70% of each market"); *id.* ¶ 176 ("Surescripts has foreclosed at least 70-80% of each of the routing and eligibility markets ….."); *id.* ¶ 181 (Surescripts has ensured that no other competitor can be or remain viable by "foreclosing approximately 80% of both markets").

Moreover, the Complaint alleges that Surescripts has locked up at least 70% of each side of both markets. *Id.* ¶¶ 172-75. These allegations further buttress the point that Surescripts has foreclosed—at a minimum—between 70-80% of each market, because a foreclosed customer on one side of the two-sided network is not available to any customer on the other side of the network. Foreclosure that covers most of one side makes it impossible for an entrant to gain critical mass. *See* David S. Evans, *Economics of Vertical Restraints for Multi-Sided Platforms* 17 (2013) ("Locking up either side of the market will make it impossible for an entrant to obtain customers on the other side.") That problem is exacerbated—as it is here (Compl. ¶¶ 176-81)— when customers are substantially foreclosed on both sides of the network, since an entrant can offer each non-foreclosed customer on one side access to only a subset (the non-foreclosed customers) on the other side, and vice-versa.

As the case law explains, foreclosure rates of such magnitude result in excluded competitors. *See supra* n.30. Though Surescripts does not dispute that competitors such as

36

Emdeon were excluded from the routing and eligibility markets, Surescripts claims that the FTC "does not even attempt to plead facts showing that Surescripts is to blame for" that exclusion (Mot. 43). Again, this is wrong legally and untrue factually. *Microsoft* rejected the proposition "that, as to § 2 *liability* in an equitable enforcement action, plaintiffs must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct." 253 F.3d at 79 (emphasis in original). In any event, an entire section of the FTC's Complaint details how Surescripts's exclusive contracts foreclosed Emdeon's extensive efforts to compete in the routing and eligibility markets. Compl. ¶¶ 128-36. Thus, Surescripts's exclusionary conduct produced the exact anticompetitive harms described in *Microsoft*.

> **c)  Surescripts's exclusionary conduct resulted in increased net prices, reduced innovation, and decreased output**

Although the FTC need not allege ultimate effects on price, innovation, or output to plead a prima facie case of anticompetitive effects, the Complaint plausibly does so. First, the FTC has alleged that but-for Surescripts's exclusionary conduct, the net price for routing (the price Surescripts charges to pharmacies less the incentive Surescripts pays to EHRs) and for eligibility (the price Surescripts charges to PBMs less the incentive Surescripts pays EHRs) would be lower. Compl. ¶ 187. The Complaint is replete with facts to support these allegations. For example, the Complaint states that in the rare cases where there has been some competition for routing on the pharmacy side, competitors' prices to pharmacies are generally ▮ lower than Surescripts's. *Id.* ¶ 189. Competitors' pricing for eligibility on the PBM side are even lower, generally by at least ▮. *Id.* ¶ 190. And competitors' incentive payments to EHRs are at least ▮ higher than Surescripts's. *Id.* ¶ 192. Because the FTC has made specific, plausible allegations that Surescripts's prices to pharmacies and PBMs are higher than with competition,

and that Surescripts's incentives to EHRs are lower than with competition, it necessarily follows that the net price for each transaction is higher than it otherwise would be.[33]

Surescripts's argument that the FTC's allegations are "precisely the type of allegations the *Amex* Court found lacking" (Mot. 39) misunderstands the source of the plaintiffs' error in *Amex*. The flaw in *Amex* was not that the plaintiffs showed harm on each side of the market separately, but that "the plaintiffs' argument about merchant fees wrongly focuses on only one side of the two-sided credit-card market." *Amex*, 138 S. Ct. at 2287. The *Amex* plaintiffs entirely ignored the other side of the network, the cardholder side, and never addressed whether there was harm or benefit to that side from Amex's conduct. *Id.* at 2288. There is no such hole here: The FTC has accounted for both sides of each market and alleged that the net price in each of the two-sided markets are higher than they would be with competition. Compl. ¶¶ 186-95.[34]

Equally erroneous is Surescripts's argument that the Complaint's allegations about net price are "implausible" because it requires the Court to "assume" that if Surescripts lowered prices or raised incentives in a competitive market, then "money would magically have appeared from somewhere." Mot. 40. There is no need for Penn & Teller: The money would have come from Surescripts's monopoly profits. Basic economics dictates that had Surescripts faced meaningful competition, its margins would shrink. *See* Areeda & Hovenkamp, *supra*, ¶ 403b

---

[33] Indeed, the FTC need not allege higher but-for prices on both sides of each market. The *net* price for each transaction is still supracompetitive even if, with competition, the price on one side would increase, so long as that increase is outweighed by a price decrease on the other side.

[34] Nor is there any authority—and Surescripts cites none (*see* Mot. 39)—requiring a complaint charging monopolistic conduct in a two-sided market to allege higher net prices on a transaction-by-transaction basis. Surescripts's demand (Mot. 39) that the FTC's Complaint trace specific transactions between specific customers to plead anticompetitive harm flies in the face of the Federal Rules of Civil Procedure, which only "require of a complaint … that it contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Hughes*, 634 F. Supp. 2d at 112 (cleaned up) (quoting *Twombly*, 550 U.S. at 555).

(explaining that a monopolist has reduced economic incentives to lower its price). The

Complaint alleges that Surescripts's margins had plenty of room to give. *See* Compl. ¶¶ 50, 52

(alleging that in 2016 Surescripts made nearly ████████ in fees charged to pharmacies and

PBMs but only paid out ███████ to EHRs).

Second, Surescripts's challenges to the FTC's well-pleaded allegations of anticompetitive

harms to quality and innovation (Mot. 40-42) are nothing more than factual disputes. For

example, while Surescripts claims that the "only factual support" the FTC offers for its harms to

quality are customer complaints (Mot. 41), it ignores its own internal documents admitting that

because "we grew up as a monopoly, we don't have the best way of dealing with customers."

Compl. ¶ 209. Surescripts likewise overlooks allegations that Surescripts knowingly double-

billed its pharmacy customers for over two years before taking any action. Compl. ¶ 211. And

while Surescripts takes issue with one portion of the FTC's allegations about the lack of

innovation in one specific service called real-time benefit check (Mot. 40-41), Surescripts

disregards the key allegation that "Surescripts has known how to transmit such real-time

formulary information since 2005," but did not bring the service to market until more than a

decade later despite multiple entreaties from its partner, RelayHealth. Compl. ¶ 205.[35] In any

event, Surescripts's narrow disputes with portions of the Complaint addressing quality and

innovation are "factual issue[s] that [are] plainly inappropriate to resolve on a motion to

dismiss." *Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 79 (D.D.C. 2009) (Bates, J.).

---

[35] The Complaint's well-pleaded allegations that Surescripts's agreements with RelayHealth
delayed innovation in both routing and eligibility (Compl. ¶¶ 196-208) and allowed Surescripts
to maximize its foreclosure of the routing market (*id.* ¶¶ 138-56, 172, 174) disprove Surescripts's
passing assertion that there is no allegation of anticompetitive harm from these agreements (Mot.
34 n.17).

Third, the FTC has plausibly alleged that Surescripts's conduct reduced output in each market. Compl. ¶¶ 213-15. As the Complaint explains, Surescripts rejected multiple offers from EHRs to enter into agreements that would have incentivized increased transaction volume. *Id.* ¶ 214. Instead, Surescripts insisted that these EHRs enter into agreements that required exclusivity. *Id.* And while it is undisputed that output in routing and eligibility has increased since 2008 (Mot. 42 n.19), Surescripts ignores the testimony of its own former CEO, who explained that it was the $38 billion in federal "meaningful use" incentives that "totally helped e-prescribing happen." Compl. ¶ 39. Had Surescripts not monopolized both markets, the Complaint alleges, output would have increased more. *Id.* ¶ 214. Therefore, the FTC plausibly alleges that there is "direct evidence that the challenged conduct has affected … output." *See McWane*, 783 F.3d at 835.

### 4. Surescripts's attempt to frame the FTC's Complaint as alleging predatory pricing is wrong as a matter of law and economics

Finally, Surescripts erroneously argues that the Complaint should be dismissed because its prices are above cost. Mot. 30-34. Above-cost low pricing is generally lawful where an "equally efficient competitor" can match the price and firms "can compete on the merits." *Eisai*, 821 F.3d at 409. But when a firm prices so low that it sacrifices profits in the short term, with the longer-term goal of "purg[ing] competition" from the market, raising prices to supracompetitive levels, and then recouping the lost profits, the pricing can be unlawfully predatory. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220, 225 (1993).

Predatory pricing is the wrong analytical framework to assess the anticompetitive conduct and harms here. Surescripts's method of exclusion is not *low* pricing; instead, the Complaint alleges that Surescripts excluded competition through loyalty contracts that punish non-loyal customers by charging *high* prices. Compl. ¶¶ 186-95. Far from sacrificing short-term

profits to drive rivals out, Surescripts has been continuously profiting since 2009 by preventing rivals from attaining the critical mass necessary to be a viable network that could challenge Surescripts's market dominance. *Id.* ¶¶ 83, 128-36. Surescripts's web of loyalty contracts makes it impossible for an equally efficient competitor to match the loyalty price and compete on the merits. *Id.* ¶¶ 128, 130, 134. Indeed, the market realities and strength of Surescripts's scheme have made it so a competitor would actually need to pay pharmacies and PBMs—while also paying the other side of the market, EHRs—to break through. *Id.* ¶¶ 129, 179-80. "Where, as here, a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand." *ZF Meritor*, 696 F.3d at 281.

The FTC further alleges that Surescripts piled on additional non-price anticompetitive conduct to exclude rivals. *See ZF Meritor*, 696 F.3d at 278 (rejecting defendant's argument that prices above cost shield conduct from antitrust scrutiny; particularly where such conduct includes non-price methods of exclusion such as threats to cut off supply and "clawbacks" that require customers to repay earned discounts). For example, Surescripts forced a key customer to terminate a connection with a competitor to contract exclusively with Surescripts (Compl. ¶ 111) and threatened to cut-off access to routing, eligibility, and other tangential products to maintain exclusivity (*id.* ¶¶ 121-22). Many of Surescripts's contracts also include "clawbacks" that require a non-loyal customer to pay both the financial penalty of higher prices in the future and refund the previously received discounts or incentives. *Id.* ¶¶ 72-75, 79. Where, as here, price is not the predominant means of exclusion, the majority of courts agree that these allegations should be

assessed as exclusive dealing, not predatory pricing. *See, e.g.*, *ZF Meritor*, 696 F.3d at 278; *Eisai*, 821 F.3d at 394; *In re EpiPen*, 2017 WL 6524839, at \*7; *Unistrip*, 153 F. Supp. 3d 728.[36]

This approach is consistent with modern economics. In a loyalty discount case, such as the one alleged here, the predatory pricing test would not be reliable because "a price below cost is neither necessary nor sufficient" to harm competition. Derek W. Moore & Joshua D. Wright, *Conditional Discounts and the Law of Exclusive Dealing*, 22 Geo. Mason L. Rev. 1205, 1236 (2015); *accord* Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371, 373 (2017). A firm can foreclose rivals without pricing below cost; conversely, pricing below cost does not always foreclose rivals in the way prohibited by the antitrust laws. Moore & Wright, *supra*, at 1209; Salop, *supra*, at 373. Loyalty contracts, therefore, "should be analyzed like near-exclusivity contracts, not as predatory pricing." Salop, *supra*, at 372; *see also* Moore & Wright, *supra*, at 1209 ("[T]he approach taken in exclusive dealing cases … is much more closely aligned with the economics of conditional discounts.").

The few cases Surescripts cites (Mot. 31-32) are inapposite. *Brooke Group*, 509 U.S. 209, *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438 (2009), and *Valassis Communications, Inc. v. News Corp.*, 17-cv-7378 (PKC), 2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) do not involve conditioning low prices or payments on exclusivity. Likewise, while *Microsoft* noted that just offering free products is not anticompetitive unless predatory, the court

---

[36] Surescripts erroneously asserts that the FTC is "seeking to extend" *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (Mot. 32-33). In fact, the cases applying exclusive dealing to loyalty pricing contracts are not limited to the Third Circuit, and none relies on *LePage's* to reach the conclusion that exclusive dealing is the correct framework. *ZF Meritor* further explained that it was not applying *LePage's* because plaintiffs had not made bundling or tying allegations. *ZF Meritor*, 696 F.3d at 274 n.11. The same is true here.

of appeals condemned contracts where Microsoft conferred value conditioned upon exclusivity. *Microsoft*, 253 F.3d at 68-69 (illegal exclusive dealing where Microsoft's agreements to provide easy access to IAPs' services from the Windows desktop were conditioned on agreement to promote Microsoft's Internet Explorer exclusively); *id.* at 75 (illegal exclusive dealing where Microsoft's agreements conditioned receipt of Windows technical information upon the agreement to promote Microsoft's software exclusively).

Surescripts's remaining cases (Mot. 31) are also distinguishable. In each, the conduct did not stop an equally efficient competitor from "compet[ing] on the merits." *Eisai*, 821 F.3d at 409. In *Concord Boat Corp. v. Brunswick Co.*, decided on appeal after a full trial, customers could and did switch almost all of their business over to a different supplier when offered a better price despite the alleged exclusive conduct. 207 F.3d 1039, 1059 (8th Cir. 2000). In *NicSand, Inc. v. 3M Co.*, the plaintiff could not "plausibly argue that the exclusivity requirement created entry barriers" since the plaintiff previously gained its 67% share with the same exclusive terms. 507 F.3d 442, 447-48, 454 (6th Cir. 2007) (en banc). Here, in contrast, the FTC plausibly alleges that Surescripts is a monopolist and that, even when offered a lower price, customers cannot switch their business to a competitor. Compl. ¶¶ 128-36, 169.

## CONCLUSION

For the foregoing reasons, the FTC respectfully requests that this Court deny Surescripts's Motion to Dismiss the FTC's Complaint. The FTC respectfully submits that oral argument is not necessary to dispose of Surescripts's motion, but we are, of course, available should the Court decide that argument would be helpful.

Dated:  August 23, 2019

Respectfully submitted,

Markus H. Meier (D.C. Bar 459715)
Bradley S. Albert
Elizabeth R. Hilder
David B. Schwartz
D. Patrick Huyett
Joseph P. Mathias
Tanya O'Neil (D.C. Bar 1021933)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: 202-326-3759

*Counsel for Plaintiff Federal Trade Commission*