UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

SURESCRIPTS, LLC,

Defendant.

Civil Action No. 19-1080 (JDB)

## MEMORANDUM OPINION

The Federal Trade Commission petitions this Court for equitable relief, including a permanent injunction and monetary relief, against Surescripts, LLC pursuant to Section 13(b) of the FTC Act. See 15 U.S.C. § 53(b). The FTC alleges that Surescripts has violated Section 2 of the Sherman Act by maintaining a monopoly in two markets—electronic prescription routing and eligibility (explained below)—through anticompetitive conduct, including an exclusive loyalty-based pricing policy. Surescripts moves to dismiss, arguing (1) that the Court lacks subject matter jurisdiction under Section 13(b) of the FTC Act, and (2) that the FTC fails to state a claim under Section 2 of the Sherman Act because it does not allege either that Surescripts employed predatory pricing or that Surescripts's market behavior violated the rule of reason. For the reasons explained below, the Court will deny Surescripts's motion.

### BACKGROUND

At the pleadings stage, the Court assumes the facts alleged in the complaint are true and presents them in the light most favorable to the plaintiff—here, the FTC. Felter v. Kempthorne, 473 F.3d 1255, 1257 (D.C. Cir. 2007). Surescripts is a health information technology company operating in two complementary markets: electronic prescription routing ("routing") and

1

eligibility, collectively known as "e-prescribing." Compl. for Injunctive & Other Equitable Relief ("Compl.") [ECF No. 1] ¶ 1. Routing involves the transmission of prescription-related data from a prescriber to a pharmacy via the prescriber's electronic health record ("EHR") system. Id. Eligibility involves the transmission of a patient's formulary and benefit information from a payer (often the patient's pharmacy benefit manager ("PBM")) to a prescriber's EHR. Id. Surescripts charges pharmacies a fee for each routing transaction and charges PBMs a fee for each eligibility transaction. Id. ¶ 49.

According to the FTC, Surescripts maintains at least a 95% share (by transaction volume) in each market using various anticompetitive measures. Id. ¶¶ 2–3. Beginning around 2009, Surescripts implemented a pricing policy that rewarded "loyal" (i.e., exclusive) customers with lower prices. Id. ¶ 2. "To be considered exclusive, Surescripts requires that a pharmacy . . . route 100% of its transactions through and only through the Surescripts network." Id. ¶ 66 (internal quotation marks omitted). "The same structure exists for PBMs in eligibility." Id. ¶ 67. For routing, the cost to non-loyal customers varies by volume, but can be as high as ▮ more than for loyal customers; for eligibility, as high as ▮ more. Id. ¶¶ 70–71. Surescripts structured its contracts with EHR providers such that loyalty in either the routing or eligibility markets resulted in an incentive payment to the EHR provider of ▮ of the fees paid by the customers in that market; exclusivity in both markets resulted in an incentive payment of ▮ of the fees from both markets. Id. ¶ 77.

The FTC contends that "[t]hose effectively exclusive contracts foreclosed at least 70% of each market, eliminating multiple competitive attempts from other companies . . . that offered lower prices and greater innovation." Id. ¶ 3. The FTC notes that these loyalty contracts are especially effective at excluding competition in the routing and eligibility markets because, given

Surescripts's dominant position, almost all market entrants must compete for customers who already use Surescripts. Id. ¶ 32. To gain a foothold in either market, entrants must convince customers to engage in "multihoming," or the simultaneous use of Surescripts as well as one or more competitors. Id. The FTC alleges that, by raising the cost of multihoming, Surescripts hindered customers' ability to "multihome" and "significantly elevat[ed] the critical mass [of initial customers] a Surescripts competitor would need to become a viable network in either routing or eligibility." Id.

Beyond the loyalty program, Surescripts employed "threats and other non-merits based competition" to keep its customers from working with its competitors. Id. ¶ 4. For instance, when a competitor, Emdeon, attempted to enter the market through contracts with Allscripts, a large EHR, Surescripts relied on its market power to force Allscripts into exclusive contracts that prevented a renewal of Allscripts's contract with Emdeon. Id. ¶¶ 110–11. Surescripts also entered into a non-compete agreement with another competitor, RelayHealth, which prevented RelayHealth from capturing up to 15–20% of the routing market. Id. ¶ 5; see also id. ¶¶ 88–99. The FTC alleges that these exclusive arrangements have allowed Superscripts to impose heightened prices on large portions of the markets, see, e.g., id. ¶¶ 187–95, and have stifled innovation and reduced quality in the two e-prescribing markets, id. ¶¶ 196–215.

Surescripts moves to dismiss the FTC's complaint, arguing that this case is both procedurally and substantively defective. Surescripts, LLC's Mot. to Dismiss Compl. ("Def.'s Mot.") [ECF No. 32] ¶¶ 1–3. First, Surescripts argues that the Court lacks subject matter jurisdiction over the request for a permanent injunction because the FTC cannot establish that this case is "proper" under Section 13(b) of the FTC Act. Id. ¶ 1; see also 15 U.S.C. § 53(b). Second, Surescripts argues that the FTC's complaint fails to state a claim under Section 2 of the Sherman

3

Act because it does not allege that the prices offered by Surescripts were predatory or that Surescripts's market practices violated the rule of reason. Def.'s Mot. ¶¶ 2–3.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court presumes the truth of a complaint's factual allegations, though it is "not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation omitted). The court then asks whether the facts alleged suffice "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted). The court considers "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (internal quotation omitted).

Under Rule 12(b)(1), a court has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority. Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). "[The] court must dismiss a case when it lacks subject matter jurisdiction." Randolph v. ING Life Ins. & Annuity Co., 486 F. Supp. 2d 1, 4 (D.D.C. 2007). "[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (internal quotation marks omitted). And the court may consider material other than allegations in the complaint in determining whether it has jurisdiction to hear the case. See Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

## ANALYSIS

### I.  Subject Matter Jurisdiction Under Section 13(b)

Surescripts first contends that the Court lacks subject matter jurisdiction over this dispute. Mem. in Supp. of Surescripts, LLC's Mot. to Dismiss Compl. ("Def.'s Mem.") [ECF No. 32] at 13–29.  Surescripts argues that Section 13(b) of the FTC Act limits the Court's power to issue permanent injunctions upon request by the FTC to "proper cases," which Surescripts interprets as "routine, straightforward" cases.  Id. at 17–18; see also 15 U.S.C. § 53(b).  This case, Surescripts continues, does not qualify as routine or straightforward because it involves complex and novel issues of antitrust law, such as how to understand the two-sided e-prescription markets of routing and eligibility in light of the Supreme Court's recent decision in Ohio v. American Express Co. ("Amex"), 138 S. Ct. 2274 (2018).  Def.'s Mem. at 24–29.

The FTC responds in two ways.  First, the FTC argues that the "proper cases" language in Section 13(b) does not limit courts' jurisdiction to hear cases brought under the Act.  Pl. FTC's Mem. of Law in Opp'n to Def. Surescripts, LLC's Mot. to Dismiss Compl. ("Pl.'s Opp'n") [ECF No. 36] at 10–12.  The FTC argues that the language of Section 13(b) does not clearly speak to courts' power to adjudicate such claims.  Pl.'s Opp'n at 11 (citing Arbaugh v. Y&H Corp., 546 U.S. 500, 515–16 (2006)).  Second, the FTC contends that this case is "proper" because that term just means "any case in which a permanent injunction would be 'appropriate,' i.e., any case in which a law enforced by the FTC has been violated and equitable remedies are needed to make harmed consumers whole."  Id. at 13.  The FTC has the stronger argument on both points.

### A. Whether "Proper Cases" Is a Jurisdictional Requirement

The Supreme Court has established a clear-statement rule for determining whether statutory elements constitute jurisdictional requirements.  See Arbaugh, 546 U.S. at 515.  "[W]hen

5

Congress does not rank a statutory limitation . . . as jurisdictional, courts should treat the restriction as nonjurisdictional in character." Id. at 516. Here, the relevant provision reads: "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Neither this specific provision nor Section 13(b)'s broader framework for seeking equitable relief even include the word "jurisdiction," let alone a clear statement that any of the statutory requirements are jurisdictional. As the Third Circuit recently concluded when analyzing the same provision, "Section 13(b) includes no indicia that Congress intended to rank a statutory limitation . . . as jurisdictional." FTC v. Shire ViroPharma, Inc., 917 F.3d 147, 154 (3d Cir. 2019) (internal quotation marks omitted).

Surescripts's best textual argument for reading "proper cases" as a jurisdictional requirement comes from the label of Section 13(a)—"Power of Commission; jurisdiction of courts." Reply Mem. in Supp. of Surescripts, LLC's Mot. to Dismiss Compl. ("Def.'s Reply") [ECF No. 39] at 4. Because Section 13(a) "is identical to Section 13(b) in structure," Surescripts argues that the latter section too should be read as jurisdictional. Id. Under Arbaugh, however, the inquiry is whether Congress "clearly states that a threshold limitation on a statute's scope" is jurisdictional, and Surescripts's structural argument from Section 13(a)'s label falls short of this high bar. 546 U.S. at 515 (emphasis added). Indeed, Section 13(b)—the actual section at issue here—has a separate and distinct label ("Temporary restraining orders; preliminary injunctions") that does not include any reference to jurisdiction. See 15 U.S.C. § 53(a)–(b); cf. Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 164 (2010) (noting that the Copyright Act's registration requirement for bringing an infringement action "is located in a provision 'separate' from those granting federal courts subject-matter jurisdiction over those respective claims").

Surescripts also emphasizes that the FTC has itself cited Section 13(b) as the basis for

personal jurisdiction and as "empower[ing] this Court to issue a permanent injunction." See Def.'s Reply at 4 (internal quotation and emphasis omitted); see also Compl. at 54. But the agency's framing of this language as "empower[ing]" the Court does not thereby transform the language of Section 13(b) into a threshold jurisdictional requirement.

Finally, although not dispositive, it is worth noting that the opposite conclusion would create a cumbersome threshold test whenever the FTC seeks a permanent injunction. Pl.'s Opp'n at 20–21; see also Tr. of Mot. Hr'g [ECF No. 41] at 49:3–6 (arguing that the FTC's "interpretation is the one that relies on the plain language of the statute and doesn't saddle the Court with the burden of deciding what a routine case is or not"). Under defendant's jurisdictional interpretation, courts would need to decide whether the claims brought are "straightforward" or "routine" and to assess the novelty or complexity of the claims' merits before deciding whether to hear the case in the first place. Pl.'s Opp'n at 20–21. This requirement is unwieldy and, given the dearth of textual support for a jurisdictional reading, suggests that the "proper cases" element is not jurisdictional.

B. Whether the FTC Pleaded a "Proper Case"

The FTC also prevails on the substance of this issue, for even if "proper cases" is jurisdictional, the agency has pleaded sufficient facts to clear the mark. Cf. Def.'s Reply at 3 (arguing that the "proper cases" question can be addressed under either Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6)).

Surescripts argues for a narrow interpretation of "proper cases" that limits the FTC's power to seek permanent injunctions to instances of routine fraud or other straightforward violations of the FTC's substantive statutes. Def.'s Mem. at 17–18. Surescripts insists that "proper cases" cannot consist of "'all cases' in which the FTC asserts a violation of the laws it enforces" because that would render the phrase superfluous. Id. at 17. Surescripts also points to the legislative

history, which suggests that at least one purpose for the permanent injunction provision was to permit the FTC "in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act." Id. at 18 (internal quotation and emphasis omitted). And Surescripts cites two cases that rely on a narrow interpretation of "proper cases"—FTC v. Abbott Labs., Civ. A. No. 92-1364, 1992 WL 335442 (D.D.C. Oct. 13, 1992), and FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020 (7th Cir. 1988)—as well as public statements by former FTC officials framing "proper cases" as involving straightforward violations. Def.'s Mem. at 18–24.

There is thus considerable weight to Surescripts's argument that "proper cases" is not synonymous with "all cases," for such an interpretation would make the phrase superfluous. At the same time, this Court's task is not to define the term "proper cases" for all scenarios, but to determine whether this case is proper. The FTC grounds its legal argument here in Circuit precedent, United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam), and does not seek to rely on its agency expertise to develop the law. See Pl.'s Opp'n at 21; Tr. of Mot. Hr'g at 67:12–16 (FTC noting that "Microsoft is the primary authority in this case" and suggesting that the Court will not "have to go much beyond Microsoft"). Under such circumstances, the Court concludes that the complaint adequately alleges a "proper case."

In terms of the statutory text, the language of Section 13(b) affords little evidence one way or the other, but it is at least not necessary to read the phrase "proper cases" so narrowly as to mean "straightforward" or "non-novel" cases, as Surescripts suggests. Def.'s Mem. at 22–24. Given that the phrase "proper cases" is embedded in the second "Provided" portion of Section 13(b), the phrase might be seen as merely distinguishing between those disputes suited for a temporary injunction—the subject of most of Section 13(b)—and those cases better suited for a permanent

injunction. See 15 U.S.C. § 53(b). Or, given the requirement that the FTC must present "proper proof," "proper cases" might be interpreted as involving disputes that do not require the exercise of the FTC's scientific expertise. See J. Howard Beales III & Timothy J. Muris, Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act, 79 Antitrust L.J. 1, 31–33 (2013). If a district court determined that the targeted entity did not have fair notice or that an administrative proceeding would be more "proper," then the court might rule against a permanent injunction. See id. at 31; see also id. at 9–13. The text alone, then, thus does not dictate either Surescripts's narrow reading of "proper cases" or the FTC's broader interpretation.

Looking beyond the text, all other factors suggest that a broader reading is correct. In terms of case law, a number of other courts have concluded that "proper cases" include more than "routine" violations. See, e.g., FTC v. Evans Prods. Co., 775 F.2d 1084, 1086–87 (9th Cir. 1985) (noting that Section 13(b) may authorize a permanent injunction in instances beyond the routine fraud case); FTC v. AmeriDebt, Inc., 373 F. Supp. 2d 558, 562–63 (D. Md. 2005) (agreeing with the FTC's reading of "proper case" as "simply one that involves a violation of any provision of law enforced by the Commission" (internal quotation marks omitted)); see also Pl.'s Opp'n at 17–20. Indeed, the FTC states that it has often relied on "Section 13(b) in a wide variety of non-'routine'" cases. See Pl.'s Opp'n at 18 & n.17 (citing FTC v. Qualcomm Inc., No. 17-CV-00220-LHK, 2019 WL 2206013 (N.D. Cal. May 21, 2019); FTC v. Cephalon, Inc., No. 2:08-cv-2141-MSG, 2019 WL 2111253 (E.D. Pa. Feb. 21, 2019); FTC v. AbbVie Inc., 329 F. Supp. 3d 98 (E.D. Pa. 2018)); see also FTC v. Mylan Labs., Inc., 62 F. Supp. 2d 25, 36 (D.D.C. 1999) ("[T]his Court finds that the permanent injunction proviso may be used to enjoin violations of any provision of law enforced by the FTC." (internal quotation marks omitted)).

Surescripts's authorities to the contrary are all wanting. In World Travel, the Seventh

Circuit held that "it is quite clear that Congress <u>at least</u> expected that the FTC could rely on [Section 13(b)] when it sought to halt a straightforward violation of section 5 [of the FTC Act] that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings." 861 F.2d at 1028 (emphasis added). <u>Abbott Labs.</u>, quoting this language from <u>World Travel</u>, noted that "Federal Courts have shied away from accepting direct court actions by the Commission . . . if the offending conduct interjects the court into areas of Commission expertise involving the creation and monitoring of new concepts of unfair competitive trade practice." 1992 WL 335442, at *2. But <u>Abbott Labs.</u> cites no authority other than <u>World Travel</u> for this gloss on Section 13(b), and <u>World Travel</u> elsewhere acknowledges that "[a] substantial argument can be made that the statutory language, when read with [the] legislative history, permits the FTC to proceed under the last proviso of 13(b) for any violation of a statute administered by the FTC." 861 F.2d at 1028.

Surescripts's other arguments fare no better. To the extent that the Court considers legislative history, the Senate report cited by Surescripts does highlight the ability of the FTC to seek a permanent injunction immediately "in the routine fraud case." Def.'s Mem. at 18 (quoting Senate Committee on Commerce, Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, S. Rep. No. 93-151, at 31 (1973)). But the report does <u>not</u> say that such circumstances are the <u>only</u> time that the FTC can seek such an injunction. <u>See id.</u> Likewise, many of the statements and academic articles that Surescripts marshals from former FTC Commissioners and other agency officials conclude that permanent injunctions are ill suited for cases requiring the FTC's expertise and the development of law through the administrative process, but they do not then go on to preclude a case brought under circuit precedent. <u>See id.</u> at 21–23.

Surescripts's argument thus largely rests on authorities that acknowledge straightforward

cases as the paradigm applications of Section 13(b), but do not preclude pursuing other claims. See Evans Prods., 775 F.2d at 1086–87. In agreement with the clear weight of relevant cases, the Court concludes that the FTC's complaint sufficiently pleads a "proper" case for a permanent injunction under Section 13(b).

## II. Failure to State a Claim Under Section 2 of the Sherman Act

Surescripts next argues that the FTC's claim should be dismissed under Fed. R. Civ. P. 12(b)(6) because the FTC's complaint fails to allege a violation of Section 2 of the Sherman Act. See Def.'s Mem. at 29–45. First, Surescripts suggests that the FTC's monopolization claim must fail because Surescripts's loyalty program was entirely optional and, therefore, its low prices could constitute anticompetitive conduct only if they were "predatory," which Surescripts denies. Id. at 30–31. Surescripts emphasizes that the FTC's complaint did not plead the necessary elements of predatory pricing. Id. at 33–34. Second, Surescripts argues that, even under the framework of exclusive dealing, the FTC's claim would fail under the rule of reason because the FTC's complaint did not adequately allege that Surescripts's loyalty programs created any anticompetitive effects. Id. at 34–45. Once again, the FTC has the stronger argument on both fronts.

### A. Exclusionary Contracts v. Predatory Pricing

The offense of monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966). Surescripts does not challenge the allegation that the company maintains a monopoly over the routing and eligibility

11

markets, see Def.'s Mem. at 29–30, and thus the only question is whether "Surescripts has illegally maintained its monopolies through exclusionary conduct," Pl.'s Opp'n at 22.

For an exclusionary act to be anticompetitive, "it must harm the competitive process and thereby harm consumers." Microsoft Corp., 253 F.3d at 58 (emphasis omitted). Here, the FTC alleges that Surescripts's loyalty programs—and the implicit threat to charge non-exclusive customers higher prices—prevented the entrance of competitors into e-prescribing markets. Compl. ¶ 58. The absence of competitors, in turn, allegedly led to increased prices for pharmacies and PBMs and lower incentive payments for EHRs. See id. ¶¶ 187–93. At least on the face of its complaint, then, the FTC appears to allege facts sufficient to state a claim under Section 2 of the Sherman Act. See Iqbal, 556 U.S. at 678.

Surescripts's arguments to the contrary are unavailing. First, the company emphasizes that its loyalty programs are entirely optional and thus do not necessarily constitute exclusive contracts. See Def.'s Mem. at 31. But a contract need "not contain specific agreements not to use the [services] of a competitor" as long as "the practical effect . . . is to prevent such use." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 326 (1961) (quoting United Shoe Mach. Corp. v. United States, 258 U.S. 451, 457 (1922)). The FTC alleges that the threat of increased prices had the "practical effect" of preventing customers from working with other e-prescribing platforms, "since doing so would trigger the massive penalty provisions in their contracts with Surescripts . . . and cost routing [and eligibility] customers millions of dollars through increased prices or, for EHRs, decreased incentive payments." Compl. ¶ 129; see also id. ¶ 79 (alleging that EHRs that "violate[] the exclusivity commitment" must "pay back [to Surescripts] the incentive fees for historical transaction volume"). Surescripts highlights that some customers, like Kroger, did manage to "multihome" and have a non-exclusive relationship with Surescripts, Def.'s Mem. at 31, but the

test of whether a monopolist forecloses competition "is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005); see also Microsoft, 253 F.3d at 70–71 (noting that the use of exclusive contracts can violate § 2 even if the contracts foreclose less than 40% or 50% of the market share). Here, the government has pleaded facts demonstrating such substantial foreclosure. See, e.g., Compl. ¶¶ 3, 135.

Surescripts next suggests that optional low pricing loyalty programs are unlawful only when they constitute "predatory" pricing, which the FTC has not pled. Def.'s Mem. at 31. But none of the authorities Surescripts cites stands for the proposition that a plaintiff must allege predatory pricing to succeed on a Section 2 claim. For instance, Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc., 555 U.S. 438 (2009), did not concern effectively exclusionary contracts, but price-squeezing. Id. at 451. In Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000), the court examined a loyalty discount program that required at most 80% compliance in the boat market, making the exclusive pressures created by the program materially different than the dynamics arising from Surescripts's total loyalty scheme. Id. at 1044. And in NicSand, Inc. v. 3M Co., 507 F.3d 442 (6th Cir. 2007) (en banc), the defendant 3M was not a monopolist. Id. at 451–52.

Surescripts also mischaracterizes the holdings in Microsoft. It quotes the court's statement that "offering a customer an attractive deal is the hallmark of competition" unless that price is "predatory," but that statement concerned only Microsoft's offering Internet Explorer free of charge. Microsoft, 253 F.3d at 67–68; Def.'s Mem. at 31. The relevant portion of the en banc D.C. Circuit's decision for this case is its ruling that Microsoft's exclusive contracts did violate Section 2 of the Sherman Act; the court noted that Microsoft's exclusive dealing with fourteen of

the fifteen access providers in North America effectively cut off one of the two major channels by which competitors could enter the internet browser market. Microsoft, 253 F.3d at 68–71. These contracts "clearly ha[d] a significant effect in preserving its monopoly; they help[ed] keep usage of [Microsoft's competitor] below the critical level necessary for [it] or any other rival to pose a real threat to Microsoft's monopoly." Id. at 71.

Like the behavior at issue in Microsoft, Surescripts's alleged practice of charging loyal pharmacies and PBMs less, and paying loyal EHRs greater incentives, do not need to constitute predatory pricing for Surescripts's exclusionary practices to constitute illegal maintenance of a monopoly. See Grinnell, 384 U.S. at 570–71. "Where, as here, a dominant supplier enters into de facto exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete . . . ." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 281 (3d Cir. 2012).

Surescripts argues that Third Circuit cases like ZF Meritor have not been adopted in the D.C. Circuit and that (for this Court) predatory pricing still remains an essential element of proving that a loyalty program is unlawful. Def.'s Mem. at 32–33. However, although the D.C. Circuit has cast doubt on the Third Circuit's decision in LePage's Inc. v. 3M, 324 F.3d 141 (3rd Cir. 2003) (en banc), see FTC v. Church & Dwight Co., 665 F.3d 1312, 1316 (D.C. Cir. 2011), much of that criticism was focused on the conclusion that "bundling" rebates (i.e., requiring retailers to carry multiple products to receive certain rebates) are anticompetitive, rather than on the Third Circuit's discussion of the exclusionary practices in question here, see id. at 1316–17. And even without these persuasive precedents, the FTC's allegations still state a claim of monopolization under the D.C. Circuit's decision in Microsoft. See 253 F.3d at 69–71.

B. Rule of Reason

Surescripts next contends that, if its loyalty contracts are viewed as exclusive dealing, the FTC's claims fail under the rule of reason. Def.'s Mem. at 34. Surescripts argues that "the FTC bears the burden of demonstrating that Surescripts'[s] alleged contractual provisions have an anticompetitive effect on competition," which in an exclusive dealing case means that Surescripts's conduct "foreclose[d] competition in a substantial share of the line of commerce affected." Id. at 35 (quoting Microsoft, 253 F.3d at 69). In particular, Surescripts suggests that, because the FTC concedes that both routing and eligibility are two-sided markets, "the FTC must plausibly plead foreclosure of a substantial share of each of those markets as a whole." Id. Surescripts insists that the FTC's complaint fails to allege either anticompetitive effects or foreclosure. Id.

The Court concludes, to the contrary, that the FTC has met its burdens. Exclusivity provisions covering about 40–50% of the relevant market have been found to foreclose competition illegally, see Microsoft, 253 F.3d at 70, and Surescripts's loyalty program allegedly places 70–80% of the routing and eligibility markets into effectively exclusive contracts, Pl.'s Opp'n at 35; Compl. ¶¶ 172–76. Surescripts insists that, under the Supreme Court's recent decision in Amex, the FTC must plead facts showing "anticompetitive effects in the market as a whole and cannot focus only on the effects on one side." Def.'s Mem. at 37; see also id. at 35–40. But the FTC's complaint does just what Surescripts wants, alleging that Surescripts's loyalty program "foreclosed at least 70% of each market," i.e., at least 70% of both two-sided markets at issue. Compl. ¶ 3 (emphasis added); see also id. ¶ 187 ("But for Surescripts's anticompetitive course of conduct, the net price (taking into account both sides of the network) of the routing

transaction would be lower. Similarly, without Surescripts's loyalty contracts, the net price (taking into account both sides of the network) of the eligibility transaction would be lower.").

Surescripts argues that these statements are conclusory and that the FTC does not plead sufficient facts to survive the motion to dismiss. Def.'s Mem. at 38; see also Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Surescripts acknowledges, for instance, that the complaint includes an allegation that, "in the routing market, the FTC states that [a competitor] charges [certain] pharmacies lower prices than does Surescripts," but notes that "the FTC does not make any allegations concerning EHRs' incentive payments from Surescripts or [the competitor] for those [same] routing transactions." Def.'s Mem. at 39. Surescripts similarly concedes that the complaint alleges that a competitor charged one PBM a lower price than Surescripts, but highlights the absence of "facts showing higher net-transaction prices across that market as a whole." Id.

This argument is wrong for two reasons. First, Surescripts reads too much into Amex. That case concerned an alleged restraint of trade in violation of Section 1 of the Sherman Act, and the Supreme Court determined that plaintiffs failed to offer evidence that the price of credit-card transactions was higher than would be expected in a competitive market because the plaintiffs provided no "reliable measure of Amex's transaction price or profit margins." 138 S. Ct. at 2288. The Court also concluded that "Amex's increased merchant fees reflect[ed] increases in the value of its services and the cost of its transactions, not an ability to charge above a competitive price." Id. Amex was not a monopolist. Id. at 2282 ("Visa . . . has 45% of the market as measured by transaction volume. Amex and MasterCard trail with 26.4% and 23.3%, respectively . . . .").

Here, on the other hand, the FTC brings a claim of monopolization under Section 2 of the Sherman Act against Surescripts, an undisputed monopolist. Regardless of Surescripts's specific above-market fees or below-market incentives, the central question is whether the FTC alleged that Surescripts engaged in exclusionary conduct that "harmed competition, not just a competitor," by blocking entrants into the market. Microsoft, 253 F.3d at 59. The FTC has done just that. See, e.g., Compl. ¶¶ 3, 135, 172–81.

But, even assuming that Surescripts is correct in its interpretation of Amex, the FTC still pleaded sufficient facts addressing the totality of both two-sided markets. In addition to charging lower fees to pharmacies and PBMs, the FTC alleges that one competitor was also willing to pay higher incentives to EHRs. Id. ¶ 192. Thus, on both sides of the market, Surescripts stood to gain above-market returns, charging higher fees and paying out lower incentives than its competitors. The FTC also alleges that Surescripts engaged in other anticompetitive conduct, like forcing key customers to terminate association with competitors. Id. ¶ 111. The FTC alleges that this conduct hurt innovation, decreased output, and lowered quality. Id. ¶¶ 196–215. Surescripts's response is largely factual, denying the FTC's allegations. Def.'s Mem. at 41–42. But such denials are not adequate grounds for dismissing the FTC's complaint; rather, they speak to the merits and the need for further factual development through discovery.

Finally, Surescripts argues that the FTC failed to plead sufficient facts showing that Surescripts's business practices foreclosed market competition to a "substantial" degree. Id. at 42–45. Surescripts observes that exclusive dealing is illegal only if the arrangement "substantially" weakens competition, see Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394, 403–04 (3d Cir. 2016), and insists that its contracts, even if facially exclusive, were easily

terminable, of short duration, and therefore presumptively lawful, see, e.g. Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 395 (7th Cir. 1984). Def.'s Mem. at 42.

Once again, however, Surescripts's argument turns on a factual dispute ill suited for the pleadings stage. Compare Pl.'s Opp'n at 30–32; Compl. ¶¶ 84–86, with Def.'s Reply at 18–20. Under Supreme Court precedent, the relevant inquiry is fact intensive:

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

Tampa Elec., 365 U.S. at 329. Even if the contracts were short term and easily terminable, the FTC argues that their exclusive terms, when combined with the nature of the two relevant markets and Surescripts's dominant monopoly position, had the effect of foreclosing large parts of both markets and harming competition. Pl.'s Opp'n at 31–32; cf. Microsoft, 253 F.3d at 70–71 (analyzing whether Microsoft's exclusive contracts had "a significant effect in preserving its monopoly"). Further factual development may vindicate Surescripts's position, but the FTC's complaint contains sufficient facts to move beyond the pleadings stage.

## CONCLUSION

For all the foregoing reasons, Surescripts's motion to dismiss will be denied. A separate order will issue on this date.

/s/<br>
JOHN D. BATES<br>
United States District Judge

Dated: January 17, 2020