# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

SURESCRIPTS, LLC,

Defendant.

Case No.: 19-cv-1080 (JDB)

**REDACTED**

**Plaintiff Federal Trade Commission's Memorandum of Law in Opposition to Defendant Surescripts, LLC's Motion for Summary Judgment**

## Table of Contents

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.     Ample evidence supports the claim that Surescripts engaged in exclusionary
conduct by substantially foreclosing competition................................................ 4

     A.    By 2010, Surescripts recognized it faced substantial competitive risk to its
dominant position in routing and eligibility............................................... 8

     B.    To protect its dominant market position, Surescripts implemented
exclusionary contracts on all sides of its routing and eligibility networks .......... 10

     C.    Surescripts' exclusionary contracts substantially foreclosed competition........... 11

II.    Surescripts misstates the relevant legal standards and ignores the factual record ........... 15

     A.    Surescripts' arguments regarding the formal terms of its contracts are
legally and factually flawed ..................................................................... 16

          1.   The substantial foreclosure test focuses on the practical effect of the
contracts rather than formalistic distinctions .................................... 16

          2.   Ample evidence shows that the practical effect of Surescripts'
contracts is to substantially foreclose competition ........................... 18

     B.    Surescripts' arguments regarding Emdeon and other foreclosed
competitors are legally and factually incorrect ...................................... 22

          1.   The FTC does not need to prove that Emdeon or any other competitor
would have successfully competed absent Surescripts' contracts ................. 23

          2.   Ample evidence shows that Emdeon was blocked by Surescripts'
contracts ......................................................................................... 24

     C.    Surescripts misstates the anticompetitive effects standard ................................. 27

          1.   The FTC does not need to prove reduced output, increased price, or
reduced quality in a but-for world .................................................... 27

          2.   While not necessary to prove an anticompetitive effect, ample
evidence shows that Surescripts' conduct likely resulted in higher
prices and reduced quality and innovation........................................ 31

CONCLUSION.................................................................................................................. 33

## Table of Authorities

<u>**Cases**</u>

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ................................................................. 18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................. 4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) .............................................................................. 14

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .............................................................................. 29

*Barry Wright Corp. v. ITT Grinnell Corp.*,
    724 F.2d 227 (1st Cir. 1983) ................................................................. 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) .............................................................................. 29

*Cf. F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) .............................................................................. 3

*Chafin v. Chafin*,
    568 U.S. 165 (2013) .............................................................................. 3

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................................... 30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .............................................................................. 16

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016) ......................................................... 17, 18, 21, 22

*FTC v. Agora Fin. LLC*,
    447 F. Supp. 3d 350 (D. Md. 2020) ...................................................... 3

*FTC v. Cephalon, Inc.*,
    551 F. Supp. 2d 21 (D.D.C. 2008) ........................................................ 29

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) .............................................................. 4

*In re EpiPen Antitrust Litig.*,
    507 F. Supp. 3d 1289 (D. Kan. 2020) ................................................... 24

*In re Nexium Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016) ............................................................................. 30

*In re Remicade Antitrust Litig.*,
345 F. Supp. 3d 566 (E.D. Pa. 2018) ......................................................... 18, 22

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
250 F.3d 972 (6th Cir. 2000) ........................................................................... 24

*J.B.D.L. Corp. v Wyeth-Ayerst Labs., Inc.*,
485 F.3d 880 (6th Cir. 2007) ........................................................................... 30

*Kentucky v. Marathon Petroleum Co. LP*,
464 F. Supp. 3d 880 (W.D. Ky. 2020) ............................................................ 30

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
No. CV 02-4770 MRP, 2006 WL 1236666 (C.D. Cal. Mar. 22, 2006) ............... 17

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
350 F. App'x 95 (9th Cir. 2009) ...................................................................... 17

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ...................................................................... 5, 17

*Ohio v. American Express Co.*,
138 S. Ct. 2274 (2018) ............................................................................... 28, 29

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ......................................................................... 24

*Perington Wholesale, Inc. v. Burger King Corp.*,
631 F.2d 1369 (10th Cir. 1979) ....................................................................... 16

*Pfizer, Inc. v. Johnson & Johnson*,
333 F. Supp. 3d 494 (E.D. Pa. 2018) ............................................................... 18

*Roland Machinery Co. v. Dresser Industries, Inc.*,
749 F.2d 380 (7th Cir. 1984) ........................................................................... 24

*SEC v. Teo*,
746 F.3d 90 (3d. Cir. 2014) ............................................................................. 29

*Standard Oil Co. of California v. United States*,
337 U.S. 293 (1949) .......................................................................................... 6

*Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) .......................................................................................... 5

iii

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ........................................................................ 5, 17

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ........................................................................................ 4

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) (en banc) ................................................... passim

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ........................................................................... 31

*Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ......................................................................................... 5

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3rd Cir. 2012) .................................................................... passim

## **Statutes**

15 U.S.C. § 26 ................................................................................................. 30

15 U.S.C. § 45(a)(2) ....................................................................................... 30

15 U.S.C. §§ 15 ............................................................................................... 30

## **Treatises**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020) ..................................... 28

## INTRODUCTION

For over a decade, Surescripts has dominated two separate health information technology markets: the electronic transmission of prescriptions ("routing"); and the electronic transmission of patient formulary and benefit information ("eligibility"). Surescripts has unlawfully monopolized these markets by preventing nascent and potential rivals from becoming viable competitors. The cornerstone of this anticompetitive scheme is an expansive web of "loyalty contracts" that financially penalizes customers unless they stay "loyal" to Surescripts. To squelch competition, Surescripts locked nearly all routing and eligibility customers—pharmacies, pharmacy benefit managers ("PBMs") and electronic health records ("EHRs")—into these contracts.

Surescripts' contracting scheme leverages its longstanding dominant position to exploit structural features of the routing and eligibility markets. Both markets are two-sided platforms with strong indirect network effects. To become viable, potential competitors must attract enough customers on each side of each market to create sufficient value for customers on the other side (the "chicken-and-egg" problem). The most likely path for any competitor to overcome these market dynamics has been to convince customers to "multihome"—i.e., use their routing or eligibility network in addition to Surescripts'. But Surescripts' loyalty contracts ensure that multihoming is not a viable option. Under the loyalty contracts, any "disloyal" customer that multihomes with a competitor is financially penalized on *all* of the huge volume of transactions that would still go through Surescripts. This penalty has been so large that no competitor could profitably offer a price to offset it. Surescripts' scheme thus guaranteed that nascent and potential entrants could never gain the critical mass necessary to overcome the chicken-and-egg problem.

The crippling impact of Surescripts' conduct is not an accident. Surescripts executives repeatedly documented the purpose and effect of their loyalty scheme. For example, one

Surescripts executive described loyalty contracts as the "main reason" customers did not

multihome. Another executive explained how loyalty contracts on each side of its routing and

eligibility networks work dynamically to increase "lock in" on the other side:

> We have done a pretty good job locking up pharmacies with the loyalty pricing –
> if we do the same on the [EHR] side . . . we significantly mitigate risk by ensuring
> we own exclusive relationships with the bulk of [EHRs], which creates additional
> lock-in from pharmacies[.]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Unrebutted economic analysis and the

actual experience of unsuccessful competitors confirm the anticompetitive effect of Surescripts'

contracts.

Faced with this mountain of evidence, Surescripts constructs an alternate reality in which

its loyalty contracts had no effect, its customers had no interest in competition, and its

competitors failed due solely to their own defects. But these arguments are twice flawed: they

rest on incorrect legal standards, and they also depend on heavily disputed factual assertions that

would preclude summary judgment in any event.

First, Surescripts contends that there is no substantial foreclosure because its loyalty

contracts are "optional" and do not require exclusivity to join the Surescripts networks. But the

substantial foreclosure test focuses on the "practical effect" of contracts, not their formal terms.

And there is ample evidence that Surescripts' loyalty contracts had the practical effect of making

it impossible for a rival to achieve the critical mass necessary to compete.

Second, Surescripts erroneously asserts that the FTC must prove a specific competitor

would have succeeded absent the challenged conduct and argues that Emdeon and other rivals

failed on their own merits. But the D.C. Circuit has rejected that proposed standard, making clear

that a plaintiff must prove only that the anticompetitive conduct "reasonably appears capable of making a significant contribution to monopoly power." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc) (internal alterations removed). In any event, the evidence shows that Emdeon and other companies *were* blocked by Surescripts' exclusionary contracts.

Third, Surescripts insists that the FTC must present a quantitative model of a "but-for" world in which prices would have been lower or output higher absent its contracts. Binding law rejects any such requirement. Regardless, substantial evidence shows that prices likely would have been lower—and innovation and quality higher—absent Surescripts' conduct.

In sum, Surescripts' arguments ask the Court to ignore the law, the practical reality of its exclusionary scheme, and the mountain of contemporaneous documents and other evidence that confirm it. Surescripts' motion should be denied.[1]

## ARGUMENT

The offense of monopolization requires two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as

---

[1] ███████████████████████████████████████████

Surescripts of course cannot suggest that this case is moot. *See, e.g.*, *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("'[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" (citation omitted)). As Surescripts implicitly acknowledges, many of its anticompetitive agreements remain in effect. Moreover, even if Surescripts were to unilaterally end those contracts, courts have long recognized that "[i]f a defendant voluntarily abandons a challenged practice, the Court generally does not lose its power to determine the policy's legality." *See FTC v. Agora Fin. LLC*, 447 F. Supp. 3d 350, 370 (D. Md. 2020). And although the FTC does not believe it appropriate to publicize details of ongoing settlement negotiations, the reason the case is not settled is that the parties do not currently agree on the relief that is needed to protect the public and redress the anticompetitive harm. *Cf. F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004) ("A Government plaintiff . . . must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm.").

distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Courts analyze monopolization claims using a burden shifting framework, under which the FTC's *prima facie* burden is to demonstrate monopoly power and "that the monopolist's conduct indeed has [an] anticompetitive effect." *Microsoft*, 253 F.3d at 58-59. Surescripts' motion does not challenge the sufficiency of the evidence of its monopoly power.[2] Instead, it challenges only whether the FTC has enough evidence to make out a *prima facie* case of anticompetitive effects. *See, e.g.*, Surescripts' Mem. in Supp. Mot. for Summ. J. ("Mot.") [ECF No. 104] at 13-15, 36.

At the summary judgment stage, Surescripts can prevail only if there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation omitted). A dispute of material fact is genuine if the evidence is such that, drawing all reasonable inferences in the FTC's favor, a reasonable factfinder could return a verdict for the FTC. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). Under these settled standards, Surescripts' summary judgment motion must be denied.

## I.  Ample evidence supports the claim that Surescripts engaged in exclusionary conduct by substantially foreclosing competition

"[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'" which means it must "harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58. "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Id.* But in general a monopolist's conduct is exclusionary if, "through

---

[2] In fact, Surescripts' extensive description of how e-prescribing is "safer, cheaper, and more efficient" than alternative methods (Mot. at 1, 5-6) supports the FTC's motion for summary judgment on monopoly power. *See* FTC's Mem. of Law in Supp. of its Mot. for Partial Summ. J. [ECF No. 103].

something other than competition on the merits, [it] has the effect of significantly reducing usage of rivals' products and hence protecting its own . . . monopoly." *Id.* at 65. Conduct that might be permissible in a competitive market "may be impermissibly exclusionary when practiced by a monopolist." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005); *see also Microsoft*, 253 F.3d at 70 (noting that a monopolist's use of exclusive contracts may be unlawful even if they foreclose less than the market share normally required). And in assessing whether conduct is impermissibly exclusionary, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).

Exclusive dealing is a well-recognized form of exclusionary conduct that "can run afoul of the antitrust laws when used by a dominant firm to maintain its monopoly." *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3rd Cir. 2012) (exclusive dealing may "be used by a monopolist to strengthen its position, which may ultimately harm competition"). Exclusive dealing is unlawful "if its 'probable effect' is to substantially lessen competition." *ZF Meritor*, 696 F.3d at 268. In general, determining substantiality in a given case is a fact-intensive inquiry. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). "[T]he test. . . 'is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.'" Mem. Op. Denying Surescripts' Mot. to Dismiss ("MTD Order") [ECF No. 45] at 12-13 (quoting *Dentsply*, 339 F.3d at 191). Exclusivity provisions covering around 40% (or less) of the market have been found to "substantially foreclose" competition. *Microsoft*, 253 F.3d at 70 (noting that a monopolist's use of exclusive contracts, even those foreclosing less than 40% to 50% of the market, may give rise to § 2 liability); *see also Standard Oil Co. of California*

*v. United States*, 337 U.S. 293, 295, 314 (1949) (arrangements extending to 16% of retail stations in relevant market constituted "substantial" foreclosure under Clayton Act Section 3).

*Microsoft* is the leading case for analyzing monopolization via exclusive dealing. There, Microsoft understood that its monopoly on PC operating systems could be threatened if a competitor developed a sufficiently popular middleware product, such as an internet browser. Middleware (like routing and eligibility) is a two-sided network with a chicken and egg problem: a browser "must have a critical mass of users in order to attract software developers to write applications," but users only want a platform "for which there already exists a large and varied set of applications." *Microsoft*, 253 F.3d at 60 (internal quotations omitted). To exploit this barrier, Microsoft sought to "keep[] rival browsers from gaining the critical mass of users necessary to attract developer attention away from Windows." *Id.*

In a lengthy, fact-intensive opinion, the en banc D.C. Circuit explained that a monopolist's use of exclusive contracts can be exclusionary when it impairs the ability of rivals to achieve the scale necessary to efficiently compete. *Microsoft*, 253 F.3d at 70-71. The court concluded that Microsoft's exclusive dealing arrangements with the top Internet Access Providers (IAPs) were exclusionary because they substantially foreclosed a nascent browser rival (Netscape) from obtaining a critical mass of users: "By ensuring that the 'majority' of all IAP subscribers are offered [Microsoft's Internet Explorer] either as the default browser or as the only browser, Microsoft's deals with the IAPs . . . help keep usage of [Netscape's] Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly." *Id*. at 71. The court also found that other deals had a similar effect of

keeping rivals from achieving sufficient scale, and made clear—over and over—that such a

showing met the government's prima facie case of "demonstrat[ing] a harm to competition." *Id*.[3]

Much like *Microsoft*, the evidence in this case confirms that Surescripts maintained

decade-long monopolies in the markets for routing and eligibility by foreclosing competition.

Surescripts' web of exclusive and loyalty contracts (together, "exclusionary contracts") and non-

compete contracts, coupled with structural features of the routing and eligibility markets,

prevented any competitor from securing more than a *de minimis* share of either market despite

significant efforts. By denying potential and nascent competitors this foothold, Surescripts'

agreements "help[ed] keep usage of [rivals] below the critical level necessary for [them] to pose

a real threat to [Surescripts'] monopoly." *See Microsoft*, 253 F.3d at 71.

---

[3] *See also id.* at 61 ("[T]he license restriction prevents many OEMs from pre-installing a rival browser and, therefore, protects Microsoft's monopoly from the competition that middleware might otherwise present."); *id.* at 62 (Microsoft's "prohibition on modifying the boot sequence . . . prevent[s] OEMs from promoting rivals' browsers. Because this prohibition has a substantial effect in protecting Microsoft's market power . . . it is anticompetitive."); *id.* ("By preventing the OEMs from [promoting rival browsers], this type of license restriction . . . is anticompetitive: Microsoft reduced rival browsers' usage share not by improving its own product but, rather, by preventing OEMs from taking actions that could increase rivals' share of usage."); *id.* at 65 ("Because Microsoft's conduct . . . has the effect of significantly reducing usage of rivals' products . . . . it is anticompetitive."); *id.* at 67 ("Plaintiffs plainly made out a *prima facie* case of harm to competition in the operating system market by demonstrating that Microsoft's actions increased its browser usage share . . . ."); *id.* at 71 ("Plaintiffs hav[e] demonstrated a harm to competition" by showing that "[b]y ensuring that the 'majority' of all IAP subscribers are offered I[nternet] E[xplorer] either as the default browser or as the only browser, Microsoft's deals with the IAPs clearly have a significant effect in preserving its monopoly; they help keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly."); *id.* at 73-74 ("Because Microsoft's exclusive contract with Apple has a substantial effect in restricting distribution of rival browsers, and because . . . reducing usage share of rival browsers serves to protect Microsoft's monopoly, its deal with Apple must be regarded as anticompetitive."); *id.* at 76 ("Because Microsoft's agreements foreclosed a substantial portion of the field for JVM distribution and because, in so doing, they protected Microsoft's monopoly from a middleware threat, they are anticompetitive.").

**A.      By 2010, Surescripts recognized it faced substantial competitive risk to its dominant position in routing and eligibility**

Surescripts is a health information technology company that provides routing and eligibility, sometimes referred to together as "e-prescribing." Mot. at 5. Routing is the electronic transmission of prescription information from prescribers (through their EHR) to a pharmacy. FTC's Statement of Undisputed Fact in Support of Mot. for Partial Summ. J. [ECF No. 103-2] ("FTC MPSJ SUF") ¶ 4. Eligibility is the electronic transmission of eligibility and formulary information between a prescriber (through their EHR) and a PBM. FTC MPSJ SUF ¶ 5. Routing and eligibility are both two-sided markets, meaning that they connect two different participants to complete transactions. FTC MPSJ SUF ¶ 7; FTC's Statement of Material Facts Presenting a Genuine Issue for Trial in Opp'n to Def.'s Mot. for Summ. J. ("SOMF") ¶ 25.

Present-day Surescripts was formed in 2008 by the merger of its two predecessors, legacy SureScripts and RxHub. Mot. at 5. As of 2003, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ But most prescription and eligibility information was still transmitted by analog methods, such as paper, phone and fax. FTC MPSJ SUF ¶¶ 27-28.

That was about to change. Beginning in 2008, the federal government stepped in to promote e-prescribing, eventually providing nearly $40 billion in financial incentives from 2009 and 2017, which dramatically increased adoption of routing and eligibility. FTC MPSJ SUF ¶¶ 15, 20, 21-26; SOMF ¶ 2. As a result, Surescripts began to fear challenges to its dominance, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Surescripts was primarily concerned with competition from Emdeon, a health information technology company with revenues many times larger than Surescripts. In July 2009, Emdeon had acquired eRx Network, a nascent routing network that Surescripts had previously described as one of its "most significant threat[s] in the near to longer term." SOMF ¶ 3 (quoting Surescripts_00253986, at -991). Surescripts viewed the combined Emdeon/eRx Network as an even more "serious competitor" because of its "[s]tated strategic intent to compete with Surescripts," its "[r]esources," and its "[m]otivation." *Id.* (quoting PX069, Surescripts_00295017, at PX069-002). Indeed, Surescripts' CEO at the time, Harry Totonis, described Emdeon as a "scary competitor" with "deep pockets":

> Emdeon was, with the acquisition of eRX, getting into the prescribing business, a competitor, and a scary competitor. You know, I can't even use the David and Goliath because we were so small, it was almost like amoeba and Goliath. They had deep pockets.

*Id.* (quoting Totonis (Surescripts) Dep. Tr. 130:25-131:5).

Surescripts feared other potential competitors as well. For example, Surescripts had a longstanding relationship with RelayHealth, its "value-added reseller" for routing. SOMF ¶ 4. As early as August 2008, though, Surescripts had recognized that "[t]here is a risk that if the [reseller] agreement with RelayHealth is not renewed, RelayHealth will create a competitive network." *Id.* (quoting Surescripts_00253986, at -991). █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Surescripts also feared competitive pressure from Allscripts, a large EHR, on two fronts. First, Surescripts was concerned that Allscripts would compete in eligibility by forming direct connections to PBMs, allowing transactions to bypass Surescripts. SOMF ¶ 5. In 2009, Surescripts then-Chief Strategy Officer, Mr. Barclay described Allscripts to then-CEO Mr.

Totonis as "a major competitor and our largest current risk. I consider them competitor first, partner (very distant) second." *Id.* (quoting PX078, Surescripts_00295007, at PX078-001). Second, Surescripts recognized that Allscripts empowered routing competition by multihoming—using Emdeon as well as Surescripts. *Id.* As ▮▮▮▮▮▮▮ explained to ▮▮▮▮▮ ▮▮▮▮▮ "the key to Emdeon is Allscripts (i.e., The key to fighting eRx networks is containing their access to POC [point of care])." *Id.* (quoting PX186, Surescripts_00072834).

### B.    To protect its dominant market position, Surescripts implemented exclusionary contracts on all sides of its routing and eligibility networks

Beginning in early 2010, Surescripts implemented the cornerstone of its anticompetitive scheme: a vast web of "loyalty contracts" on nearly all market participants. SOMF ¶¶ 6-7, 17-24. For pharmacies, the loyalty contracts provided a structure in which they would be charged a higher price on all transactions unless they agreed to route all routing transactions through Surescripts. SOMF ¶ 7. Surescripts implemented the same framework for PBMs for eligibility transactions. *Id.* For EHRs, the loyalty contracts provided EHRs incentive payments only if they use Surescripts exclusively. *Id.* Many contracts also gave Surescripts the right to claw back previously distributed discounts and incentives for violations of the loyalty commitments. SOMF ¶ 11. In addition to the loyalty contracts, some of Surescripts' contracts were explicitly exclusive, either directly or through RelayHealth. SOMF ¶ 10. Around this same time, Surescripts also removed competitive threats from Allscripts and RelayHealth with explicit exclusivity and non-compete contracts. SOMF ¶¶ 12-16.

Surescripts' web of exclusionary contracts exploited the special features of two-sided networks to protect Surescripts' dominant position. Routing and eligibility are characterized by "indirect network effects," where participants on one side of the platform value having more participants on the other side. SOMF ¶ 25. Indirect network effects lead to a "chicken-and-egg"

problem for entrants: the entrant cannot attract participants to one side without having sufficient participants on the other side on board, and vice versa. SOMF ¶ 26. To attain a viable path to growth, any new competitor must reach "critical mass," or a minimum number of relevant participants. *Id.* If a platform does not reach critical mass, new participants will tend not to join the platform because it provides insufficient value. SOMF ¶ 27. The most common way for entrants to build critical mass in two-sided markets dominated by a "must-have" incumbent, such as Surescripts in routing and eligibility, is to convince customers to simultaneously use both the entrant's network and the incumbent's—in other words, to multihome. SOMF ¶¶ 28-30.

Surescripts was well aware of these dynamics. It knew that an entrant could threaten Surescripts' dominant position if the entrant could attain a foothold on one side of the market, thus making its network more attractive to the other side. SOMF ¶ 6. Less than two months before implementing the loyalty scheme, Surescripts' Chief Strategy Office wrote: "[Surescripts] should be demanding 100% exclusivity with [EHRs]! If all of them are decide [sic] to route 10% of traffic to [Emdeon], it will significantly bolster [Emdeon]'s market position to win away pharmacy customers." *Id.* (quoting PX102, Surescripts_00216317, at PX102-001).

### C. Surescripts' exclusionary contracts substantially foreclosed competition

To keep rivals from gaining the critical mass necessary to become meaningful competitors, Surescripts entered exclusionary contracts with virtually all of its routing and eligibility customers. According to calculations by the FTC's economic expert, Dr. David Evans, Surescripts' exclusionary contracts covered (either directly or through Relay Health), on average, at least ███ of routing and eligibility transaction volume:

- ███ of EHR routing volume between 2010-2019. SOMF ¶ 18.

- ███ of pharmacy routing volume between 2010-Q1 2019. SOMF ¶ 19.

- ███ of EHR eligibility volume between 2010 and 2019. SOMF ¶ 20.

- ███ of PBM eligibility volume between 2010 and 2017. SOMF ¶ 21.[4]

The actual foreclosure, though, is even greater than these percentages indicate. In a two-sided market, a competitor can only transmit a transaction if it can supply both parties to that transaction—in other words, only if neither customer is exclusive to Surescripts. SOMF ¶ 23. This means that "the competitive consequences of foreclosure on each side are magnified because two parties are needed for every transaction and foreclosure of competition for one is enough to foreclose competition for both." *Id.* (quoting Evans Rep. ¶ 276). Therefore, the relevant measure of foreclosure is how many transactions are foreclosed on *at least one side*. Using that metric, over ███ of routing transactions and over ███ of eligibility transactions were foreclosed on at least one side between 2010 and 2019. SOMF ¶ 24.

The foreclosure from Surescripts' exclusionary contracts, thus, far exceeds the levels that can give rise to liability under the Sherman Act. *See Microsoft*, 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."). And, contrary to Surescripts' contention, the FTC's evidence of substantial foreclosure is not limited to this "arithmetic." Mot. at 2.

First, Surescripts' own employees repeatedly admit, in contemporaneous ordinary-course business documents, that Surescripts' exclusionary contracts have substantially foreclosed competition, and that elimination of these contracts will allow rivals to emerge. SOMF ¶ 31. ███

████████████████████████████████████████████████████████████████

---

[4] ████████████████████████████████████████████████████████████████
████████████



Many other documents express the same sentiment:

- "Surescripts['] efforts to lock in our customers through Loyalty programs have likely had a strong impact to Emdeon's initial strategy. With most top [EHRs] signed to Loyalty Incentive plans, and, a significant portion of the Pharmacy industry signed to Loyalty pricing plans (direct and via [RelayHealth]), Emdeon's ability to expand their direct connection to prescribers and pharmacies has been greatly reduced." SOMF ¶ 55 (quoting PX044, Surescripts_00019573, at PX044-004).

- "We have done a pretty good job locking up pharmacies with the loyalty pricing – if we do the same on the [EHR] side . . . we significantly mitigate risk by ensuring we own exclusive relationships with the bulk of [EHRs], which creates additional lock-in from pharmacies . . . ." SOMF ¶ 52 (quoting PX010, Surescripts_00023267 at PX010-001).

- "Why will it be extremely hard for eRx/Emdeon to expand their connections to prescribers/vendors beyond where they are today, or to come anywhere close to the prescriber connections that Surescripts has today. . . . Our Reserve Program for prescriber vendors [i.e., EHRs] that severely limits their incentive fees from us for

splitting transactions is a powerful reason.[] " SOMF ¶ 54 (quoting PX039, Surescripts_00072283, at PX039-001).

- "Yes, basically, the incentives have been the main reason I believe the [EHR] vendors have not agreed to split traffic with Emdeon; that, and the fact that they are too busy. The incentives on the POC [point of care, i.e., EHR] side, along with the loyalty price differential on the Rx [i.e., pharmacy] side, are the reasons why we are in a stronger competitive position now than when Emdeon purchased eRx." SOMF ¶ 57 (quoting PX195, Surescripts_00016046, at PX-195-001).

- "eRx/Emdeon can undercut Surescripts on price, but only on a margin of volume ███████ ███████████████████████████████████████████ and Surescripts pricing differential on pharmacy side and loyalty incentive program on POC side are worth more than eRx /Emdeon's proposition on <10% of scripts ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████

- ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████

These documents are not just evidence of "intent,"[5] as Surescripts contends (Mot. at 2); they are compelling confirmation from Surescripts that its exclusionary conduct worked.

Second, evidence from potential routing and eligibility rivals tells the same story of substantially foreclosed competition. After it acquired eRx Network in 2009, Emdeon began to recruit routing customers, but was blocked by Surescripts' exclusionary contracts on all sides of the routing network. SOMF ¶¶ 60-65. After several years of being stymied, Emdeon embarked on ███████████████████ an attempt to circumvent Surescripts' loyalty contracts by simultaneously signing up nearly all EHR customers. SOMF ¶¶ 66-69. Emdeon's efforts failed

---

[5] In any event, evidence of intent is relevant to determining whether conduct is anticompetitive. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (intent is "relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' . . . there is agreement on the proposition that 'no monopolist monopolizes unconscious of what he is doing'" (citation omitted)).

due to the ▓▓▓▓▓▓ nature of the plan and Surescripts' exclusive contract with Allscripts. SOMF ¶¶ 70-73. In late 2013 or early 2014, Emdeon tried to enter eligibility, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. SOMF ¶ 80-84. Despite significant efforts over nearly a decade, Emdeon has never gained more than 5% share of routing or eligibility transactions. FTC MPSJ SUF ¶¶ 108, 116, 118. No other competitor has made any headway either. Surescripts has maintained a 95% share in routing and eligibility since at least 2010. *Id.* ¶¶ 100-21.

Third, the economic analysis from the FTC's expert, Dr. David Evans, shows that Surescripts' loyalty contracts kept customers from multihoming by imposing substantial penalties for doing so, making it virtually impossible for entrants to build critical mass, secure indirect network effects, and grow profitably. SOMF ¶ 36. Dr. Evans' analysis shows that rival networks could not earn any revenue (and in most cases, would lose money) from supplying routing or eligibility transactions to customers subject to Surescripts loyalty provisions. SOMF ¶¶ 37-41. This is because the rivals would have to compensate customers for the financial penalties they would incur from using the rival in addition to Surescripts. *Id.* These financial penalties have thus allowed Surescripts to "keep usage of [rivals] below the critical level necessary . . . to pose a real threat" to Surescripts' monopoly. *Microsoft*, 253 F.3d at 71.

**II.    Surescripts misstates the relevant legal standards and ignores the factual record**

Despite this clear factual record of substantial foreclosure, Surescripts somehow claims that the undisputed facts show the opposite: that (1) Surescripts' contracts did not prevent competitors from entering the routing and eligibility markets; (2) potential and nascent competitors were not affected by Surescripts' conduct and failed on their own; and (3) Surescripts' conduct did not cause any anticompetitive effects in routing and eligibility, such as higher prices or reduced output. But in each of these arguments, Surescripts puts forward an incorrect heightened legal standard and disregards the extensive factual record.

A.      **Surescripts' arguments regarding the formal terms of its contracts are legally and factually flawed**

Ignoring the overall context and effect of its contracts, Surescripts argues that they cannot substantially foreclose competition as a matter of law because many were not technically exclusive (and were therefore purportedly "optional") and some had short terms or were terminable by customers. Mot. at 20-21. Legally, Surescripts errs by focusing narrowly on the contracts' formal terms rather than addressing their practical effect on competition. Factually, ample evidence shows that, in practice, Surescripts' contracts were not optional, short-term, or terminable, but instead that they substantially foreclosed competition.

1.  **The substantial foreclosure test focuses on the practical effect of the contracts rather than formalistic distinctions**

"Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992). Surescripts' reliance on formalistic legal arguments about individual terms—rather than the contracts' practical effect on competition—is thus misplaced.

First, the fact that most of Surescripts' contracts technically allowed customers to reject loyalty pricing without being cut off from Surescripts' network does not mean that "customers [are] . . . free to contract with other suppliers if they chose to do so." Mot. at 19. As this Court explained, "a contract need 'not contain specific agreements not to use the [services] of a competitor' as long as 'the practical effect . . . is to prevent such use.'" MTD Order at 12 (quoting *Tampa Elec.*, 365 U.S. at 326); *see also Microsoft*, 253 F.3d at 75-76 (condemning deals that were "not literally exclusive" but "exclusive in practice"); *Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1374 (10th Cir. 1979) ("The agreement need not specifically require the buyer to forego other supply sources if the practical effect is the same."). The practical effect inquiry is "fact intensive," MTD Order at 18, focusing on whether the contracts

"break the competitive mechanism and deprive customers of the ability to make a meaningful choice." *ZF Meritor*, 696 F.3d at 285.

Second, as this Court has also observed, the term and terminability of the contracts do not immunize them from antitrust liability. MTD Order at 17-18; *see also McWane*, 783 F.3d at 833-835, 840 (holding that exclusive dealing program harmed competition despite being "nonbinding . . . short-term and voluntary" and stating "these characteristics do not render the program presumptively lawful"). Contracts that are "terminable on short notice on their face" may not be terminable "in practice" and thus can be "de facto exclusive." *Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02-4770 MRP, 2006 WL 1236666, at *6 (C.D. Cal. Mar. 22, 2006), *aff'd*, 350 F. App'x 95 (9th Cir. 2009). Indeed, as the Third Circuit explained in *ZF Meritor*, when a defendant has "assured that there would be no other supplier that could fulfill the [customers'] needs or offer a lower price," the right to terminate the agreements may be "essentially meaningless." 696 F.3d at 287; *see also Dentsply*, 399 F.3d at 194 ("[I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying [the monopolist's product].").

Finally, the loyalty contracting cases cited by Surescripts (Mot. at 19-20) are consistent with the need to conduct a fact-intensive inquiry into the practical effect of specific contracts in specific circumstances. For example, in *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016), the Third Circuit found that a set of market share and pharmaceutical volume discount contracts did not sufficiently foreclose competition "at least on the facts before [it]," and distinguished cases where "[a]lthough consumers had a choice between products . . . the

17

defendant's anticompetitive conduct rendered that choice meaningless." *Id.* at 404-06.[6] And in *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983), the First Circuit affirmed the district court's finding, based on a full trial record, that the contracts were not exclusionary "in light of the nature of the contracts and the market, their fairly short time period, their business justifications, the characteristics of the parties, and their likely motives as revealed by their business interests." *Id.* at 238; *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) ("[O]n the facts of this case something more than the discount itself is necessary to prove that Tyco's market-share discount agreements forced customers to purchase its sensors rather than generics.").

In sum, Surescripts' contract terms must be considered in the context of the entire record to determine their practical effect on competition.

### 2. Ample evidence shows that the practical effect of Surescripts' contracts is to substantially foreclose competition

Surescripts contends that its contracts "did not foreclose any competition" because its loyalty discounts were optional, the contracts were short term and terminable, and customers preferred to remain exclusive. Mot. at 18. But these factual assertions are heavily disputed. There is more than enough evidence for the Court to conclude that, in practice, Surescripts' customers

---

[6] Two District Courts within the Third Circuit, in denying motions to dismiss, made clear that *Eisai* does not foreclose the theory that 'all-or-nothing' discounts on a single product could "break the competitive mechanism and deprive new [purchasers] of the ability to make a meaningful choice." *Pfizer, Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 504 (E.D. Pa. 2018); *see also In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 580 (E.D. Pa. 2018) ("Unlike in *Eisai*, where plaintiff customers did not risk penalties for terminating the defendants' program or violating its terms, here Plaintiff purchasers allege the risk of rebate penalties forecloses competition by [rivals] who cannot financially offset the losses posed to purchasers through J&J's rebate threats." (cleaned up)).

were not free to contract with other routing or eligibility providers regardless of the contracts' formal terms.

First, Surescripts' assertion that customers could theoretically reject its loyalty discounts ignores the practical reality that those contracts "deprive[d] customers of the ability to make a meaningful choice." *See ZF Meritor*, 696 F.3d at 285. Surescripts is a dominant, "must-have" routing and eligibility provider. FTC MPSJ SUF ¶¶ 100-127. And as explained in Section I.C, Surescripts' web of exclusionary contracts has prevented any rival from gaining the foothold necessary to become a viable competitor. *See supra* pp. 11-15; SOMF ¶¶ 25-41, 47-91. Therefore, a customer that multihomed with a competitor would still need to use Surescripts for the vast majority of its transactions and would incur an enormous financial penalty on those transactions for its "disloyalty." SOMF ¶¶ 36-57.[7] As established by Surescripts' own admissions, the experience of nascent rivals, and Dr. Evans' unrebutted analysis, it has been impossible for a rival to profitably compensate customers for these penalties. SOMF ¶¶ 17-91.

Surescripts expressly explained this dynamic to customers. For example, Surescripts told RiteAid that, even if Emdeon offered lower prices than Surescripts, RiteAid would "still need to route the great majority of transactions through Surescripts," would suffer a pricing penalty on those transactions, and "[t]he total cost . . . to split traffic would therefore be higher than if [RiteAid] continue[d] to route 100% through" Surescripts. SOMF ¶ 48 (quoting PX038, Surescripts_00069300, at PX038-012). ██████████████████████████

---

[7] Surescripts makes much of a so-called "loophole" that permitted entities to connect to another company that was not on the Surescripts network without risking their loyalty status and discount. Mot. 20-21, 37-38. The utility of this alleged loophole is limited, however, by the fact that virtually all routing and eligibility customers have been connected to Surescripts' network since at least 2010. FTC Resps. to Def.'s MSJ SUF ¶¶ 31-33.

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████  As such, it is not surprising that both Surescripts and its customers

describe the loyalty contracts as functionally exclusive. SOMF ¶¶ 42-43. Even in its current

motion, Surescripts acknowledges that agreeing to loyalty was the "economically rational"

choice for customers. Mot. at 10.

Second, in practice, Surescripts' contracts were not "short-term and easily terminable."

Mot. at 21. Surescripts' cited termination provisions ████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████  And even an  ████  customer that had the option to "terminate" or decline to renew a

Surescripts loyalty contract would face the same insurmountable problem: Since Surescripts was

a "must-have" network, the  ████  would have no choice but to maintain a connection to

Surescripts for the vast majority of transactions and face prohibitive financial penalties for not

being loyal. SOMF ¶¶ 36-57. The putative right to terminate the agreements was therefore

"essentially meaningless because [Surescripts] had assured that there would be no other supplier

that could fulfill the [customers'] needs or offer a lower price." *See ZF Meritor*, 696 F.3d at 287.

In fact, no customer that joined Surescripts' loyalty program has ever terminated its

participation. FTC Resps. to Def.'s MSJ SUF ¶ 25.

Third, Surescripts' factual claim that customers signed up for loyalty "because they saw

value in having a single network and did not want to multihome" (Mot. at 21-22) is also belied

by the evidence. ██████████████████████████████████████████████████



In light of these specific facts, this case is not "very similar to" *Eisai*, 821 F.3d 394, as Surescripts claims. Mot. at 19. Although *Eisai* also involved allegations of a discounting scheme used to foreclose competition, the parallels end there. The Third Circuit found that Eisai did not adequately establish the "incontestable demand" that required purchasers to buy Sanofi's Lovenox product and also "fail[ed] to tie [its economic expert's] model to concrete examples of anticompetitive consequences in the record." 821 F.3d at 406. Here, the foreclosure effect of the contracts is demonstrated both by robust analysis and concrete evidence. *See In re Remicade*,

---

[8] Surescripts also asserts that customers' purported preference for a single network is a feature of "'markets characterized by network effects,'" Mot. 22 (quoting *Microsoft*, 253 F.3d at 49), citing to the D.C. Circuit's observation that competition in such markets is often "'for the field rather than within the field.'" *Id*. The D.C. Circuit, however, made clear that this "backdrop" discussion was "theoretical" and the subject of "significant debate." *Microsoft*, 253 F.3d at 49-50. Regardless, it has no bearing here on the factual question of whether customers wanted to multihome—which Surescripts itself anticipated they would.

345 F. Supp. 3d at 580 (distinguishing *Eisai* and noting "[t]he threat of losing rebates on all Remicade prescriptions . . . is similar to the effect of defendants' anticompetitive conduct in *Dentsply*, where the threat to cut off supply ultimately provided customers with no choice but to continue purchasing from the defendants" (internal quotation marks omitted)).

*Eisai* also found that "nothing in the record demonstrate[d] that a [customer's] supply of Lovenox would be jeopardized in any way or that discounts already paid would have to be refunded" if the customer terminated exclusivity. 821 F.3d at 406-07. Here, Surescripts threatened to cut off Allscripts—one of the largest EHR customers—from its network and other critical data sources unless Allscripts agreed to loyalty. FTC Resps. to Def.'s MSJ SUF ¶ 29 (describing Surescripts' threats to Allscripts). Other customers similarly feared Surescripts would remove them from its network if they were not exclusive. FTC Resps. to Def.'s MSJ SUF ¶ 22. And many of Surescripts' contracts included claw backs requiring customers to forfeit previous discounts if they stopped being loyal. SOMF ¶ 11.

*Eisai* also lacked critical features that make this case analogous to *Microsoft*: network effects and the chicken-and-egg problem. Rather than involving different, interdependent groups of users, *Eisai* only involved one set of customers (hospitals). Here, in contrast, the record establishes that Surescripts' contracts magnified the chicken-and-egg problem for entrants by preventing customers from multihoming, thereby "keep[ing] usage of [rivals] below the critical level necessary . . . to pose a real threat" to Surescripts' monopoly. *Microsoft*, 253 F.3d at 71.

**B.    Surescripts' arguments regarding Emdeon and other foreclosed competitors are legally and factually incorrect**

Surescripts' contention that "the FTC here must present real-world evidence sufficient to raise a genuine dispute that a significant competitor would have entered the market or grown its share" and has not done so (Mot. at 15) is both legally and factually meritless. The D.C. Circuit

…

has expressly rejected any legal requirement to show that a specific competitor actually would have succeeded absent the restrictive conduct. Moreover, even under Surescripts' erroneous standard, there is more than sufficient evidence that Emdeon was prevented from getting a foothold in the routing or eligibility markets because of Surescripts' exclusionary contracts.

### 1. The FTC does not need to prove that Emdeon or any other competitor would have successfully competed absent Surescripts' contracts

The D.C. Circuit has squarely rejected Surescripts' argument that, "as to § 2 *liability*, in an equitable enforcement action, plaintiffs must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct." *Microsoft*, 253 F.3d at 79. And it has made clear that questions of whether "there has been an actual loss to competition that needs to be restored" go to "the appropriate remedy issue" rather than liability. *Id.* at 80. Instead, to make out a *prima facie* case the FTC need only show that Surescripts "has engaged in anticompetitive conduct that 'reasonably appear capable of making a significant contribution to monopoly power.'" *Id.* at 79 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 651c (1996)) (internal alterations omitted). As the D.C. Circuit elaborated in *Microsoft*:

> [T]he question . . . is not whether [nascent competitors] would actually have developed into viable platform substitutes, but (1) whether as a general matter the exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a defendant's continued monopoly power and (2) whether [nascent competitors] reasonably constituted nascent threats at the time [defendant] engaged in the anticompetitive conduct at issue.

*Microsoft*, 253 F.3d 79. In that case, the court found that Netscape and Java qualified as nascent rivals because they "showed potential as middleware platform threats." *Id.*

The cases cited by Surescripts (which are not controlling in any event) are not to the contrary. Each undertook a fact-based inquiry into the practical effect of specific contracts in specific industries. None involved a government plaintiff, most involved different procedural postures, and most analyzed conduct by a non-monopolist or situations where a competitor

successfully gained market share. For example, in *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997), the Ninth Circuit concluded based on a full post-trial record that plaintiffs had failed to show an anticompetitive effect where another competitor actually entered and expanded during the relevant period. *Id.* at 1164. And in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir. 1984), an appeal of a district court preliminary injunction order, the Seventh Circuit found that Komatsu, a competitor to the defendant and the "second largest manufacturer of construction equipment in the world," was likely not foreclosed from a regional Illinois market by the defendant's alleged preference for dealer exclusivity. *Id.* at 393. The court noted that "[t]he nationwide practice of exclusive dealing [in the industry] has not kept Komatsu from becoming a major factor in the U.S. market, apparently in a short period of time." *Id*. at 393-94.[9] None of these cases supports Surescripts' claim that the FTC is required to show Emdeon or another competitor would have succeeded absent the contracts to establish liability.

### 2.   Ample evidence shows that Emdeon was blocked by Surescripts' contracts

As required by *Microsoft*, Emdeon clearly "constituted [a] nascent threat[] at the time [Surescripts] engaged in the anticompetitive conduct at issue." *Microsoft*, 253 F.3d 79; SOMF ¶ 3, 58-84. A further showing is unnecessary, ███████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

---

[9] *See also Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976-78 (6th Cir. 2000) (finding plaintiff failed to allege antitrust injury because, among other reasons, "customers were free to seek other power generators at the conclusion of the [challenged] contracts"); *In re EpiPen Antitrust Litig.*, 507 F. Supp. 3d 1289, 1340-59 (D. Kan. 2020) (granting summary judgment on exclusive dealing and single-product bundling claims based on 20-page factual analysis and noting, among other things, that the contracts were frequently terminated and re-negotiated (*id.* at 1345-46), that the plaintiff won contracts when it offered better prices (*id.* at 1346, 1357), and that many customers requested exclusive agreements (*id.* at 1347)).

███████████████████████████████████████████████████████████

████████████ Contemporaneous internal Surescripts documents confirm why. SOMF ¶¶ 53-

57. As one of many examples, in 2010, Surescripts VP of Pharmacy Customer Relations

explained in an "Emdeon Overview Memo" that "Surescripts efforts to lock in our customers

through Loyalty programs have likely had a strong impact to Emdeon's initial strategy":

> With most top [EHRs] signed to Loyalty Incentive plans, and, a significant
> portion of the Pharmacy industry signed to Loyalty pricing plans (direct and via
> [RelayHealth]), Emdeon's ability to expand their direct connection to prescribers
> and pharmacies has been greatly reduced.

SOMF ¶ 55 (quoting PX044, Surescripts_00019573, at PX044-004).

Surescripts' contrary claims ████████████████████████████ are the

subject of material factual disputes. First, Surescripts asserts that ███████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

To the extent ██████████████████████████ is relevant, that is a factual issue for trial.

Second, ███████████████████████████████████████████ is

incorrect and disputed. In July 2009, Emdeon acquired eRx Network, a small Surescripts routing

competitor, and aggressively attempted to recruit routing customers. SOMF ¶¶ 3, 59-60; FTC

Resps. to Def.'s MSJ SUF ¶ 58. At this time, ████████████████████████████████████

███████████████████████████████████████████████

████████████ Surescripts immediately began planning its exclusionary strategy to foreclose

competition from Emdeon, which it implemented mere months later. SOMF ¶¶ 3, 6-11.

Emdeon's efforts to compete in eligibility several years later ████████████████████████████

████████. SOMF ¶¶ 80-84.

Third, Surescripts draws the wrong conclusion from Emdeon's failed ███████████ Mot. at 24-25. This failed entry effort confirms—rather than refutes—the exclusionary impact of Surescripts' loyalty contracts. Absent Surescripts' exclusionary contracts, Emdeon could have built critical mass incrementally via multihoming, as entrants typically do in two-sided networks. SOMF ¶¶ 25-35. But with that traditional approach foreclosed by Surescripts' massive financial penalties for multihoming, Emdeon was forced to embark on a ███████ strategy to simultaneously sign up ███████ EHRs. SOMF ¶¶ 65-69; FTC Resps. to Def.'s MSJ SUF ¶ 62. And that ███████ strategy may even have succeeded had Surescripts not forced one large EHR, Allscripts, to become exclusive to Surescripts. SOMF ¶¶ 70-73.

Surescripts also wrongly claims there is no evidence that "Surescripts took actions that actually foreclosed any other entities," such as █████████████████████████████████ ███████████ Contemporaneous documents and sworn testimony make clear, however, that ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ As to ██████████████████████████ there is substantial evidence that Surescripts feared competition from these two entities and eliminated that risk through exclusionary and non-compete contracts. FTC Resps. to Def.'s MSJ SUF ¶¶ 72-73.[10] In short, the record establishes that Surescripts' contracts worked exactly as intended to block potential and nascent competitors.

---

[10] As to ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

### C.      Surescripts misstates the anticompetitive effects standard

Surescripts next contends that the FTC must prove "reduced output, increased price, or reduced quality in goods or services" and "produce evidence of causation that can tie [those effects] specifically to Surescripts' loyalty discounts." Mot. at 30 (quotation marks omitted). Once again, this argument is legally and factually mistaken. As *Microsoft* makes clear, the government satisfies its *prima facie* burden to show anticompetitive effects with evidence that a monopolist's conduct helped keep nascent and potential rivals from obtaining a critical mass of users. Since Surescripts' exclusion of nascent competitors "reasonably appears capable of making a significant contribution to maintaining monopoly power," *Microsoft*, 253 F.3d at 79 (internal alterations omitted), there is no need to make a further showing that the contracts actually resulted in higher prices, lower output, or reduced quality. Moreover, as a factual matter, the record contains ample evidence that the likely effect of Surescripts' conduct was higher prices, lower quality, and reduced innovation.

### 1.      The FTC does not need to prove reduced output, increased price, or reduced quality in a but-for world

 Surescripts' erroneous claim that the FTC must prove a but-for world with higher prices, reduced quality and innovation, or lower output (Mot. at 29-35; 39-41) misunderstands the relevant legal standards.

First, the en banc D.C. Circuit in *Microsoft* expressly rejected the argument that proving an anticompetitive effect requires an analysis of the but-for world: "To require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." 253 F.3d at 79. The court explained the "underlying proof problem" with such a standard: "neither plaintiffs nor the court can confidently reconstruct a product's

hypothetical technological development in a world absent the defendant's exclusionary conduct." *Id.* Thus, "[t]o some degree, the defendant is made to suffer the uncertain effects of its own undesirable conduct." *Id.* (quoting 3 Areeda & Hovenkamp, Antitrust Law 651c at 78).

Instead, as *Microsoft* makes clear, a plaintiff can establish anticompetitive effects by showing that a monopolist's use of exclusive contracts impairs the ability of rivals to achieve the scale necessary to efficiently compete. For example, *Microsoft* held that plaintiffs "made a *prima facie* showing that [Microsoft's exclusive] deals [with Independent Software Vendors] have an anticompetitive effect" by demonstrating that they "ke[pt] rival browsers from gaining widespread distribution," such that "the deals have a substantial effect in preserving Microsoft's monopoly." 253 F.3d at 71-72; *see also supra* n.3. As detailed above, Surescripts' exclusionary contracts similarly kept rivals below the critical level necessary to compete. This establishes the FTC's *prima facie* case of anticompetitive effects. *See also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1802c (4th ed. 2020) (explaining that when a dominant incumbent imposes a "set of strategically planned exclusive-dealing contracts" that "slow [a] rival's expansion," "[c]onsumer injury results from the delay that the dominant firm imposes on the smaller rival's growth").

Second, Surescripts' continued reliance on *Ohio v. American Express Co.* ("*Amex*"), 138 S. Ct. 2274 (2018) is misplaced. *See* MTD Order at 16 ("Surescripts reads too much into *Amex*."). This Court has previously noted *Amex* was not a monopoly maintenance case and Amex was not a monopolist. MTD Order at 16. As this Court explained:

> Here, on the other hand, the FTC brings a claim of monopolization under Section 2 of the Sherman Act against Surescripts, an undisputed monopolist. Regardless of Surescripts' specific above-market fees or below-market incentives, the central question is whether the FTC alleged that Surescripts engaged in exclusionary conduct that "harmed competition, not just a competitor," by blocking entrants into the market.

MTD Order at 17 (quoting *Microsoft*, 253 F.3d at 59). As such, *Amex* did not undermine
*Microsoft*'s holding that a monopolist's foreclosure of nascent or potential rivals is an
anticompetitive effect if it is "reasonably capable of contributing significantly to a defendant's
continued monopoly power." *Microsoft*, 253 F.3d 79.[11]

Third, Surescripts' other purportedly supportive cases do not address the standard for
proving anticompetitive effects, but instead the standards for proving antitrust injury or
damages—which are inapplicable in a government injunction suit. Mot. at 32-34. Private
antitrust plaintiffs must establish that they suffered an antitrust injury caused by the defendant's
unlawful conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977). And
a private plaintiff seeking monetary relief must show damages "by reason" of the antitrust
violation. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S.
519, 543 (1983). But the FTC is not seeking damages.[12] And a federal government enforcer does
not need to show antitrust injury. *See FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 29 (D.D.C.
2008) (Bates, J.) (noting that "private litigants must demonstrate antitrust injury and prove

---

[11] Even under Section 1 of the Sherman Act proof of higher prices or reduced output is not
necessary to make out a *prima facie* case. *Amex*, 138 S. Ct. at 2284, 2287 (explaining that a
plaintiff can prove anticompetitive effects *either* with "[d]irect evidence" such as "reduced
output, increased prices, or decreased quality," *or* "indirectly," with "proof of market power plus
some evidence that the challenged restraint harms competition.").

[12] In a May 17, 2021 order, the court approved a stipulation to dismiss without prejudice the
FTC's request for equitable monetary relief. Order Regarding Req. for Equitable Monetary
Relief [ECF No. 93]. The order provides that "[s]hould Congress subsequently authorize the
FTC to seek equitable monetary relief under Section 13(b) of the FTC Act or any other provision
of law, the FTC may seek leave to reinstate its request for such relief." *Id.* If the FTC's claim for
equitable monetary relief is reinstated, the FTC need only "establish[] a reasonable
approximation of the profits tainted by the violation" to meet its initial burden for an award of
equitable monetary relief, and then the burden shifts to defendants to show that the
"approximation [is] unreasonable." *SEC v. Teo*, 746 F.3d 90, 107 (3d. Cir. 2014).

damages" while the FTC does not); *In re Nexium Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016) ("[P]rivate plaintiffs and the FTC stand in different shoes.").[13]

Surescripts thus rests its but-for world argument on cases that are inapposite to the FTC here. For example, in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) (cited Mot. at 33), the Court noted that "to enable the jury to assign damages," the plaintiff's expert was "required to construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive." *Id.* at 1054-55. In the cited portion of *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) (Mot. at 33), the Court affirmed the exclusion of plaintiff's expert opinion on the amount of damages the plaintiff suffered from the violation because the expert did not construct "a reasonable offense free world as a yard stick for measuring what, hypothetically would have happened 'but for' the defendant's unlawful activities." 696 F.3d at 291-92. And in *J.B.D.L. Corp. v Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880 (6th Cir. 2007) (cited Mot. at 32-33), the Court addressed "the evidence the Purchasers offer to establish the critical link between Wyeth's actions and the antitrust injury the plaintiffs allege, namely increased prices." 485 F.3d at 888; *see also Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 897 (W.D. Ky. 2020) (cited Mot. at 30) (state government plaintiff seeking damages for citizens of the state was required to prove antitrust injury).[14]

---

[13] The distinction arises because private plaintiffs' authority to bring antitrust suits arises from Clayton Act provisions requiring proof of actual or threatened injury from the violation. *See* 15 U.S.C. §§ 15, 26. The federal government enforces the antitrust laws directly. *See, e.g.*, 15 U.S.C. § 45(a)(2). This difference reflects the different objectives of private and public suits. The "interest of private plaintiffs is to remediate an injury they have suffered or may suffer. The interest of the government is to 'prevent and restrain' violations of the antitrust laws along with the attendant social costs such violations can cause." *Nexium*, 842 F.3d at 60.

[14] Surescripts also errs when it contends that the law requires the FTC to present a quantitative but-for analysis because in some circumstances exclusive contracts can address a market failure (Continued…)

**2.    While not necessary to prove an anticompetitive effect, ample evidence shows that Surescripts' conduct likely resulted in higher prices and reduced quality and innovation**

The FTC has ample evidence that Surescripts' conduct resulted in higher prices, lower quality, and reduced innovation.[15]

*Prices.* Routing and eligibility prices likely would have been lower in a competitive market, as evidenced by ████████████████████████████████████ ████████████████████████████████ First, in developing its loyalty scheme, Surescripts executives recognized that competition would reduce routing and eligibility prices. SOMF ¶ 93. Surescripts even quantified the expected price drops, for example, noting in a 2009 presentation to the Board of Directors that "competitive pressures require precipitous price drops, down near or below our average unit costs (~5c)." SOMF ¶ 94. Between 2010 and 2012, Surescripts average net prices (taking into account the prices charged to pharmacies and PBMs minus the incentives paid to EHRs)—around ██████ for routing and ██████ for eligibility—████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████



---

arising from free riding or negative externalities. Mot. at 31. The FTC need not disprove theoretical procompetitive justifications in its *prima facie* case. *Microsoft*, 253 F.3d at 59, 71.

[15] Even if this were a Sherman Act Section 1 case (which it is not) and the FTC were required to prove anticompetitive effects directly (which we would not be) the FTC would need only show one of higher prices, reduced output, *or* reduced quality or innovation, not all three. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63 (2d Cir. 2019) ("The use of the disjunctive—'or'—in these statements of law by Supreme Court contradicts Sabre's assertion that all of those elements had to be established in order for liability under the Sherman Act to arise under [*Amex*].").

Second, in the limited instances of competition, Emdeon and Allscripts offered lowered routing and eligibility prices despite their smaller scale. SOMF ¶¶ 97-98. Surescripts protests that "[e]vidence of lower prices offered to select, high-profit-margin customers (leaving smaller, low-profit-margin customers out to dry) does not show harm to the market overall." Mot. at 31. As explained in the rest of this section, these examples are not the FTC's only evidence of lower prices in the but-for world (evidence that is unnecessary in any event). But these prices are probative of lower prices being possible, and the harm that comes from Surescripts' conduct foreclosing lower cost competitors from expanding.

Third, though Surescripts nowhere mentions it in its motion, Dr. Rosa Abrantes-Metz, a PhD economist retained as an expert by the FTC, concluded that Surescripts' profitability and net pricing for both routing and eligibility are higher than what would be expected in a competitive market. SOMF ¶ 99. Dr. Abrantes-Metz estimated the net price on average from 2010-2019 in the but-for world would have been between ████████ per routing transaction and ████████ per eligibility transaction, on average, for 2010-2019. *Id*. These estimates are lower than Surescripts' actual average net prices during the same period, calculated by Dr. Abrantes-Metz to be ██████ for routing and ██████ for eligibility. *Id*. Dr. Abrantes-Metz thus estimates that Surescripts overcharged its customers on average by between ██████████ for routing and ██████████ for eligibility. *Id*. In total for 2010-2019, she calculated that Surescripts overcharged its routing customers by between ████████████████████ and its eligibility customers by between ████████████████████ *Id*.

*Quality and Innovation*. There is substantial evidence that Surescripts would have had greater incentive to provide better services to its customers had it faced competition. In addition to complaints from customers, the record contains admissions from Surescripts itself that its

monopoly position led to a culture of complacency. SOMF ¶¶ 102-103. For example, one internal evaluation stated that "[s]uccess in e-prescribing led to an inward focus and sluggish responses to customer needs" because "there's a 'we've got such a dominant market position in e-prescriptions, who's going to come in and threaten us?' attitude." SOMF ¶ 102 (quoting PX1230, Surescripts_00086012, at PX1230-045). And on innovation, multiple market participants have complained that Surescripts lags on innovation. SOMF ¶ 103. ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

## CONCLUSION

In sum, Surescripts asks the Court to look anywhere but the practical effect of its exclusionary contracts. It seeks to create artificially heightened legal standards to increase the FTC's burden. And it casts heavily contested factual claims as undisputed. But the law is clear: the FTC can make out a *prima facie* case of anticompetitive effect by showing that the practical effect of Surescripts' contracts is to prevent rivals from attaining the critical mass necessary to compete in the routing or eligibility markets. And the record is equally clear: ample evidence shows that Surescripts' contracts have had precisely this effect. The Court should deny Surescripts' motion.

Dated: April 25, 2022                    Respectfully submitted,


                                         */s/ Tanya O'Neil*                 

                                         Tanya O'Neil (D.C. Bar 1021933)
                                         Markus H. Meier (D.C. Bar 459715)
                                         Bradley S. Albert
                                         Daniel Butrymowicz
                                         Timothy Grayson (D.C. Bar 1028502)
                                         Andrew Kennedy
                                         Nicholas Leefer (D.C. Bar 1049160)
                                         Joseph P. Mathias

                                         Federal Trade Commission
                                         600 Pennsylvania Avenue, NW
                                         Washington, DC 20580
                                         Tel: 202-326-2053

                                         *Counsel for Plaintiff*
                                         *Federal Trade Commission*