# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

       **Plaintiff,**

       **v.**

**SURESCRIPTS, LLC,**

       **Defendant.**

**Case No.: 19-cv-1080 (JDB)**

**REDACTED**

## Plaintiff Federal Trade Commission's
## <u>Statement of Undisputed Facts</u>

In support of its Motion for Partial Summary Judgment, Plaintiff Federal Trade Commission ("FTC") respectfully submits this statement of undisputed facts. Accompanying this document is an Index of Exhibits and Exhibits 1-58.

**Table of Contents**

I.      Background ......................................................................................................... 1

II.     Federal laws enacted in 2008 and 2009 incentivized the use of routing and
        eligibility over analog methods.......................................................................... 2

III.    Routing and eligibility have become the dominant methods of transmitting
        prescription and formulary information since MIPPA and HITECH ................ 5

IV.     Routing and eligibility market participants are unlikely to revert to analog
        methods ............................................................................................................... 7

V.      Routing is not reasonably substitutable with analog methods of transmitting
        prescriptions....................................................................................................... 8

VI.     There are no reasonable substitutes for eligibility ........................................... 12

VII.    Market participants' ordinary course documents recognize that routing and
        eligibility are separate and distinct from analog methods ................................ 17

VIII.   The geographic markets for routing and eligibility are the United States. ....... 19

IX.     Surescripts has been the dominant provider of routing since 2010 ................... 19

X.      Surescripts has been the dominant provider of eligibility since 2010 .............. 23

XI.     Surescripts has had a dominant share of all prescription transmissions, including
        routing and analog methods, since 2014............................................................ 25

XII.    Surescripts has had a dominant share of all eligibility information transmissions,
        including eligibility and any other methods, since 2014 ................................... 26

XIII.   Entry into routing and eligibility is costly and time-consuming....................... 27

## I.    Background

1.      Defendant Surescripts, LLC ("Surescripts") is a Delaware limited liability company, with its principal place of business in Arlington, Virginia. Ex. 1, Compl. ¶ 14; Ex. 2, Answer ¶ 14.

2.      Surescripts was created in 2008 by the merger of RxHub LLC ("RxHub") and SureScripts Systems, Inc. ("Legacy SureScripts"). Ex. 1, Compl. ¶ 40; Ex. 2, Answer ¶ 40. RxHub and Legacy SureScripts were formed in 2001. Ex. 3, Report of Dr. Thomas R. McCarthy ("McCarthy Rep.") ¶ 106; Ex. 1, Compl. ¶¶ 41-42; Ex. 2, Answer ¶¶ 41-42.

3.      Surescripts operates both a routing and an eligibility platform. Ex. 3, McCarthy Rep. ¶ 12; Ex. 1, Compl. ¶ 48; Ex. 2, Answer ¶ 48.

4.      A routing transaction ("routing") is the electronic transmission of prescription and prescription-related information between a prescriber's electronic health record vendor ("EHR") and a pharmacy (either directly or indirectly via a pharmacy intermediary called a pharmacy technology vendor ("PTV")). Ex. 1, Compl. ¶ 19; Ex. 2, Answer ¶ 19; Ex. 3, McCarthy Rep. ¶¶ 9, 12, 51.

5.      An eligibility transaction ("eligibility") is an electronic process by which a prescriber, through their EHR, communicates a request for eligibility and formulary information to the appropriate pharmacy benefit manager ("PBM"), who then replies with the information. Ex. 3, McCarthy Rep. ¶¶ 9, 12. The information provided by an eligibility transaction "includes information on benefits rules, showing a physician what drugs are covered and, to some degree, the approximate costs to the patient." Ex. 3, McCarthy Rep. ¶ 107.

6.      Routing and eligibility collectively are sometimes referred to as "e-prescribing."

7.     "Surescripts and other e-prescribing companies are two-sided transaction platforms—they connect two different participants (e.g., an EHR and a pharmacy) in order to complete various e-prescribing transactions (e.g., sending a prescription from a physician to a pharmacy that can fill it)." Ex. 3, McCarthy Rep. ¶ 51.

8.     Routing can also occur through "direct connections" between an EHR and a pharmacy/PTV. *See* ████████████████████████ Eligibility can also occur through "direct connections" between an EHR and a PBM. *See* ████████████████████ ████████████

9.     Before routing, prescriptions were transmitted predominantly by analog methods such as paper, fax, and phone. Ex. 3, McCarthy Rep. ¶ 26; Ex. 9, McCarthy Dep. Tr. 93:14-17.

10.    Before eligibility, transmitting and receiving eligibility information involved an "ad hoc mix" of "phone calls, benefit manuals, and at times a lack of [eligibility] information for prescribers and patients." Ex. 3, McCarthy Rep. ¶ 192; *see also* Ex. 4, Report of Dr. David S. Evans ("Evans Rep.") ¶¶ 84, 139.

11.    Routing and eligibility are distinct from each other because they provide different information and connect different parties. Ex. 3, McCarthy Rep. ¶ 182.

## II.    Federal laws enacted in 2008 and 2009 incentivized the use of routing and eligibility over analog methods

### A.  The Medicare Improvements for Patients and Providers Act ("MIPPA")

12.    In 2008, Congress enacted the Medicare Improvements for Patients and Providers Act of 2008, Pub. L. No. 110-275, 122 Stat. 2494 ("MIPPA"). Ex. 1, Compl. ¶ 34; Ex. 2, Answer ¶ 34.

13.    MIPPA established a federal incentive program called the Electronic Prescribing Incentive Program ("eRx Incentive Program") that ran from 2009 to 2013. Ex. 5, Report of Dr. Julia Adler-Milstein ("Adler-Milstein Rep.") ¶ 15.

14.    Under the MIPPA eRx Incentive Program, prescribers could not receive incentive payments, and later were subject to financial penalties, unless they met certain criteria regarding transmitting prescriptions electronically and using e-prescribing technology capable of providing eligibility checks. Ex. 5, Adler-Milstein Rep. ¶¶ 16-19.

15.    Under MIPPA, the federal government provided approximately $1.2 billion in incentives to prescribers. Ex. 5, Adler-Milstein Rep. ¶ 43, Table 7.

**B. Health Information Technology for Economic and Clinical Health Act ("HITECH")**

16.    In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226 (2009) ("HITECH"). Ex. 1, Compl. ¶ 35; Ex. 2, Answer ¶ 35.

17.    HITECH established EHR Incentive Programs that promoted physician adoption of electronic health records. Ex. 5, Adler-Milstein Rep. ¶ 21.

18.    Under the HITECH EHR Incentive Programs, beginning in 2011, eligible prescribers could receive tens of thousands of dollars in incentive payments by meeting certain criteria for the "meaningful use" of certified EHRs. Eligible prescribers also faced financial penalties for not satisfying "meaningful use" criteria. Ex. 5, Adler-Milstein Rep. ¶¶ 23-28.

19.    HITECH's definition of "meaningful use" required prescribers to engage in routing (unless the prescriber qualified for a narrow list of exceptions). Ex. 5, Adler-Milstein Rep. ¶¶ 36, 52. HITECH also required prescribers to use an EHR capable of conducting formulary checks and, later, to conduct formulary checks through their EHR. Ex. 5, Adler-

3

Milstein Rep. ¶¶ 37, 52. This meant that a physician could satisfy HITECH requirements by using the eligibility transaction or by accessing formulary information embedded in the EHR. *See* Ex. 10, Adler-Milstein Dep. Tr. 72:12-73:7.

20.     Through HITECH, the government provided approximately $38.2 billion in incentives to prescribers and hospitals. Ex. 5, Adler-Milstein Rep. ¶ 44, Table 8.

### C.  MIPPA and HITECH increased e-prescribing adoption and use

21.     Prescribers were motivated to conform to HITECH and MIPPA requirements because of the financial incentives and penalties established by these programs. ████████

████████████

22.     In 2013, Surescripts employees co-authored a published study titled "E-Prescribing Adoption And Use Increased Substantially Following The Start Of A Federal Incentive Program" that analyzed electronic routing adoption and use following MIPPA. Ex. 12, PX1171, Surescripts_02721182, at PX1171-002. As explained by one of the study's authors (former Surescripts Vice President of Corporate Strategy Seth Joseph), the study concluded that "the MIPPA e-prescribing incentive program materially and favorably, positively impacted the physician adoption and use of e-prescribing[.]" Ex. 13, Joseph (Surescripts) Dep. Tr. 216:3-217:3.

23.     The study found that in the 26-month period prior to MIPPA, there were, on average, 1,437 new e-prescribers monthly. Ex. 12, PX1171, Surescripts_02721182, at PX1171-005-006. After the MIPPA incentives were put in place, that figure jumped to 6,346 new e-prescribers monthly from August 2008 through 2010, an increase of roughly 450%. Ex. 12, PX1171, Surescripts_02721182, at PX1171-005-006; Ex. 14, Max Sow (Health Affairs), "Federal Incentives Drove E-Prescribing Increase," at 2, available at https://www.health affairs.org/do/10.1377/forefront.20130710.032980/full/.

24.     EHRs were motivated to provide routing and eligibility so that their prescriber-customers could satisfy requirements for receiving federal incentives and avoiding financial penalties. *See* ████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████

25.     Surescripts has credited MIPPA and HITECH as substantial reasons for the dramatic growth of e-prescribing. Ex. 16, Totonis (Surescripts) IH Tr. 37:24-38:11 (Surescripts' former CEO testifying that HITECH "totally helped e-prescribing happen"); Ex. 17, Currie (Surescripts) Dep. Tr. 230:24-25 (former Surescripts employee testifying that "[t]here was no other reason outside of MIPPA for which we could attribute this growth."); Ex. 18, Martin (Surescripts) IH Tr. 24:11-21 (then-Surescripts Vice President of Strategic Alliances testifying that MIPPA and HITECH "really drove the market, the EHR market" to become customers of Surescripts).

26.     Dr. Thomas McCarthy, Surescripts' economic expert, acknowledges that "[t]here is no dispute that laws like MIPPA, HITECH, and others helped to fuel growth in e-prescribing." Ex. 3, McCarthy Rep. ¶ 113.

### III.    Routing and eligibility have become the dominant methods of transmitting prescription and formulary information since MIPPA and HITECH

27.     The number of transactions routed electronically grew from 3% in 2008, to 53% in 2013, to more than 90% since 2018. The number of routing transactions as a percentage of all U.S. prescriptions according to Surescripts' economic expert is listed below. Ex. 3, McCarthy Rep. Ex. 10C.

| Year | Dr. McCarthy's calculation of routing transactions as a percentage of all U.S. prescriptions |
|------|-----------------------------------------------------------------------------------------------|
| 2007 | 1% |
| 2008 | 3% |
| 2009 | 10% |
| 2010 | 16% |
| 2011 | 28% |
| 2012 | 42% |
| 2013 | 53% |
| 2014 | 62% |
| 2015 | 70% |
| 2016 | 79% |
| 2017 | 85% |
| 2018 | 93% |
| 2019 | 98% |
| 2020 | 101% |

28.     Eligibility transactions have also "grown from infrequent use at the outset to widespread adoption in recent years." Ex. 3, McCarthy Rep. ¶ 217. Because quantifying eligibility adoption is "somewhat more difficult than routing because there exists no comprehensive data on the number of non-electronic eligibility transactions," Dr. McCarthy illustrates eligibility adoption by "compar[ing] the number of electronic eligibility transactions relative to (a) the number of electronic routing transactions and (b) the total number of U.S. prescriptions." Ex. 3, McCarthy Rep. ¶ 216. Dr. McCarthy noted, "[w]hile neither of these two aggregate measures is an exact quantification of the total number of eligibility transactions in the market, it is reasonable to assume that the true level of eligibility demand (which is not observed) is roughly proportional to these measures." Ex. 3, McCarthy Rep. ¶ 216. Using these measures, Dr. McCarthy finds that in 2007 less than 1% of all prescriptions were accompanied by an eligibility transaction. Ex. 3, McCarthy Rep. Ex. 17B. That figure rose to over 53% in 2013 and has remained over 95% since 2017. Ex. 3, McCarthy Rep. Ex. 17B.

| Year | Dr. McCarthy's calculation of eligibility transactions per routing transaction | Dr. McCarthy's calculation of eligibility transactions per total U.S. prescriptions |
|------|------|------|
| 2007 | 61.2% | 0.9% |
| 2008 | 68.4% | 2.3% |
| 2009 | 82.6% | 7.9% |
| 2010 | 113.5% | 18.2% |
| 2011 | 122.2% | 34.6% |
| 2012 | 107.6% | 45.6% |
| 2013 | 101.1% | 53.7% |
| 2014 | 98.8% | 61.6% |
| 2015 | 104.3% | 73.5% |
| 2016 | 104.2% | 81.9% |
| 2017 | 112.2% | 95.3% |
| 2018 | 119.6% | 110.9% |
| 2019 | 130.3% | 127.5% |
| 2020 | 123.4% | 124.9% |

## IV.    Routing and eligibility market participants are unlikely to revert to analog methods

29.    Surescripts has repeatedly acknowledged that routing and eligibility participants are unlikely to revert from routing and eligibility to analog methods.

30.    Former Surescripts CEO Harry Totonis believes that there is no "realistic scenario" under which the United States would revert to prescribers using paper and fax prescriptions as opposed to e-prescribing. Ex. 19, Totonis (Surescripts) Dep. Tr. 59:7-10.

31.    Surescripts' Chief Customer Officer recognized in 2013 that "[i]t's not like" doctors "would stop e-prescribing." Ex. 20, PX1035, Surescripts 00185454, at PX1035-001 (discussing negotiations with an EHR, stating "Take the last deal with loyalty or you get nothing from us for your volume. It's not like [the EHR's] [doctors] can go anywhere else for at least 93% of their [prescriptions] or would stop e-prescribing.").

32.    A 2015 study published by Surescripts employees concluded that "once adopted, the use of EHR systems to e-prescribe is 'sticky'— meaning that once prescribers enact the requisite change management process to adjust their clinical work flow, they are likely to

continue to use and increase their use of e-prescribing." Ex. 21, PX1186, Surescripts_02721190, at PX1186-004; *see also* Ex. 13, Joseph (Surescripts) Dep. Tr. 221:5-25 ("Q. And does this statement and your study generally suggest that a prescriber that was once using other means of prescribing such as paper, fax, once they start e-prescribing they are less likely to go back to those other methods such as paper and fax? A. Yes.").

33.     Surescripts' economic expert does not dispute that routing and eligibility market participants are unlikely to revert to analog methods. Ex. 3, McCarthy Rep. nn. 346 (routing), 351 (eligibility).

**V.     Routing is not reasonably substitutable with analog methods of transmitting prescriptions**

**A.     Routing is safer and more efficient than analog methods of transmitting prescriptions**

34.     Routing is safer than paper, phone, and fax prescriptions. Ex. 22, Hansen (Surescripts) Dep. Tr. 323:20-324:2; Ex. 1, Compl. ¶ 17; Ex. 2, Answer ¶ 17; *see also* Ex. 3, McCarthy Rep. ¶ 25 ("adoption of e-prescribing products is nearly universal and the products themselves provide value, efficiency, and save lives.").

35.     One reason routing is safer is that "there are problems and errors that can be created or occur with handwritten prescriptions that do not exist with . . . electronic routing" such as illegible handwriting. Ex. 23, Yakimischak (Surescripts) Dep. Tr. 23:13-24:11; *see also* Ex. 1, Compl. ¶ 17; Ex. 2, Answer ¶ 17; ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

36.     Routing is more efficient than analog methods because analog methods "caused more manual follow-ups, less operating efficiency throughout the healthcare system, and more adverse patient events." Ex. 3, McCarthy Rep. ¶ 26.

37.     ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

38.     Routing eliminates the possibility that the patient loses or damages the paper prescription while in transit to the pharmacy. ███████████████████████

39.     Routing results in increased prescription adherence, i.e., the likelihood that a patient will pick up a prescription at a pharmacy after leaving the prescriber's office. Ex. 1, Compl. ¶ 17; Ex. 2, Answer ¶ 17.

40.     Routing eliminates the delay of a patient handing the paper prescription to the pharmacist and waiting for it to be filled. ████████████████████

41.     Surescripts' economic expert, Dr. McCarthy, agrees that "[i]t is undisputed that these products [routing and eligibility] are a measurable improvement on the 'analog' methods that existed prior to e-prescribing and Surescripts." Ex. 3, McCarthy Rep. ¶ 26.

**B.  Routing is significantly more cost effective than analog methods**

42.     For pharmacies, routing is a lower-cost method of communicating and processing prescriptions between prescribers and pharmacies than paper, fax, and phone. Ex. 1, Compl. ¶ 17; Ex. 2, Answer ¶ 17.

43.    According to █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

44.    For perspective, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

45.    According to Surescripts' economic expert, Dr. McCarthy, Surescripts' pharmacy

prices for routing were between ████████████ from 2009 to 2020.[1] Ex. 3, McCarthy Rep. Ex.

12A. As such, the savings associated with using routing rather than analog methods ████████

███████████████████████████████████ higher than cost of Surescripts' routing product.

46.    Dr. McCarthy does not calculate any pricing for analog routing methods. Ex. 9,

McCarthy Dep. Tr. 97:1-4, 99:2-5.

47.    For prescribers, "the federal laws and the federal money also lowered the price of

switching [from analog methods to electronic routing], and people switched." Ex. 9, McCarthy

Dep. Tr. 97:22-24.

---

[1] Although the FTC disagrees with these exact prices, that is not material here, as the cost
savings from using routing are ████████████ of any measure of routing price.

48.     Given these significant savings relative to the price, and the lack of reasonable alternatives, pharmacies, prescribers, and EHRs would have no financial incentive to switch back to analog methods, even in the face of substantial routing price increases. *See supra* ¶¶ 34-47.

49.     Dr. McCarthy does not opine on the price increase in routing needed to cause a customer to switch to phone, fax, and paper prescriptions. Ex. 9, McCarthy Dep. Tr. 105:12-18.

## C.  Routing has distinct pricing from analog methods

50.     Surescripts charges a per-transaction price to pharmacies and PTVs for using its routing network to receive and send prescription information. Ex. 3, McCarthy Rep. ¶¶ 9 & n.1, 151.

51.     Surescripts charges a zero or often negative price—termed a "loyalty incentive" payment—to EHRs on a per-transaction basis for routing. Ex. 3, McCarthy Rep. ¶¶ 149, 155.

52.     Although there is a cost to the process of transmitting prescriptions by analog methods, there is not a per transaction "price" to either the prescriber or the pharmacy like there is for a routing transaction. *See* Ex. 9, McCarthy Dep. Tr. 95:3-96:24 ("[I]t's not a question of what the paper costs to write down the script or what the fax machine charge[s]. . . . It is more about the process and the fact that that process is being challenged by a new technology.").

## D.  Routing has different customers than analog methods

53.     EHRs contract for electronic routing. Ex. 3, McCarthy Rep. ¶ 143. In routing, EHRs are the "senders" that transmit prescriptions on the prescribers' behalf to Surescripts, which then sends those prescriptions on to designated pharmacies. *Id.*

54.     EHRs do not contract for prescriptions delivered by analog methods.[2] *See* Ex. 9, McCarthy Dep. Tr. 93:14-96:4 (describing analog routing methods and not including EHRs in the described processes).

55.     PTVs contract for electronic routing. Ex. 3, McCarthy Rep. ¶ 130. PTVs provide software to pharmacies for the purpose of routing, among other things. *Id.*; ██████████

██████████████████

56.     PTVs do not contract for prescriptions delivered by analog methods. *See* Ex. 9, McCarthy Dep. Tr. 93:14-96:4. (describing analog routing methods and not including PTVs in the described processes).

**E.  Routing is provided by vendors, unlike analog methods**

57.     Surescripts is a routing provider. Ex. 1, Compl. ¶ 48; Ex. 2, Answer ¶ 48.

58.     Emdeon is a routing provider. Ex. 3, McCarthy Rep. ¶ 12.

59.     No vendor sells the process of transmitting analog prescriptions.[3] *See* Ex. 9, McCarthy Dep. Tr. 94:12-96:4.

**VI.    There are no reasonable substitutes for eligibility**

**A.  Eligibility was a new product with no reasonable alternatives**

60.     Before eligibility, "healthcare providers had less information when preparing prescriptions, which led to higher costs for patients, less operating efficiency throughout the

---

[2] There is a narrow exception in cases where electronic delivery of a prescription fails due to technical issues. In such cases, EHRs can contract with Surescripts to send the prescription to the pharmacy by fax as a backup. Ex. 3, McCarthy Rep. ¶ 184. But such a prescription would originate at the EHR in electronic form and so would not be a true analog prescription. As a backup system used only in case of failure, it would also not be a substitute for electronic prescriptions.

[3] As discussed *supra*, n. 2, there is a is a narrow exception in cases where electronic delivery of prescription fails due to technical issues. In such cases, Surescripts can send the prescription to the pharmacy by fax as a backup.

healthcare system, and more adverse patient events." Ex. 3, McCarthy Rep. ¶ 26; *see also* Ex. 4, Evans Rep. ¶¶ 84, 139. Eligibility provides more effective communication of a patient's insurance coverage and generic alternatives, which reduces the possibility that a patient does not pick up their prescription due to a surprising high price. Ex 1, Compl. ¶ 17; Ex. 2, Answer ¶ 17; Ex. 4, Evans Rep. ¶ 141.

61.    Surescripts' economic expert Dr. McCarthy cannot identify any quantity of eligibility transactions that were conducted by analog methods. Ex. 3, McCarthy Rep. ¶¶ 216-217, Ex. 17B; Ex. 9, McCarthy Dep. Tr. 80:1-10 ("The eligibility market is a little different because . . . there's no clean denominator, so it's done as a percent of proxies.").

62.    Dr. McCarthy cites no record evidence to support his conclusion that the eligibility market includes analog methods. Ex. 3, McCarthy Rep. ¶¶ 191-197.

63.    There are no alternatives to electronic eligibility for EHRs. ████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████

64.    There are no reasonable alternatives to electronic eligibility for PBMs. ████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

13

**B.  Eligibility is significantly more cost effective than analog methods**

65.     PBMs are interested in eligibility services because it saves them money by encouraging prescribers to use cheaper generic drugs. Ex. 3, McCarthy Rep. ¶ 105; Ex. 4, Evans Rep. ¶¶ 140, 145.

66.     Eligibility services can reduce insurer spending on drugs by 8-15%. Ex. 28, Surescripts_00016381, at -383, slide 4 (2009 Surescripts PowerPoint assessing benefits of eligibility).

67.     Surescripts has found eligibility provides substantial value to PBMs, delivering several times the return on investment per transaction. *See* Ex. 58; Surescripts_00959721 at -722, slide 8 (finding eligibility delivers "████ per eligibility [transaction] to PBM alone, or ██ return [on investment].").

68.     Using the eligibility transaction could make prescribers eligible for federal incentives under MIPPA and HITECH. Ex. 5, Adler-Milstein Rep. ¶¶ 16-19, 37, 52; Ex. 10, Adler-Milstein Dep. Tr. 72:12-73:7.

69.     Given these significant savings and the lack of reasonable alternatives, PBMs, prescribers, and EHRs would have no financial incentive to switch back to analog methods, even in the face of substantial eligibility price increases. *See supra* ¶¶ 60-68.

70.     Surescripts' economic expert does not opine about the price increase in eligibility that would be needed to cause a customer to switch to other methods of eligibility transmissions. *See generally* Ex. 3, McCarthy Rep.

**C.  Eligibility has distinct pricing from analog methods**

71.     PBMs are charged per eligibility transaction by Surescripts. Ex. 3, McCarthy Rep. ¶ 153.

72.     EHRs are charged a zero or negative price—termed a "loyalty incentive"—by Surescripts on a per-transaction basis for eligibility. Ex. 3, McCarthy Rep. ¶¶ 149, 155.

73.     Although there is a cost to the process of transmitting eligibility through analog methods, there is not a per transaction "price" to either the prescriber or the PBM like there is for an eligibility transaction. *Cf.* Ex. 9, McCarthy Dep. Tr. 95:3-96:24 (explaining that the price for analog methods are the costs of the "process").

**D.  Eligibility has different customers than analog methods**

74.     EHRs are a customer of eligibility. Ex. 3, McCarthy Rep. ¶ 143. In eligibility, EHRs are the "senders" that initiate queries to Surescripts for eligibility information on behalf of prescribers, and then, later, accept the responses and display the eligibility information to prescribers. *Id*.

75.     EHRs are not customers for the analog methods of transmitting eligibility information, such as prescribers calling PBMs directly or PBMs mailing plan information to prescribers. *See* Ex. 3, McCarthy Rep. ¶ 192 (description of parties involved in analog eligibility requests does not include EHRs).

**E.  Eligibility is provided by vendors, unlike analog methods**

76.     Surescripts sells eligibility. Ex. 3, McCarthy Rep. ¶ 124.

77.     Emdeon attempted to compete in eligibility. Ex. 3, McCarthy Rep. ¶ 125.

78.     No vendor sells the "analog" methods of transmitting eligibility information, such as phone calls and benefit manuals. *See* Ex. 3, McCarthy Rep. ¶ 192 (describing analog methods of transmitting eligibility information as not including a vendor used to transmit the information).

**F. Electronic prior authorization and real-time benefit check are not substitutes for eligibility**

79. Electronic prior authorization ("ePA") provides a different service than eligibility; specifically, ePA involves providers electronically transmitting information to obtain approval from payers for prior authorization requests. Ex. 17, Currie (Surescripts) Dep. Tr. 51:6-13; Ex. 29, ███████████████████████████████████████████████████ ████████ Prior authorization is a process used by payers to determine if they will cover (i.e., pay for) a prescribed medication under a patient's prescription benefit plan. ████████████ ████████████████████

80. The Surescripts ePA transaction cannot function independently from eligibility. *See* ██████████████████████████████████████████████████████

81. Real-time benefit check ("RTBC"), also called "real-time prescription benefit" or "RTPB" by Surescripts, provides a different service than eligibility. As Surescripts explains, eligibility "is used to determine coverage and inform initial drug selection. When a medication search is performed, the [EHR] automatically displays coverage status and indicates which drugs are on formulary and in preferred tiers. Once it's determined that the medication is covered, Real-Time Prescription Benefit completes the picture by adding patient-specific information such as deductible, out-of-pocket cost and therapeutic alternatives into the e-prescribing workflows." Ex. 32, Surescripts, "How Patient Benefit Data Enhances E-Prescribing," available at https://surescripts.com/docs/default-source/intelligence-in-action/2021_surescripts_patient-benefit-data-enhances-e-prescribing.pdf.

82. The Surescripts RTBC product cannot function independently from eligibility. Ex. 17, Currie (Surescripts) Dep. Tr. 45:11-46:9, 162:7-162:20: ██████████████████████ ██████████

83. RTBC was not introduced by Surescripts and others until at least 2017. Ex. 3, McCarthy Rep. ¶¶ 109, 127 n.266.

84. RTBC and ePA have "separate technical compliance guides, schemas, [and] rules" from eligibility. Ex. 17, Currie (Surescripts) Dep. Tr. 43:18-44:7.

## VII. Market participants' ordinary course documents recognize that routing and eligibility are separate and distinct from analog methods

85. Throughout the relevant time period, Surescripts and other market participants recognized routing and eligibility as separate and distinct from analog methods.

86. A 2009 presentation to the Surescripts Board of Directors includes a chapter called "Current market and competitive dynamics." Ex. 33, PX1279, Surescripts_00346103, at PX1279-026-032. As of 2009, the description of "current market and competitive dynamics" notes Surescripts' 96% "market share" in "e-prescribing scripts," with no mention of a market share that includes paper, fax, or phone prescriptions. Ex. 33, PX1279, at PX1279-026-028.

87. The same 2009 presentation notes Surescripts' 98% "market share" in "PBM transactions" (i.e., eligibility transactions), with no mention of a market share that includes receiving eligibility through analog methods. *Id.*

88. The same 2009 presentation notes "[s]erious competition emerging driven by the growth of e-prescribing" from actual and potential competitors such as Emdeon, Allscripts, and RelayHealth, with no mention of competition from analog methods. Ex. 33, PX1279, at PX1279-029. Although the presentation discusses pricing strategy at length, it does not consider prices of analog methods in forming a pricing strategy.

89. In 2009, Surescripts' Chief Strategy Officer identified "significant competitive pressure" as coming from Emdeon and other companies that may be "trying to create a

'network,'" but does not identify any competitive pressure from analog methods. Ex. 34, PX090, Surescripts_00073416, at PX090-001.

90.    A 2012 Surescripts "Competition Analysis" describes competition only among routing providers with no mention of analog methods. Ex. 35, PX1156, Surescripts_00173993, at PX1156-003-012.

91.    A 2014 presentation created by ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████

92.    A 2015 "Competition Analysis" created for the Surescripts Executive Team by Surescripts' Vice President of Corporate Strategy discusses the "core" competitive landscape for Surescripts' routing and eligibility products as being solely among actual and potential providers of routing and eligibility, without mention of competition with analog methods. Ex. 37, PX1159, Surescripts_00235586, at PX1159-055-092. A "Strength, Weaknesses, Opportunities, Threats" ("SWOT") analysis included in these materials also did not list analog methods as "threats" to Surescripts' routing and eligibility networks. *Id.* at PX1159-043.

93.    ██████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████

94.     A 2017 Surescripts' assessment of competitive threats in routing and eligibility did not mention analog methods. Ex. 39, Surescripts_01797504, at -505, slides 8-12.

95.     ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

96.     Surescripts' economic expert cites no contemporaneous business documents in his report that Surescripts ever considered analog methods to be competitive constraints on Surescripts' routing product since 2010. *See generally*, Ex. 3, McCarthy Rep. ¶¶ 183-90

97.     Surescripts' economic expert cites no contemporaneous business documents in his report that Surescripts ever considered analog methods to be competitive constraints on Surescripts' eligibility product since 2010. *See generally*, Ex. 3, McCarthy Rep. ¶¶ 191-97.

**VIII.   The geographic markets for routing and eligibility are the United States.**

98.     The geographic market for routing is the United States. Ex. 3, McCarthy Rep. ¶ 198; Ex. 4, Evans Rep. ¶ 134.

99.     The geographic market for eligibility is the United States. Ex. 3, McCarthy Rep. ¶ 198; Ex. 4, Evans Rep. ¶ 154.

**IX.    Surescripts has been the dominant provider of routing since 2010**

**A.   Surescripts has had connections to almost all major pharmacies and EHRs for routing since at least 2010**

100.    "By virtually any conceivable measure, the data show that the vast majority of customers (and nearly all significant customers) joined Surescripts' routing network before 2010. Ex. 3, McCarthy Rep. ¶ 171.

101.    Specifically, pharmacies who ultimately accounted for more than 95% of the routing transaction volume joined Surescripts network before 2010. Ex. 3, McCarthy Rep. ¶ 171.

102.    EHRs who ultimately accounted for more than 94% of routing transaction volume likewise joined the Surescripts network before 2010. Ex. 3, McCarthy Rep. ¶ 171.

**B.  Surescripts has handled at least 95% of all routing transactions since 2010**

103.    Surescripts' share of routing transactions has been 95% or greater since at least 2009. Ex. 4, Evans Rep. ¶ 169, Table III.1. Surescripts' economic expert does not disagree. Ex. 3, McCarthy Rep. ¶ 214; *see also* Ex. 9, McCarthy Dep. Tr. 87:5-91:18.

104.    Numerous Surescripts documents confirm that Surescripts' share of routing transactions has been 95% or greater since at least 2009. *See, e.g.*, Ex. 41, Surescripts_00064354, at –355, slide 4 (2009 presentation sent to Surescripts then-CEO noting that 96% of routing transactions went through Surescripts); Ex. 33, PX1279, Surescripts_00346103, at PX1279-028 (2009 presentation to the Surescripts Board of Directors noting that "~96% of all e- prescribing scripts route through our network."); Ex. 42, Surescripts_00077226, at -227 (2011 "Surescripts Overview" reporting that Surescripts has "~96%" of all routing transactions and "no serious competitor."); Ex. 35, PX1156, Surescripts_00173993, at PX1156-004 (2012 presentation prepared for Surescripts' then-CEO, stating that an estimated 98.8% of routing transactions went through Surescripts' network); Ex, 43, PX1175, Surescripts_02463008, at PX1175-014 (2016 Surescripts analysis finding that only around 0.9 to 1.6% of routing transactions were not sent over Surescripts' network); Ex. 44, PX1563, Surescripts_00384179, at PX1563-044 (2017 memo from Surescripts' CEO to Surescripts' Board of Directors stating that only an estimated 1% of routing transactions were "inefficient," meaning sent "around (not on)" Surescripts network and the number of inefficient routing transactions "has been relatively stable[] for the past several years.").

105.    Surescripts' economic expert opines that "[i]t is indeed the case that Surescripts could be characterized as a 'monopolist' at the current time in the sense that it accounts for the vast majority of U.S. prescription routing and eligibility checks today." Ex. 3, McCarthy Rep. ¶ 205.

### C.  Surescripts has had no meaningful competitors in routing

106.    There is a "lack of comparable rival networks" to Surescripts. Ex. 3, McCarthy Rep. ¶ 223.

107.    "Emdeon has been (and continues to be) Surescripts' main rival in routing services." Ex. 3, McCarthy Rep. ¶ 125.

108.    Emdeon has handled ███████████ of electronic routing volume from 2009 to 2020. Ex. 3, McCarthy Rep. ¶ 214; *see also* Ex. 9, McCarthy Dep. Tr. 86:17-21; Ex. 4, Evans Rep. ¶ 169, Table III.1.

### D.  Surescripts is a "must-have" routing network

109.    There has never been a viable alternative network to Surescripts' routing network.

110.    Numerous EHRs believe that Surescripts is a "must-have" vendor in that they need Surescripts to be able to provide routing and there are no reasonable alternatives. *See, e.g.*,

███████████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████

█████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████

█████████████████████████

111.    Prescribers have ███████████████████████ – Surescripts – that

allows them to comply with MIPPA and HITECH for e-prescribing. *See* ████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████

112.    Numerous pharmacies and PTVs believe that Surescripts is a "must-have" vendor

in that they need Surescripts to be able to provide routing and there are no reasonable

alternatives. *See, e.g.,* ████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

**X.    Surescripts has been the dominant provider of eligibility since 2010**

**A.  Surescripts has had connections to almost all major PBMs and EHRs for eligibility since at least 2010**

113.    "By virtually any conceivable measure, the data show that the vast majority of customers (and nearly all significant customers) joined" Surescripts' eligibility network before 2010. Ex. 3, McCarthy Rep. ¶ 171.

114.    Specifically, PBMs who ultimately accounted for more than 97% of the eligibility transaction volume joined the Surescripts network before 2010. Ex. 3, McCarthy Rep. ¶ 171.

115.    EHRs who ultimately accounted for more than 83% of the eligibility transaction volume joined the Surescripts network before 2010. Ex. 3, McCarthy Rep. ¶ 171.

**B.  Surescripts has handled at least 95% of all eligibility transactions since 2010**

116.    Surescripts' share of eligibility transactions has been 95% or greater since 2009. Ex. 4, Evans Rep. ¶¶ 189-191. Surescripts' economic expert does not disagree. *See* Ex. 3, McCarthy Rep. ¶ 218 (noting "[i]t is true that the vast majority of electronic eligibility requests have been transmitted by Surescripts and the known examples of alternatives comprise small networks or direct connections with little volume compared with Surescripts" and citing to Dr. Evans' evidence that Surescripts has had greater than 95% share of eligibility transactions.).

117.    Numerous Surescripts documents confirm that Surescripts' share of eligibility transactions has been 95% or greater since 2009. Ex. 33, PX1279, Surescripts_00346103, at PX1279-028 (2009 presentation to Surescripts' Board of Directors stating that Surescripts transmits "98% of connected PBM transactions."); Ex. 42, Surescripts_00077226, at -227 (2011 Surescripts document reporting that "Surescripts performs ~95% of all Rx eligibility checks, no real competitors."); Ex. 49, Surescripts_02149850, at slide 8 (2014 Strategic Account Review of PBM customers noting that "Surescripts has all but 100% of the [eligibility] market."); Ex. 43,

PX1175, Surescripts_02463008, at PX1175-014 (2016 Surescripts presentation stating that only around 2.2% to 3.9% of eligibility transactions don't go through the Surescripts network); Ex. 44, PX1563, Surescripts_00384179, at PX1563-044 (2017 memo from Surescripts' CEO to Surescripts Board of Directors noting that Surescripts estimated that only around 2-3% of eligibility transactions were "inefficient," meaning sent "around (not on)" Surescripts' network and these numbers "ha[ve] been relatively stable[] for the past several years.").

**C.  Surescripts has had no meaningful competitors in eligibility**

118.    "[T]he vast majority of electronic eligibility requests have been transmitted by Surescripts and the known examples of alternatives comprise small networks or direct connections with little volume compared with Surescripts." Ex. 3, McCarthy Rep. ¶ 218.

**D.  Surescripts is a "must-have" eligibility network**

119.    There has never been a viable alternative network to Surescripts' eligibility network.

120.    Numerous EHRs believe that Surescripts is a "must-have" vendor in that they need Surescripts to be able to provide eligibility and there are no reasonable alternatives. *See, e.g.*,

121.    Numerous PBMs believe that Surescripts is a "must-have" vendor in that they need Surescripts to be able to provide eligibility and there are no reasonable alternatives. *See, e.g.*,

**XI.    Surescripts has had a dominant share of all prescription transmissions, including routing and analog methods, since 2014**

122.    According to Surescripts' economic expert, Dr. McCarthy, since 2014, Surescripts has possessed at least a 62.4% share of a routing market that includes electronic, paper, fax, and phone prescriptions. Ex. 3, McCarthy Rep. Ex. 17A.

123.    Dr. McCarthy reports that Surescripts' estimated share of all transmitted prescriptions has increased each year since 2014 and is about 100% as of 2020.[4] The following chart includes data from Exhibit 17A of Dr. McCarthy's report.

| Year | Dr. McCarthy Calculation of Surescripts' Share of All Transmitted Prescriptions |
|------|-------------------------------------------------------------------------------|
| 2009 | 9.5% |
| 2010 | 16.0% |
| 2011 | 28.3% |
| 2012 | 42.4% |
| 2013 | 53.1% |
| 2014 | 62.4% |

---

[4] In Dr. McCarthy's Exhibit 17A, Surescripts' share is over 100% in 2020. Dr. McCarthy acknowledges in his report that this is likely due to some imprecision in the estimate of total U.S. Prescriptions contained in Surescripts' ordinary course data, but that correcting it to a more precise number would not likely impact his results. Ex. 3, McCarthy Rep. ¶ 216, n.367.

| 2015 | 70.5% |
|------|-------|
| 2016 | 78.5% |
| 2017 | 85.0% |
| 2018 | 92.7% |
| 2019 | 97.8% |
| 2020 | 101.3% |

**XII.    Surescripts has had a dominant share of all eligibility information transmissions, including eligibility and any other methods, since 2014**

124.    Surescripts' economic expert does not calculate eligibility market shares in his proposed broader market that includes eligibility, analog, and other electronic transmissions such as ePA and RTBC. Ex. 9, McCarthy Dep. Tr. 85:21-86:1; Ex. 3, McCarthy Rep. ¶¶ 191-92 (defining Dr. McCarthy's proposed eligibility market). He claims that eligibility market shares are impossible to calculate precisely because "there's no clean denominator." Ex. 9, McCarthy Dep. Tr. 80:1-21.

125.    Surescripts' economic expert provides two proxies for Surescripts' share in his proposed eligibility information market: (1) the percentage of routing transactions accompanied by an eligibility transaction and (2) the percentage of prescriptions delivered by any method accompanied by an eligibility transaction. Ex. 9, McCarthy Dep. Tr. 81:1-21; Ex. 3, McCarthy Rep. Ex. 17B.

126.    As described above, *supra* ¶ 28, according to Surescripts' economic expert, eligibility transactions have accompanied at least 61.6% of all prescriptions delivered by analog or electronic methods since 2014. That number has exceeded 95% since 2017. Ex. 3, McCarthy Rep. Ex. 17B. And, Dr. McCarthy admits that "eligibility transactions are essentially ubiquitous today." Ex. 3, McCarthy Rep. ¶ 216.

127.    Dr. McCarthy states that "[a]s with routing, it is true that these numbers show relatively little difference between [the FTC's economic expert] Dr. Evans' market definition and my own in the last few years." Ex. 3, McCarthy Rep. ¶ 196.

## XIII.    Entry into routing and eligibility is costly and time-consuming

128.    Entry into the routing and eligibility markets is "not easy" for "a lot of reasons." Ex. 9, McCarthy Dep. Tr. 202:25-203:6.

129.    For routing, EHRs are more attracted to a network that connects their prescribers to many pharmacies, and vice versa. Ex. 3, McCarthy Rep. ¶ 13. For eligibility, EHRs are more attracted to a network that connects to many PBMs, and vice versa. *Id*. Therefore, routing and eligibility networks have to solve a "chicken and egg" adoption problem, where users on each side of a network will not invest in the network until they are confident that there will be enough users on the other side. Ex. 53, PX002, Surescripts' CID Response (Jan. 26, 2016), at PX002-037, -048; Ex. 9, McCarthy Dep. Tr. 216:9-20; Ex. 4, Evans Rep. ¶¶ 181, 197.

130.    Routing and eligibility networks must comply with federal and state laws and regulations. *See* Ex. 54, Surescripts, "Blueprint for E-Prescribing: A Detailed Plan of Action for Implementing E-Prescribing" at 14-15, available at https://surescripts.com/docs/default-source/PressRelease-Library/blueprintfore-prescribing.pdf (providing that e-prescribing networks comply with HIPAA and state privacy laws and regulations); *see also* Ex. 55, Surescripts, "Protecting patient privacy," available at https://surescripts.com/our-story/privacy.

131.    Routing and eligibility are governed by their own industrywide standard created by the National Council for Prescription Drug Programs ("NCPDP"). Ex. 1, Compl. ¶ 21; Ex. 2, Answer ¶ 21.

132.    Surescripts has a "first-mover advantage," having signed up all key market participants by 2010. Ex. 3, McCarthy Rep. ¶ 229; Ex. 4, Evans Rep. ¶ 182; Ex. 9, McCarthy

Dep. Tr. 204:15-23. Therefore, an entrant must convince routing and eligibility customers to pay the costs associated with using their network instead of, or in addition to, Surescripts. Ex. 4, Evans Rep. ¶ 182; ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

133.    Entry into routing and eligibility requires substantial investment on the order of tens of millions of dollars. Ex. 9, McCarthy Dep. Tr. 202:25-204:14; *see also* ████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████

134.    Entry into routing and eligibility would take several years. *See* ██████████

███████████████████████████████████████████████

███████████████████████████████ Ex. 57, Keith (Surescripts) IH Tr.

197:24-198:15 (former Surescripts VP of Pharmacy Customer Relations testifying that Surescripts "just didn't feel like it was physically possible" for Emdeon to sign up 90% of prescribers in six months in part because "it took Surescripts ten years to do it"); Ex. 9, McCarthy Dep. Tr. 203:21-204:3 (testifying that it could take a decade to enter e-prescribing.).

Dated: March 28, 2022                    Respectfully submitted,

                                         */s/ Tanya O'Neil*
                                         Tanya O'Neil (D.C. Bar 1021933)
                                         Federal Trade Commission
                                         Bureau of Competition
                                         400 7th Street, SW
                                         Washington, DC 20024
                                         Telephone: (202) 326-2053
                                         Email: toneil@ftc.gov
                                         *Counsel for Plaintiff*
                                         *Federal Trade Commission*