# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION** | |
| Plaintiff, | Case No.: 1:19-cv-01080 |
| v. | |
| **SURESCRIPTS, LLC** | Judge John D. Bates |
| Defendant. | **REDACTED** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SURESCRIPTS, LLC'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ............................. 5

ARGUMENT ...................................................................................................... 13

I.    THE FTC FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL
FACT AS TO WHETHER SURESCRIPTS' CONTRACTS VIOLATED
SECTION 2 IN THE ROUTING MARKET (COUNT I) ............................................. 14

    A.    The FTC Failed To Raise A Genuine Dispute Of Material Fact As To Surescripts'
Alleged Foreclosure Of The Routing Market ....................................... 15

        1.    The FTC Must Show That Surescripts' Loyalty Contracts Actually
Prevented Competitors From Entering The Routing Market.................. 15

        2.    The FTC Failed to Show that Any Competitor Was Actually Prevented
from Entering the Routing Market.......................................... 17

            a.    The FTC Has Failed To Show That Any Customer That Wanted
To Multihome For Routing Transactions Was Unable To Do So
Because Of Its Contract With Surescripts .................................. 18

            b.    The Undisputed Evidence Shows That Emdeon's Routing Product
Failed For Reasons Other Than Exclusion Via Surescripts' Loyalty
Contracts .................................................................. 23

            c.    The FTC Has Put Forth No Evidence That Any Other Competitors
Wanted To Compete In Routing And Were Foreclosed............. 27

    B.    The FTC Has Failed To Raise A Genuine Issue Of Material Fact As To
Anticompetitive Effects Allegedly Caused By Surescripts' Loyalty Provisions. 29

        1.    The Undisputed Facts Show Lower Routing Transaction Prices And
Increased Routing Transaction Output Since Surescripts Implemented Its
Loyalty Provisions In 2010 ................................................ 31

        2.    The FTC Never Even Attempted To Evaluate What Prices And Output
Would Have Been In A But-For World Without Surescripts' Loyalty
Discounts.................................................................. 32

        3.    The FTC Put Forth No Evidence That Surescripts' Loyalty Discounts Had
A Negative Effect On Innovation Or Quality .......................... 35

II.    THE FTC HAS FAILED TO RAISE A GENUINE ISSUE OF
MATERIAL FACT AS TO WHETHER SURESCRIPTS VIOLATED
SECTION TWO AS TO THE ELIGIBILITY MARKET (COUNT II)......................... 36

    A.    The FTC Failed To Raise A Genuine Dispute Of Material Fact As To Surescripts'

         Alleged Foreclosure Of The Eligibility Market...................................................... 36

   B.     The FTC Failed To Raise A Genuine Dispute Of Material Fact As To
          Anticompetitive Effects Allegedly Caused By The Loyalty Provisions In
          Surescripts' Eligibility Contracts ........................................................................ 39

CONCLUSION.................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ...................................................................20

*Am. Banana Co. v. J. Bonafede Co.*,
    407 F. App'x 520 (2d Cir. 2010) ..............................................................31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................13, 14

*Barry Wright Corp. v. ITT Grinnell Corp.*,
    724 F.2d 227 (1st Cir. 1983)....................................................................20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................14

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .................................................................34

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016)..................................................19, 20, 21, 31

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    545 F. Supp. 3d 922 (D. Kan. 2021)...........................................16, 17, 22

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
    250 F.3d 972 (6th Cir. 2000) ...................................................................17

*J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.*,
    485 F.3d 880 (6th Cir. 2007) ...................................................................34

*Kentucky v. Marathon Petroleum Co. LP*,
    464 F. Supp. 3d 880 (W.D. Ky. 2020).....................................................31

*McWane, Inc. v. F.T.C.*,
    783 F.3d 814 (11th Cir. 2015) .................................................................31

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    859 F.3d 408 (7th Cir. 2017) ...................................................................24

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018).................................................................... *passim*

*Omega Env't, Inc. v. Gilbarco*,
    127 F.3d 1157 (9th Cir. 1997) .....................................................17, 21, 37

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ........................................................................... *passim*

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ................................................................................15, 16, 37

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ......................................................................... *passim*

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012).................................................................................20, 34

## RULES

Fed. R. Civ. P. 56(a) .................................................................................................13

iv

## INTRODUCTION

Twenty years ago, electronic prescribing did not exist. Doctors provided handwritten prescriptions to patients to carry to the pharmacy to be filled (if they didn't lose the paper or forget). The most technologically advanced method for a prescriber to transmit a prescription to a pharmacy was via a fax. And there was also no reliable way for prescribers to find out from insurance companies what prescription coverage their patients had in advance of an appointment. These were serious inefficiencies. They resulted in patients losing their prescriptions, getting them late, or receiving the wrong dosage—if not the wrong medication altogether—because the handwriting or fax was unintelligible. Without reliable insurance information, patients could be prescribed overpriced medication not covered by their insurance, leaving them to refuse the medication when they went to pick it up at the pharmacy.

Surescripts changed all that. Through the legacy SureScripts company, Surescripts made extensive investments to develop a new electronic "routing" network that allowed prescribers (operating through their electronic health record ("EHR") systems) to send prescriptions electronically directly to pharmacies. Gone were the days of crumpled and forgotten prescriptions in the bottom of purses and pockets. Thanks to Surescripts, when a patient walks into a pharmacy today, the correct prescription is ready for pick up. Surescripts' predecessor RxHub did the same for "eligibility," creating an electronic network that enables physicians to obtain prescription coverage information for patients the night before office visits so that the patient receives affordable, in-coverage medication. This technology transformed prescriptions, making them safer and more efficient. As SureScripts and RxHub joined forces to become Surescripts and the combined company continued to invest, proselytize and innovate, the number of electronic routing and eligibility transactions skyrocketed. And throughout this time, Surescripts consistently *dropped the prices that it charges for these transactions*.

In light of this pro-competitive history, why is the FTC claiming that Surescripts acted anticompetitively in the routing and eligibility markets?   Quite simply, it is because in the process of providing its customers the option to earn lower prices and higher incentive payments for being "loyal" to Surescripts, some Surescripts employees created some very flamboyant internal documents about the program and the effect that it might have on competition for Surescripts' products. To be sure, a small number of the documents produced by Surescripts in the investigation have buzzwords that could intrigue a regulator investigating a potential monopoly: "bribe," "lock in," "crush."  The FTC has gotten hooked on these documents. The FTC's Complaint features quotes from these documents prominently and makes them the cornerstone of the FTC's case. We expect that the FTC will quote them again in its opposition to this motion. It is fair to say that, after a three-year investigation and three years of litigation, those quotes are the best that the FTC has to show for itself.

Following fact and expert discovery, however, it is also clear that those documents do not suffice to advance the FTC's case as a matter of law. The FTC touts them as evidence that Surescripts executives intended to monopolize the markets for routing and eligibility, and used a "web" of *de facto* exclusive dealing contracts with customers to exclude rivals from competing. But intent is not an element of monopolization. Instead, to prove its case, the FTC must prove that Surescripts' loyalty contracts (1) actually foreclosed a significant amount of commerce; and (2) actually caused anticompetitive effects like higher prices, lower output, worse customer service, and reduced innovation. The evidence shows that Surescripts' loyalty program did no such thing. The FTC has no evidence of either substantial foreclosure or anticompetitive effects caused by the loyalty programs in either routing or eligibility.

The FTC's evidence on substantial foreclosure essentially boils down to arithmetic—the FTC asks this Court to add up the number of Surescripts' EHR, pharmacy/PTV, and PBM

customers that chose to join the loyalty programs and to call that number (or the market share represented by that number) "substantial." But antitrust law requires more than elementary school math. It requires an analysis and showing of substantial foreclosure using real-world evidence of the terms of the loyalty provisions and their effect on competitors. That is where the FTC's case first fails.

As the FTC admits, Surescripts' loyalty program was *optional*—Surescripts provided incentives and lower prices to customers that **chose** to join. Users of Surescripts' routing and eligibility networks could always use the network even if they declined to join a loyalty program. Large customers like ███████ chose not to join and continued to use Surescripts for years; they just did not receive the financial incentives they could have earned. As a result, there can be no foreclosure—any competitor could have bid for and earned the business of any Surescripts customer. There was nothing that prevented them from winning the business of ██████ or any other customer. Indeed, even those customers that chose to join had ample opportunity to use other networks while in the program, or to terminate participation completely. The EHR loyalty program (known as the "Reserve Program") required EHRs to join for a three-year period but allowed unilateral termination with a mere six months' notice, thus making the program's actual term six months. And the 100% loyalty requirement itself had a gaping loophole—customers could use other networks to connect with users that were not connected to the Surescripts network *with zero impact on their loyalty payments or incentives*.

The evidence also shows that *no competing routing or eligibility network was actually excluded by these loyalty provisions.* Surescripts created the first routing and eligibility networks and had a lawful first mover advantage. The only real competitor during the relevant period was Change Healthcare ("Emdeon"), which failed on its own lack of merit. At the outset few customers were even interested in "multihoming" – *i.e.*, connecting to more than one network – which meant

Emdeon had to provide a product that made it worthwhile to do just that. Emdeon's own documents show ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

The FTC also fails to put forward any evidence that the loyalty programs caused any anticompetitive effects in the routing or eligibility markets. Anticompetitive effects are traditionally shown with proof of higher prices and/or lower output. Here, overall transaction **prices for routing and eligibility fell steadily** and **output skyrocketed** throughout the relevant period. This is not what monopolized markets look like. The only way that the FTC could hope to salvage its case in light of these remarkable facts would be with proof that prices would have been even lower and output would have been even higher **but for** the Surescripts' loyalty programs. But the FTC provides no "but-for world" analysis. Instead the FTC relies on anecdotal examples of lower pricing that Emdeon offered large customers at various points in time, and offhand complaints about customer service issues and disappointment with the delay of products. But that is not enough. The FTC has **no evidence** that any anticompetitive effects resulted from Surescripts' loyalty contracts.

This case should not continue to trial. The FTC's entire case, or what is left of it, is premised on seeking an injunction to stop conduct that Surescripts itself ceased in 2019.[1] But just as importantly, the FTC has a total failure of proof on its monopolization claims. It cannot show that any of the actual programs Surescripts instituted violated the law by foreclosing a substantial

---

[1] There is nothing to be gained even if Surescripts were to be found liable. The Supreme Court has held the FTC cannot seek monetary relief resulting in the voluntary dismissal of the disgorgement claims. As to the injunctive claims, Surescripts already announced back in April 2019 that would not enforce the loyalty provisions for pharmacies and PTVs, and has represented to this Court and the FTC time and again that it will resolve this lawsuit by discontinuing the programs for EHRs and PBMs as well.

amount of competition or causing any anticompetitive effects. There is simply nothing to fight about here, and this Court should grant summary judgment for Surescripts on all counts.

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A.    Surescripts' History and Early Investment in E-Prescribing

Surescripts is a health information technology company that provides e-prescribing services, including, routing and eligibility services. *See* Compl. ¶ 1. Indeed, Surescripts is largely responsible for creating the e-prescribing industry. Prior to Surescripts' and its predecessor companies' substantial investments in e-prescribing technology and advocacy, e-prescribing essentially did not exist. At the turn of the century, prescribers largely relied upon paper prescriptions, fax, and phone calls in order to transmit a patient's prescriptions to pharmacies. Ex. 11, McCarthy Rep. ¶ 105. As of 2003, Surescripts' predecessor companies (legacy SureScripts and RxHub) were effectively the only game in town and had begun offering core e-prescribing products including routing and eligibility. *Id*. ¶ 107. Between 2003 and 2008, the companies took on the risk of investing tens of millions of dollars to build the necessary infrastructure and grow their respective e-prescribing networks. Statement of Undisputed Material Facts in Supp. Mot. for Summ. J. ("SUF") ¶ 15. They did this despite the fact that e-prescribing remained unlawful in many states and the majority of prescriptions were not transmitted electronically. Ex. 11, McCarthy Rep. ¶¶ 10, 108, 114; SUF ¶ 14. Additionally, Surescripts and its predecessor companies engaged in extensive state-by-state and federal lobbying efforts, which were instrumental in legalizing e-prescribing. *See* SUF ¶ 16. In 2008, the federal government enacted the first legislation aimed at incentivizing e-prescribing and spurring adoption. *See* Ex. 11, McCarthy Rep. ¶ 10.

In May 2008, present-day Surescripts was created by the merger of (legacy) SureScripts and RxHub. *See* SUF ¶ 10. RxHub was the first major eligibility network and was created by the three largest pharmacy benefits manager ("PBM") players at the time: Caremark, ExpressScripts,

and Medco. SUF ¶ 11. Legacy SureScripts focused mainly on routing and was created by two trade organizations, National Community Pharmacists Association ("NCPA") and National Association of Chain Drug Stores ("NACDS"). SUF ¶ 12.

The goal of Surescripts' and its predecessors' substantial investment (despite the obvious risks) was to create an alternative to paper prescriptions that was safer, cheaper, and more efficient. From its inception, Surescripts has been a customer-owned firm, and it is currently owned 17% by CVS Health ("CVS") (which has both pharmacy and PBM operations), 33% by ExpressScripts (a PBM), and 25% each by NCPA and NACDS (both pharmacy trade associations). SUF ¶ 13. As such, because of its unique ownership structure, Surescripts' customer-owners play a key role in regulating its prices and keeping it at or near cost. *See, e.g.*, Ex. 5, Totonis (Surescripts) Dep. 182:6-183:9 (testifying that the Surescripts owners "wanted th[e] price to go down to zero" and that "they thought of this as a utility"); *id*. 183:17-20 (explaining that the Surescripts owners "had no incentive other than to get the e-prescribing prices to zero … [t]hey are giving the service away for free"); *see also* Ex. 69, Surescripts_00307261, at -263 (Surescripts' internal "media highlights" quoting one report as saying "Surescripts sees itself more as a utility that's operating for the good of the health system.").

As the charts below show, over the past decade, e-prescribing has grown tremendously in popularity. As the FTC acknowledges, in 2017, nearly 77% of all prescriptions were delivered through e-prescribing. Compl*.* ¶ 38; *see also* Ex. 11 McCarthy Rep. Ex. 10A, 10B. During the period between 2007 and 2020, e-prescribing routing transactions grew from 1.6 million in January 2007 to 189.2 million in August 2020, and eligibility transactions from 1.2 million in January 2007 to 248.4 million in August 2020. Ex. 11 McCarthy Rep. ¶¶ 487, 490; SUF ¶¶ 17-18





## B.    Routing and Eligibility

E-prescribing is the electronic transmission of prescription or prescription-related information between a prescriber, a pharmacy, and a payer, either directly or through an intermediary. Compl. ¶ 16. E-prescribing is a safer, more accurate, more efficient, and lower-cost alternative to paper prescriptions for prescribers, pharmacies, and PBMs to communicate and

process prescriptions. Among the benefits of e-prescribing are patient safety and operational efficiencies. *Id.* ¶ 17; ███████████████████████████████████

Routing is the transmission of prescription and prescription-related information (including requests for refills) from a prescriber to a pharmacy. SUF ¶ 2. In many cases, prescribers contract with an EHR system to handle the transmission of the prescriptions and related information. *Id.* ¶ 3. A pharmacy can route its transactions through a pharmacy technology vendor ("PTV"), which aggregates pharmacies and contracts with them to provide services, including software for routing transactions. SUF ¶ 4. Eligibility is the transmission of a patient's formulary and benefit information from a payer (usually the patient's PBM) to a prescriber's EHR. *Id.* ¶ 5.

EHRs operate in both routing and eligibility networks. In a routing network, EHRs provide the prescription information from prescribers to pharmacies. In an eligibility network, EHRs receive the patient's formulary and benefit information from PBMs. *Id.* ¶ 7. PBMs participate in the eligibility market by transmitting a patient's formulary and benefit information to a prescriber's EHR prior to the patient's appointment so that the prescriber has information about the patient's insurance plan and cost implications such as co-pays for the patient at the time of the appointment. *Id.* ¶ 6. Pharmacies (and PTVs) participate in the routing market by receiving prescription information sent by prescribers and their EHRs, and by transmitting refill requests to a prescriber's EHR. *Id.* ¶ 8.

## C.    Surescripts' Pricing and Contracts with its Customers

There are many costs associated with developing and operating an e-prescribing network, and Surescripts has developed its pricing models to cover its costs while also growing its network. *See, e.g.,* Ex. 11, McCarthy Rep. Exs. 19B, 19E. Routing and eligibility are fully cross-subsidized markets, meaning that Surescripts *pays* EHRs an incentive fee for each routing and eligibility transaction, and *charges* pharmacies and PBMs a fee for each routing and eligibility transaction

respectively. SUF ¶ 19. The difference between the fee charged to pharmacies or PBMs and the payment made to EHRs constitutes Surescripts' net transaction price. *Id*.

In early 2010, Surescripts instituted an optional loyalty program for its customer groups for routing and eligibility transactions. The loyalty program gave customers the choice of agreeing to a loyalty provision of a limited duration in exchange for a loyalty discount or a loyalty payment, depending on the type of customer. *See id.* ¶ 21. Surescripts began its "Reserve Program" in 2010, which provided EHRs the optional opportunity to earn higher incentive fees if they satisfied certain requirements. *See id.* ¶¶ 21-24. Surescripts' contracts do not state, and the FTC does not allege, that EHRs are required to join the Reserve Program or that they must meet loyalty or exclusivity requirements in order to connect to the Surescripts network. *See id.* ¶ 23. EHRs could earn incentive fees of ███ of the routing fee paid by pharmacy customers for each routing transaction or of ███ of the eligibility fee paid by PBM customers for each eligibility transaction if they join the program for routing eligibility only, or could earn a ███ incentive fee for participating for both routing and eligibility. *See id.* ¶ 24. An EHR can earn incentive fees even if it uses a different network (*i.e.*, is not "exclusive") to route to pharmacies that are not part of the Surescripts network. *See id.* ¶ 31 (citing Ex. 4, Surescripts_00672562 at -564) ("[N]othing in the Surescripts Reserve Program shall limit a Participating Aggregator's ability to send electronic messages for prescription information and prescribing transactions via another network or system to pharmacies, pharmacy aggregators, value-added resellers, pharmacy benefit managers, health plans who do not participate in the Surescripts Network."). While the contract provisions nominally covered a three-year period, an EHR could unilaterally terminate participation in the program with 6 months' notice. *See id.* ¶ 25.

Similarly, Surescripts' contracts did not state, and FTC does not allege, that a pharmacy, PTV, or PBM was required to participate in the loyalty discount program to access the Surescripts

network. *See, e.g., id.* ¶ 23; Compl. ¶ 189 (noting how Kroger, a pharmacy customer, uses both Surescripts and Emdeon). For instance, ███████████████ connects to the Surescripts network but did not agree to a loyalty provision with Surescripts. ██████ representatives testified that █████ was still permitted to access the Surescripts network even if it was not loyal, and that Surescripts never told █████ that it could not connect to the Surescripts routing network if it was also connected and contracted with Emdeon. *Id.* ¶ 42. A pharmacy, PTV, or PBM could earn loyalty discounts even if it used a different network to route prescriptions to prescribers that were not part of the Surescripts network. *See* SUF ¶¶ 32, 33.

The loyalty pricing benefits were not essential from a customer perspective. Surescripts' customers could (and many did) decline the loyalty discounts or the incentive fees without any consequences. Customers that declined to participate in the loyalty program were still permitted to access the Surescripts network. *See id.* ¶ 34 (citing Ex. 8, Evans Dep. 126:24–127:24) ("Q. . . . Can you point me to any evidence where Surescripts discovered that an EHR with whom it had a loyalty position was not being loyal within the terms of the contract, and as a result cut off incentive payments to that EHR? . . . A. . . . I'm unaware of it happening. . . . Q. . . . And on the pharmacy and PBM side, you're not aware of Surescripts cutting off discounts to any entity on the basis that it wasn't being loyal under a loyalty provision?  A. I'm not.").

In other words, Surescripts' customers recognized that the contracts provided certain benefits that were economically rational and so chose to accept loyalty discounts or payments in exchange for using the Surescripts network for a certain percentage of transaction volume. For instance, ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

Surescripts' customers, loyal or not, saw consistent price decreases. Between 2009 and 2020, Surescripts lowered its prices for both routing and eligibility products such that Surescripts' net two-sided price of routing transactions has fallen from ████████████ and eligibility from ██████████. *See* SUF ¶¶ 36-37. This is consistent with Surescripts' primary goal of lowering e-prescribing prices. Ex. 5, Totonis (Surescripts) Dep. 168:6–21 ("Well, it is fair to say that soon after I became CEO of Surescripts the board said to me to lower the e-prescribing price, that's the mission of the company. . . . for e-prescribing, both routing and eligibility."); *id.* 242:17–21 ("[A] lot of the board members were saying, you know, we want a lower price and if we don't get lower prices if somebody came in and gave us a lower price we are going to go with them. So we reduced our price to a lower level.").

### D.    Surescripts' Competition in the E-Prescribing Market

While Surescripts was investing heavily to grow the e-prescribing industry and its own network, Surescripts' competitors in the industry, particularly Emdeon, did not similarly make investments early on in the e-prescribing market or take steps to grow their e-prescribing networks as Surescripts did. *See* SUF ¶ 8 (citing Ex. 8, Evans Dep. 89:1–20) ████████████████████████

████████████████████████████████████████████████

In the routing market, Emdeon's witnesses and documents show ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ mdeon's most concerted effort to enter the routing market came as late as 2012 through its so-called ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ The project saw limited success, and Emdeon attributed the failure to the fact that ██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ Notably, Mr. Bigler is now working for First Databank, Inc. ("FDB") to launch a new cloud-based e-prescribing network, which ████████████████████████ he believes will be a "flexible, customer-focused ePrescribing network." *See* Ex. 70 (PR Newswire, "FDB Launches FDB Vela – A New ePrescribing Network to Delvier Greater Choice and Value," Mar. 15, 2022).

Emdeon attempted to enter the eligibility market only in late 2013 and 2014, more than ten years after Surescripts' initial entry, with its ███████████ *See* SUF ¶ 68. As with Emdeon's foray into routing, Project Victory also saw limited success, as Emdeon ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

The FTC has tried to characterize some other entities as potential competitors to Surescripts, including Allscripts and RelayHealth. *See* Compl. ¶¶ 4, 5. The record does not support those characterizations. ████████████████████████████████████

███████████████████████████████████████████████████

 That

neither Allscripts nor RelayHealth—two highly capitalized firms—saw any value in entering the

e-prescribing market underscores the narrow margins typical of the industry and the risk that

Surescripts undertook early on to invest in and build e-prescribing from the ground up.

## ARGUMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A dispute is "genuine" only if a reasonable jury could find for the non-moving party and

"material" only if it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 248 (1986). The moving party carries its initial burden merely by demonstrating the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Upon such a showing, the burden shifts to the non-moving party to set forth specific facts by

affidavit or other evidence to demonstrate a genuine, material factual issue for trial. *Id*. at 324. The

burden on the non-moving party is significant:  The non-moving party must present more than a

"scintilla of evidence," but rather must demonstrate "evidence on which the jury could reasonably

find for the plaintiff." *Anderson*, 477 U.S. at 252.

At the motion to dismiss stage, the Court found that the FTC's complaint contained enough

factual matter to survive dismissal but noted that "[f]urther factual development may vindicate

Surescripts' position" that "Surescripts' contract provisions did not substantially foreclose the market to competition." Order at 17-18, ECF No. 44. After dozens of depositions of fact witnesses, hundreds of thousands of documents produced, and the close of expert discovery, the FTC has not raised a triable dispute as to whether Surescripts' loyalty provisions substantially foreclosed competition or caused any anticompetitive effects in the routing or eligibility markets. Summary judgment is therefore appropriate.

## I.    THE FTC FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER SURESCRIPTS' CONTRACTS VIOLATED SECTION 2 IN THE ROUTING MARKET (COUNT I)

Courts evaluate "monopolization" claims arising from vertical restraints on trade—those between firms at different levels of distribution, such as exclusive dealing agreements—under the rule of reason.[2] *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The rule of reason employs a three-step burden shifting framework. *Id.* The plaintiff "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* This is because, unlike horizontal restraints on trade which are presumptively unlawful, exclusive dealing agreements can be and often are pro-competitive; for instance, they may enable a firm to overcome free-rider problems. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (Posner, J.)*.* Accordingly, they are not reviewed as *per se* unlawful. *United States v. Microsoft*, 253 F.3d 34, 71 (D.C. Cir. 2001).

To carry its initial burden under the rule of reason, a plaintiff must show, as further detailed below, (i) that it was the defendant's conduct which caused competitors to be excluded from a

---

[2] While Surescripts does not agree that as a matter of law the allegedly exclusive contracts are so-called *de facto* exclusive contracts and subject to legal analysis of exclusive dealing, this Court must grant summary judgment to Surescripts because even under the rule of reason analysis, the FTC cannot raise a genuine dispute of material fact that Surescripts' loyalty contracts actually foreclosed competition by rivals or resulted in any harm to competition or consumers. *United States v. Microsoft Corp.*, 253 F.3d 34, 58, 69 (D.C. Cir. 2001).

"substantial" portion of the market ("substantial foreclosure") and (ii) that the alleged exclusive dealing caused anticompetitive effects in the relevant market ("anti-competitive effects"). *See id.* at 69; *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (noting that a Section 2 challenge to a vertical exclusive or requirements contract requires showing that "a substantial share of the line of commerce [is] affected"). Only upon such a showing does "the burden shift[] to the defendant to show a procompetitive rationale for the restraint." *Amex*, 138 S. Ct. at 2284. If the defendant puts forth a procompetitive rationale, the burden shifts back to the plaintiff "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* A failure to raise a genuine issue of fact as to either prong of its initial burden is independently fatal to the FTC's Section 2 claims.

A.    **The FTC Failed To Raise A Genuine Dispute Of Material Fact As To Surescripts' Alleged Foreclosure Of The Routing Market**

1.    <u>The FTC Must Show That Surescripts' Loyalty Contracts Actually Prevented Competitors From Entering The Routing Market</u>

Proof of substantial foreclosure requires the FTC to produce actual, real-world evidence of competition in the routing market to prove that Surescripts' loyalty contracts actually foreclosed competition in a substantial share of the line of commerce affected. *Tampa Elec.*, 365 U.S. at 328. That means the FTC here must present real-world evidence sufficient to raise a genuine dispute that a significant competitor would have entered the market or grown its share but was prevented from doing so by Surescripts' loyalty discounts. As the Supreme Court has explained, "[t]o determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Id.* at 329. This is a "prudential

requirement" designed to screen out challenges to exclusive contracts with no or an insignificant effect because "[p]ermitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions." *Microsoft*, 253 F.3d at 69; *Tampa Elec.*, 365 U.S. at 327 (noting that not all "exclusive-dealing arrangements" violate the Sherman Act).

The FTC has repeatedly focused on a simple quantitative argument to demonstrate foreclosure—it claims that Surescripts entered into exclusive contracts (it did not) and that the share of the market covered by those contracts is substantial. But even if that FTC's arithmetic is correct (it is not) the inquiry would not end there. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 545 F. Supp. 3d 922, 1014 (D. Kan. 2021) (noting that "calculated foreclosure percentages [of exclusive contracts] alone don't suffice to create a triable issue of foreclosure," and that courts must also consider whether the exclusive contracts actually prevented competitive entry). Instead, as the case law makes clear, the FTC must produce "credible evidence" that Surescripts' loyalty contracts "actually deterred entry into [the] market." *Omega Env't, Inc. v. Gilbarco*, 127 F.3d 1157, 1164 (9th Cir. 1997).

In *Gilbarco*, for example, the Ninth Circuit overturned a jury verdict for the plaintiff finding that defendant Gilbarco's exclusive dealing contracts for petroleum distribution equipment violated Sections 1 and 2 of the Sherman Act, because the plaintiff failed to prove substantial foreclosure. 127 F.3d at 1164. The Court rejected the plaintiff's claims that two foreign competitors were deterred by the exclusive contracts because the evidence submitted on this point was speculative and "[*was*] *insufficient to establish that the exclusive dealing caused the competitors' failed distribution"* and entry. *Id*. at 1164 n.7 (emphasis added). There was also evidence that another competitor actually entered and expanded during the relevant period. *Id*. at 1164.

Similarly, in *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977–78 (6th Cir. 2000), the Sixth Circuit similarly affirmed dismissal of a Section 2 claim where the plaintiff alleged that the defendant foreclosed 87% of the relevant market through exclusive contracts. The court held that "even if [the plaintiff] were able to establish the preemption from the relevant market that it asserts, it has failed to allege how such acts have injured competition," in light of other factual evidence including "the discounted rates offered to the customers, [] the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [competitors] at the conclusion of the contracts." *Id.*; *see also In re EpiPen*, 545 F. Supp. 3d at 1014 (granting summary judgment on Section 2 exclusive dealing claim after assessing multiple categories of real world evidence including that there was no coercion by defendant and the contracts were "short in duration and easily terminable").

Likewise, in *Roland Machinery*, the Seventh Circuit Court of Appeals reversed the district court's preliminary injunction against a purported exclusive contract because the plaintiff had not submitted sufficient evidence of foreclosure; specifically, that the agreement was "likely to keep at least one significant competitor of the defendant from doing business in a relevant market" and "that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition…" *Roland Mach.*, 749 F.2d at 394. The Seventh Circuit explained that "[i]f there is no exclusion of a significant competitor, the agreement cannot possibly harm competition." *Id.*

The FTC cannot meet its burden under these cases given the record evidence.

2.    The FTC Failed to Show that Any Competitor Was Actually Prevented from Entering the Routing Market

The real-world evidence of competition in the routing market over the past 12 years proves that Surescripts' loyalty pricing contract provisions cannot have foreclosed the routing market. First, there is simply no evidence that the loyalty discounts actually foreclosed any competitors in

the routing market. The undisputed evidence proves that customers did not lack choice in the routing market. No customer was required to agree to the loyalty provisions to use Surescripts' network. To the contrary, the evidence is unanimous that the complained-of provisions merely offered an optional discount to customers in exchange for their loyal usage of the Surescripts network. Many customers took advantage of those advantageous prices because they had no interest in using multiple routing networks in any event, while others declined the advantageous pricing. Surescripts' competitors, like Emdeon, had the opportunity to take advantage of customers' freedom. But they failed to successfully offer a routing product that customers preferred (on price or otherwise) to Surescripts, for reasons wholly apart from Surescripts' loyalty contracts.

> a.    *The FTC Has Failed To Show That Any Customer That Wanted To Multihome For Routing Transactions Was Unable To Do So Because Of Its Contract With Surescripts*

Evidence from customers confirms that Surescripts' loyalty contracts did not foreclose any competition in the routing market. The FTC argues that Emdeon (or other competitors) would have offered an additional routing network that EHR and pharmacy customers could use to "multihome" (that is, have the option of using multiple networks for a given routing transaction). But, the FTC claims, the loyalty prices that Surescripts offered in essence created "golden handcuffs"—Emdeon could not offer prices low enough to overcome the lost incentives and low prices that customers earned by being "loyal" and they refused to multihome. The undisputed evidence shows that any customer that wanted to multihome was free to do so. Surescripts' loyalty contracts provided only the *option* of incentives and rebates if the customer *chose* to be loyal. Any customer could still use Surescripts' network, as much or as little as it wanted, even if it refused to sign a loyalty contract. And unrefuted evidence shows that many customers had no desire to multihome at all and saw "loyalty" rebates and incentives as found money—payments for doing what they would do

anyway. As the FTC conceded, customers in some cases may have chosen not to multihome because it was less profitable, not because Surescripts forced them to do so.

Substantial foreclosure does not exist where the customers were free to contract with other suppliers if they chose to do so. *See, e.g.*, *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406-07 (3d Cir. 2016). In *Eisai*, a case very similar to this one, the plaintiff competitor challenged defendant Sanofi's contracts with customers that provided increased discounts for buying more than 75% of a category of drug from Sanofi. The plaintiff argued that customers were foreclosed and had "no choice" but to buy from Sanofi because they received discounts. The Court of Appeals for the Third Circuit rejected that argument and held that there was no foreclosure where the "customers did not risk penalties or supply shortages" for not meeting the threshold, but instead risked only not receiving the discount the defendant offered to customers who met it. The court rejected the plaintiff's argument that "the threat of not obtaining a higher discount (ranging up to 30% off) 'handcuffed' [customers] to the [defendant's product]" because "[i]f a customer chose to terminate the contract entirely, it could still obtain Lovenox at the wholesale price. *Id.*; *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,* 592 F.3d 991, 997 (9th Cir. 2010) (affirming summary judgment against Sherman Act claims because evidence showed that "[a]ny customer subject to one of [the defendant's] market-share discount agreements could choose at anytime to forego the discount offered by [the defendant] and purchase from a generic competitor[,]" so the "agreements at issue here did not foreclose [the defendant's] customers from competition because a competing manufacturer needed only offer a better product or a better deal to acquire their business" (internal quotation marks and citation omitted)); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 238 (1st Cir. 1983) (Breyer, J.) (no foreclosure where the buyer

"could have obtained [contracts without the allegedly exclusionary provisions] had it given up the 'special' extra 5 to 10 percent price discount").[3]

*First*, regardless of terminology used, there are no Surescripts contracts that require exclusivity to access to the Surescripts network. Instead, the only consequence for not being exclusive with Surescripts is missing out on the advantageous pricing that comes with loyalty. The loyalty pricing was, thus, entirely optional, and any company could still connect to Surescripts' network even if it chose not to be loyal. In fact, the record includes multiple examples of EHR and pharmacy customers that opted not to be "loyal" without any evidence (1) of any inability to reliably transmit transactions on Surescripts' network, or (2) that any customer failed to prosper without Surescripts' rebates or incentives. *See, e.g.,* ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

And customers that did choose to be "loyal" were hardly "handcuff[ing]" themselves to Surescripts. *See Eisai,* 821 F.3d at 406-07. Surescripts' loyalty provisions explicitly permitted entities to connect to another company that was not on the Surescripts network without risking their loyalty status and discount—for example, a pharmacy that had signed a loyalty provision

---

[3] Surescripts' loyalty contracts are radically different than those determined to be unlawful exclusive dealing by the Third Circuit in *ZF Meritor*. Unlike in *ZF Meritor*, Surescripts did not require customers to join loyalty programs in order to access the Surescripts network or threaten to disconnect them from the network if they quit the program or became non-loyal. As discussed above, many large customers in fact declined to entered into loyalty provisions. Thus, this is demonstrably not a situation where failing to be loyal would "jeopardize" customers' relationships to Surescripts. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 278 (3d Cir. 2012). To the contrary, those customers would keep on connecting and using Surescripts, albeit at less favorable prices.

could still connect to an EHR that was not connected to the Surescripts network without risking its loyalty discount. SUF ¶ 32. The FTC ignores these facts to argue that Surescripts' loyalty discounts foreclosed competition from gaining a foothold through a strategy of multihoming. Indeed, and as further described herein, certain of Surescripts' "loyal" customers were poised to take advantage of this very loophole by signing up with Emdeon during ████████████.

Finally, many of Surescripts' contracts were short-term and easily terminable, and therefore "presumptively lawful." *Roland Mach.*, 749 F.2d at 395; *see also Gilbarco, Inc.*, 127 F.3d at 1163 ("[S]hort duration and easy terminability of [] agreements negate substantially their potential to foreclose competition."); *In re EpiPen*, 545 F. Supp. 3d at 1014 (granting summary judgment in on Section 2 exclusive dealing claim because there was no evidence that the defendant's exclusive contracts actually prevented a competitor from entering the relevant market, given that those contracts were "short in duration and easily terminable"). Most of Surescripts' EHR contracts terminated on six months' notice. SUF ¶ 25. Other contracts were of even shorter duration, such as Surescripts' contract with and ████████ which was terminable on just "three (3) months written notice," and Surescripts' contract with ████████, which was terminable with just "sixty (60) days written notice." *Id.* ¶ 26. Even Surescripts' 2010 contract with ████ which the FTC will surely claim was fatal to Emdeon's attempts to set up a competing routing network, only provided for ████ loyalty for 11 months. *Id.* ¶ 27. These customers were free to contract with whichever network they chose after only a short period of loyalty.

***Second,*** and of equal importance, the undisputed evidence shows that the Surescripts' pharmacy and EHR customers that did sign up for loyalty did so because they saw value in having a single network and did not want to multihome. For example, ████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

     This is typical in "markets characterized by network effects"—like the two-sided routing market. *Microsoft Corp.*, 253 F.3d at 49. "One product or standard tends towards dominance, because the utility that a user derives from consumption of the good increases with the number of other agents consuming the good. . . . Competition in such industries is for the field rather than within the field." *Id.* (internal quotation marks and citations omitted). ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

     The FTC's case is implicitly based on the contrary notion that customers, to a material degree, would have preferred to multihome. But the FTC did not produce evidence from customers to support that supposition. At best, customers saw multihoming as a pointless redundancy, and declined to contract with Emdeon for that reason. *See* SUF ¶ 62 ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

At worst, customers worried that multihoming could be potentially dangerous due to the technical issues involved.███████████████████████████████

████████████████████████████████████████████████

███████ In contrast to the value customers saw in having a single connection, the record in this case makes clear that multihoming presented risks of technical issues that many customers wanted to avoid.████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

        b.     *The Undisputed Evidence Shows That Emdeon's Routing Product Failed For Reasons Other Than Exclusion Via Surescripts' Loyalty Contracts*

Throughout this case, the FTC has touted Emdeon as the only rival that actually sought to compete with Surescripts in routing and was supposedly stymied by Surescripts' "web" of loyalty provisions in routing contracts with EHR and pharmacy customers. The actual evidence in this case shows that EHRs were free to contract with Emdeon (and did), but that Emdeon failed to offer them a sufficiently compelling product. That is an independent cause of Emdeon's struggles, not the result of any actionable exclusionary effect of Surescripts' contracts, and that is fatal to the FTC's claim that Surescripts monopolized the routing market and substantially foreclosed

competition. *See Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410–11

(7th Cir. 2017) (affirming summary judgment dismissing a Section 2 claim and holding that a

hospital's exclusive contracts with insurers covering more than half of all commercially insured

patients was insufficient because the contracts expired periodically and plaintiff was free to bid for

the business, but "if a health insurance company prefers to contract with [the defendant], the logical

inference is that [the defendant] offered the health insurer a better deal").

Put simply, Emdeon did not make the kind and magnitude of investments it needed, when

it belatedly decided to compete with Surescripts. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ In contrast to Surescripts, there is no evidence showing that Emdeon made any

significant efforts to expand its market share (through lower prices or innovative pricing) during

its early years.

In 2012, Emdeon explored a strategy to grow its routing business that it called ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED] And, importantly, becoming an Emdeon customer and transmitting routing messages to PDX pharmacies would not have cost EHRs *any* of their loyalty incentives with Surescripts. As the FTC concedes, once PDX disconnected from Surescripts and used only Emdeon for routing, the terms of Surescripts' contracts explicitly allowed an EHR to send routing messages to PDX pharmacies on Emdeon's network and still earn loyalty incentives for the messages it sent to other pharmacies over Surescripts. *See, e.g.,* Compl. ¶ 135; SUF ¶ 61.

Emdeon ultimately did not go forward with [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] By definition, that failure to attract EHRs cannot lie at the feet of loyalty provisions, because (1) no EHR would have lost any incentives had Emdeon disconnected and (2) no PDX pharmacies received any loyalty discounts from Surescripts, [REDACTED] Thus, while the FTC points to the failure of [REDACTED] as evidence of foreclosure, the real-world evidence shows Emdeon failed to attract EHRs to its routing network for reasons other than Surescripts' loyalty contracts with EHRs.

For starters, Emdeon admits it. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]



████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

     In the face of these admissions by Emdeon, the FTC has produced no evidence from any EHRs stating that they declined to sign up for routing from Emdeon as part of ███████████ because they did not want to lose loyalty incentives from Surescripts. That is not surprising, since Surescripts' EHR contracts demonstrate that, had Emdeon gone forward with ████████ and disconnected from the Surescripts network, EHRs would *not* have lost any loyalty incentives by dealing with Emdeon/PDX.

              *c.*     *The FTC Has Put Forth No Evidence That Any Other Competitors Wanted To Compete In Routing And Were Foreclosed*

     In addition to Emdeon, extensive discovery in this matter did not reveal any evidence that Surescripts took actions that actually foreclosed any other entities that would otherwise have competed in routing. The FTC's allegations that these other potential competitors would have entered the routing market are even less plausible than its allegations about Emdeon.

     ***RelayHealth***: Although the FTC suggests that RelayHealth was an excluded competitor, the facts are otherwise. RelayHealth (backed by the giant McKesson Corporation) has never tried to enter the routing market. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ elayHealth's

unilateral business decision not to attempt to enter the market does not constitute foreclosure.

*PrescribersConnection*: The FTC also fails in its effort to paint PrescribersConnection as an excluded routing competitor. PrescribersConnection is a network that provides long-term care ("LTC") routing services.███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████ Ex. 3 (Hansen Dep. Tr. 321:25–322:22) ("PrescribersConnection essentially free-r[o]d[e] the network infrastructure . . . and connectivity and breadth and reach of the network that Surescripts had . . . built over time . . . ."). There is no evidence in the record that PrescribersConnection sought to compete in retail routing, or that it was prevented from doing so by Surescripts' loyalty discounts. PrescribersConnection continues to operate and serve LTC customers.

*DrFirst*: DrFirst also does not provide the required real-world evidence of actual exclusion. DrFirst is a mid-sized EHR customer that connects to Surescripts' routing network. ████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

28

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ his natural experiment proves that it was not the loyalty contracts that caused DrFirst's inaction.

*     *     *     *

In sum, the record evidence demonstrates that the alleged potential routing competitors that the FTC has identified were not foreclosed by Surescripts' loyalty discounts and that Surescripts' EHR and pharmacy routing customers were always free to contract with them in any event. Those customers chose not to "multi-home" with competitors because they did not see the value in it, and especially did not see the value in Emdeon's subpar, "me too" offering. Surescripts won their business with a better product and better pricing, not exclusive contracts.

The FTC has not raised a triable question of fact as to whether Surescripts substantially foreclosed competition from the market because the FTC has not shown (and cannot show) that there were any viable competitors to Surescripts' network or that Surescripts' loyalty discounts prevented entry into the market.

### B.    The FTC Has Failed To Raise A Genuine Issue Of Material Fact As To Anticompetitive Effects Allegedly Caused By Surescripts' Loyalty Provisions

Even if the FTC had raised a genuine issue of material fact as to foreclosure, its claims against Surescripts would still fail because it has no evidence that Surescripts' loyalty discounts caused any anticompetitive effects in the relevant market. To show a Section 2 violation, the FTC must show "harm [to] the competitive process[,] and thereby harm [to] consumers." *Microsoft Corp.*, 253 F.3d at 58; *see also id.*, at 58-59 (to succeed under Section 2 plaintiffs must "demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect"). It

cannot meet this burden by showing merely harm to a competitor. *Id.* at 59; *see also McWane, Inc. v. F.T.C.*, 783 F.3d 814, 835 (11th Cir. 2015) (noting that while exclusive dealing used to require only "proof of substantial foreclosure," now a "broader analysis" is required in exclusive dealing cases, including a fulsome analysis under the rule of reason). Instead, the FTC must prove that Surescripts' loyalty discounts resulted in "reduced output, increased price or reduced quality in goods or services" in the routing market. *Esai,* 821 F.3d at 403 (explaining that the court must analyze both substantial foreclosure and "the likely or actual anticompetitive effects of the exclusive dealing arrangement…").

Coincidence is not enough; the FTC must produce evidence of causation that can tie any alleged anticompetitive effects specifically to Surescripts' loyalty discounts. *See Am. Banana Co. v. J. Bonafede Co.*, 407 F. App'x 520, 523 (2d Cir. 2010) (dismissing Section 2 claims where plaintiffs "fail[ed] to establish a genuine issue of material fact with respect to the necessary causation" because "ample evidence in the record negat[ed] the reasonableness of any inference that the [alleged anticompetitive conduct] had anticompetitive effects."); *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 897 (W.D. Ky. 2020) (holding that dismissal of an antitrust claim on summary judgment is appropriate where "there is no evidence of a causal connection between Defendants' conduct and the [defendants'] allegedly anticompetitive prices . . ." (internal quotation marks omitted)).

The FTC's choice to bring this case against Surescripts is surprising when viewed in light of the undisputed fact that since 2010, prices for routing transactions have fallen significantly and output has dramatically increased. These results are the hallmarks of an efficient market, not an anticompetitive one. The FTC's lack of evidence of anticompetitive effects caused by the loyalty contracts is fatal to its claims.

1.    The Undisputed Facts Show Lower Routing Transaction Prices And Increased Routing Transaction Output Since Surescripts Implemented Its Loyalty Provisions In 2010

The FTC's lack of evidence of actual anticompetitive effects is striking. Typically in a monopolization case the plaintiff can show that prices for the purportedly restrained product increased over time, and the parties dispute whether the conduct caused that increase. Here, the FTC cannot even show higher prices for routing. To the contrary, the prices of routing transactions have dropped significantly over time and continue to drop. *See* SUF ¶ 36 (citing McCarthy Rep. ¶¶ 233-35).[5] That is not surprising given that Surescripts' owners developed its e-prescribing platform to lower to the cost and improve the quality of prescription transactions. Rather than attempt to show that Surescripts caused a market-wide adverse effect on pricing, the FTC at best offers anecdotal stories of individual pricing offers to isolated customers.

But these examples, *see* Ex. 14 (Evans Rep., nn.707, 708, 710, 712, 714, 719, 726, 730, 732), merely illustrate why the law requires the FTC to put forth a but-for model showing that the loyalty provisions were anticompetitive; restrictive provisions often result in higher prices for select customers but lower market prices overall. *See Roland Mach.*, 749 F.2d at 395 (Posner, J.) ("Exclusive dealing may also . . . prevent dealers from taking a free ride."); *See Amex*, 138 S. Ct. at 2289 (Restrictive contract provisions "stem[med] negative externalities."). Evidence of lower prices offered to select, high-profit-margin customers (leaving smaller, low-profit-margin customers out to dry) does not show harm to the market overall. Thus, even if taken as true, the FTC's anecdotal evidence of low prices offered to select customers does not show that the market price of routing transactions was high.

---

[5] Plaintiffs' economist, Dr. Evans, does not appear to dispute that Surescripts' prices dropped over time, arguing instead that Dr. McCarthy "overstates the price decline." *See* Ex. 76 (Evans Rebuttal Rep. at 354).

At the same time, the undisputed facts show that output increased dramatically from 2010 to the present. Similarly, the FTC has failed to raise a genuine dispute of fact that Surescripts caused any restriction in output (no matter how the market is defined). *See Amex*, 138 S. Ct. at 2289. To the contrary, it is undisputed that since the inception of e-prescribing, the routing market has grown rapidly. *See* SUF ¶ 17 (citing Evans Dep. 210:19–211:16) ("Q. You would agree that output in routing has expanded during the period of the alleged exclusionary contracts, wouldn't you? A. I do agree.").[6] The market's continued expansion is wholly inconsistent with the FTC's unsupported claim that Surescripts' loyalty discounts injured competition and consumers in routing. *Cf. Amex*, 138 S. Ct. at 2289.

> 2. <u>The FTC Never Even Attempted To Evaluate What Prices And Output Would Have Been In A But-For World Without Surescripts' Loyalty Discounts</u>

Faced with incontrovertible evidence of lower prices and increased output, the FTC attempts to salvage its case by proposing that prices would have been even lower, and output even higher, in a "competitive" market without Surescripts' loyalty provisions. But looking at the actual evidence, the FTC has failed to show "that the price of [routing] transactions was higher than the price one would expect to find in a competitive market," or that output was lower, because the FTC did no but-for analysis of how the market would look without Surescripts' loyalty discounts. *See Amex*, 138 S. Ct. at 2288. The FTC cannot merely "proceed on the assumption" that, but for the conduct at issue, prices would have been even lower or output even higher without "account[ing] for the numerous alternative explanations" for the alleged effects. *J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.*, 485 F.3d 880, 890 (6th Cir. 2007) (affirming dismissal of a Section 2

---

[6] *See also id.* ("Q. . . . In fact, the volume of routing transactions has grown each and every year during that relevant time period, hasn't it? A. Yes. Q. The volume of eligibility transactions has grown each and every year during that relevant time period, hasn't it? A. Yes. Q. The number of routing and eligibility transactions transacted has never declined, has it? A. It has not.").

claim on summary judgment where the plaintiffs' experts failed to analyze a but-for world). That is, antitrust plaintiffs must construct a but-for world in order to show what prices and output would have been in the allegedly "competitive" market, and they must put forth some evidence that the challenged conduct, as opposed to other market factors, actually *caused* the alleged price or output to differ from the model.

This analysis of what the market would have looked like absent challenged restraints, or "but for" the restraints, is ingrained in antitrust jurisprudence. Thus, in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000), the Eighth Circuit affirmed the district court's holding that the plaintiff's economic expert was "required to construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive." *Id.* The court held that the trial court has an obligation to do a "thorough analysis of the expert's economic model and his proffered opinion." *Id.*; *see also ZF Meritor,* 696 F.3d at 292 ("Ordinarily . . . an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." (citation omitted)); *J.B.D.L. Corp.*, 485 F.3d at 890.

The FTC did not even try to meet this standard. And as a result, it has no idea what prices or output would be in its hypothetical competitive market. The FTC's argument is based almost entirely on the opinion of its economics expert, Dr. David Evans. But Dr. Evans admits that he did not attempt to construct any but-for model of a world without the allegedly anticompetitive loyalty provisions, against which Surescripts' actual-world prices could be compared. Dr. Evans admitted that he had not analyzed whether, in the absence of Surescripts' loyalty provisions, customers would have preferred a competitor over Surescripts or quantified how many customers would have preferred to multi-home. *See* Ex. 8 (Evans Dep. 39:13-25, 40:2-9). He did not attempt to quantify what prices would have been in any particular year in the but-for world. *Id.* at 44:16-45:10. Nor

did he attempt to quantify what output would have been absent Surescripts' loyalty contracts. *See id*. at 45:11-17, 212:3-5 ("Q. And you agree you've not tried to quantify any but-for output; right? A. That's correct."). Finally, because the FTC has not calculated what prices or output would have been in its hypothetical competitive market, it would be utterly unable to show that Surescripts' loyalty provisions, as opposed to myriad other market forces, caused prices to be lower or output to be higher than the (unidentified) benchmark levels.

The FTC's other experts did not fill in the gaps; they also failed to provide any evidence that but-for Surescripts' loyalty provisions, the market would have been more competitive. The FTC's expert on damages and remedies, Dr. Rosa Abrantes-Metz, confirmed that she had not "disclosed any opinion as to whether any contractual provisions actually forestalled competitive entry and discouraged customers from using alternatives to Surescripts," instead opining merely that "ending the loyalty programs would – *potentially open[] the possibility* more easily for multihoming." Ex. 73 (Abrantes-Metz Dep. 31:23-32:8) (emphasis added). While she *assumed* that there would be "significant competition" in the but-for world, she did not attempt to quantify what that competition would look like. *Id*. at 32:24-35:9; *id.* at 239:14–240:10 (Dr. Abrantes-Metz did not assess the probability that removing Surescripts' loyalty provisions might lead a new competitor to enter the market); *id.* at 240:11–241:8. Finally, Dr. Abrantes-Metz "did [not] disclose a definition of what the but-for world would be" and argued that "it was not necessary for [her] to define a but-for world because [she was] relying on" Dr. Evans' characterization of the but-for world (even though Dr. Evans, by his own admission, provided no analysis of the but-for world). *Id.* at 231:10–22; *see also id.* at 34:16–35:14.

And Dr. Julia Adler-Milstein, the FTC's expert on federal healthcare legislation, admitted she did not know what a "but-for" world is and testified that because "I don't think there's a way to think about a world in which [the relevant federal legislation] didn't exist," she did not attempt

to model a but-for world. Ex. 74 (Adler-Milstein Dep. 121:9-11, 123:24-124:11, 126:20-127:18). The FTC's experts unanimously did not attempt to model a world in which Surescripts' loyalty discounts did not exist: They did not opine on which (or how many) competitors would have entered the market, what prices and innovations they would have offered (or to whom), or whether (or how many) customers would have utilized the available rival networks.

The FTC's failure to put forth any but-for world whatsoever is total, and is fatal to its claims because it leaves the FTC nothing more than supposition to say that the prices or output observed in the market are different than they would have been in a market free of the challenged restraint, or that Surescripts' loyalty provisions caused these unquantified differences. Speculation and assumptions cannot replace actual modeling. Without any analysis of a but-for world, the FTC has not shown actual anticompetitive effects in the market.

        3.      <u>The FTC Put Forth No Evidence That Surescripts' Loyalty Discounts Had A Negative Effect On Innovation Or Quality</u>

Finally, the FTC has put forth no evidence that innovation was stifled or quality decreased because of Surescripts' loyalty provisions. Yet again the FTC fails to present any analysis of what innovation and quality would like in a but-for world, absent the challenged restraints. Ex. 8 (Evans Dep. 46:12-47:15). Instead, the FTC highlights a hodgepodge of customer complaints and speculation that more innovation could have occurred. *See* Ex. 14 (Evans Rep. ¶¶ 420-25). Of course, Surescripts could easily counter that "evidence" with abundant evidence of Surescripts' dedication to quality and consistent innovation throughout the time period. But there is no need, and such competing narratives cannot create a dispute of fact. That is because regardless of what isolated customers say, the FTC has offered no evidence of what *would have happened* in the routing market absent the loyalty provisions.

II.    **THE FTC HAS FAILED TO RAISE A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER SURESCRIPTS VIOLATED SECTION TWO AS TO THE ELIGIBILITY MARKET (COUNT II)**

The FTC's evidence regarding the eligibility market is, remarkably, even thinner. As with routing, to prevail on its eligibility claims, the FTC has the burden to show both (i) foreclosure and (ii) anticompetitive effects. *See Microsoft*, 253 F.3d at 69. The FTC's inability to create a genuine issue of fact as to each of foreclosure and anticompetitive effects is independent grounds for summary judgment on the FTC's claims regarding the eligibility market.

A.    **The FTC Failed To Raise A Genuine Dispute Of Material Fact As To Surescripts' Alleged Foreclosure Of The Eligibility Market**

The FTC's failure to demonstrate foreclosure is even starker in the eligibility market than in routing. As explained above, to demonstrate substantial foreclosure, the FTC has the burden to show that Surescripts' contracts "foreclosed" its competitors from "a substantial share of the relevant market," *Tampa Elec.*, 365 U.S. at 328, and it must put forth evidence that Surescripts' loyalty provisions prevented "at least one significant competitor . . . from doing business" in the eligibility market. *Roland Mach.*, 749 F.2d at 394. In other words, it must point to an actual competitor that would have entered the eligibility market if it had not been for the loyalty provisions "significantly limit[ing]" the "opportunities" to do so. *Microsoft*, 253 F.3d at 69; *see also Gilbarco*, 127 F.3d at 1164. The FTC did not, and cannot, show this.

To begin with, the FTC cannot show that loyalty provisions in Surescripts' eligibility contracts foreclosed competition for eligibility networks. As with routing, Surescripts' eligibility loyalty program was entirely ***optional***. Surescripts never required an eligibility customer to be exclusive to Surescripts in order to access its network. ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████    In fact, some of

Surescripts' large eligibility customers did not chose to join loyalty programs at all. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

And the same loopholes and easy termination options that existed in routing also existed in eligibility contracts. As with routing, Surescripts' eligibility contracts with its EHR and PBM customers did not actually require exclusivity. Surescripts' contracts with the EHRs in the Reserve Program did not limit loyalty payments when EHRs multihomed with PBMs outside the Surescripts network, so EHRs were free to continue multihoming with PBMs outside Surescripts' network and still receive the loyalty payments. Large EHRs responsible for significant eligibility transaction volume took advantage of this provision. SUF ¶ 31 ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

Yet despite the freedom to multihome, most EHRs and PBMs did not do so for their eligibility transactions, again because of added complexity for limited benefit. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Thus, even if the FTC could show that a competitor had sought to enter the eligibility market, there is no evidence that customers actually wanted to connect to other networks and were prevented from doing so.

Nor can the FTC show that any specific competition was foreclosed. The FTC has identified three potential competitors of Surescripts that could have been foreclosed from entering the eligibility market: Emdeon, Allscripts, and DrFirst. Compl. ¶¶ 103 (Allscripts), 136 (Emdeon), 192 (DrFirst). But there is not a shred of evidence that any of these competitors actually tried to enter the eligibility market, much less that Surescripts foreclosed them from doing so. To the contrary, undisputed evidence shows that every competitor the FTC points to as evidence of foreclosure failed to enter the market for reasons not caused by Surescripts' loyalty contracts.

**Emdeon.** With respect to eligibility, Emdeon did not even attempt to enter the eligibility market until late 2013 and 2014, more than *ten years* after Surescripts' initial entry. *See* SUF ¶ 68.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Yet, again, Emdeon's own "post-mortem" of its exit is undisputed proof that Emdeon's failure in eligibility was not caused by Surescripts' alleged contract provisions. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

***Allscripts***: █████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

***DrFirst***: ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

**B.** **The FTC Failed To Raise A Genuine Dispute Of Material Fact As To Anticompetitive Effects Allegedly Caused By The Loyalty Provisions In Surescripts' Eligibility Contracts**

The FTC also fails to raise a genuine issue of fact that Surescripts' loyalty provisions caused any anticompetitive effects in the eligibility market. This failure constitutes independent ground to grant summary judgment on the FTC's eligibility claims. *See Amex*, 138 S. Ct. at 2287 (Plaintiff must show the challenged conduct "caused" "anticompetitive effects in the relevant market."). Here again, the FTC's failure to analyze a but-for model of the eligibility market undermines any claim that Surescripts' loyalty discounts caused higher eligibility prices or reduced output. *See* Ex. 8 (Evans Dep. 39:13-25, 40:2-9, 42:5-25).

Just like with its routing evidence, the FTC's eligibility evidence does not demonstrate that prices or output have suffered. The price of eligibility transactions has fallen consistently since 2007. *See* SUF ¶ 37.[7]  And the quantity of eligibility transactions in the market has grown each and every year both for Surescripts and for the market as a whole. *Id.* ¶ 18 (citing McCarthy Rep. Ex. 10B) (showing growth in the number of eligibility transactions); *see also* Ex. 75 (Surescripts 2019 National Progress Rep. at 4) (e-prescribing transactions grew from 6 billion in 2013 to 19.15 billion in 2019).

But, once again, the FTC has put forth no evidence that the market-wide price of eligibility transactions would be lower if Surescripts had not offered loyalty discounts, or that that output, innovation, or quality would be even higher. *See* Ex. 8 (Evans Dep. 39:13-25, 40:2-9, 42:5-25).

In place of any holistic analysis of the but-for world, the FTC offers one-off examples of competitors offering lower prices to isolated customers. *See, e.g.*, Ex. 14 (Evans Rep. ¶¶104-05). But these one-off prices do not show that Surescripts' loyalty discounts had an anticompetitive effect on the price of eligibility transactions overall; at best, it shows prices that competitors offered to a few large, high-profit-margin customers they wanted to cherry-pick off Surescripts' network.

Meanwhile, in place of a rigorous but-for analysis to show that innovation or quality would have been higher in a world without Surescripts' loyalty discounts, the FTC's evidence once again consists of isolated customer comments. These isolated comments are meaningless without any context or any comparison to what innovation or quality in eligibility transactions would look like a but-for world without Surescripts' loyalty discounts. The FTC's expert Dr. Evans relies on unbounded supposition; he speculates that the general "economics of innovation" suggest Surescripts "would have" innovated more. Ex. 14 (Evans Rep. ¶ 433). But even Dr. Evans then

---

[7] Again, Dr. Evans does not appear to dispute that the actual-world prices for eligibility transactions fell, instead arguing that they "would likely have been lower." Ex. 76 (Evans Rebuttal Rep. ¶ 350).

admits that it is "impossible to know what innovation would have occurred," and he admits that he "ha[s] not attempted to quantify" the degree to which innovation was supposedly stifled. *Id.*; *id.* ¶ 461. It is the FTC's burden to show that innovation was stifled, and the FTC's unsupported speculation falls far short of meeting its burden.

## CONCLUSION

For the foregoing reasons, Surescripts respectfully requests that the Court grant its motion for summary judgment and dismiss the FTC's claims under Sherman Act Section 2.

Dated: March 28, 2022                    Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Amanda P. Reeves*
Amanda P. Reeves (D.C. Bar 496338)
Allyson M. Maltas (D.C. Bar 494566)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2183
Facsimile: (202) 637-2201
Email: amanda.reeves@lw.com
Email: allyson.maltas@lw.com

Alfred C. Pfeiffer, Jr. (*appearing pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: al.pfeiffer@lw.com

*Attorneys for Defendant Surescripts, LLC*