# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

      **Plaintiff,**

      **v.**

**SURESCRIPTS, LLC,**

      **Defendant.**

**Case No.: 19-cv-1080 (JDB)**

**REDACTED**

**Plaintiff Federal Trade Commission's Memorandum of Law in Support of its
Motion for Partial Summary Judgment**

**Table of Contents**

INTRODUCTION ................................................................................................................ 1

SUMMARY OF UNDISPUTED FACTS ........................................................................... 3

I.   Routing and Eligibility Differ Significantly from Other Methods of Transmitting
     Prescriptions or Eligibility Information ..................................................................... 3

II.  As a Result of Federal Laws Enacted in 2008 and 2009, Routing and Eligibility Have
     Grown Explosively ...................................................................................................... 5

III. Since 2010, Surescripts Has Been—by Far—the Largest Provider of Routing and
     Eligibility ..................................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.   Surescripts Has Possessed Monopoly Power in the Relevant Markets of Routing and
     Eligibility Since 2010 .................................................................................................. 8

     A.  The relevant product markets are routing and eligibility ...................................... 9

         1.  The undisputed facts demonstrate that customers will not switch back to
             outdated analog methods from routing or eligibility .................................... 11

         2.  The *Brown Shoe* practical indicia show that the relevant product markets are
             limited to routing and eligibility ................................................................... 14

     B.  Since at least 2010, Surescripts has possessed dominant shares in the routing and
         eligibility markets that have been protected by barriers to entry ...................... 21

II.  Even in the Broadest Possible Relevant Markets, Surescripts has Possessed Monopoly
     Power Since 2014 ....................................................................................................... 23

CONCLUSION .................................................................................................................. 25

## Table of Authorities

<u>**Cases**</u>

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
    342 F. Supp. 3d 126 (D.D.C. 2018) ................................................................................. 21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .......................................................................................................... 8

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ............................................................................................... 2, 14, 15

*Fineman v. Armstrong World Indust., Inc.*,
    980 F.2d 171 (3d Cir. 1992) ............................................................................................ 21

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 2d 34 (D.D.C. 1998) .................................................................................... 17

*FTC v. Facebook, Inc.*,
    No. CV 20-3590 (JEB), 2022 WL 103308 (D.D.C. Jan. 11, 2022) ........................... 8, 21, 23

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986) .......................................................................................................... 9

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) .............................................................................. 10, 15

*FTC v. Swedish Match*,
    131 F. Supp. 2d 151 (D.D.C. 2000) ................................................................................ 10

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) .................................................................................... 11

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ................................................................................. 11, 20

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004) ........................................................................................... 10

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    467 F. Supp. 2d 74 (D.D.C. 2006) .................................................................................... 9

*Photovest Corp. v. Fotomat Corp.*,
    606 F.2d 704 (7th Cir. 1979) .......................................................................................... 12

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
    899 F.2d 951 (10th Cir. 1990) ........................................................................................ 21

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ....................................................................................... 14

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    740 F.2d 980 (D.C. Cir. 1984) ........................................................................ 22

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) ........................................................................ 10

*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953) ................................................................................. 2, 10

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) ..................................................................... 10, 13

*United States v. Aetna Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017) ...................................................... 1, 9, 10, 15

*United States v. Archer-Daniels-Midland Co.*,
    866 F.2d 242 (8th Cir. 1988) ........................................................................ 10

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................................... 8, 9

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ....................................................................................... 8

*United States v. H & R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ................................................. 11, 12, 18, 19

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................... 1, 8, 9, 23

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................................................. 12

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ........................................................................ 12

## **Rules**

Fed. R. Civ. P. 56(a) ......................................................................................... 7

## INTRODUCTION

This antitrust case challenges Surescripts' exclusionary contracts that foreclosed competition in two prescription-related services: routing, which allows physicians and other prescribers to send a prescription to a pharmacy electronically; and eligibility, which allows prescribers to check a patient's insurance coverage and benefits electronically. It is undisputed that Surescripts has long been the dominant provider of both routing and eligibility, processing 95% or more of routing and eligibility transactions. It is undisputed that routing and eligibility have supplanted older "analog" methods (such as prescribers faxing prescriptions or making phone calls to insurers to learn about patients' benefits). And it is undisputed that, in Surescripts' economic expert's words, entry into routing and eligibility is "not easy" for "a lot of reasons," including time, money, and the need to solve the "chicken-and-egg" problem of convincing customers to use a new network without being able to guarantee that other users will join.

In sum, Surescripts possesses monopoly power: it controls dominant shares of markets protected by barriers to entry. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc). Surescripts' economist agrees that Surescripts can "be characterized as a 'monopolist' at the current time."

The only dispute is about the precise contours of the relevant antitrust product markets in which Surescripts is a monopolist and thus when exactly Surescripts obtained its monopoly power. Surescripts asserts that the product markets must encompass all means of exchanging "prescription information" and "eligibility information," including displaced and outdated analog methods. But the properly defined markets are narrower than Surescripts contends. As this Court and others have recognized, "[n]ot every competitor—not even every competitor with a functionally interchangeable product—must be included in the product market." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 23 (D.D.C. 2017) (Bates, J.). Instead, the relevant market "must be

drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953). Absence of substitution, and other "practical indicia," demonstrate that a narrow market, encompassing less than all functionally interchangeable products, is "appropriate for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

The undisputed facts show that, since at least 2010, analog methods of communicating prescription- and eligibility-related information have not been reasonable alternatives to routing and eligibility. Market participants have switched en masse to routing and eligibility, in large part due to federal legislation enacted in 2008 and 2009 that incentivized their use. Since adopting routing and eligibility, market participants have not switched back to older analog methods. This is because routing and eligibility are more efficient and many times more cost-effective than other methods. The *Brown Shoe* practical indicia also show the absence of a genuine dispute of material fact about the relevant markets. Surescripts and others recognize that routing and eligibility are distinct from analog methods, with different characteristics, different business models and service providers, and different customers who pay different prices. In the properly defined markets of routing and eligibility, Surescripts has possessed dominant positions that are protected by strong entry barriers since at least 2010.

Moreover, even if the broadest possible markets proposed by Surescripts were supported (and they are not), according to its own economic expert, Surescripts has possessed at least 60% shares in each, protected by barriers to entry, since 2014. This establishes monopoly power under the law.

Accordingly, the Court should enter summary judgment that (1) the relevant markets in this case are the U.S. markets for routing and eligibility; and (2) Surescripts has possessed

monopoly power in both markets since 2010. In the alternative, and at minimum, the Court

should enter summary judgment that Surescripts has possessed monopoly power since at least

2014, leaving for trial the questions of market definition and Surescripts' monopoly power from

2010-2013.

**SUMMARY OF UNDISPUTED FACTS**

**I.    Routing and Eligibility Differ Significantly from Other Methods of Transmitting
       Prescriptions or Eligibility Information**

Since 2001, Surescripts (or its predecessor entities) has offered two services relating to

electronically prescribing medications: routing and eligibility. Statement of Undisputed Facts

("SUF") ¶¶ 2-3. Routing involves the transmission of prescription and prescription-related

information between a prescriber's electronic health records vendor ("EHR") and a pharmacy

(either directly or indirectly via a software intermediary known as a pharmacy technology vendor

("PTV")). SUF ¶ 4. Eligibility is the process by which a prescriber, again using an EHR,

communicates a request for a patient's insurance or formulary benefit information to the

pharmacy benefit manager ("PBM") responsible for the patient, which then responds with that

information. SUF ¶ 5. While routing and eligibility collectively can be referred to as "e-

prescribing," they are distinct transactions that involve different customers and different

information. SUF ¶¶ 6, 11.

Surescripts' routing and eligibility services both can be characterized as two-sided

platforms, enabling transactions between EHRs and either pharmacies or PTVs (for routing) or

between EHRs and PBMs (for eligibility). SUF ¶ 7. The different sides of the platforms pay

different prices. For routing, Surescripts charges a zero or often negative price—termed a

"loyalty incentive"—to the EHR that originates the transaction and charges a positive price to the

pharmacy that receives the electronic prescription. SUF ¶¶ 50-51. Similarly, for eligibility,

3

Surescripts often pays the EHR and charges the PBM. SUF ¶¶ 71-72. In addition to platforms like Surescripts, routing and eligibility can occur via "direct connections" between an EHR and a pharmacy/PTV or a PBM. SUF ¶ 8.

Before routing, prescriptions were transmitted predominantly from prescriber to patient to pharmacy on paper or from prescriber to pharmacy by fax or phone. SUF ¶ 9. Before eligibility, transmitting and receiving eligibility information, to the extent it occurred at all, involved an ad hoc mix of prescribers making phone calls to PBMs or consulting hard-copy manuals provided by PBMs. SUF ¶ 10. Routing and eligibility improved on these analog predecessors. SUF ¶ 41. Routing is safer than analog prescribing, for many reasons, including because it avoids errors that can arise from, for example, illegible handwriting. SUF ¶¶ 34-35. Routing is more efficient and requires less interruption to a pharmacy's workflow. SUF ¶¶ 36-37. And routing avoids the possibility a patient will lose a prescription and minimizes delay between the patient receiving, and a pharmacy filling, a prescription. SUF ¶¶ 38, 40. In turn, routing results in greater prescription adherence, i.e., the likelihood that a patient will pick up a prescription at a pharmacy after leaving the prescriber's office. SUF ¶ 39. Eligibility also helps avoid adverse health outcomes for patients by providing more effective communication of a patient's insurance coverage and generic alternatives, which reduces the possibility that a patient does not pick up their prescription due to a surprising high price. SUF ¶ 60. Eligibility also improves efficiency throughout the healthcare system. *Id.*

Routing and eligibility also entail significant cost savings. According to one large pharmacy, each routing transaction saved it $1.05 compared to "analog" methods like paper and fax. SUF ¶ 43. Surescripts similarly concluded that each routing transaction saves that pharmacy $0.89. *Id.* These savings represent significant portions (6% to 35%) of the $3 to $15 margin that

pharmacies collected on prescriptions. *See* SUF ¶ 44. For eligibility, Surescripts estimated that insurers' spending on drugs could be reduced by 8% to 15%. SUF ¶ 66. Surescripts also estimated that eligibility provides several times the return on investment per eligibility transaction for PBMs. SUF ¶ 67.

## II.   As a Result of Federal Laws Enacted in 2008 and 2009, Routing and Eligibility Have Grown Explosively

Around the time Surescripts was created from the merger of two predecessor entities, SUF ¶ 2, Congress passed two laws to spur physicians and other healthcare providers to adopt electronic health records generally and routing and eligibility specifically: the Medicare Improvements for Patients and Providers Act ("MIPPA") of 2008 and the Health Information Technology for Economic and Clinical Health Act ("HITECH") of 2009. SUF ¶¶ 12, 16. Under MIPPA, from 2009 to 2013, the Electronic Prescribing Incentive Program provided incentive payments to prescribers who met certain criteria regarding transmitting prescriptions electronically and using e-prescribing technology capable of eligibility checks. SUF ¶¶ 13-14. Under HITECH, beginning in 2011, prescribers could receive tens of thousands of dollars in federal incentive payments by engaging in the "meaningful use" of EHRs—including using EHRs for routing. SUF ¶¶ 18-19. Receiving these incentives further required prescribers to use EHRs capable of conducting formulary checks and, later, to conduct such checks through their EHR. SUF ¶ 19. MIPPA and HITECH also penalized prescribers that did not satisfy their requirements. SUF ¶¶ 14, 18. Together, MIPPA and HITECH provided nearly $40 billion in incentives to prescribers. SUF ¶¶ 15, 20.

MIPPA and HITECH were extremely successful. According to a paper published by then-Surescripts employees, "the MIPPA e-prescribing incentive program materially and favorably, positively impacted the physician adoption and use of e-prescribing." SUF ¶¶ 22-23.

5

Surescripts' former CEO explained that HITECH's meaningful use requirements "totally helped e-prescribing happen." SUF ¶ 25. In the words of Dr. Thomas McCarthy, the economic expert Surescripts retained in this matter, "[t]here is no dispute that laws like MIPPA, HITECH, and others helped to fuel growth in" routing and eligibility." SUF ¶ 26. Moreover, once a prescriber starts using routing or eligibility, their adoption is "sticky," that is, prescribers do not revert to older methods. SUF ¶ 32. Surescripts' former CEO testified that there was no "realistic scenario" in which prescribers would revert from routing to paper, fax, or phone prescriptions. SUF ¶ 30. Dr. McCarthy does not dispute that routing and eligibility market participants are unlikely to revert to analog methods. SUF ¶ 33.

Indeed, routing and eligibility have become virtually ubiquitous since MIPPA and HITECH. Today, according to Dr. McCarthy, nearly every prescription in the United States is transmitted via a Surescripts routing transaction. SUF ¶ 27. Likewise, nearly every prescription—whether sent using routing or a different method—is accompanied by an eligibility transaction. SUF ¶ 28. This explosive growth benefitted Surescripts in particular. Prescribers seeking incentives needed EHRs with which they could engage in routing and eligibility, and because Surescripts has long been the only meaningful provider of either service (as described below), MIPPA and HITECH "really drove the market . . . to become customers of Surescripts." SUF ¶ 25.

## III.   Since 2010, Surescripts Has Been—by Far—the Largest Provider of Routing and Eligibility

While the adoption of routing and eligibility has increased over time, Surescripts' position in routing and eligibility has been consistently dominant. By 2010, Surescripts connected to all the major EHRs, pharmacies, and PBMs needed to offer routing and eligibility. SUF ¶¶ 100-02, 113-15. Since then, Surescripts has continuously processed 95% or more of all

routing and eligibility transactions. SUF ¶¶ 103-05, 116-17. Dr. McCarthy does not dispute that Surescripts' share of both routing and eligibility transactions has at all relevant times been 95% or greater. SUF ¶¶ 103, 116.

There is no other significant provider of routing or eligibility. Surescripts' main and much smaller rival in routing, a company called Emdeon, has handled ███████ of electronic routing volume from 2009 to 2020. SUF ¶¶ 106-08. Similarly, for eligibility, alternative providers have always processed ███████ of eligibility volume. SUF ¶¶ 116-18. EHRs, pharmacies, and PBMs have all described Surescripts as a "must-have" routing and eligibility vendor, for which there are no viable alternatives. SUF ¶¶ 109-12, 119-21.

Barriers to entry contributed to Surescripts' longstanding dominance in routing and eligibility. As Dr. McCarthy put it, entry is "not easy" for "a lot of reasons." SUF ¶ 128. Any routing or eligibility network must solve a "chicken and egg" problem: users on each side of a network will not invest in the network until they are confident that there will be enough users on the other side. SUF ¶ 129. Routing and eligibility networks must comply with federal laws and regulations as well as technical standards. SUF ¶¶ 130-31. Building a routing or eligibility network requires a substantial investment, ███████ according to one third-party, and takes years. SUF ¶¶ 133-34. And any entrant must face off against an incumbent—Surescripts—with a strong first-mover advantage and established customer base, which would require convincing customers to pay the costs associated with connecting to the new network instead of, or in addition to, Surescripts. SUF ¶ 132.

## ARGUMENT

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if "the evidence is such that a reasonable

[factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it "might affect the outcome . . . under the governing law." *Id.* A mere "scintilla" of evidence for the non-moving party does not preclude summary judgment. *Id.* at 252.

One of the two elements of a monopolization offense is possessing monopoly power in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Here, the undisputed facts show that Surescripts has possessed monopoly power in the relevant markets of routing and eligibility since at least 2010. Surescripts appears to dispute these relevant markets, arguing that they must be defined broadly to include any analog or functional alternative to routing and eligibility, such as transmitting prescriptions by paper or fax, or checking eligibility information by consulting hard-copy books or calling PBMs. Those arguments misconstrue both the law and the facts. But even accepting Surescripts' arguments, Surescripts own economic expert demonstrates that Surescripts has been a monopolist since at least 2014. At minimum, therefore, the Court should enter partial summary judgment on monopoly power beginning in 2014, and defer until trial the questions concerning the appropriate relevant product market definitions and whether Surescripts has been a monopolist since 2010.

## I.    Surescripts Has Possessed Monopoly Power in the Relevant Markets of Routing and Eligibility Since 2010

Monopoly power is "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Monopoly power may be shown directly through evidence of higher prices, reduced quality, or decreased innovation. *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) ("monopoly power is clear" from profitably pricing above the competitive level); *FTC v. Facebook, Inc.*, No. CV 20-3590 (JEB), 2022 WL 103308, at *13 (D.D.C. Jan. 11, 2022) (effects of monopoly can include

"a decrease in service quality" or a "lack of innovation"). Alternatively, monopoly power may be proven indirectly "from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51. The FTC focuses here on indirect proof.

The undisputed facts show that there have been no reasonable substitutes for either routing or eligibility since 2010, making each a relevant product market for assessing the possible effects of Surescripts' conduct. The undisputed facts also show that Surescripts has had a dominant share of both markets, protected by barriers to entry, since at least 2010.

**A.      The relevant product markets are routing and eligibility**

Under the indirect approach to monopoly power, courts define relevant markets along two dimensions: product and geographic area. *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 19 (D.D.C. 2017) (Bates, J.).[1]

Market definition aids in "determin[ing] whether an arrangement has the potential for genuine adverse effects on competition," *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986), by "identify[ing] the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output," *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81 (D.D.C. 2006). Accordingly, market definition involves more than identifying theoretical functional substitutes that could be used for the same purpose. As this Court has explained, "[n]ot every competitor—not even every competitor with a functionally interchangeable product—must be included in the product market." *Aetna*, 240 F. Supp. 3d at 23. Rather, a relevant product market includes only those products that are reasonably interchangeable, *du Pont*, 351 U.S. at 395; *Microsoft*, 253 F.3d at 51-52, "exclud[ing]

---

[1] The FTC and Surescripts agree that the relevant geographic area here is the United States. SUF ¶¶ 98-99.

any other product to which, within reasonable variations in price, only a limited number of buyers will turn," *Times-Picayune Pub. Co. v. United States,* 345 U.S. 594, 612 n.31 (1953).

In defining relevant markets, courts in this district routinely exclude functionally interchangeable products that are not reasonable substitutes. For instance, in *Aetna*, this Court acknowledged that Medicare Advantage and Original Medicare insurance plans were, "at least to some extent, functionally interchangeable." 240 F. Supp. 3d at 23. Nonetheless, it found the market limited to Medicare Advantage because substitution between Advantage and Original plans was "not nearly as substantial as defendants . . . suggest[ed]." *Id.* at 24. Likewise, in *FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000), the court "found loose leaf and moist snuff [tobacco] to be functionally interchangeable," but limited the product market to loose-leaf tobacco because "substitution to moist snuff [was] unlikely." *Id.* at 158-59. And in *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997), despite "perfect 'functional interchangeability'" between the office supplies sold by superstores and those sold by other retailers, the court defined a product market limited to the sale of office supplies through superstores, because "superstore customers do not turn to a non-superstore alternative." *Id.* at 1074, 1080.[2]

In this case, the undisputed facts show that analog methods of prescribing and receiving eligibility information are not reasonable substitutes for electronic routing or eligibility. The

---

[2] *See also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (relevant market limited to generic warfarin sodium, excluding the functionally equivalent branded version); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 997 (11th Cir. 1993) (branded anchors and generic anchors not in same product market even though they are identical); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246, 248 (8th Cir. 1988) (functionally interchangeable sweeteners—sugar and high fructose corn syrup—were not in same product market); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1064 (3d Cir. 1978) (relevant market limited to cephalosporin antibiotics despite "a certain degree of interchangeability among all antibiotics").

"practical indicia" the Supreme Court identified in *Brown Shoe* further show that routing and eligibility are distinct relevant product markets.

### 1. The undisputed facts demonstrate that customers will not switch back to outdated analog methods from routing or eligibility

"Courts have often found that sufficiently innovative retailers can constitute a distinct product market even when they take customers from existing retailers." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J.).[3] As Judge Tatel explained in *Whole Foods*:

> [W]hen the automobile was first invented, competing auto manufacturers obviously took customers primarily from companies selling horses and buggies, not from other auto manufacturers, but that hardly shows that cars and horse-drawn carriages should be treated as the same product market.

*Id.* Thus, the D.C. Circuit found that, even though a Whole Foods may take business from conventional grocery stores, innovative "premium, natural, and organic supermarkets" like Whole Foods were in a distinct product market because they served "a core group of particularly dedicated" customers who would not switch back to conventional supermarkets. *Id.* at 1039-40 (Brown, J.); *see also id.* at 1048 (Tatel, J.) (premium, natural, and organic supermarkets "satisf[ied] a previously-unsatisfied consumer demand" (internal quotation marks omitted)).

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) also illustrates this principle. There, the court considered whether "digital-do-it-yourself" tax preparation software was in the same market as all functional alternatives—including filling out tax returns manually with pen and paper. Finding it "beyond debate" that "all methods of tax preparation [we]re, to some degree, in competition," the court nevertheless concluded that digital-do-it-yourself

---

[3] Because there was no controlling opinion in *Whole Foods*, we include the concurring judge's name with any citation. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 31 (D.D.C. 2015).

software was in a distinct product market. *Id.* at 54. As the court explained, substitution from pen-and-paper to digital-do-it-yourself "would likely be limited and marginal," because pen-and-paper "was not a 'product' at all" and its "functional experience" was "meaningfully different," requiring "different tools, effort, resources, and time investment." *Id.* at 57-58.[4]

The undisputed facts here fit this same pattern. Surescripts' digital routing and eligibility were innovative ways to transmit prescription and eligibility information. When initially introduced, these services grew by shifting prescribers primarily from older, analog methods such as submitting prescriptions using fax, paper, or phone. This switching, however, occurred only in one direction. As providers have adopted e-prescribing, they have not switched back to outdated forms of prescribing or obtaining eligibility information. SUF ¶¶ 30-33. Indeed, Surescripts' employees published an academic study documenting how switching from analog methods to routing and eligibility is "sticky," that is, prescribers are unlikely to revert to older analog methods, and Surescripts' executives and its economic expert both concede as much. *Id.*

There are sound economic reasons for this observable trend. First, by 2010, multiple federal programs substantially incentivized EHRs to offer and prescribers to use routing and eligibility. MIPPA initially applied a "carrot and stick" regime by providing incentive payments to prescribers who met certain criteria regarding routing and eligibility and imposing financial penalties on those who did not. SUF ¶¶ 12-14. HITECH established "meaningful use" criteria requiring routing to receive incentive payments and mandated that prescribers could not qualify

---

[4] *See also United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 338 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) (limiting the relevant product market to credit cards, even though "cash and checks compete with [credit] cards" and that "growth in payments via cards t[ook] share from cash and checks in some instances"); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712-14 (7th Cir. 1979) (affirming a distinct market of drive-up photo-processing companies even though such companies took customers from drugstores, camera stores, and supermarkets).

for these incentive payments without a certified EHR technology capable of handling formulary

checks (for example, using eligibility). SUF ¶¶ 16-20. HITECH likewise threatened financial

penalties to those prescribers that did not meet the meaningful use criteria. SUF ¶ 18. These

financial programs motivated prescribers. SUF ¶¶ 21-23. In turn, as Surescripts recognized,

MIPPA and HITECH "really drove the [EHR] market . . . to become customers of Surescripts"

services, because EHRs needed to enable their prescriber-customers to secure incentive

payments and avoid penalties. SUF ¶¶ 24-25. These government programs also ensured that

EHRs would stick with routing and eligibility once adopted; abandonment would be █

███████████████ SUF ¶¶ 24, 30-33. As Dr. McCarthy put it, there is "no dispute that laws

like MIPPA, HITECH, and others helped to fuel growth in" routing and eligibility. SUF ¶ 26.

Second, as Surescripts admits, routing offered significant cost savings for pharmacies

over analog prescribing methods. SUF ¶ 42. Studies by a large pharmacy and Surescripts in 2012

concluded that each electronically-routed prescription saves the pharmacy between $0.89 and

$1.05 over analog methods. SUF ¶ 43. These cost savings are at least ████████████████

the price Surescripts' economic expert calculates pharmacies pay Surescripts for electronic

routing ███████████.[5] SUF ¶ 45. Given these significant savings, pharmacies would have

no financial incentive to switch back to analog methods of prescribing, even in the face of

substantial e-prescribing price increases. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d

986, 997 (11th Cir. 1993) (finding that "the large spread in prices" between generic and branded

anchors "tends to suggest that the shift [between them in response to a price increase] would not

---

[5] Although the FTC disagrees with these exact prices, that is not material here, as the cost
savings from using routing are many multiples of any measure of routing price.

have been great.").[6] Far from disputing this conclusion, Surescripts' economic expert admitted in his deposition that he offers no opinions about how large a price increase in e-prescribing would cause a significant number of customers to switch to analog prescribing methods. SUF ¶ 49.

Third, eligibility likewise offered substantial cost savings for PBMs. Eligibility was a new service for which there were no reasonable alternatives. SUF ¶¶ 60-64. Prior to the development of eligibility, the primary way for prescribers to obtain eligibility information (in other words, whether a prescribed drug would be covered by the patient's insurance) was by calling or manually reviewing formulary documents prepared by PBMs; this was done infrequently, if at all. SUF ¶ 10. The eligibility transaction, which is a more reliable and comprehensive method of providing eligibility information to prescribers, has been important to PBMs because it saves them and insurers money by encouraging prescribers to use cheaper generic drugs. SUF ¶¶ 65-67. For example, Surescripts has found that eligibility provides substantial value to PBMs, delivering several times the return on investment per transaction. SUF ¶ 67. Given the lack of alternatives, PBMs would be unlikely to stop using eligibility, thus foregoing the substantial cost savings.

## 2. The *Brown Shoe* practical indicia show that the relevant product markets are limited to routing and eligibility

In *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), the Supreme Court identified "practical indicia" to determine, "for antitrust purposes," whether the relevant market may be narrower than all functionally interchangeable products. *Brown Shoe*, 370 U.S. at 325; *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). These

---

[6] The FTC's economic expert, Dr. David Evans, has concluded that, given these significant cost savings and based on his own economic analysis, it is implausible that a pharmacy would substitute analog methods if faced with a small but significant non-transitory increase in price ("SSNIP") for routing. Ex. 4, Evans Rep. ¶¶ 117-118, 131-133.

practical indicia include "industry or public recognition of [a] submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.[7] In applying these indicia, courts pay particular attention to a defendant's ordinary-course documents and other evidence from industry participants. *Aetna*, 240 F. Supp. 3d at 21. Here, the *Brown Shoe* indicia and the undisputed facts show that electronic routing and eligibility are distinct antitrust product markets.

<ol type="a">
<li>**The *Brown Shoe* practical indicia show that routing is a relevant market**</li>
</ol>

*Industry recognition*. Surescripts has consistently recognized routing as a distinct market from analog prescribing methods. SUF ¶¶ 86, 88-90, 92, 94. For example, a 2009 "current market and competitive dynamics" presentation to Surescripts' Board of Directors discussed Surescripts' market share in "e-prescribing scripts" with no mention of paper, fax, or phone, and identified "serious competition emerging" from e-prescribing companies—like Emdeon, Allscripts, and RelayHealth—but made no reference to competition from analog prescribing methods. SUF ¶¶ 86, 88. The same year, Surescripts' Chief Strategy Officer identified "competitive pressure" as coming only from other companies that may be "trying to create a 'network.'" SUF ¶ 89. Put another way, even when routing accounted for around 10% of all prescriptions, Surescripts saw its competitors as other e-prescribing platforms—not analog methods of prescribing. *See* SUF ¶ 27. Surescripts' view of the competitive landscape has remained narrowly focused on routing. In 2012, a Surescripts "Competition Analysis" described

---

[7] *Brown Shoe* referred to "submarkets," but "[w]hatever term is used—market, submarket, relevant product market—the analysis is the same." *Staples*, 970 F. Supp. 1066 at 1080 n.11. Moreover, "[s]ince [*Brown Shoe*] described these factors as 'practical indicia' rather than requirements, subsequent cases have found that submarkets can exist even if only some of these factors are present." *Id.* at 1075.

competition only among routing providers, without mentioning analog methods. SUF ¶ 90. In 2015, an analysis by Surescripts' head of corporate strategy showed that Surescripts viewed the competitive landscape for routing as consisting only of providers of electronic prescribing. SUF ¶ 92. And in 2017, Surescripts' assessment of competitive threats remained focused on routing, not analog methods. SUF ¶ 94.

Other market participants focused on the same routing market. In a 2015 presentation, Emdeon, Surescripts' only notable competitor, described the competitive landscape of an "ePrescribing Market," without any mention of analog prescribing methods. SUF ¶ 93. Likewise, in a 2018 retrospective of its unsuccessful efforts to compete in routing, Emdeon provided the "market overview / competitive landscape" of the "e-prescribing market" and noted Surescripts' dominant market position but did not identify any other competitors or analog alternatives to routing. SUF ¶ 95. Surescripts' economic expert cites no contemporaneous business documents—from Surescripts or any other party—identifying analog prescribing methods as competitive constraints on electronic routing. SUF ¶ 96.

*Distinct pricing.* Surescripts' pricing of routing is distinct from the pricing of analog prescriptions. Surescripts charges a per transaction routing price to pharmacies and PTVs. SUF ¶ 50. And it often pays loyalty incentives to EHRs for each routing transaction. SUF ¶ 51. By comparison, there is no analogous 'price' associated with analog prescribing methods. SUF ¶ 52. To be sure, when a physician writes a prescription or a pharmacist receives a prescription from a patient, there is some cost associated with that process, but there is no direct price paid by the prescriber or pharmacy because there is no vendor providing this service. *Id*.

*Sensitivity to price changes.* The use of routing shows little sensitivity to price changes because routing offers significant cost savings over analog prescribing methods. There is no

dispute—in fact Surescripts admitted in its answer to the FTC's complaint—that electronic routing is a lower cost method of sending prescriptions than paper, fax, or phone. SUF ¶ 42. The $0.89 and $1.05 per transaction savings for routing over analog methods is significant in relation to pharmacy gross margins of $3 to $15 per prescription filled. SUF ¶¶ 43-44. Because routing prices are small in comparison to these savings, pharmacies would not stop routing in favor of analog prescribing even in the face of substantial price increases. *See supra* pp. 13-14. EHRs are likewise unlikely to forego routing due to small price changes: EHRs that failed to provide routing services would not have been attractive alternatives to prescribers seeking to obtain incentives and avoid penalties under MIPPA and HITECH. *See supra* p. 13.

*Peculiar characteristics.* It is "undisputed" that routing is a "measurable improvement" over analog methods. SUF ¶ 41. Routing is safer for patients. SUF ¶¶ 34-35. It is also more efficient, allowing a prescription to be dispensed with fewer resources while eliminating the possibility that a patient will lose or damage a written prescription or take time to deliver it to the pharmacy. SUF ¶¶ 36-40. These relative efficiency gains as compared to analog methods support a narrow product market. *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 47 (D.D.C. 1998) (finding that drug wholesaling was a distinct market in part because it "provid[ed] customers with an efficient way to obtain prescription drugs").

*Specialized vendors.* Routing also has unique vendors—Surescripts and its competitors (namely, Emdeon). SUF ¶ 57-58. These companies do not transmit prescriptions that originate through paper, phone, or fax.[8] There is no evidence in the record of vendors that sell the process

---

[8] In some cases where electronic delivery of prescription fails due to technical issues, Surescripts can send the prescription to the pharmacy by fax as a backup. SUF ¶ 54 n.2. But such a prescription would originate at the EHR in electronic form and so would not be a true analog prescription.

of sending analog prescriptions. *See* SUF ¶ 59. *See also H & R Block*, 833 F. Supp. 2d at 57 (pen-and-paper tax preparation was "not a product at all" and not in the relevant market).

*Distinct production facilities.* Surescripts and other e-prescribing companies use distinct "production facilities" for routing: electronic networks, including two-sided transaction platforms or "direct connections," involving electronic connections between specific EHRs and pharmacies/PTVs. *See* SUF ¶¶ 7-8. These networks are purpose-built for the routing transaction; paper, phone, or fax prescriptions are transmitted by other means.

*Distinct customers*. An electronic routing platform connects two different customer groups—EHRs and pharmacies/PTVs—to provide the routing transaction. SUF ¶¶ 4, 53, 55. EHRs enable prescribers to transmit electronic prescriptions. SUF ¶ 53. PTVs are technology vendors that provide software pharmacies use to receive electronic prescriptions. SUF ¶ 55. Neither EHRs nor PTVs are involved in a prescription that is delivered by analog methods. *See* SUF ¶¶ 54, 56.

### b) The Brown Shoe practical indicia show that eligibility is a relevant market

*Industry Recognition.* Surescripts' economic expert cites no contemporaneous business documents identifying analog methods as competitive constraints on eligibility. SUF ¶ 97. To the contrary, undisputed evidence supports a relevant market limited to eligibility. For example, a 2009 presentation to the Surescripts' Board of Directors discussed Surescripts' "market share" in eligibility transactions with no mention of other sources of eligibility information. SUF ¶ 87. This presentation went on to discuss competition from e-prescribing companies such as Emdeon, Allscripts, and RelayHealth, with no mention of competition from analog sources. SUF ¶ 88. There was no discussion of analog methods for obtaining eligibility information in forming a pricing strategy. *Id*. Earlier that year, Surescripts' Chief Strategy Officer had identified

"significant competitive pressure" as coming from other companies that may be "trying to create a 'network,'" but not from analog methods. SUF ¶ 89. Later Surescripts documents—including a 2015 "Competition Analysis" and a 2017 assessment of "competitive threats"—likewise describe the competitive landscape for eligibility without mentioning competition from analog methods. SUF ¶¶ 92, 94.

Emdeon's documents are in accord. A 2015 Emdeon overview of "ePrescribing Market Conditions" discusses eligibility with no mention of analog delivery of eligibility information. SUF ¶ 93. Similarly, a 2014 Emdeon presentation notes that Surescripts "currently 'owns' the market for connectivity between EHR[s] and pharmacy/PBMs." SUF ¶ 91. There is no mention of competition from analog sources to the eligibility market. *Id.* In fact, this presentation highlights that some prescribers cannot access all patient eligibility information because not all PBMs are connected to Surescripts—illustrating a lack of alternatives for accessing this information. *Id.*

*Distinct prices.* Like routing, eligibility has a pay side and a paid side of the market. PBMs pay a per transaction price for eligibility, while EHRs may receive loyalty incentives on a per transaction basis. SUF ¶¶ 71-72. By contrast, there is no analogous "price" charged to PBMs or prescribers for analog formulary information. That is because the costs associated with analog methods are related to the process, such as the cost associated with the time it takes for a prescriber to review analog formulary data or the cost to a PBM in publishing formulary manuals or other sources of eligibility information. SUF ¶ 73. Thus, eligibility has distinct pricing from analog methods, which are not truly products at all. *See H & R Block*, 833 F. Supp. 2d at 57.

*Sensitivity to price changes.* EHRs regard eligibility as a must-have service, without which the EHR's services would be ███████████████ and "would not be . . . competitive."

SUF ¶¶ 24, 63. As there have been no reasonable alternatives to eligibility for obtaining patient

eligibility information, EHRs would not be sensitive to changes in price. *See supra* pp. 13-14.

PBMs likewise have been dependent on eligibility. Eligibility has saved PBMs significant sums

of money by encouraging prescribers to use cheaper generic drugs, *see supra* p. 14, and there has

been no reliable alternative to eligibility for getting formulary information to prescribers, SUF ¶

64. Surescripts' economic expert could not quantify the use of any alternate methods of

obtaining eligibility information. SUF ¶ 61. The substantial cost savings and lack of alternatives

confirm that EHR and PBM customers would not be sensitive to changes in price.

*Peculiar characteristics.* While it is theoretically possible to get eligibility information

delivered by analog methods, it is undisputed that eligibility is a "measurable improvement."

SUF ¶ 41. As Surescripts' economic expert opines, before eligibility, "healthcare providers had

less information when preparing prescriptions, which led to higher costs for patients, less

operating efficiency throughout the healthcare system, and more adverse patient events." SUF ¶

60. Eligibility was an innovative product that met a previously underserved need. *See, e.g.*,

*Whole Foods*, 548 F.3d 1028 at 1048-49 (innovative "premium, natural, and organic"

supermarkets were in their own relevant market) (Tatel, J.). Eligibility also differs materially

from other electronic transactions between EHRs and PBMs. SUF ¶¶ 79-84.

*Specialized vendors*. Surescripts sells the eligibility transaction but does not offer analog

methods of receiving eligibility information. SUF ¶¶ 76, 78. There is no evidence in the record of

companies selling the previous "ad hoc" methods of obtaining eligibility information. SUF ¶ 78.

*Unique production facilities*. Like routing, but unlike analog methods, eligibility requires

electronic networks involving, or "direct connections" between, EHRs and PBMs in order to

facilitate the exchange of eligibility information. *See* SUF ¶¶ 7-8. By comparison, the analog

methods of obtaining eligibility information do not involve two-sided platforms or an electronic network, but rather simple phone calls or paper books.

*Distinct Customers*. EHRs facilitate the eligibility transaction for prescribers. SUF ¶ 74. They do not participate in the publication of formulary manuals by PBMs or the "ad hoc" review of such information that prescribers may have engaged in before eligibility. *See* SUF ¶ 75. As such, EHRs are not involved with the exchange of eligibility information through analog methods.

*       *       *

In sum, the undisputed facts show that there is little, if any, substitution of analog or any other alternatives for routing or eligibility. And the *Brown Shoe* practical indicia show that the relevant markets are limited to routing and eligibility.

### B.   Since at least 2010, Surescripts has possessed dominant shares in the routing and eligibility markets that have been protected by barriers to entry

Under the legally correct definition of the relevant markets, Surescripts has dominant shares of both routing and eligibility. A 60% market share establishes dominance. *See, e.g.*, *FTC v. Facebook, Inc.*, No. CV 20-3590 (JEB), 2022 WL 103308, at *4 (D.D.C. Jan. 11, 2022) (citing *FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020)); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 140 (D.D.C. 2018) (54% plausibly alleged dominance); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 969 & n.26 (10th Cir. 1990) (47% to 62% sufficed). Other indicators of dominance include the durability of the defendant's share, competitors' shares, and customers' ability to substitute comparable services. *Reazin*, 899 F.2d at 967; *Fineman v. Armstrong World Indust., Inc.*, 980 F.2d 171, 202 (3d Cir. 1992).

The undisputed facts here readily show Surescripts has possessed a dominant position in the routing market since at least 2010. Surescripts has connected to all the major pharmacies and

21

EHRs required to offer a successful routing network. SUF ¶¶ 100-02. Surescripts' internal documents have continuously touted a routing market share of 95% or greater. SUF ¶ 104. By contrast, Surescripts' most significant rival, Emdeon, has consistently handled ██████ of routing transactions. SUF ¶¶ 106-08. Pharmacies and EHRs view Surescripts as a "must have" provider of routing. SUF ¶¶ 110-12.

Much as in routing, the undisputed facts establish Surescripts' dominance in eligibility. Since at least 2010, Surescripts has had connections to all the major PBMs and EHRs necessary to offer a successful eligibility network. SUF ¶¶ 113-15. Surescripts' internal documents have consistently touted an eligibility market share of 95% or more. SUF ¶¶ 116-17. The only other providers of eligibility are "small" and process "little volume." SUF ¶ 118. And PBMs and EHRs have emphasized that Surescripts is a "must have" for eligibility. SUF ¶¶ 120-21.

Surescripts' dominant positions in the routing and eligibility markets are protected by significant barriers to entry. A barrier to entry is "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on . . . the dominant firm." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 1001 (D.C. Cir. 1984). As Surescripts' economic expert put it, entry into these markets is "not easy" for "a lot of reasons." SUF ¶ 128. One significant barrier is a "chicken-and-egg" adoption problem: users on each side of a routing or eligibility network will not invest in the network until they are confident that there will be enough users on the other side. SUF ¶ 129. In *Microsoft*, the en banc D.C. Circuit affirmed that an analogous "chicken-and-egg" problem— consumers preferred an operating system with many applications already written while developers preferred to write applications for operating systems with a substantial customer

base—was an entry barrier that "protect[ed] a dominant operating system" and "g[ave] Microsoft power to stave off even superior new rivals." *Microsoft*, 253 F.3d at 54-56.

In addition, federal and state laws, as well as technical standards, regulate the transmission of prescription and eligibility information. SUF ¶¶ 130-31; *Microsoft*, 253 F.3d at 51 (entry barriers include "regulatory requirements"). Entry requires confronting Surescripts, a dominant rival with a "strong first-mover advantage" that already has signed up nearly all possible customers. SUF ¶ 132; *Microsoft*, 253 F.3d at 56 (treating as an entry barrier the need to "confront a dominant rival" with a "massive . . . installed base"). As such, entrants must convince customers to pay the costs associated with using their network instead of, or in addition to, Surescripts. SUF ¶ 132; *Facebook*, 2022 WL 103308 at *9 ("switching costs are commonly recognized" as entry barriers). In total, entry into routing or eligibility requires "substantial investment," as much as ██████, over several years. SUF ¶¶ 133-34.

*     *     *

In sum, Surescripts has had well over a 60% share in each of the routing and eligibility markets for over a decade, and these positions are insulated from competition by barriers to entry. Because there is no genuine dispute of material fact over the definition of those relevant markets, Surescripts' shares in those markets, and the barriers to entry in those markets, Surescripts has possessed monopoly power in routing and eligibility since 2010 as a matter of law.

## II.   Even in the Broadest Possible Relevant Markets, Surescripts has Possessed Monopoly Power Since 2014

Surescripts' economic expert, Dr. McCarthy, asserts that the relevant markets should include all possible means of transmitting prescriptions and checking eligibility information. These expansive proposed markets are flawed as a matter of law and undisputed fact. But even if

23

Dr. McCarthy's opinions could create a genuine dispute of material fact regarding market definition (which they cannot), it would remain undisputed that Surescripts has possessed monopoly power since at least 2014.

First, Dr. McCarthy concedes that "Surescripts could be characterized as a 'monopolist' at the current time in the sense that it accounts for the vast majority of U.S. prescription routing and eligibility checks today." SUF ¶ 105.

Second, the undisputed facts show that, since at least 2014, Surescripts has held a dominant share of transmitting prescription information, defined overly broadly to include electronic routing plus analog methods of transmitting prescriptions. Dr. McCarthy affirmatively calculates that Surescripts has had at least a 62.4% share since 2014, and 100% share as of 2020. SUF ¶¶ 122-23.

Third, the undisputed facts show that, since at least 2014, Surescripts has held a dominant share of checking eligibility information, defined overly broadly to include electronic eligibility and analog methods. Dr. McCarthy's two "proxies" for eligibility's adoption show eligibility has been used with essentially every routing transaction since 2010 and with 60% or more of all prescriptions since 2014. SUF ¶¶ 124-26. Dr. McCarthy acknowledges that Surescripts has been effectively the only eligibility provider, SUF ¶ 118, demonstrating that Surescripts' share of his broader "eligibility information" market has been 60% or more since at least 2014.

Fourth, there are barriers to entering the broad markets Surescripts proposes. Analog alternatives to routing and eligibility are not "products" at all, but rather a process, *see* SUF ¶¶ 52, 73, meaning the only entrants into Surescripts' proposed markets will be firms seeking to offer routing or eligibility. As discussed above, there are barriers to entering routing or eligibility, including the "chicken-and-egg" problem, compliance with legal and technical

standards, facing a dominant and established rival, and other "substantial investment[s]." *See supra* pp. 22-23.

At minimum, therefore, the Court should enter summary judgment that Surescripts has possessed monopoly power since 2014, even if it does not decide the relevant markets now.

## CONCLUSION

For the foregoing reasons, the FTC respectfully requests that this Court grant the FTC's Motion and enter summary judgment that (1) the relevant markets in this case are the U.S. markets for routing and eligibility; and (2) Surescripts has possessed monopoly power in both routing and eligibility since at least 2010. In the alternative, and at minimum, the Court should enter summary judgment that Surescripts has possessed monopoly power since at least 2014, deferring for trial the issues of market definition and Surescripts' monopoly power from 2010-2013.

Dated: March 28, 2022                    Respectfully submitted,

                                         */s/ Tanya O'Neil*
                                         Tanya O'Neil (D.C. Bar 1021933)
                                         Markus H. Meier (D.C. Bar 459715)
                                         Bradley S. Albert
                                         Nicholas Leefer (D.C. Bar 1049160)
                                         Timothy Grayson (D.C. Bar 1028502)
                                         Federal Trade Commission
                                         600 Pennsylvania Avenue, NW
                                         Washington, DC 20580
                                         Tel: 202-326-2053

                                         *Counsel for Plaintiff Federal Trade
                                         Commission*