# Exhibit 112
## (REDACTED)

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4  FEDERAL TRADE COMMISSION,   ) Civil Action
                         )

5        Plaintiff,    ) No. 1:19-cv-01080
                         )

6  vs.                   )
                         )

7  SURESCRIPTS, LLC,       )
                         )

8        Defendant.    ) Pages 1 - 292
  _____  )

9

10

11

12    VIDEOTAPED DEPOSITION OF GLENN CAMERON DEEMER

13           (Via Videoconference)

14            April 27, 2021

15

16

17

18

19

20

21  Reported by:

22  Lisa O'Sullivan

23  Az CR No. 50952

24  RMR, CRR

25  Job No. 192569

1                    G. C. DEEMER

2    of that would prevent you from testifying completely

3    and truthfully today?

4         A.    No.

5         Q.    Where do you work, Mr. Deemer?

6         A.    I work at DrFirst.

7         Q.    And what is DrFirst?

8         A.    DrFirst is a healthcare information

9    technology company that creates technology platforms

10   that are typically embedded inside medical record

11   systems, although we also market a number of

12   standalone applications.

13        Q.    So you just said "medical record."  Is that

14   sometimes referred to as an electronic medical record

15   or electronic health record?

16        A.    Yes.  Probably I would use the term "EHR,"

17   you know, during the deposition.

18        Q.    Is DrFirst an EHR?

19        A.    No.  DrFirst is specifically not an EHR.

20        Q.    Have you heard DrFirst referred to as an

21   EHR aggregator before?

22        A.    I have.

23        Q.    What does that term mean to you?

24        A.    That term means that we provide services

25   that the EHRs embed in their system to replace having

1                        G. C. DEEMER

2    to create that for themselves.  As an example, our

3    e-prescribing system is embedded in over 200 EHRs at

4    the moment.

5        Q.   So e-prescribing is one of the services

6    that DrFirst offers to EHRs.  Is that fair to say?

7        A.   Yes.

8             MS. MALTAS:  Objection to form.

9    BY MR. GRAYSON:

10       Q.   How does e-prescribing work at DrFirst

11   today?

12       A.   Can you clarify what you're asking me?

13       Q.   Sure.  So maybe I'll ask a slightly

14   different question.

15            Today does DrFirst have its own

16   e-prescribing network?

17       A.   DrFirst does not have an e-prescribing

18   network of its own to transmit prescriptions from

19   physicians to pharmacy, if that was the question.

20       Q.   That is the question.  So thank you.

21   That's very helpful.

22            Does DrFirst use a third-party prescribing

23   network today?

24       A.   Today DrFirst exclusively uses the

25   Surescripts network.

1                    G. C. DEEMER

2   them know what the key points were in the new

3   contract; and in exchange for exclusivity, we would

4   have a best price guarantee that we would, you know,

5   be properly certified and that our med history

6   pricing would be, you know, maintained at a

7   reasonable level.  That appears to be what it is.

8        Q.   Let's unpack that all a little bit.

9             Do you see, on February 17th, 2010, you

10  wrote an email to Mary Martin?

11       A.   Yes.  Yes, I do.

12       Q.   And who did you say that Mary Martin was?

13       A.   Mary Martin was the Surescripts employee

14  who had responsibility to manage the DrFirst account.

15  She was our account manager.

16       Q.   And why were you communicating with

17  Ms. Martin in February 2010?

18       A.   It appears I was -- I was writing to her

19  because she had reached out to me about a change to

20  the vendor reserve program at Surescripts.

21       Q.   What was the vendor reserve program at

22  Surescripts, to the best of your recollection?

23       A.   Yeah.  That was the name that was applied

24  to the loyalty agreement in exchange for exclusively

25  transmitting claims -- or sorry, not claims --

1                          G. C. DEEMER

2    prescriptions through the Surescripts network.  We

3    would be granted certain -- whatever certain

4    arrangements around payment levels.

5              And in this example, it looks like it was

6    also tied to our medication history pricing and

7    certification services as well.

8         Q.   Do you see where you wrote to Ms. Martin of

9    Surescripts, "I'm making the assumption that this is

10   the change in pricing contract; if so, I believe the

11   issues would primarily be around the exclusivity

12   clause and what that means to both of us"?

13        A.   Yes, I see that.

14        Q.   What did you mean by "change in pricing

15   contract"?

16        A.   I don't recall specifically what I meant by

17   "change in pricing contract."  I just know that over

18   the course of our contracts with Surescripts, you'll

19   see that each contract had a change in pricing that

20   became -- I would say became less and less beneficial

21   to DrFirst.

22             The pricing was continually reduced through

23   the period of our contracts.  So I suspect I was

24   talking about I assume this is the bad news I was

25   waiting for.

1                    G. C. DEEMER

2        Q.   And what issues did you think there were,

3    for DrFirst, associated with being exclusive to

4    Surescripts?

5              MS. MALTAS:   Objection to form.  Misstates

6    the document.

7        A.   The kind of things we always worried about

8    with exclusivity was the degree to which it would

9    limit our business flexibility.  DrFirst has a

10   history of innovation.  And in order to innovate, we

11   needed to work with many different kinds of

12   businesses, and any exclusivity could cause us to

13   have a problem with some other player.

14             That was primarily our concern, that

15   exclusivity limited our freedom to arrange other

16   business deals that we might need to do in some way

17   or other.

18   BY MR. GRAYSON:

19       Q.   Now, did DrFirst ultimately agree to use

20   Surescripts exclusively for e-prescribing?

21       A.   Yes.

22             MS. MALTAS:   Objection to form.

23   BY MR. GRAYSON:

24       Q.   Why did you agree to use Surescripts

25   exclusively for e-prescribing?

1                          G. C. DEEMER

2          MS. MALTAS:  Objection to form.

3      A.   We felt that we had no choice, that

4  ultimately, no matter what we were presented with,

5  unless Surescripts would just agree for whatever, for

6  their own internal reasons, to any changes we

7  requested, there really was no viable alternative to

8  the Surescripts network, and so yes, we had to sign

9  up.

10  BY MR. GRAYSON:

11      Q.   When you say, "There was no viable

12  alternative to the Surescripts network," what do you

13  mean by that?

14      A.   There are two key sides of a viable

15  e-prescribing network.  We talked about them earlier.

16  There's the ability to transmit and receive

17  transactions to and from pharmacy.  That's one side.

18  The second side is receiving eligibility for

19  patients, so you know who's covered by what plan, and

20  then the ability to connect that to patient benefit

21  information.

22          The other alternatives in the market could

23  not provide both sides of that equation, and

24  generally they could provide only a partial, you

25  know, only a partial capability on either side.  So

1                         G. C. DEEMER

2  they might have a few health plans, they might have a

3  few pharmacy chains, but nobody had the complete --

4  the complete network, both sides, that Surescripts

5  had -- or Surescripts has.

6          I don't want to mischaracterize this.  I

7  don't necessarily think that that in and of itself is

8  a huge issue.  There is some obvious benefit in, you

9  know, somebody having everything, and we certainly

10  appreciated that Surescripts put together the entire

11  network.  But it's just a fact there was no viable

12  alternative.  There's no way around that.

13      Q.  Did you ever develop a view as to why there

14  was no viable alternative to Surescripts?

15          MS. MALTAS:  Objection to form.  Lacks

16  foundation.  Calls for speculation.

17      A.   I do.  In my opinion, there is synergy, as

18  I mentioned earlier, in a single source for these

19  kind of services.

20          I think, before Surescripts existed as it

21  does today, there were obviously two companies.

22  RxHub, which had persuaded the payers that there

23  would be strength in, you know, everybody getting

24  together rather than distributing the record over a

25  bunch of different networks, and they had formed a

1                    G. C. DEEMER

2      A.   Because to do so we believe would put us in

3  danger of decertification by Surescripts and

4  certainly cause the loss of our loyalty, you know,

5  arrangement with Surescripts.

6      Q.   What did you understand Mr. Barclay to mean

7  when he said that big EMRs connecting with pharmacies

8  directly would hurt Surescripts?

9           MS. MALTAS:   Objection to form.   Lacks

10  foundation.

11      A.   Based on my conversations with Dr. Barclay,

12  you know, when we would discuss this, he was

13  referring to the fact that it would be a viable

14  alternative, and once one large pharmacy chain saw

15  they could do that effectively, the others would

16  naturally want to follow because they would want the

17  same advantages.

18  BY MR. GRAYSON:

19      Q.   Did you agree with Mr. Barclay that big

20  EMRs like DrFirst connecting with pharmacies directly

21  would hurt Surescripts?

22      A.   Yes.

23      Q.   Why did you think that it would hurt

24  Surescripts for big EMRs like DrFirst to connect

25  directly with pharmacies?

1                    G. C. DEEMER

2      A.    Because, from what I understood of the

3   pharmacy contracts with Surescripts, pharmacies felt

4   aggrieved that they were paying large amounts of

5   money for something that was essentially a very

6   simple operation to just switch traffic back and

7   forth.  And because of that, if they could do a

8   direct connect instead, they could have most of that

9   cost removed.

10           We actually -- you know, depending on the

11  pharmacy, what the final business relationship is, it

12  would be possible for the pharmacy to both

13  dramatically reduce its cost and for the EMR to

14  dramatically improve its income just by removing the

15  transaction network from the middle.

16      Q.    And to the best of your knowledge, is

17  DrFirst capable of establishing a direct connection

18  to a pharmacy for e-prescribing?

19      A.    Yes.

20      Q.    How would you describe the amount of work

21  level and effort required?

22      A.    For DrFirst it would be several months of

23  effort for the technology and probably several months

24  of effort for the contracting.

25      Q.    And do you recall whether you had any

1                          G. C. DEEMER

2        Q.    Just one minor clarification question.

3   When you say "the early days" of e-prescribing, I

4   mean, are you talking 2000, 2010, 2015?  What sort of

5   time period are you referring to?

6        A.    Yeah.  I'm talking the early 2000s.

7        Q.    So did you think that this model of relying

8   on direct connections for the large players in the

9   industry, and then multiple networks for the smaller

10  players, made sense for DrFirst?

11       A.    Oh, absolutely, as an endgame.  It's just

12  something that we have been prevented from doing

13  because we've got concerns about what would happen to

14  our business if we make a partial attempt at it.

15       Q.    And what are those concerns?

16       A.    Again, we do not have control over our

17  negotiations with Surescripts.  We rarely get

18  concessions that we ask for.  We don't really have

19  control over their perception of our performance.  We

20  continually deal with broken promises, from our

21  perspective, around, you know, what we've signed up

22  to do.  So we don't feel that -- we don't feel that

23  we are safe to continue to operate our e-prescribing

24  business if we try to make a break from the network

25  at this point.

1                    G. C. DEEMER

2          Loyalty agreement notwithstanding, there is

3    still the issue of -- a simple example.  We, for many

4    years, did not do a lot of work in the long-term-care

5    space.  More recently we were approached by a number

6    of long-term-care vendors, similar to the EHRs we

7    work with, and they asked us to provide e-prescribing

8    services to them.

9          We agreed to do so.  We took them through

10   the development process, exchanged monies, you know,

11   had them all ready to go.  Took them to Surescripts

12   to be certified, and we were told they could not be

13   certified.

14         We asked, "Why not?"

15         They said, "You're not licensed to operate

16   in the long-term-care space."

17         We disagreed.  Our contract was clear that

18   we were licensed to provide e-prescribing services.

19   That's exactly what we were doing.  So we escalated

20   the issue to, at the time, Greg Hansen, who was my

21   second-in-command at Surescripts at the time.

22         Greg said, "Must be a mistake."  You know,

23   "We'll take care of it."  And he said he would go

24   back and talk to the certification people.

25         We took the clients back again.  They were

1                        G. C. DEEMER

2    again told they could not be certified.  And by now

3    our clients were getting very angry that we had

4    misrepresented ourselves.

5              I escalated again.  Greg told me, "It must

6    be a mistake."

7              We went back for a third time and again

8    were told they couldn't be certified.

9              I took it back to Greg, said I was getting

10   sick and tired of this, "What's going on?"

11             And at that point he told me, "Oh, yeah.

12   Well, what's happening is that you are certified for

13   e-prescribing services -- or you're allowed to

14   certify for e-prescribing services, but long-term

15   care requires a different set of transactions, and

16   you're not certified for that."

17             And I said, "Don't care.  We're not asking

18   to be certified for that.  We're only going to

19   provide our standard e-prescribing.  So what right do

20   you have to not certify us?"

21             He said, "Well, we believe this is a very

22   small space.  We don't need another vendor playing

23   there.  We will provide the services to the space,

24   and we will not certify you, regardless of what your

25   contract says."

```
 1                    G. C. DEEMER

 2          So per Greg, even with a, you know, a very

 3   clear contract and every right in the world to

 4   certify and clients waiting to be certified, we were

 5   told we were out of business in the long-term-care

 6   space and they would never certify us for that space.

 7          So that's what I'm talking about, the

 8   whimsy.  What good is a contract if, at someone's

 9   whim, they can decide, "Well, we've decided now to

10   take over that part of the market"?

11          Had a very similar situation occur in the

12   med history side of our business.  We -- I had been

13   talking with again Greg Hansen for some time about

14   cooperating on med history instead of fighting with

15   each other.  We are a value-added reseller for

16   Surescripts medication history for the acute care

17   space, the hospital space.

18          Greg entertained, you know, several

19   meetings with me to talk about how we could work

20   together, how -- because of the ways we improved the

21   Surescripts med history.  But then finally, at HIMSS

22   I believe in 2016, I finally confronted Greg and

23   said, "Look, are we doing this, or are we not doing

24   this?  You know, I don't understand what's

25   happening."
```

1                     G. C. DEEMER

2          He said, "No, we're not doing it.  In fact,

3    we don't want you in the Epic and Cerner space,"

4    which is a large part of the market, "and we don't

5    want you to operate there at all."

6          I said, "Well, we have every right in the

7    world to sell to those sites, and, you know, if you

8    want to compete, fine, but we're going to sell."

9          He said, "Well, we don't make as much money

10   if you sell as if we do," which is true, you know,

11   because we're a VAR.  We're not the source.  And he

12   told me straight to my face, "We will do whatever it

13   takes to get you out of this market.  You know, if

14   you're not going to get out voluntarily, we'll price

15   you out.  I mean, we'll just raise your price to a

16   point where you guys can't afford to be in the

17   market."

18         And I said, "Come on.  You know we got a

19   contract."

20         And he says, "Well, you know, we're going

21   to change the contract, then."

```
13              So I don't really know what the rationale
14      was for tying it to e-prescribing services.
15              The bottom line is in both cases we were
16      able to be kept in place, kept in line, potentially
17      shut down as a business, strictly at the whim of
18      Surescripts because they decided they should own a
19      piece of the market.
20              So certainly poor business practice.  It's
21      no way to run a VAR network.  But that's why we're
22      afraid, right?  I mean, so we pull the trigger on a
23      direct connect to pharmacy.  What are we going to
24      find out with our next phone call from Surescripts?
25              So until we are sure we can do it without
```

                      G. C. DEEMER

1    repercussion, we're unlikely to step out with this

2    kind of innovation.

3       Q.   Yeah.  Well, that's -- I want to put a pin

4    in both medication history and long-term care,

5    because I do think that there's a little bit more for

6    us to talk about there.  But before we -- before we

7    do that, I want to first go back to this email from

8    Scott Barclay to you in May 2014, PX1614, that we've

9    been looking at.

10          And I'm going to ask you to look at page

11   PX1614-005 and focus on the bullet points under "We

12   go to the three board members that really matter:

13   WAG, CVS, and ESI."

14          Are you with me?

15      A.   I am.

16      Q.   You see one thing Mr. Barclay was

17   suggesting saying is that, "The Surescripts network

18   is in the way of innovation, adherence solutions, the

19   right data sharing.  It's acting like a bad

20   monopoly."

21          What were your thoughts on whether

22   Surescripts was in the way of innovation?

23          MS. MALTAS:  Objection to form.

24      A.   From the DrFirst perspective, we found that

```
 1                       G. C. DEEMER
 2   when we would bring innovation to market, Surescripts
 3   would quickly copy it and make it difficult for us to
 4   operate.  So we were -- we were certainly on the bad
 5   monopoly side of innovation.
 6   BY MR. GRAYSON:
 7       Q.   Any specific examples that you're thinking
 8   of where Surescripts copied one of your innovations
 9   and then made it difficult for you to operate?
10       A.   Sure, when we brought realtime patient
11   benefit checks.  We call it -- we call it
12   myBenefitCheck.  It's our product name.  We actually
13   brought that to market while Surescripts was still in
14   the process of deciding what they would do in that
15   space.
16            We found then, in a subsequent contract
17   negotiation, that we were forced to tie the renewal
18   of our e-prescribing contract to adopting their
19   version of the realtime benefit check.  And we were
20   tied to it in a way that was very unhappy for us to
21   be tied to it.  So that was a key example, for
22   instance.
23       Q.   And so on PX1614-004, in the email you sent
24   Mr. Barclay that has numbered questions, the second
25   question is "Is Surescripts likely to compete on
```

1                    G. C. DEEMER

2        A.    Yes.  I put the document together.

3        Q.    So and preparing the document in PX1617 was

4    part of the ordinary course of your duties and

5    responsibilities as president of DrFirst?

6        A.    Yes.  I brief the board on strategic issues

7    related to our business.

8        Q.    And you would have sent these slides to

9    your boss, Mr. Chen, around the time that you

10   prepared them.  Is that fair to say?

11       A.    Yes.

12       Q.    And would a communication like this,

13   material like this, have been stored on DrFirst's

14   electronic system?

15       A.    Yes.

16       Q.    So can I ask you to turn to page

17   PX1617-003, which looks like the -- yeah.  So this

18   looks like it's the first page with content of your

19   presentation to the DrFirst board, and the header is

20   "Surescripts Strategy."

21       A.    Yes.

22       Q.    So the first bullet on the top of the page.

23   "The problem: worsening relationship due to

24   Surescripts' newly aggressive posture on markets and

25   services."

1                          G. C. DEEMER

2          Do you see that?

3      A.    I do.

4      Q.    And so just at a high level, what is this

5   slide -- what are you describing on this slide that

6   you prepared for the Surescripts board?

7      A.    I'm describing the examples that I gave you

8   earlier regarding how we believed Surescripts was

9   leveraging their position as the sole e-prescribing

10  network to significantly damage our business

11  prospects in different markets.

12          I'd already mentioned that we were forcibly

13  held out of the long-term-care market in spite of our

14  contract, that we were told we were not welcome in

15  the Epic-Cerner space and we would be priced out of

16  it if we wouldn't just agree not to compete.  I

17  mentioned that we had a major dispute over payment

18  for the work we completed related to the ePA

19  contract.

20          One thing I didn't mention that's on this

21  slide is the issues we had around a realtime benefit

22  check pilot.  This was related to the situation I

23  described where we created the realtime benefit check

24  space in conjunction with Humana, and then

25  Surescripts was working on their own version of this

```
 1                    G. C. DEEMER
 2   as well.
 3          When they brought it to market, they wanted
 4   to shut DrFirst out of the pilot, even though ESI
 5   wanted us in the pilot.  And they proceeded to make
 6   our life as miserable as they could in our
 7   relationship with ESI by misconveying information
 8   about our attitudes, saying that we were choosing not
 9   to participate when we very much were wanting to
10   participate, things like that.  So actively
11   undercutting us with a major business partner.
12          So I was referring to all of that and then
13   speculating that we may very well find that we are
14   completely out of business if Surescripts decides
15   they will no longer allow aggregators moving forward,
16   of which DrFirst is an aggregator.
17      Q.   Just a couple of clarifying --
18           MS. LOWERY:  Yeah.  Sorry.  I just wanted
19   to make sure you clarified your prior question.  I
20   think you phrased your prior question as his
21   presentation to the Surescripts board.  I believe
22   this presentation was not made to the Surescripts
23   board.
24           MR. GRAYSON:  I apologize.  To whatever
25   extent I said the Surescripts board, I certainly
```

1                        G. C. DEEMER

2    service?

3        A.    It was DrFirst and Humana.

4        Q.    And this slide refers to ESI, and you

5    referred to ESI.  Just to clarify, who's ESI?

6        A.    Express Scripts, the big PBM.

7              What you're seeing here is the tail end of

8    a process that Surescripts conducted with players

9    from industry, including me--I was participating in

10   this group as well--as they kind of worked through a

11   couple issues really.

12             One was that they didn't want to provide

13   formulary and plan design files anymore.  They wanted

14   to put that all on the cloud, and they were trying to

15   get industry support for that.

16             The other thing was what should a realtime

17   benefit check program look like if Surescripts

18   offered one?  And they were asking for, you know,

19   advice and assistance and volunteers to participate

20   in a pilot.

21       Q.    I understand.  Thank you.

22             So in the bullet point that says "Future"

23   on PX1617-003, you told the DrFirst board, "We

24   believe there is significant risk that Surescripts

25   will eliminate aggregators and resellers in the

1                    G. C. DEEMER

2    future, forcing DrFirst into a different

3    relationship."

4            Do you see that?

5    A.    Yes, I do.

6    Q.    Why did you think there was a significant

7    risk that Surescripts would eliminate EHR aggregators

8    like DrFirst?

9    A.    Up till, say, the 2015 to, you know, to the

10   date of this document time frame, Surescripts had

11   been pushing us into less and less beneficial pricing

12   situations in terms of a loyalty program, but this

13   was the first time period when they started actually

14   telling us we couldn't do business.

15           It really shocked us to be thrown out of

16   the long-term-care market.  That was a horrendous

17   breach of their agreement with us.  And but again, we

18   felt that we couldn't really do anything about it

19   without jeopardizing our whole business.

20           Same thing with the med history pricing.

21   That was just absolutely aimed directly at DrFirst.

22   We were told to my face that they would not put up

23   with our competition in this space and they would

24   keep us out.

25           So just take that one.  We were at that

                          G. C. DEEMER

1

2   point a VAR of DrFirst, a reseller of med history --

3   or sorry, a VAR of Surescripts, a reseller of their

4   med history.  And he just told me to my face, "I

5   don't -- we're not going to have you competing with

6   us in the Epic and Cerner space.  We reserve that for

7   ourselves."  So they could well have just said, "We

8   will no longer have resellers.  We'll just sell it

9   all ourselves."  So I was worried about that.

10          And in terms of aggregators, the reason

11  aggregators exist is because there are hundreds of

12  EMRs, EHRs, that just really can't handle their own

13  e-prescribing very well.  Surescripts has always

14  accepted that for them to provide service to all

15  these little guys would be excessively expensive, so

16  let the aggregators handle it instead.

17          They seemed to be becoming more and more

18  uncomfortable with the fact that we were working our

19  way upstream and starting to provide services to the

20  bigger players as well.  And based on their current

21  behavior, I thought there was a significant risk that

22  they would just say, "All right.  Well, you did have

23  an aggregator contract.  We no longer have

24  aggregators.  So yeah, you can do direct business, or

25  you can just not do business."

Page 153

1                         G. C. DEEMER

2              "Direct business" meaning we could service

3    doctors we sold to directly, but not vendors that we

4    would serve, if you're following me.

5         Q.    I am.  Thank you.

6              Let's turn to the next page, PX1617-004.

7    And there are some numbered points under the bullet

8    heading "Progress to Date."  Do you see that?

9         A.    I do.

10        Q.    Do you see there the third point on

11   PX1617-004 is "Surescripts has changed the terms of

12   the loyalty program significantly, and we are

13   currently negotiating that"?

14        A.    Yes.  Yes, I do.

15        Q.    Do you recall what changes to the loyalty

16   program Surescripts was instituting in the 2017 time

17   period?

18        A.    Yeah.  This is where they were start --

19   sorry.

20              This is where they were, you know,

21   continually reducing price, but they were also moving

22   toward a whole new way of handling loyalty, which

23   they called the CPI program.  They said they were

24   going to base payments on quality of transmissions,

25   quality in the way you use the network, different --

1                           G. C. DEEMER

2    whether or not the network existed for us.  I mean, I

3    didn't think the network was going to disappear, but

4    I believed we may no longer have access to the

5    network.  So we figured we had about three years to

6    make sure that we had an alternative to the

7    Surescripts network or, again, we might find our

8    business no longer viable.

9        Q.   And when you say "alternative to the

10   Surescripts network," in your mind, what did that

11   alternative consist of?

12       A.   Hang on just one second.  Let me read what

13   I wrote here.

14            Yeah.  So it's actually a multi-pronged

15   approach, and I believe I've outlined them all here

16   on this page.  I just wanted to make sure I didn't

17   just talk about one of them here.

18            We viewed it as, look, we could create an

19   alternative.  We could, you know, either ourselves,

20   you know, put together a network or work with a

21   network to get enough pharmacies and payers all

22   agreeing to work together, that we could do that.

23   That's kind of a long shot, but that's a possibility.

24            We could put together direct connects on

25   both sides and at least continue to operate with the

1                        G. C. DEEMER

2   big guys while we -- "the big guys" meaning the big

3   pharmacy chains, the big payers, while we did

4   whatever we could, the best we could, with the people

5   who were smaller players, whether that was reverting

6   to faxing instead of electronic or some new

7   methodology.  We could put together something like

8   that.

9            So one alternative is a different network.

10  Another one is being able to direct connect.  Third

11  possibility would be that we would have the ability

12  to continue to operate our business, but without a

13  contractual relationship with Surescripts.  In other

14  words, since we could no longer aggregate people, we

15  might have to allow Surescripts to hold the paper

16  with our EHRs, hold the contracts, but we could

17  perhaps be hired as their development partner.

18           So just like they would hire any outsource

19  company, they could hire DrFirst.  We could provide

20  them with code.  They could operate it out of their

21  own, you know, data centers, and we would essentially

22  be a, you know, computer consulting company at that

23  point and no longer an innovator and direct

24  participant in the Surescripts network.

25           So we were -- we were evaluating and

1                         G. C. DEEMER

2   considering pursuing all those options.

3        Q.   Did you have a preferred option among the

4   three of alternative network, series of direct

5   connections, and becoming sort of a software

6   development partner?

7        A.   Our preferred solution was the direct

8   connect.  It, like -- like any of the other ones,

9   though, it's -- you can't do it by half-measures.

10  You've got to have enough volume.  You've got to have

11  enough critical mass to actually make it work.  So

12  our -- the direct connect was our preferred

13  alternative.

14       Q.   And did you spend time after January 2017

15  evaluating the possibility of setting up what, in

16  your view, was a sufficient number of direct

17  connections for e-prescribing?

18       A.   We did.  We start up -- we kicked off a

19  project led by Zach Fox, and he attempted to make the

20  rounds of the industry, trying to elicit enough

21  support to actually pull this off.

22            In the actual event, he was unsuccessful at

23  lining up enough, you know, resource, and we were

24  forced back into hoping we could get to a new

25  contract with Surescripts.

1                           G. C. DEEMER

2        Q.    And is that a project that was code named

3   Project Rex?

4        A.    It was.  Little inside joke.

5        Q.    What's the inside joke?

6        A.    Prescription is Rx, right?  And Surescripts

7   is the king, so Rex.  And we were just figuring out a

8   way we could operate in that environment.

9        Q.    I see.  So in the 2017 time period, was

10   your view that DrFirst had technical capability of

11   establishing direct connections for e-prescribing?

12       A.    Yes.

13       Q.    And do you recall that -- well, maybe let's

14   put a pin in that, and I want to ask you about the

15   bullet sort of near the top of the page that starts,

16   "Ally with major EHRs."

17             Do you see that?

18       A.    Yes.

19       Q.    Yeah.  So on PX1617-005, you wrote that

20   part of DrFirst's strategy was to "Ally with major

21   EHRs to improve buying power and give credibility to

22   alternative ideas."

23             Do you see that?

24       A.    I do.

25       Q.    Why was part of DrFirst's post-network

1                          G. C. DEEMER

2    strategy to ally with major EHRs to improve buying

3    power and give credibility to alternative ideas?

4        A.    Yeah.    Same reason we talked about before.

5    You've got to have critical mass.    I keep saying on

6    each side.    Think of it as a three-sided network.    We

7    needed to have critical mass on all three sides to

8    make it work.

9            Our problem was the same as Emdeon's

10   problem or RelayHealth's problem.    If we couldn't

11   line up enough EHR traffic on the physician side,

12   very hard to pull over the pharmacies and payers to

13   participate.

14       Q.    And so you continued to evaluate the

15   possibility of establishing direct connections for

16   e-prescription routing after January 2017, right?

17       A.    We did.    We actually tried to make this

18   happen through Project Rex and never quite got there.

19       Q.    Now, what challenges did you experience

20   with Project Rex, your project of establishing

21   e-prescribing direct connections?

22       A.    It appeared to be a little too early for

23   the chain pharmacies.    They were unhappy, but they

24   had other development priorities at the time and were

25   not willing yet to invest in this.

G. C. DEEMER

1

2    Q.   And to you, what did it mean for DrFirst to

3    be able to deliver core eRx services without

4    Surescripts dependency?

5    A.   It meant that if our contract was not

6    renewed, or renewed in a way that essentially put us

7    out of business for the way we were doing business,

8    we would not miss a beat and be able to continue to

9    service our customers.

10   Q.   Why was not being dependent on Surescripts

11   for e-prescribing something you were interested in?

12   A.   Because we believed, with the increasing

13   antagonism of Surescripts to our business, that they

14   were targeting us, and we did not know where -- how

15   far that targeting was going to go.  It had already

16   resulted in us being removed from one market and put

17   us under a severe disadvantage in another market, and

18   we were very suspicious that there was additional

19   shoes to drop going forward.

20   Q.   And looking at the orange box under

21   "Achieving Independence, Key Targets for Success" on

22   PX1618-004, what's your understanding of what's being

23   depicted in this orange box?

24   A.   We had taken the time to say, "Look, if

25   we're going to have independence, what is the minimum

1                     G. C. DEEMER

2          Do you see that?

3     A.    I do.

4     Q.    Do you recall thinking that Surescripts'

5  exclusivity and punitive contract terms were an issue

6  or challenge for DrFirst's efforts to become

7  independent from Surescripts for e-prescribing?

8          MS. MALTAS:  Objection to form.  Leading.

9     A.    Zach, in this bullet point, is simply

10  reporting back what he was told when he had meetings

11  or when other business leaders from DrFirst, who were

12  responsible for these areas, had meetings.  And they

13  were told repeatedly, "We cannot participate with you

14  in a different way because our Surescripts contracts

15  prohibit us from doing so."

16  BY MR. GRAYSON:

17     Q.    Let me ask you a similar question.  What

18  effect, if any, did you understand Surescripts

19  contracts with parties other than DrFirst to have on

20  DrFirst's ability to gain independence from

21  Surescripts for e-prescribing?

22          MS. MALTAS:  Objection to form.  Lacks

23  foundation.  Calls for speculation.  Assumes facts

24  not in evidence.

25     A.    We were repeatedly told by, you know,

1                          G. C. DEEMER

2    people we approached to participate that they could

3    not participate with us until their Surescripts

4    contracts expired and they had a chance to

5    renegotiate.

6              They were -- we did not see any contracts,

7    you know, and they weren't at liberty to discuss

8    exact terms of contracts.  But they represented to us

9    that their contracts prohibited them, until they were

10   modified in some way, from participating in anything

11   outside the Surescripts network.

12   BY MR. GRAYSON:

13      Q.   And who were some of the entities who were

14   providing DrFirst with this information about their

15   Surescripts contracts?  I don't mean specific

16   companies.  Just sort of what types of players were

17   they?

18      A.   Yeah.  They were pharmacy chain, you know,

19   leadership, the leadership of major PBMs, and the

20   leadership of major EHRs in our -- in the area where

21   we worked.  So say the people that were 50,000

22   doctors and up, the big guys.

23      Q.   In your experience, would it have been

24   easier for DrFirst to establish direct connections

25   for routing if pharmacies didn't have exclusivity

```
 1                    G. C. DEEMER
 2   detail.
 3          I just -- I did want to mention, though,
 4   that I know in healthcare that there have been
 5   situations where monopolies were allowed to exist for
 6   the benefit of patients, you know.  Maybe it's
 7   considered vital to patient care, you know, something
 8   along those lines.
 9          So again, it's not that we necessarily
10   object to a monopoly structure.  It's what you do
11   with the monopoly once you start using it to, you
12   know, hinder innovation, make patient care worse, you
13   know.  Those are the kind of things that we think
14   should not exist, which is why we were weighing the
15   possibility of action.
16   BY MR. GRAYSON:
17      Q.   And in your view, was Surescripts hindering
18   patient care -- or I'm sorry -- hindering innovation
19   and making patient care worse?
20      A.   In my opinion, they were absolutely doing
21   that by dumbing the industry down to the speed at
22   which they were willing to work and the degree to
23   which they were willing to provide service.
24      Q.   Do you recall whether, after February 2018,
25   DrFirst continued to be interested in direct
```

1                      G. C. DEEMER

2    connecting is something we can do.  It's always in

3    the plans."  Do you see that?

4        A.    Yes.

5        Q.    What made you say direct connecting is

6    something DrFirst can do and is always in the plans?

7        A.    As we've discussed earlier, it's a

8    capability we developed early on.  And we're very

9    good at interoperability.  It's not a difficult thing

10   for us to do if we decide we're going to do it.

11       Q.    And how would you describe your level of

12   interest in direct connecting for e-prescribing?

13       A.    Extremely high under the right conditions.

14   Under the wrong conditions, near zero.

15       Q.    And so continuing on your email in PX1620,

16   you wrote, "The reason we haven't pulled the trigger

17   has been the SS clawback on the loyalty fees."

18            Do you see that?

19       A.    I do.

20       Q.    What did you mean by "the SS clawback on

21   the loyalty fees"?

22       A.    I mean at the time and in the past we've

23   been very concerned that it wasn't clear whether

24   Surescripts would attempt to claw back everything

25   that they had paid us back to the beginning of when

1                    G. C. DEEMER

2   we first entered a loyalty agreement, which would

3   have been many, many years, you know, prior to that.

4          And the total cash outlay we would have to

5   make to pay that all back, if it turned out that's

6   what they were demanding that we pay back, it would

7   be extraordinarily large to do all at once.  So in

8   the bigger scheme of things, since we had a number of

9   issues related to making it successful anyway, it

10  didn't seem worth risking the giant clawback of

11  funds.

12     Q.   I take it that the giant clawback of funds

13  would have been one of the wrong conditions under

14  which you would have had a near-zero interest in

15  direct connections for e-prescribing?

16          MS. MALTAS:  Objection to form.

17     A.   So I'm going to say yes.  But my major one

18  is lining up the critical mass I talked about

19  earlier, the ability to do that.

20  BY MR. GRAYSON:

21     Q.   Any other sort of not-ideal conditions that

22  would have given you -- sort of taken you to

23  near-zero interest in direct connecting for

24  e-prescribing?

25     A.   Yes, if you couldn't do it immediately,

1                        G. C. DEEMER

2  because the possibility of being declared in breach

3  of our Surescripts agreement and then having services

4  discontinued while we waited for a court to sort it

5  out, you know, potentially for years, would

6  effectively put us out of business, and direct

7  connecting to pharmacy is not a good enough reason to

8  take a risk of being put out of business.

9       Q.    You also said in PX1620 that, "We believe

10  we have a path to make it happen."  Do you see that?

11       A.    Where?

12       Q.    Right after the "SS clawback on the loyalty

13  fees" in the second paragraph of your email.

14       A.    Yes.  Okay.

15       Q.    So and by "We have a path to make it

16  happen," were you referring to direct connections?

17       A.    Yeah.  I was referring to the fact that by

18  that time we had had a handful of pharmacy chains

19  tell us they were very interested in this now, and

20  they were starting to get their heads above water in

21  terms of development projects and things.  So we were

22  for the first time having substantive discussions

23  about it.  So the path was let's say dim, but at

24  least there was interest.

25       Q.    And what did you mean when you said that

1              G. C. DEEMER

2  you had a path to make direct connections happen,

3  "But to date, pharmacy hasn't cooperated in the way

4  we need them to"?

5      A.   What I referred to earlier, that they said

6  their contracts were too punitive and exclusive and

7  they weren't able to participate.  But some of those

8  were coming to an end.  You know, I mean, the time

9  had to pass.

10     Q.   Is DrFirst's loyalty -- strike that.

11          Is the loyalty provision in DrFirst's

12  contract with Surescripts still in place today, to

13  the best of your knowledge?

14     A.   Yes.

15     Q.   Since 2010, was there any time when you did

16  not believe DrFirst to have a contractual loyalty

17  provision with Surescripts?

18     A.   No.

19     Q.   Has Surescripts removed the loyalty clause

20  in DrFirst's contract?

21     A.   I am actually not 100 percent sure where we

22  stand as of today.  I haven't looked at it for a

23  while.

24     Q.   Do you recall learning at some point that

25  Surescripts had removed loyalty clauses from pharmacy

1                          G. C. DEEMER

2      A.    Again, just understand the realities of our

3  business.  Again, my goal in life is not to do

4  anything bad to Surescripts.  I don't care.  I'm

5  happy to use Surescripts.  I think they're doing a

6  fine job.  It's the abuse of their position that is a

7  problem for me.  It's the only reason we would try to

8  get away from them.

9          So to some extent, I was just trying to

10  calm Zach down a little bit here too, tell him,

11  "Look, you know, you gotta think bigger picture here.

12  This isn't all about -- we don't have to get away

13  from Surescripts, but here's some of the things we

14  ought to consider if we actually need to."

15      Q.    And is that what you were referring to in

16  your third bullet point, where you said, "After a

17  successful number 2, go for it, but go big"?

18      A.    Yes.  Yeah.  Remember you gotta -- we gotta

19  be ready.  As I said, "burning the boats on the

20  beach," right?  I mean, there is no going back.  So

21  if you're not going to go big on this, don't bother

22  me about it.  It's -- I'm not --

23      Q.    Have you --

24      A.    -- going to accept a half-measure.

25      Q.    Have you burned the boats on the beach yet?

1                    G. C. DEEMER

2   DrFirst in September 2013, you said, "They know our

3   policy on connecting to alternate networks only when

4   the pharmacies can't be reached through Surescripts."

5           Do you see that?

6       A.   I do.

7       Q.   Was that an accurate description of

8   DrFirst's policy about connecting to e-prescribing

9   networks other than Surescripts?

10      A.   Yes.  We try to play it straight.

11      Q.   And why was that the DrFirst policy on

12  connecting to alternate networks other than

13  Surescripts for e-prescribing?

14      A.   That was our contractual commitment with

15  Surescripts.

16      Q.   And what was your understanding of what

17  would happen to DrFirst if DrFirst used an

18  alternative e-prescribing network to transact with

19  pharmacies that could be reached through the

20  Surescripts network?

21          MS. MALTAS:  Objection.  Asked and

22  answered.  We went through the contracts.

23      A.   We would be in breach of the loyalty

24  agreement.

25  ///

1          REPORTER CERTIFICATION

2       I, the undersigned Certified Reporter licensed in

3   the State of Arizona, do hereby certify:

4       That the foregoing deposition of Glenn Cameron

5   Deemer was taken before me remotely at the date and

6   time therein set forth, at which time the witness was

7   put under oath or affirmation by me;

8       That the foregoing pages constitute a full, true,

9   and accurate transcript of all proceedings had in the

10  matter;

11      That signature ( )was requested (X)was not

12  requested ( )was waived by the witness.

13      I further certify that I am not related to nor

14  employed by any of the parties hereto and have no

15  interest in the outcome of the action.

16      In witness whereof, I have subscribed my name

17  this date: April 30, 2021.

18                      _Lisa O'Sullivan_
                        _____
19                      Lisa O'Sullivan
                        Az Certified Reporter No. 50952
20                      Registered Merit Reporter
                        Certified Realtime Reporter
21

22  (The foregoing certification of this transcript does

23  not apply to any reproduction of the same by any

24  means, unless under the direct control and/or

25  supervision of the certifying reporter.)