# Exhibit 165

```
 1           UNITED STATES DISTRICT COURT FOR THE
 2                    DISTRICT OF COLUMBIA
 3
 4    FEDERAL TRADE COMMISSION,
 5          Plaintiff,           CASE NO.:  1:19-cv-01080 (JBD)
 6    vs.
 7    SURESCRIPTS, LLC,
 8          Defendant.
 9    _____/
10
11    VIDEOCONFERENCE
12    VIDEOTAPED REALTIME
13    DEPOSITION OF:     MICHAEL SUSLAK
14    DATE:              THURSDAY, DECEMBER 3, 2020
15    TIME:              9:57 A.M. - 5:40 P.M.
16    PLACE:             VIA ZOOM VIDEOCONFERENCE
17
18
19
20
21    STENOGRAPHICALLY
22    REPORTED BY:       JAZZMIN A. MUSRATI, RPR, CRR
23                       Registered Professional Reporter
24                       Certified Realtime Reporter
25    JOB NO. 4333196
```

Page 1

1  Q. In the next sentence, you wrote: "Based on this,
2  we would like to extend the current agreement for an
3  additional year while modifying the reserve (loyalty)
4  program to a nonexclusive basis (as we have with
5  multiple vendors in other verticals)."
6     Do you see that?
7  A. I see that.
8  Q. Did I read that correctly?
9  A. You did.
10 Q. So when you wrote "the current agreement" in
11 PX 1001, what were you referring to?
12 A. I was referring to the agreement -- the original
13 agreement from 2004 as -- as amended in 2010.
14 Q. So when you say "amended in 2010," you mean in
15 Suslak Exhibit 4 that we were looking at a moment ago?
16 A. Correct.
17 Q. And when you refer in this email, in PX 1001, to
18 the "reserve (loyalty) program," are you also referring
19 to Suslak Exhibit 4?
20 A. Yes.
21 Q. Why did eClinicalWorks want to change its
22 relationship with Surescripts to one that was
23 nonexclusive?
24    MS. GREENWALD: Object to form.
25 A. We were looking at two things: One, to have it

Page 172

```
 1   tied to volume because it was our contention that we
 2   were providing a significant amount of volume to
 3   Surescripts through the connection with our -- with our
 4   customers, and, therefore, the compensation should be
 5   based on that.
 6           This was a time that I believe many other EMRs
 7   were losing providers.  And we had been on a -- a steady
 8   growth curve, which we're still in.  So we felt that it
 9   should be based upon volume and not upon whether we were
10   loyal to Surescripts or not.
11   BY MR. GRAYSON:
12      Q.   Okay.  Can I ask you to pull up Suslak Exhibit 8,
13   which we looked at earlier today.
14           Do you have that document in front of you?
15      A.   It's spinning.  So it looks like it -- it's up
16   now.  Let me just make sure I have the other pages.  It
17   looks like I do.
18      Q.   So this is an email that you sent in July of 2013
19   to Greg Hansen and Catherine Murphy at Surescripts,
20   correct?
21      A.   Correct.
22      Q.   And does this relate to volume-based incentives
23   that we were just discussing?
24      A.   Yes.
25      Q.   So what was the eClinicalWorks' position as of
```

Page 173

1   the time of the CPI incentive contract, that intervening
2   period was covered by what you refer to as a
3   "gentlemen's agreement"?
4       A.   Correct.
5       Q.   And under this gentlemen's agreement, Surescripts
6   continued to pay incentives to eClinicalWorks?
7       A.   Correct.
8       Q.   And what did eClinicalWorks do under this
9   gentlemen's agreement?
10      A.   We continued --
11           MS. GREENWALD:  Object to form.
12      A.   We continued to support Surescripts, just as we
13  had in the past.
14  BY MR. GRAYSON:
15      Q.   What did you do specifically with respect to
16  loyalty?
17      A.   We did not engage with any other vendor for
18  similar services.
19      Q.   Mr. Suslak, in general, how would you describe
20  eClinicalWorks' attitude towards exclusive agreements?
21           MS. GREENWALD:  Objection to form.
22      A.   It is something that is -- that's not our
23  standard policy.
24  BY MR. GRAYSON:
25      Q.   Why is it not your standard policy to enter into

Page 190

1  exclusive agreements?
2     A.  We -- we feel that we neither grant nor request
3  exclusivity.  People should be free to choose whatever
4  they want.  When -- when we have a vendor that engages
5  with us, we don't ask them to be exclusive to
6  eClinicalWorks.  And by the same token, we would want
7  that same right to not have to be exclusive to the
8  vendor.  So it's a -- our perception is, it should be
9  reciprocal.  Neither party should be restricted to
10 whether they can engage with somebody else or not.
11    Q.  Is it fair to say that you have a preference for
12 being nonexclusive?
13    A.  Correct.
14         MS. GREENWALD:  Objection to form.
15 BY MR. GRAYSON:
16    Q.  What leads eClinicalWorks to prefer nonexclusive
17 agreements?
18    A.  As mentioned, the flexibility.  Particularly if
19 we have a -- if we have a large client that we're
20 onboarding, and they use a different vendor, we don't
21 want to be in the position to say we can't work with
22 that vendor because we have an exclusive with vendor X.
23 So if somebody's coming on board with us and wants to
24 use a different vendor, we want to have that flexibility
25 to -- to do that to meet the needs of the marketplace.

Page 191

1  anymore.  But my understanding is the plan was that the
2  client would choose one or the other.
3      Q.  So why did eClinicalWorks decide to sign
4  contracts with both Surescripts and CoverMyMeds related
5  to electronic prior authorization?
6      A.  We wanted the opportunity to give choice to
7  our -- to our clients.  Some -- many are already using
8  CoverMyMeds.  CoverMyMeds has been established in the
9  marketplace for a longer period of time.  So many people
10 are using it already, but in one integrated fashion.  So
11 that's the rationale as to why we have two.
12     Q.  Did either CoverMyMeds or Surescripts ask
13 eClinicalWorks to be exclusive for electronic prior
14 authorization?
15          MS. GREENWALD:  Objection to form.
16     A.  I don't recall specifically.  They may have.
17 BY MR. GRAYSON:
18     Q.  So when -- so once electronic prior authorization
19 is actually implemented, who would decide whether an
20 electronic prior authorization transaction would proceed
21 over the Surescripts service or the CoverMyMeds service?
22     A.  My understanding is that the practice would make
23 that decision, the practice or the provider.  But in any
24 case, the customer would make that determination if they
25 wanted Surescripts or CoverMyMeds.

Page 194

1    MR. GRAYSON:  Yeah, I think under the
2    scheduling order in the case, we're entitled to two
3    hours of our own examination, even if we don't
4    cross-notice, but your objection is noted.
5    MR. YOUNG:  I will add it's -- there was no
6    subpoena to Mr. Suslak in his personal capacity.  So
7    you're -- you are -- I'm not as familiar with the
8    scheduling order.  But, you know, the scope of his
9    subpoena was the scope of the subpoena to
10   eClinicalWorks, and Mr. Suslak is here in that
11   capacity.
12   BY MR. GRAYSON:
13   Q.  Mr. Suslak, earlier today you mentioned
14   clearinghouses claims.
15       Do you recall that?
16   A.  I do.
17   Q.  What are clearinghouses' claims?
18   A.  Typically, every -- every provider uses a
19   clearinghouse in the -- to route every -- every claim
20   that they have so that the provider doesn't have to be
21   connected with Aetna or with Humana, with Blue Cross and
22   Blue Shield.  All of their claims get sent to a
23   clearinghouse.  The clearinghouse then run -- run checks
24   against the claim to make sure there are no errors on
25   the claim, and then the clearinghouse forwards it along

Page 196

1  to the respective payer.
2      Q.  Is that also known as medical claim adjudication?
3      A.  Yes.  The adjudication part is -- is -- would
4  take place more so on the -- on the payer side, but it
5  is a medical claim.  It's the -- it's the transference
6  of the medical claim from the provider to the
7  clearinghouse, and ultimately to the payer.
8      Q.  And how many partners does eClinicalWorks work
9  with for clearinghouses?
10     A.  We have --
11         MR. YOUNG:  Objection; beyond the scope.
12 BY MR. GRAYSON:
13     Q.  You can answer.
14     A.  We have four primary.  I think we may work with
15 some others, but there are four principal clearinghouses
16 that we work with.
17     Q.  And how many partners does eClinicalWorks have
18 for eligibility?
19         MS. GREENWALD:  Objection to form.
20     A.  Eligibility, which eligibility are you talking
21 about?  Eligibility in terms of -- are we talking about
22 prescriptions or are we talking about medical claims?
23 BY MR. GRAYSON:
24     Q.  Let's refocus on prescriptions, okay?
25     A.  Uh-huh.

Page 197

```
 1                 CERTIFICATE OF REPORTER
 2    STATE OF FLORIDA:
 3    COUNTY OF ORANGE:
 4
 5       I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State
 6    of Florida, certify that I was authorized to and did
 7    stenographically report the deposition of MICHAEL
 8    SUSLAK; that a review of the transcript was requested;
 9    and that the foregoing transcript, Pages 1 through 217,
10    is a true and accurate record of my stenographic notes.
11       I further certify that I am not a relative, employee,
12    or attorney, or counsel of any of the parties, nor am I
13    a relative or employee of any of the parties' attorneys
14    or counsel connected with the action, nor am I
15    financially interested in the action.
16
17                   DATED:  December 17, 2020.
18
19                   [signature]
20
                     Jazzmin A. Musrati, RPR, CRR
21                   Registered Professional Reporter
                     Certified Realtime Reporter
22
23
24
25

                                                    Page 214
```