EXHIBIT 23

Page 1

1           UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3
4    FEDERAL TRADE COMMISSION,    ) Civil Action
                        )
5        Plaintiff,        ) No. 1:19-cv-01080
                        )
6    vs.                )
                        )
7    SURESCRIPTS, LLC,        )
                        )
8        Defendant.        ) Pages 1 - 292
     _____    )
9
10
11
12    VIDEOTAPED DEPOSITION OF GLENN CAMERON DEEMER
13            (Via Videoconference)
14              April 27, 2021
15
16
17
18
19
20
21   Reported by:
22   Lisa O'Sullivan
23   Az CR No. 50952
24   RMR, CRR
25   Job No. 192569

Deemer, Glenn Cameron

1                    G. C. DEEMER

2    more than 50 percent of the lives that they

3    administer for prescription benefit programs.

4          If we were not able to contract directly

5    with them to have access to that eligibility, we

6    would have less than half of the patients in the

7    country that we would be able to cover for formulary

8    benefits and eligibility.  That would also affect our

9    med history dramatically.  I mean, they control such

10   a large part of the market that any solution that

11   doesn't pull them in is going to be too incomplete.

12         CVS compounds the issue by the size of

13   their pharmacy network, which I believe is the

14   biggest pharmacy network now.  If you don't have the

15   biggest pharmacy network, you're not going to do

16   really great transmitting prescriptions to pharmacy

17   either.

18         And we've never been able to do a contract

19   with CVS.  I mean, that could be for any number of

20   business reasons.  I can't represent it was

21   necessarily Surescripts.  But without an ability to

22   contract with either one of them, we weren't really

23   going anywhere with this.

24     Q.  And what reaction did you anticipate from

25   Surescripts if DrFirst embarked on this strategy to

Deemer, Glenn Cameron

Page 172

```
1              G. C. DEEMER
2    establish direct connections for e-prescribing -- I'm
3    sorry.  Strike that, and let me just ask the question
4    again so the record's clear.
5          What reaction did you anticipate from
6    Surescripts if DrFirst were to embark on this direct
7    connection strategy for e-prescribing?
8          MS. MALTAS:  Objection.  Lacks foundation.
9    Calls for speculation.
10      A.   Per the third bullet, we expected that we
11   would immediately face some kind of unilateral demand
12   that we do something damaging to our business.
13         What we would have really expected was
14   suddenly we wouldn't be able to certify new clients,
15   or we would lose the ability to have medication
16   history for hospitals, or we would lose something
17   else, or any number of ways Surescripts could damage
18   us if they knew that we were starting to try to go
19   big in creating some independence.
20   BY MR. GRAYSON:
21      Q.   Did DrFirst's Project Rex strategy of
22   creating direct connections for e-prescribing
23   succeed?
24      A.   No, it did not.
25      Q.   So what did you end up doing instead?
```

Deemer, Glenn Cameron

Page 173

1                    G. C. DEEMER

2      A.   We ended up actually having our contract

3   renewed, so the urgency around this was less.

4      Q.   Do you remember why you decided to renew

5   your contract with Surescripts?

6      A.   Well, that -- if you noticed on the other

7   slide that we looked at earlier, that was a parallel

8   process.

9           Our -- the simplest way for us -- again, we

10  as a company, our goal in life is not to replace the

11  Surescripts network.  Our goal in life is to

12  innovate, contribute to the healthcare space, and

13  ideally make sure patients are better served by

14  making sure everybody collaborates well that's

15  involved in patient care.

16          The issues we've had with Surescripts are

17  more around the danger to a segment of our business

18  and not about the fact that we are just dying to

19  destroy the Surescripts network or something.

20          You saw some pretty nasty quotes from Scott

21  Barclay.  We didn't subscribe to Scott's attitude.

22  We were just looking for a way to survive as a

23  business in the face of what we thought was extremely

24  unfair competition from Surescripts.

25          So yeah, our first choice was just renew

Deemer, Glenn Cameron

Page 174

1                    G. C. DEEMER

2    the contract.  If they would renew the contract and

3    allow us to live, we were okay with that.

4        Q.   Let's do a new document, which we've marked

5    as PX1619.

6             And while that's getting uploaded and while

7    you're pulling it up and perusing it, Mr. Deemer,

8    I'll state for the record that PX1619 appears to be a

9    February 5th, 2018 email from Cam Deemer to Timothy

10   Kaja, maybe, with the subject "Update on DF/SS

11   Contracting" and the Bates label DRFIRST00031228.

12           (Exhibit PX1619 is marked for

13   identification and attached hereto.)

14       A.   Yeah, I'm familiar with this.

15       Q.   Okay.  What is PX1619?

16       A.   This is a touch-base I was having with Tim

17   Kaja.  He was, I think, with -- at the time this was

18   taking place, I believe he was the COO for United

19   Health Networks.  And Tim had been working with us on

20   realtime benefit check, for UnitedHealthcare to be

21   one of our sources of realtime benefit check.

22           So he had an agenda to develop this

23   capability separately from Surescripts and was

24   touching base with us on whether in fact we were

25   going to accept the Surescripts version of realtime

Page 175

1            G. C. DEEMER

2   benefit check or not.

3     Q.   And so you wrote to Mr. Kaja, "Hi, Tim.  We

4   received word from Surescripts last week that our

5   contract renewal is off the table if we don't sign as

6   is within a few days."

7        Do you see that?

8     A.   Yes, I do.

9     Q.   Is that consistent with your recollection

10  of how contract negotiations with Surescripts and

11  DrFirst were proceeding in February 2018?

12    A.   Yes.  We had asked simply for a lengthening

13  of the contract, basically just cross out the old

14  date, put in a new date, and instead we received a

15  whole new contract with dramatic changes that we had

16  to negotiate through again.  That's how it's always

17  been.

18    Q.   And so you said --

19    A.   At the end of the day, they said, "Look,

20  we're not going to negotiate.  You know, sign it or,

21  you know, we'll go whatever, year to year."  I forget

22  what they said exactly, but basically it was just,

23  "Sign the contract."

24    Q.   And so you said, "This was the next step I

25  expected from Surescripts, and we really are out of

Deemer, Glenn Cameron

Page 201

1                    G. C. DEEMER

2       A.   Yes.

3       Q.   And if you could just -- and what is this

4    document?

5       A.   This is a contract between DrFirst and

6    Surescripts for a number of services.

7       Q.   And that was my next question.  Do you know

8    what services are covered by this contract?

9       A.   I would have to leaf down through all the

10   different sections.  The ones I immediately

11   understand are electronic prescribing and medication

12   history.

13      Q.   And by electronic prescribing -- I'm sorry?

14      A.   No, I answered.  Acute care, medication

15   history is also covered in this.

16      Q.   By electronic prescribing, do you mean both

17   routing and eligibility services?

18      A.   Yes.

19      Q.   All right.  And if you could just please

20   turn to page 23 and just confirm the date of this

21   agreement, when it was signed.

22      A.   Signed, on our side, 7-28-2014.

23      Q.   And I believe that Mr. Kamal-Grayson asked

24   you some questions earlier today about contract

25   negotiations between DrFirst and Surescripts in 2013.

Deemer, Glenn Cameron

1                    G. C. DEEMER

2         Do you recall that?

3      A.  I do.

4      Q.  This is the contract that resulted

5    ultimately from those negotiations?

6      A.  Yes.

7      Q.  And this wasn't the first agreement between

8    DrFirst and Surescripts, was it?

9      A.  No.

10     Q.  And I believe you said that you began or

11   DrFirst began using Surescripts for routing in 2002.

12   Is that right?

13     A.  That's my understanding.  I was not with

14   the company until 2004.

15     Q.  All right.  Do you have any knowledge of

16   when DrFirst started using RxHub for eligibility

17   network services?

18     A.  I would have believed also 2002.

19     Q.  To your knowledge, at any point has DrFirst

20   paid Surescripts for the use of its routing or

21   eligibility network?

22     A.  No.

23     Q.  And pursuant to this August 2014 contract

24   between Surescripts and DrFirst, did DrFirst pay

25   Surescripts for its use of routing and eligibility

Deemer, Glenn Cameron

1              G. C. DEEMER

2    network?

3        A.   No.

4        Q.   Pursuant to this August 2014 contract, did

5    DrFirst receive any incentive payments from

6    Surescripts for its use of routing and eligibility

7    network?

8        A.   So I am -- I'm not sure what section of the

9    contract that's covered under.  To my knowledge, yes,

10   we did receive payments for the use of the network.

11       Q.   And we can go ahead and turn to that.

12   That's going to be Exhibit 2, Surescripts reserve

13   program, beginning on page 32 of the agreement.

14       A.   Okay.  I've got it.  There it goes.  Okay.

15       Q.   And to your knowledge, is this, the

16   Exhibit 2 Surescripts reserve program section of the

17   contract, the section that lays out the terms and

18   conditions for DrFirst's receipt of incentive

19   payments by Surescripts?

20       A.   Yes.

21       Q.   Was DrFirst required to participate in the

22   Surescripts reserve program in order to access the

23   Surescripts routing and eligibility network?

24       A.   No.

25       Q.   So this was an optional program?

Deemer, Glenn Cameron

1                G. C. DEEMER

2      A.   Yes.

3      Q.   And why did DrFirst choose to participate

4    in the Surescripts reserve program?

5      A.   Two reasons.  One, that we believed that

6    for the work we were doing, we did in fact deserve to

7    receive remuneration.  Second reason was to stay in

8    the good graces of the e-prescribing network and

9    assure Surescripts that we would in fact be a loyal

10   participant.

11     Q.   And why did you believe that DrFirst

12   believed -- deserved to receive remuneration for its

13   use of Surescripts' eligibility and routing network?

14     A.   Because the physician side of the equation

15   was the only participant who was not receiving a

16   direct benefit from the network.

17     Q.   And why do you believe the physicians did

18   not receive any direct benefit from the use of --

19   we'll start with routing with e-prescribing?

20     A.   Physicians, as was evidenced very early on,

21   say between -- well, sorry.  Let me back up a minute.

22         I've actually been close to e-prescribing

23   since the early '90s.  I mentioned earlier it wasn't

24   my primary responsibility, but I was involved sort of

25   on the edges of some of the earliest pilots with

Deemer, Glenn Cameron

1                    G. C. DEEMER

2    PBMs that were also connected to the Surescripts

3    network?

4        A.   Yes.

5        Q.   So it was not a full exclusivity, but had a

6    carve-out for pharmacies and PBMs that were not

7    connected to Surescripts?

8            MR. GRAYSON:  Objection to form.  Leading.

9        A.   I don't fully understand the question.  Can

10   you try that one again?

11   BY MS. MALTAS:

12       Q.   Sure.  So the reserve program did not in

13   fact require 100 percent exclusivity.  It had a

14   carve-out for pharmacies and PBMs that were not

15   connected to Surescripts.

16           Is that right?

17       A.   That's correct.

18           MR. GRAYSON:  Same objections.

19           MS. MALTAS:  Yeah.  And I feel comfortable

20   leading the witness, so you can have a standing

21   objection on that.

22           MR. GRAYSON:  That's fine, yeah.  I'll just

23   have a standing objection to all leading questions,

24   then.  Makes my life easier.

25   ///

Deemer, Glenn Cameron

Page 214

1                G. C. DEEMER

2    BY MS. MALTAS:

3       Q.   And during the term of this contract, did

4    first -- excuse me.  Strike that.

5            During the term of this contract, did

6    DrFirst use another provider for eligibility or

7    routing services if the PBM or pharmacy was not

8    connected to Surescripts?

9       A.   Yes.

10      Q.   And which network or networks did DrFirst

11   use?

12      A.   I mentioned Humana earlier.  Actually,

13   sorry, this may not be directly applicable to your

14   question.

15           We did not use an alternative routing

16   network.  The work we did with Humana, we downloaded,

17   for instance, an eligibility file locally, and then

18   we tapped the file from our own servers.  So we

19   weren't using another network per se, if that was

20   your particular question.

21      Q.   So to clarify, there were no other networks

22   used?

23      A.   Not that I'm aware of during this time

24   period.

25      Q.   Okay.  But DrFirst did directly connect to

Deemer, Glenn Cameron

Page 215

1                  G. C. DEEMER

2    Humana outside of the Surescripts network during the

3    term of this contract.  Is that right?

4        A.   Yeah.  Not in the same way that we connect

5    to Surescripts.

6        Q.   And you don't feel that -- do you feel that

7    DrFirst was in violation of its loyalty provisions in

8    the reserve program in any way by that connection

9    with Humana?

10       A.   No.

11       Q.   Did Surescripts ever threaten to take away

12   loyalty payments because DrFirst had this connection

13   with Humana?

14       A.   No.

15       Q.   Did Surescripts ever say that DrFirst

16   needed to pay back loyalty payments because DrFirst

17   had a connection with Humana?

18       A.   No.

19       Q.   And during this time, did DrFirst still

20   receive loyalty incentive payments from Surescripts

21   for the routing and eligibility messages that were

22   transferred over the Surescripts network?

23       A.   That took a little twist I wasn't expecting

24   at the end.  Could you say that again, please?

25       Q.   Sure.  So during this time, did DrFirst

Deemer, Glenn Cameron

Page 216

1            G. C. DEEMER

2    still receive loyalty incentive payments from

3    Surescripts for the routing and eligibility messages

4    that were transferred over the Surescripts network?

5      A.  Yes.

6         MR. GRAYSON:  Objection.  Vague.

7    BY MS. MALTAS:

8      Q.  All right.  And in this contract, do you

9    recall that DrFirst actually negotiated an additional

10   carve-out from the loyalty program as well?

11     A.  I am not specifically -- well, I'm possibly

12   aware of that.  Could you point the language out to

13   me that you're referring to?

14     Q.  Sure.  Let's turn to paragraph 3A.

15     A.  Okay.

16     Q.  Paragraph 3A --

17         MS. LOWERY:  I'm sorry.  Page 33?

18         MS. MALTAS:  Yes.

19         THE WITNESS:  I'm there.

20         MS. LOWERY:  All right.  Thanks.

21   BY MS. MALTAS:

22     Q.  And paragraph 3A is entitled "Incentive

23   Fees: Amounts, Loyalty Commitment for Both

24   Prescription Routing Transactions and Prescription

25   Eligibility Transactions."

Deemer, Glenn Cameron

1          G. C. DEEMER

2     Do you see that?

3    A.   Yes.

4    Q.   And it reads, "If a participating

5 aggregator commits for the duration of the loyalty

6 term to route, and does route, all of its

7 prescription routing transactions as well as all of

8 its prescription eligibility transactions through the

9 Surescripts network unless otherwise directed and

10 required by aggregator customer, and aggregator

11 provides adequate documentation evidencing such

12 direction or requirement to Surescripts, either

13 directly or through a certified VAR, for all

14 pharmacies and pharmacy benefit managers connected to

15 the Surescripts network, then during the loyalty term

16 Surescripts shall pay participating aggregator

17 15 percent of the applicable weighted average

18 eligibility transaction fee for each eligible

19 prescription eligibility transaction, plus 15 percent

20 of the applicable weighted average routing

21 transaction fee for each eligible prescription

22 routing transaction."

23     Do you see that?

24    A.   Okay.   I do.   I think it's little clearer

25 later on in the paragraph, but yes, I understand it.

Deemer, Glenn Cameron

Page 218

1                    G. C. DEEMER

2      Q.   Okay.  And what do you understand this

3   carve-out to mean?

4      A.   What this carve-out means -- we spoke about

5   this earlier, that DrFirst had acquired a business of

6   a few EHRs that were using the Emdeon network.  And

7   we had carved them out in order to be able to

8   continue to provide service to them so that they

9   could continue to honor their relationship with

10  Emdeon and, you know, route what they said they were

11  going to route through Emdeon.

12     Q.   And do you recall which EHRs those were?

13     A.   I do not.  I'm sorry.

14     Q.   So this provision provides that if any EHR

15  customer of DrFirst directed DrFirst to use Emdeon,

16  for example, that DrFirst could do so, and that would

17  not affect the loyalty payments from Surescripts.

18       Is that right?

19     A.   That appears to be what it says for this

20  contract, yes.

21     Q.   And it's not limited to just the EHRs that

22  DrFirst acquired.  Is that right?  It could be any

23  EHR customer?

24       MR. GRAYSON:  Objection to form.

25     A.   Yeah.  I'm sorry.  I didn't mean acquired

Deemer, Glenn Cameron

1                    G. C. DEEMER

2    carve-out for EHR customers as part of the plan to

3    contract with Emdeon?

4        A.   No, I don't, other than, I mean, as I noted

5    to you earlier, I knew we had a handful of EHRs that

6    were using Emdeon, and I -- again, I don't recall

7    this particular contract, so I don't know if this was

8    just to be able to service those EMRs or what this

9    was about.  I don't know.  I don't have specific

10   knowledge this.

11       Q.   Okay.  And that was my question.  So it's

12   possible that DrFirst entered into this contract in

13   order to have a connection with Emdeon to service

14   those specific EHRs --

15       A.   Yes.

16       Q.   -- that had signed up with DrFirst?

17       A.   That's what I assume it is, but I --

18   honestly, I don't remember.

19       Q.   And nothing in the Surescripts contract

20   prohibited DrFirst from signing this contract with

21   Emdeon.  Is that right?

22       A.   Correct.

23           MR. GRAYSON:  Objection.  Foundation.

24   BY MS. MALTAS:

25       Q.   And DrFirst still received loyalty

Deemer, Glenn Cameron

1                    G. C. DEEMER

2    incentive payments from Surescripts after signing

3    this contract, correct?

4       A.  For the non-Emdeon business, I presume.

5       Q.  Yes, exactly.

6       A.  Uh-huh.

7       Q.  Do you know when DrFirst actually connected

8    to the Emdeon network for routing?

9       A.  I do not.

10      Q.  Do you know if DrFirst ever connected to

11   the Emdeon network for routing?

12      A.  Yes, I know that we did.

13      Q.  Do you have any ballpark idea of when the

14   connection occurred?

15      A.  No, I'd just be speculating.  I mean,

16   clearly, it was around this time period.

17      Q.  Do you know if DrFirst ever actually

18   connected to the Emdeon eligibility network?

19      A.  I do not know whether we actually connected

20   to the eligibility network.  I think this is an

21   indication of how unimportant this was to us, that I

22   really didn't pay any attention to it.

23      Q.  Do you have any knowledge if Emdeon

24   actually ever had an eligibility network?

25      A.  No.  I know that Emdeon represented that

Deemer, Glenn Cameron

Page 234

```
1              G. C. DEEMER
2    they had eligibility, but it was never enough to have
3    any real interest to me.
4        Q.  Let's just take a brief look at section 10
5    of this contract, which is on the page that ends 91.
6        A.  Okay.
7        Q.  And it's entitled "Section 10,
8    Communications and Marketing."
9        A.  Okay.  I'm there.
10       Q.  Great.  Just take a minute and read through
11   this.  I don't mean to read all of it out loud.
12       A.  Yes.  Okay.
13       Q.  And in this provision, is DrFirst agreeing
14   to market and help Emdeon sell its products,
15   including routing and eligibility, to other
16   participants?
17       A.  I believe it's requiring us to stand with
18   them and recognize that we have the ability to carry
19   traffic to Emdeon, yes.  To be clear, this is all
20   being driven from the Emdeon side and was of very
21   little interest to DrFirst.
22       Q.  Why was it of very little interest to
23   DrFirst?
24       A.  For the reasons I mentioned previously,
25   that we didn't really have a need to escape from
```

1              G. C. DEEMER

2    Surescripts nor a desire to escape from Surescripts.

3    We have always been trying to protect our business.

4    And in this event, with an incomplete solution, I

5    didn't feel that there was much need to focus on

6    Emdeon as a way to escape Surescripts.

7              Clearly, Emdeon wanted us to focus on them

8    as a way to escape Surescripts, but it's not really

9    an escape.  It's a lesser network without full

10   capabilities.  And if they could win more EHRs, more

11   power to them, but it wasn't -- you know, it wasn't

12   where we were connecting new EHRs.

13       Q.   Do you recall if DrFirst actually took any

14   of these steps, attended any meetings in order to

15   market the Emdeon products and services?

16       A.   I was thinking about that when you showed

17   me this document.  I don't recall whether we did or

18   not.  Nothing is immediately coming to mind.

19       Q.   All right.  Let's introduce the next

20   document, which is going to be Deemer Exhibit 3,

21   Bates number DRFIRST00011554.  And it's a June 4th,

22   2014 email from Maria Barhams to Cam Deemer, Akanshka

23   Verma, Gary Steier -- well, I'm not going to read all

24   of them -- Jim Chen, a number of employees at

25   DrFirst, titled "Data Health" -- "Health Datapalooza

Deemer, Glenn Cameron

Page 236

```
1                    G. C. DEEMER
2   Business Takeaways, Meeting Date June 3rd, 2014."
3       A.  Right.
4           (Exhibit 3 is marked for identification and
5   attached hereto.)
6       Q.  And have you ever seen this email before?
7       A.  Yes.
8       Q.  Do you have any reason to believe that this
9   is not an accurate copy of an email between you and
10  others at DrFirst from June 2014?
11      A.  No.
12      Q.  And did you send and receive this email in
13  the regular course of your business at DrFirst?
14      A.  Yes.
15      Q.  And was this email maintained in the
16  DrFirst email repository in the regular course of
17  DrFirst's business?
18      A.  Yes.
19      Q.  If you'll turn to the last page, the email
20  from Maria Barhams.  You can see she emails
21  PI2_Business, which appears to be a listserv.
22          Are you on that listserv?
23      A.  I wouldn't think so.  I was probably in the
24  other one, but I honestly don't recall.  Again, to be
25  clear, this is PI2, patient innovations.  Maria I
```

Deemer, Glenn Cameron

Page 237

1                    G. C. DEEMER

2    believe was part of the patient innovations

3    department.

4        Q.   You respond to Maria's email, so is it fair

5    to say that you received it through one of the two

6    listservs?

7        A.   Yes.  But I was actually a little fuzzy on

8    how I actually got this email, looking at the

9    addressing, so but sure, I must have had -- must have

10   gotten it somehow.

11       Q.   And who is Maria Barhams?

12       A.   She was an employee who was working with

13   the patient innovations team.  Her title was program

14   director.  She was working on, you know, things like

15   lab data and stuff like that, how we could make that

16   available to doctors, in other words, non-

17   e-prescribing-type things.  She was working on

18   innovations we could add to our physician software.

19       Q.   And it appears from this email that she

20   attended something called the Health Datapalooza.  Do

21   you know what the Health Datapalooza is?

22       A.   I do not.  It's a clever name, though.

23       Q.   If you'll turn to Ms. Barhams' email, the

24   very last paragraph, number 3, titled "Emdeon."  And

25   she has highlights and then a concern.

Page 292

1                    REPORTER CERTIFICATION

2        I, the undersigned Certified Reporter licensed in

3    the State of Arizona, do hereby certify:

4        That the foregoing deposition of Glenn Cameron

5    Deemer was taken before me remotely at the date and

6    time therein set forth, at which time the witness was

7    put under oath or affirmation by me;

8        That the foregoing pages constitute a full, true,

9    and accurate transcript of all proceedings had in the

10   matter;

11       That signature ( )was requested (X)was not

12   requested ( )was waived by the witness.

13       I further certify that I am not related to nor

14   employed by any of the parties hereto and have no

15   interest in the outcome of the action.

16       In witness whereof, I have subscribed my name

17   this date: April 30, 2021.

18

        _____

19        Lisa O'Sullivan

         Az Certified Reporter No. 50952

20        Registered Merit Reporter

         Certified Realtime Reporter

21

22   (The foregoing certification of this transcript does

23   not apply to any reproduction of the same by any

24   means, unless under the direct control and/or

25   supervision of the certifying reporter.)