# EXHIBIT 28

## REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                     DISTRICT OF COLUMBIA

 3

 4    FEDERAL TRADE COMMISSION,

 5         Plaintiff,         CASE NO.:  1:19-cv-01080 (JBD)

 6    vs.

 7    SURESCRIPTS, LLC,

 8         Defendant.

 9    _____/

10

11   VIDEOCONFERENCE

12   VIDEOTAPED REALTIME

13   DEPOSITION OF:      MICHAEL SUSLAK

14   DATE:              THURSDAY, DECEMBER 3, 2020

15   TIME:              9:57 A.M. - 5:40 P.M.

16   PLACE:             VIA ZOOM VIDEOCONFERENCE

17

18

19

20

21   STENOGRAPHICALLY

22   REPORTED BY:       JAZZMIN A. MUSRATI, RPR, CRR

23                      Registered Professional Reporter

24                      Certified Realtime Reporter

25   JOB NO. 4333196
```

Page 1



Page 58



Veritext Legal Solutions
866 299-5127



Page 60



Page 61



Page 62



Page 63



Page 73



Page 74



Page 75



17    Q.  So during the loyalty term in this amendment,

18   which is 2010 to 2013, do you have a -- do you know what

19   the approximate volume of routing transactions that

20   eClinicalWorks sent to the Surescripts network was on an

21   annual basis?

22    A.  I -- I don't recall.  It was -- I believe it was

23   likely millions of transactions on a monthly basis, but

24   I don't know the actual dollar amount, you know,

25   associated with that.

Veritext Legal Solutions
866 299-5127

```
 1       Q.   Okay.  So you -- I asked about volume.  So you --
 2       A.   Correct.
 3       Q.   You believe it was likely millions of
 4  transactions on a monthly basis --
 5       A.   Correct.  I don't --
 6       Q.   -- and you don't have a sense of the dollar
 7  amount of the incentives?
 8       A.   When -- I think when -- when I first started
 9  getting directly involved, it was probably in the
10  vicinity of 2 1/2 to 3 million dollars annually, total.
11       Q.   And that was for --
12       A.   That was for both --
13       Q.   -- incentives for both routing and eligibility?
14       A.   Yes.
15       Q.   Between 2010 and 2013, during the loyalty term of
16  this amendment, did eClinicalWorks send routing
17  transactions through any other networks besides
18  Surescripts?
19       A.   Not to my knowledge, any other networks, no.
20       Q.   During the loyalty term in this amendment of 2010
21  to 2013, did eClinicalWorks send eligibility
22  transactions through any other network besides
23  Surescripts?
24       A.   Not to my knowledge.
25       Q.   During the loyalty term in this amendment, did
```

Page 77

1    eClinicalWorks comply with its loyalty commitment?

2        A.  To my knowledge, yes.

3        Q.  Are you aware whether Surescripts ever took any

4    steps to monitor whether eClinicalWorks was complying

5    with its loyalty commitment?

6            MR. GRAYSON:  Objection; foundation.

7        A.  I don't know.

8    BY MS. GREENWALD:

9        Q.  To your knowledge, did Surescripts ever audit

10   eClinicalWorks to try to assess whether eClinicalWorks

11   was complying with its loyalty commitment?

12       A.  I don't know.  I wouldn't be involved in that

13   aspect.

14       Q.  To your knowledge, did Surescripts ever provide

15   eClinicalWorks with notice that Surescripts did not

16   believe eClinicalWorks was complying with its loyalty

17   commitment?

18           MR. GRAYSON:  Objection to form; lacks

19       foundation.

20       A.  Not to my knowledge.

21   BY MS. GREENWALD:

22       Q.  As far as you know, would Surescripts have had

23   any way of knowing if eClinicalWorks' prescribers were

24   sending transactions to a Surescripts-connected pharmacy

25   on an alternative network?

Veritext Legal Solutions
866 299-5127

1    of the performance of your job for eClinicalWorks?

2        A.  I did.

3        Q.  Did you send this email to Ms. Murphy as part of

4    eClinicalWorks' regular business activity?

5        A.  Yes.

6        Q.  Did you draft this email around the time you sent

7    it?

8        A.  Yes.

9        Q.  Is it your understanding that eClinicalWorks

10   maintains email as part of its regular business

11   activity?

12       A.  Yes.

13       Q.  If you look at your message, you wrote:  "The

14   attached is based upon the following:  This will be a

15   three-year agreement.  It would not be tied to loyalty

16   or CI provisions, but would be strictly volume based.

17   The revenue share would also include RX history, which

18   is not factored into these projections.  The annual

19   payments for eligibility increases yearly in order to

20   account for the fact that eligibility is growing at a

21   more rapid rate."

22           Do you see that?

23       A.  I do.

24       Q.  In the second bullet, you noted that:  "The

25   incentives would not be tied to loyalty or IC

                                                Page 95

1    provisions, but would be strictly volume based."

2        A.  Correct.

3        Q.  What did you mean by "CI"?

4        A.  Trying to recall.  This is 2000 -- I don't

5    specifically recall what -- what I was referencing with

6    CI.

7    BY MS. GREENWALD:

8        Q.  Okay.  If you look at the spreadsheet that you

9    attached to your email, did that include eClinicalWorks'

10   proposal to Surescripts for a new incentive agreement?

11       A.  I believe so.

12       Q.  Okay.  And so based on the -- the projected

13   number of routing transactions, how much did

14   eClinicalWorks propose Surescripts pay eClinicalWorks

15   over the three-year period?

16       A.  For the three-year period would have been...

17       Q.  I can represent to you that if you add up the --

18   the rows and annual payments, it totals just over

19   $12.4 million over the three years.

20           Does that sound right to you?

21       A.  Yeah, sounds about right.

22       Q.  So eClinicalWorks proposed that Surescripts pay

23   eClinicalWorks approximately $12.4 million over the

24   three-year period for eClinicalWorks' use of

25   Surescripts' network?

                                            Page 96

```
 1           MR. GRAYSON:  Objection to form.

 2    BY MS. GREENWALD:

 3       Q.  You can go ahead and answer.

 4       A.  Correct.

 5       Q.  Did Surescripts agree to this proposal?

 6       A.  I do not believe so.

 7       Q.  Were Surescripts and eClinicalWorks able to reach

 8    an agreement regarding a new incentive structure around

 9    this time, so 2013?

10       A.  I don't recall that we were.

11       Q.  When we looked at -- I believe it was -- let me

12    double-check -- Exhibit 4 earlier, which was the

13    amendment about the Surescripts reserve program, I

14    believe you testified that that amendment had a

15    three-year term.

16           Do you recall that?

17       A.  Yes.

18       Q.  After April 2013 did Surescripts continue to pay

19    eClinicalWorks incentives for routing and eligibility?

20       A.  Yes.

21       Q.  Does Surescripts continue to pay eClinicalWorks

22    incentives for routing and eligibility, even though the

23    loyalty term had expired?

24           MR. GRAYSON:  Objection to form; calls for

25        legal conclusion; lacks foundation.
```

Page 97

1    BY MS. GREENWALD:

2        Q.  You can go ahead and answer.

3        A.  Yes, I believe they continued.

4        Q.  So was eClinicalWorks able to continue to receive

5    incentives without any contractual loyalty obligation?

6            MR. GRAYSON:  Objection to form; lacks

7        foundation; calls for legal conclusion;

8        argumentative.

9        A.  Yes.

10   BY MS. GREENWALD:

11       Q.  After April 2013 did eClinicalWorks remain loyal

12   to Surescripts?

13       A.  Yes.

14       Q.  eClinicalWorks remained loyal to Surescripts,

15   even though it had no contractual obligation to do so.

16   Is that your understanding?

17           MR. GRAYSON:  Objection to form; lacks

18       foundation; calls for speculation; argumentative.

19       A.  That's my understanding.

20           MS. GREENWALD:  I think it might be a good time

21       to break for lunch.

22           What if we take -- what if we take a break

23       until 1:30?  Is that enough time for people?

24           MR. GRAYSON:  Should be enough.

25           THE WITNESS:  Works for me.

                                        Page 98

1           THE VIDEOGRAPHER:  Time is 12:53 p.m.  We're

2      off the record.

3           (Whereupon, a break was taken from 12:53 p.m.

4      to 1:32 p.m.)

5           THE VIDEOGRAPHER:  Time is 1:32 p.m.  We're

6      back on the record.

7   BY MS. GREENWALD:

8      Q.  Good afternoon, Mr. Suslak.  I want to change

9   gears a little bit.

10     A.  Okay.

11     Q.  Does eClinicalWorks ever evaluate the quality of

12  the electronic prescriptions sent by its prescribers?

13     A.  I'm not sure of what -- what you mean.  In what

14  sense do we evaluate the quality?

15     Q.  Well, when -- when eClinicalWorks thinks about

16  the quality of electronic prescribing, what does it

17  measure or evaluate?

18     A.  Well, I think first and foremost is the fact of

19  whether the -- whether the transmission was successful,

20  made it from the provider to the pharmacy, and that the

21  pharmacy could -- could, you know, open it and read it,

22  in layman's terms.

23     Q.  Is eClinicalWorks concerned about prescription

24  accuracy?

25     A.  Yes.  Our -- you know, patient safety is really

                                              Page 99

1    the -- one of the overriding values of eClinicalWorks,

2    so it's very important.

3        Q.  And does eClinicalWorks also consider the ease of

4    use for its prescribers when thinking about the quality

5    of e-prescribing?

6        A.  It does, yes.

7        Q.  Would you agree with me that to -- one way to

8    improve electronic prescribing quality would be to

9    improve prescription accuracy?

10       A.  Yes.

11       Q.  Can taking steps to improve prescription accuracy

12   impose additional burdens on prescribers?

13       A.  It could but ideally shouldn't.

14       Q.  Who, in your view, benefits from improvements in

15   prescription accuracy?

16           MR. GRAYSON:  Objection; vague.

17       A.  Well, I think first and foremost, the patient.

18   The more accurate the prescription is, the more accurate

19   the medication the patient will receive.

20   BY MS. GREENWALD:

21       Q.  Do -- do pharmacies benefit from -- from more

22   accurate prescriptions?

23           MR. GRAYSON:  Objection; foundation.

24       A.  Yes, they do.

25

Veritext Legal Solutions
866 299-5127

1      Q.  If you look at Paragraph A, which is titled

2   "Target QIS Goal," for each calendar year, did

3   eClinicalWorks have a quality index score pointed goal?

4      A.  Goal from Surescripts?

5      Q.  Yes.

6      A.  Yes.

7      Q.  And what was the target goal and points for 2018?

8      A.  I don't have that --

9      Q.  It's in the exhibit on -- on Page 11.

10      A.  For 2018 it looks like it was 300.

11      Q.  Okay.  And for 2022 what was the target?

12      A.  1,000.

13      Q.  So under this agreement, as time went on,

14   eClinicalWorks' QIS target increased; is that right?

15      A.  Right.

16      Q.  And you'll see in Paragraph B, CPI incentive fee

17   rate.

18          Does that describe the -- the incentives fees

19   that Surescripts would pay eClinicalWorks if it hit its

20   QIS goal?

21      A.  It does, again, offsetting other revenue that was

22   declining.

23      Q.  As time went on, assuming eClinicalWorks hit the

24   QIS targets, would the incentives have increased over

25   time as well?

Veritext Legal Solutions
866 299-5127

1          MR. GRAYSON:   Objection; vague; lacks

2     foundation.

3     A.   My recollection is once we reached the

4     1,000 points, our compensation or our incentive fee

5     would mirror what it was before CPI started.  So, in

6     essence, the CPI is replacing the incentive that was

7     disappearing in the old program.  So once you reach the

8     full incentive, it should be back to where it was before

9     it started.

10    BY MS. GREENWALD:

11    Q.   Since January 1, 2018, has eClinicalWorks ever

12    hit its QIS target in any quarter?

13    A.   Not to my knowledge.

14    Q.   If eClinicalWorks had taken the steps required to

15    hit its QIS target, would it have received CPI

16    incentives detailed in this amendment?

17         MR. GRAYSON:   Objection; calls for speculation.

18    A.   It would have, but, I mean, there were -- there

19    were some extenuating circumstances as to why goals were

20    not hit.

21    BY MS. GREENWALD:

22    Q.   And what are those extenuating circumstances?

23    A.   That we were changing our drug database to a -- a

24    totally new -- same company, but a totally different

25    upgrade, which is required in order to hit some of these

Page 122

1    targets.  So it's ongoing.

2        Q.  Mr. Suslak, are you familiar with the term

3    "multihoming" in the context of electronic prescribing?

4        A.  Multiwhat?

5        Q.  Multihoming.

6        A.  No, I'm not.

7        Q.  If I use the term "multihoming" to refer to the

8    use of two different providers for sending electronic

9    prescriptions, will you understand what I mean?

10       A.  No.

11       Q.  When I say "multihoming," I'm referring to the

12   use of two different networks for routing.  So, for

13   example, using Surescripts and a second network at the

14   same time.

15       A.  Okay.

16       Q.  If I use the term in that way, will you

17   understand what I mean?

18       A.  Yes.

19       Q.  Has eClinicalWorks ever multihomed or used two

20   different providers at the same time for routing?

21       A.  By "providers," you mean vendors?

22       Q.  Yeah, third parties.

23       A.  Okay.  The confusion -- we refer to doctors as

24   providers.  I want to make sure we're -- we're speaking

25   the same language.

Page 123

1          To my knowledge, we have not used two -- you're

2    talking with the same provider, with the same doctor?

3      Q.  Yes.  Talking about a situation where a

4    prescriber could use two different networks to send a

5    routing transaction.

6      A.  To my knowledge, no.  To my knowledge, it's --

7    it's just we use one at a time.

8      Q.  And why, to your knowledge, has eClinicalWorks

9    used one provider at a time for routing?

10          MR. GRAYSON:  Objection; foundation.

11     A.  There was -- it's difficult technically.  And I'm

12   not a -- I'm not a technical person, but my

13   understanding is it's difficult technically to -- to

14   have two operating within the same software at the same

15   time.  It could -- it could lead to potential issues.

16   BY MS. GREENWALD:

17     Q.  What kinds of issues?

18          MR. GRAYSON:  Objection; foundation.

19     A.  Something theoretically could get routed the

20   wrong way if it was not specifically selected, not

21   specifically set up properly.

22   BY MS. GREENWALD:

23     Q.  Are there additional costs for eClinicalWorks or

24   its prescribers associated with multihoming for routing?

25          MR. GRAYSON:  Objection; lacks foundation;

Page 124

```
 1        calls for speculation.
 2        A.  We -- to my knowledge, we don't offer it.  So
 3   there is no additional fee.
 4   BY MS. GREENWALD:
 5        Q.  Would it -- would it be more costly for
 6   eClinicalWorks to allow its prescribers to multihome to
 7   use two different networks for routing?
 8             MR. GRAYSON:  Objection; lacks foundation;
 9        calls for speculation.
10        A.  I don't know.  I would -- I would assume it
11   would.
12   BY MS. GREENWALD:
13        Q.  To your knowledge, would multihoming for routing
14   potentially create inefficiencies for eClinicalWorks'
15   prescribers?
16             MR. GRAYSON:  Objection; lacks foundation;
17        calls for speculation; vague.
18        A.  It could.
19   BY MS. GREENWALD:
20        Q.  To your knowledge, could it be more difficult for
21   eClinicalWorks' prescribers to have to use two different
22   networks for routing prescriptions?
23             MR. GRAYSON:  Objection; lacks foundation;
24        calls for speculation; assumes facts.
25        A.  I don't know.
```

Page 125

1    BY MS. GREENWALD:

2       Q.  Has eClinicalWorks ever multihomed for

3    eligibility?

4       A.  Not to my knowledge.

5       Q.  To your knowledge, why has eClinicalWorks never

6    multihomed for eligibility?

7           MR. GRAYSON:  Objection; foundation.

8       A.  There is -- in my opinion, there is -- if you

9    have one that provides the service, there's no need for

10   more than one.

11   BY MS. GREENWALD:

12      Q.  Do you think that using a single provider for

13   routing has an impact on patient safety?

14          MR. GRAYSON:  Objection; lacks foundation;

15      calls for speculation.

16      A.  I couldn't say for certain.

17   BY MS. GREENWALD:

18      Q.  In your view, are there disadvantages to

19   multihoming and using two different networks at the same

20   time for eligibility?

21          MR. GRAYSON:  Objection; lacks foundation;

22      calls for speculation.

23      A.  That's really not my area of expertise.

24   BY MS. GREENWALD:

25      Q.  To your knowledge, was Surescripts the first

1    company to stand up a viable network for both routing

2    and eligibility?

3              MR. GRAYSON:  Objection; lacks foundation;

4         calls for speculation.

5         A.  To my knowledge, yes.

6    BY MS. GREENWALD:

7         Q.  Is the size of Surescripts' network important in

8    eClinicalWorks' decision to contract with Surescripts?

9         A.  Yes.

10        Q.  In your opinion, did being the first to market

11   allow Surescripts to scale its network and sign up a

12   significant number of network participants?

13        A.  I was not present at the time, but I would assume

14   being the first in would get them that type of

15   advantage.

16        Q.  Has eClinicalWorks ever considered using other

17   providers or other networks, besides Surescripts, for

18   routing?

19        A.  Yes.

20        Q.  What other networks has eClinicalWorks considered

21   using for routing?

22        A.  Emdeon.

23        Q.  Anyone else?

24        A.  We -- we have some direct connects, but that's

25   kind of a different situation.  Those are very specific

Veritext Legal Solutions
866 299-5127

1    situations.

2        Q.  When eClinicalWorks evaluates an alternative

3    network for routing, what does it consider?

4        A.  It considers, first of all, the expertise that

5    the particular company might have.  And it also

6    considers the reach that they have across the -- the --

7    network of pharmacies and PBMs on the eligibility side.

8        Q.  Does eClinicalWorks also consider the amount of

9    incentives that the provider or network is willing to

10   pay?

11       A.  It's a consideration, but it's not a primary

12   consideration.

13       Q.  Would eClinicalWorks be willing to use a provider

14   who paid higher incentives for routing but was less

15   reliable than Surescripts?

16            MR. GRAYSON:  Objection; calls for speculation.

17       A.  On the surface, I would -- I would say no.

18   BY MS. GREENWALD:

19       Q.  So is it -- it's fair to say there are factors

20   beyond just incentives that eClinicalWorks considers

21   when considering a routing network; is that right?

22       A.  Correct.

23       Q.  Has eClinicalWorks ever considered using other

24   providers besides Surescripts for eligibility?

25       A.  Yes.

Veritext Legal Solutions
866 299-5127

1    business under the name Emdeon?

2        A.   Correct.   And multiple other names.

3        Q.   If I use the name "Change Healthcare" today, will

4    you understand that I'm also referring to the company

5    that used to be called "Emdeon"?

6        A.   Yes.

7        Q.   Okay.   What -- what do you understand Change

8    Healthcare's business to be?

9        A.   Well, they've made several acquisitions of late,

10   but the -- the primary understanding, from my

11   perspective, and how eClinicalWorks uses them, the

12   primary focus is as a clearinghouse.

13       Q.   In your role at eClinicalWorks, have you had any

14   dealings with Change Healthcare?

15       A.   Yes.   They are one of our clearinghouses that we

16   use -- one of the four clearinghouses that we use.

17       Q.   Have you interacted with them with relation to

18   any other products?

19       A.   Yes.

20       Q.   What other -- could you describe those -- those

21   dealings?

22       A.   It's primarily clearinghouse for the processing

23   of -- of claims and ERAs, the return of remittances, and

24   the various services associated with that, including

25   eligibility, but it's eligibility for claims as opposed

Page 130

1    to eligibility for prescriptions.

2       Q.  Do you know whether that one time Change

3    Healthcare attempted to contract with EHRs to provide

4    routing and eligibility services?

5           MR. GRAYSON:  Objection; compound.

6       A.  Yes.

7    BY MS. GREENWALD:

8       Q.  Do you know whether Change Healthcare attempted

9    to contract with EHRs to provide routing?

10      A.  Yes.

11      Q.  Did Change Healthcare ever approach

12   eClinicalWorks about entering into an agreement for

13   routing?

14      A.  Yes.

15      Q.  When did Change Healthcare approach

16   eClinicalWorks about a potential routing agreement?

17      A.  It was in the 2014/2015 time frame, from my

18   recollection.

19      Q.  Were you involved in those discussions in 2014

20   with Change Healthcare?

21      A.  I was.

22      Q.  Are you aware of any proposal to eClinicalWorks

23   made to the change -- excuse me.

24          Are you aware of any proposal that Change

25   Healthcare made to eClinicalWorks prior to 2014?

Page 131

1    A.  I -- I don't know the specific date.  My

2    recollection is it was around that time frame, in terms

3    of routing and eligibility.  We -- we had a relationship

4    with them on the clearinghouse side.  We've had that for

5    years.

6    Q.  Okay.  I want to talk specifically about any

7    proposal that -- that Change Healthcare has made to

8    eClinicalWorks about routing.

9    A.  Uh-huh.

10   Q.  What is your recollection as to when Change

11   Healthcare first made a proposal to eClinicalWorks for

12   routing?

13   A.  I think it's in maybe the 2014 time frame, but,

14   again, that's -- that's from memory.

15   Q.  Okay.  But sitting here today, you're not aware

16   of any prior proposal earlier than 2014?

17   A.  Not that I recall.

18   Q.  Okay.  Are you familiar with an individual who

19   worked at Change Healthcare named Lathe Bigler?

20   A.  Yes.

21   Q.  Was Mr. Bigler involved in conversations with

22   eClinicalWorks regarding routing around 2014?

23   A.  Yes.

24   Q.  To your knowledge, did Mr. Bigler have a

25   relationship with anyone at eClinicalWorks?

Veritext Legal Solutions
866 299-5127

1      A.   What do you mean by "relationship"?

2      Q.   Professional relationship.

3      A.   I -- I don't know.  I had engaged with him and I

4   think others -- I'm drawing a blank as to where -- where

5   he was prior to being at Change Healthcare.  I know he

6   was with at least one other company just prior to or

7   just after Change Healthcare.  And I -- I had engaged

8   with him at another company besides Change Healthcare,

9   at least one other company.

10     Q.   Okay.  So you knew Mr. Bigler from -- from his

11  employer prior to Change Healthcare?

12     A.   I don't recall any other employers before or

13  after, but I had dealt with him with another company.

14  And I believe maybe one of my colleagues might have

15  engaged with him with another company, but I don't

16  recall which company that was.

17     Q.   Would you describe the relationship you had with

18  Mr. Bigler as a close relationship?

19     A.   I would describe it as a vendor relationship.  I

20  don't categorize beyond whether somebody is a -- is a

21  vendor or prospective vendor or not.

22     Q.   And what did Change Healthcare propose to

23  eClinicalWorks with respect to routing around 2014?

24     A.   They had a plan that -- that put in place

25  eligibility, routing, and then there was also a direct

Veritext Legal Solutions
866 299-5127

1    messaging component to it.  So it was a little bit

2    broader than what we were currently doing with

3    Surescripts.

4        Q.  With respect to -- to routing, did Change

5    Healthcare propose any type of rebate or incentive for

6    routing transactions?

7        A.  They did.

8        Q.  What was the -- what did they propose?

9        A.  I don't recall the specifics.  But off the top of

10   my head, I think it was fairly -- that portion of it

11   was, I think, pretty comparable to what Surescripts was

12   proposing, maybe a bit enhanced on the routing side.

13       Q.  What about for eligibility?

14       A.  For eligibility, the initial proposal was no

15   incentive.

16       Q.  And when Change Healthcare approached

17   eClinicalWorks in the 2014 time period, was it a joint

18   proposal for both routing and eligibility?

19       A.  It was routing, eligibility, and direct

20   messaging.

21       Q.  Okay.  What was your understanding of the -- the

22   number of pharmacies that were connected to Change

23   Healthcare in 2014?

24       A.  I don't remember the -- the total number, but

25   from recollection, I believe they were connected to

Page 134

1    maybe 70 percent of the pharmacies that Surescripts was

2    connected to.

3        Q.  Do you know, on an annual basis, had

4    eClinicalWorks contracted with Change Healthcare, what

5    that -- what Change Healthcare was proposing to pay

6    eClinicalWorks for routing transactions?

7            MR. GRAYSON:  Objection; calls for speculation.

8        A.  I don't recall the exact amount at this point in

9    time.  As I said, I think it was probably close to what

10   Surescripts was, maybe a little bit enhanced.

11   BY MS. GREENWALD:

12       Q.  My understanding is you're talking about the per

13   transaction incentive for routing; is that correct?

14       A.  Correct.

15       Q.  All right.  On an annual basis, when you factor

16   in the volume of transactions, how did the amount of

17   incentive that Change Healthcare was willing to pay

18   compare to what Surescripts was paying eClinicalWorks?

19       A.  I don't recall the -- the cumulative number

20   between the two.  There were multiple conversations back

21   and forth.

22       Q.  Okay.  Did eClinicalWorks agree to any proposals

23   from Change Healthcare in 2014 for routing?

24       A.  That -- we never reached agreement to move

25   forward.

Veritext Legal Solutions
866 299-5127

1    Q.  And why not?

2    A.  We -- we had a concern that the reach wasn't

3    comparable.  So it wasn't worth the added effort and

4    potential downside of having multiple vendors in the

5    space.  And knowing that, from recollection, about

6    30 percent of the transactions would have to be routed

7    through Surescripts, and we thought that that had

8    potential to be problematic.

9    Q.  So did eClinicalWorks think that -- that

10   essentially multihoming with -- with Healthcare Change

11   and Surescripts would create issues?

12       MR. GRAYSON:  Objection; lacks foundation;

13   misstates testimony; calls for speculation.

14   A.  That could be one potential issue, yes.

15   BY MS. GREENWALD:

16   Q.  And did eClinicalWorks ever reach any agreement

17   with Change Healthcare with respect to eligibility?

18   A.  Not on the e-prescribing side.  As I mentioned,

19   we do have functionality for eligibility on the claims

20   side, but that's -- I just want to be clear.

21   Q.  Right.

22       In terms of eligibility in the context of

23   e-prescribing, why did eClinicalWorks decide not to

24   contract with Change Healthcare?

25   A.  For the -- for the same reason -- well, part of

Page 136

1    it is that there was no -- no revenue share associated

2    with it.  And then we had the same concern relative to

3    reach.  They didn't have the same coverage, to our

4    understanding, that Surescripts did at the time.

5        Q.  Why was the reach important to eClinicalWorks?

6        A.  Because if we were going to switch from one to

7    the other or have -- have two at the same time, they

8    should be comparable so that -- we didn't want a

9    situation where if somebody decided to use Change

10   Healthcare, and they were using a specific pharmacy, it

11   wouldn't go through -- well, it would go through, but

12   would have to be routed through Surescripts.  And,

13   again, we thought that would be problematic.

14       Q.  And Change Healthcare did not offer any

15   incentives for eligibility?

16       A.  Initially, no.

17           MR. GRAYSON:  Objection; vague.

18       A.  Initially there was no incentive for eligibility.

19   BY MS. GREENWALD:

20       Q.  Did they ever make a proposal that included an

21   incentive for eligibility?

22       A.  I believe one of the subsequent discussions did

23   include some -- some revenue for eligibility.

24       Q.  And how did that compare to the incentive paid by

25   Surescripts for eligibility transactions?

                                                Page 137

1      A.  I don't recall specifically how it compared.

2      Q.  Did the quality of Change Healthcare's services

3    play any role in eClinicalWorks' decision not to

4    contract with Change Healthcare for routing or

5    eligibility?

6      A.  We really didn't have any experience in terms of

7    the quality since we -- we hadn't used them, but we --

8    had we decided to use them, we would have vetted the --

9    the functionality.

10     Q.  So you -- you didn't vet the quality of Change

11   Healthcare's services for routing or eligibility?

12     A.  Not, not to my knowledge, but that could have

13   been done on the technical side, and I was -- I was only

14   dealing on the business side.

15     Q.  Did you have any reason to think that the

16   quality -- that Change Healthcare's quality was better

17   than Surescripts?

18          MR. GRAYSON:  Objection; lacks foundation;

19     calls for speculation.

20     A.  It was -- it was a different proposal, which

21   broader than -- than the -- what we were receiving from

22   Surescripts.  So in terms of quality of routing and

23   eligibility, I have no reason to believe that it would

24   have necessarily been better, but there were other

25   components associated with it.

```
 1    BY MR. GRAYSON:
 2       Q.  Do you recall giving testimony earlier today
 3    about eClinicalWorks' obligation to be loyal to
 4    Surescripts after the expiration of the three-year
 5    loyalty term?
 6       A.  I don't recall any -- any specific obligation to
 7    be loyal beyond the term.
 8       Q.  Okay.  So it's your testimony that -- so what you
 9    recall testifying earlier is that eClinicalWorks did not
10    have an obligation to be loyal after the expiration of
11    the three-year loyalty term; is that right?
12           MR. YOUNG:  Objection to form.
13       A.  That's -- that's my recollection.  There was a
14    period of time where both were operating beyond the term
15    of the original agreement.
16    BY MR. GRAYSON:
17       Q.  So is -- is your recollection based on any
18    communications with legal counsel?
19           MR. YOUNG:  Objection to form.
20           Remind you not to answer to the extent you're
21        disclosing the contents of conversations with your
22        attorneys.
23       A.  I don't recall.
24    BY MR. GRAYSON:
25       Q.  And you yourself are not a lawyer?
```

Page 164

```
 1        A.  I am not.

 2        Q.  Right?

 3        A.  I am not.

 4        Q.  Did Surescripts ever tell you that -- strike

 5    that.

 6             Did anyone from Surescripts ever tell you that

 7    they thought that eClinicalWorks was no longer obligated

 8    to be loyal to Surescripts after the expiration of the

 9    loyalty term in Suslak Exhibit 4?

10             MS. GREENWALD:  Objection to form.

11        A.  Not to my recollection.

12    BY MR. GRAYSON:

13        Q.  What consequences would eClinicalWorks have faced

14    if it had stopped being loyal to Surescripts during the

15    loyalty term?

16             MS. GREENWALD:  Objection to form.

17        A.  My assessment is we would have potentially lost

18    the incentive.

19    BY MR. GRAYSON:

20        Q.  Do you have an understanding of how that loss of

21    incentives would operate?

22        A.  We -- my understanding of -- we would lose the

23    incentives going forward.  And depending on the nature,

24    there may have been an obligation to pay back some

25    previous incentives.
```

Page 165

```
 1      Q.  Did you understand there to be any risk -- strike

 2   that.

 3         Did you understand there to be any possibility

 4   that if eClinicalWorks ceased to be loyal to

 5   Surescripts, Surescripts would disconnect eClinicalWorks

 6   from the Surescripts network?

 7            MS. GREENWALD:  Object to form.

 8      A.  That was never implied.

 9   BY MR. GRAYSON:

10      Q.  Did you feel like eClinicalWorks could have

11   stopped being loyal to Surescripts?

12      A.  We -- we could have.  Don't know exactly what the

13   consequences might have been, but that was a potential

14   option.

15      Q.  What factors would you have considered in making

16   a decision about whether or not to cease being loyal to

17   Surescripts?

18      A.  The possibility of potentially losing the

19   existing connection and also the -- the incentive fee

20   component.

21      Q.  Mr. Suslak, how do you feel about eClinicalWorks

22   being loyal to Surescripts?

23            MR. YOUNG:  Objection.

24            MS. GREENWALD:  Objection to form.

25      A.  I don't really have an opinion on it.
```

Page 166

```
 1    BY MR. GRAYSON:

 2        Q.  So we've been referring to eClinicalWorks as

 3    loyal to Surescripts.

 4            To you, what's the difference between being loyal

 5    to Surescripts and being exclusive to Surescripts?

 6            MS. GREENWALD:  Objection to form; calls for a

 7        legal conclusion.

 8        A.  To me, I think they are fairly -- fairly similar.

 9    This does give the option to -- to not be exclusive, but

10    it's, you know, tantamount to being exclusive.

11    BY MR. GRAYSON:

12        Q.  Okay.  One thing that you testified about earlier

13    today is the idea of being able to connect to pharmacies

14    or PBMs or other parties that are not connected to the

15    Surescripts network.

16            Do you recall testifying about that topic?

17        A.  Correct.  Yes.

18        Q.  So, Mr. Suslak, when you think of the major

19    pharmacies, what are the companies that you think of?

20        A.  What are the companies that --

21            MS. GREENWALD:  Object to form.

22        A.  Was that the question?  What are the companies?

23    BY MR. GRAYSON:

24        Q.  Yes.

25        A.  Okay.  I think of CVS, Walgreens, Walmart, people
```

Page 167

1    in that ilk.

2        Q.  I'm sorry.  I think -- I think you cut out for a

3    second.  I heard you say CVS, Walgreens, Walmart --

4        A.  I said and others of that ilk, so others --

5        Q.  Okay.

6        A.  -- in that category, but...

7        Q.  Okay.  And when you think of major PBMs, what are

8    the companies you think of?

9        A.  Express Scripts.  I think there's -- I'm not as

10   familiar with the PBMs on -- on that side.  I think

11   there's Caremark.  There's a -- there's a number of

12   larger ones.  But I don't deal in that area, so not on

13   the tip of my --

14       Q.  Uh-huh.  I understand.

15           Well, then I'll ask if you know.  So you just

16   named CVS, Walgreens, Walmart on the pharmacy size and

17   Express Scripts and Caremark on the PBM side.

18           Do you know if any of those companies is not

19   connected to the Surescripts network?

20           MS. GREENWALD:  Objection to form; foundation.

21       A.  I do not know whether any of them are not

22   connected.

23   BY MR. GRAYSON:

24       Q.  Okay.  I would like to introduce an exhibit.

25   We're going to mark this as PX 1001.  And while we are

Page 168

```
 1                 CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA:

 3    COUNTY OF ORANGE:

 4

 5       I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

 6    of Florida, certify that I was authorized to and did

 7    stenographically report the deposition of MICHAEL

 8    SUSLAK; that a review of the transcript was requested;

 9    and that the foregoing transcript, Pages 1 through 217,

10    is a true and accurate record of my stenographic notes.

11       I further certify that I am not a relative, employee,

12    or attorney, or counsel of any of the parties, nor am I

13    a relative or employee of any of the parties' attorneys

14    or counsel connected with the action, nor am I

15    financially interested in the action.

16

17                 DATED:  December 17, 2020.

18

19

20

                  Jazzmin A. Musrati, RPR, CRR

21                Registered Professional Reporter

                  Certified Realtime Reporter

22

23

24

25

                                            Page 214
```