**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

        **v.**

**SURESCRIPTS, LLC,**

    **Defendant.**

**Civil Action No. 19-1080 (JDB)**

---

## MEMORANDUM OPINION

Before the Court are two motions for summary judgment.  This case arises from loyalty pricing contracts offered beginning in 2010 by defendant Surescripts, LLC ("Surescripts"), a health information technology company, to its customers in the electronic prescription routing and eligibility markets, complementary markets collectively known as "e-prescribing."  Plaintiff Federal Trade Commission (the "FTC") brought this suit against Surescripts alleging two violations of Section 2 of the Sherman Act—Count I alleges a violation in the electronic routing market, and Count II alleges a violation in the electronic eligibility market.  The FTC argues that Surescripts violated Section 2 through its loyalty pricing contracts and other allegedly anticompetitive conduct in both markets.  The parties now each seek summary judgment: Surescripts seeks total summary judgment on both claims, and the FTC seeks partial summary judgment on a limited pair of issues—specifically, market definition and monopoly power.  Almost a year after summary judgment briefing began, the parties recently notified the Court that the case may be moot due to Surescripts's voluntary cessation of its loyalty pricing program.  For the reasons explained below, the Court determines that the case is not moot at this time and will grant the FTC's motion for partial summary judgment but reserve decision on Surescripts's motion for summary judgment.

## Background

### I.    Factual Background

Surescripts is a Virginia-based health information technology company created in 2008 by the merger of RxHub LLC and SureScripts Systems, Inc. that provides routing and eligibility network services.   Statement of Undisputed Facts in Supp. of Surescripts's Mot. for Summ. J. [ECF No. 104][1] ¶¶ 1, 10 ("Surescripts SUF"); Pl. FTC's Statement of Undisputed Facts [ECF No. 103-2] ¶¶ 1–3 ("FTC SUF").

### A.   Routing and Eligibility

An electronic routing transaction is the transmission of prescriptions and prescription-related information (e.g., requests for prescription refills) from a prescriber's electronic health record vendor ("EHR") to a pharmacy either directly or indirectly through an intermediary pharmacy technology vendor ("PTV").   FTC SUF ¶ 4; Surescripts SUF ¶¶ 2–4.  An electronic eligibility transaction is the request for and subsequent transmission of a patient's formulary and benefit information from the pharmacy benefit manager ("PBM") to the prescriber's EHR before the patient's appointment.   Surescripts SUF ¶ 5; FTC SUF ¶ 5.  This information includes "which drugs are covered by the patient's drug benefit plan, the location of covered drugs on a patient's health insurance company's formulary, what copay (if any) a patient will have to pay to obtain a prescribed drug, and lower-cost alternatives, such as generic drugs."  Surescripts SUF ¶ 6; see id. ¶ 9; FTC SUF ¶ 5.  Electronic routing and eligibility are sometimes referred to collectively as "e-prescribing."  FTC SUF ¶ 6.  While routing and eligibility transactions can occur directly between the relevant parties, id. ¶ 8, Surescripts provides a two-sided platform to connect the players in

---

[1] Surescripts's statement of undisputed facts is appended to its motion for summary judgment in the same document.  References to the statement of undisputed facts will be denoted by the corresponding paragraph within this section of the document, which spans pages 50 through 69 of the PDF.

both routing and eligibility markets, id. ¶ 7.  Before the advent of e-prescribing, the transmission of routing and eligibility information occurred only by other means, such as by paper, fax, or phone, referred to as "analog methods."  Id. ¶¶ 9–10.

Routing and eligibility are two-sided platforms with indirect network effects, meaning that "participants on one side of the platform value having more participants on the other side."  Pl. FTC's Statement of Material Facts Presenting a Genuine Issue for Trial in Opp'n to Def.'s Mot. for Summ. J. [ECF No. 156-1] ("FTC SOMF") ¶ 25;[2] see Surescripts Resp. to FTC SOMF ¶ 25;[3] see also FTC SUF ¶ 7.  Indirect networks often feature a "chicken-and-egg" problem in which "the entrant cannot get one side on board without having the other side on board, and vice versa."  FTC SOMF ¶ 26; see Surescripts Resp. to FTC SOMF ¶ 26.  Indirect network effects tend to work against new entrants and instead in favor of preexisting market participants that have already amassed a large customer base on both sides of the market.  See FTC SOMF ¶ 27; see Surescripts Resp. to FTC SOMF ¶ 27.

---

[2] The FTC filed this statement of material facts presenting a dispute for trial in addition to responding to Surescripts's statement of facts.  Surescripts argues that the Court should not consider this filing because "the Local Rules are clear that a litigant responding to a statement of facts accompanying a dispositive motion is only afforded a single statement in which to set out its areas of disagreement."  Def. Surescripts' Resp. to FTC SOMF [ECF No. 119-1] ("Surescripts Resp. to FTC SOMF") at 1.  Local Civil Rule 7(h) requires that an opposition to a motion for summary judgment "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  In support of its argument, Surescripts cites cases in which courts found that merely filing a separate statement of facts that does not engage with the movant's statement of facts is not sufficient to meet Local Civil Rule 7(h)'s requirement.  See id. at 1–2.  But that is not the case here.  The FTC both responded to Surescripts's statement of facts and provided an additional, if unnecessary, statement of material facts in dispute.  Accordingly, the Court will consider both submissions in resolving these motions.

Further, although the FTC styles the submission as a statement of material facts "which preclude summary judgment," FTC SOMF at 1, upon review, there are several facts therein that are not in dispute.  The Court thus references certain aspects of this statement of material facts, and Surescripts's response, in this Opinion's factual section to establish facts not in dispute where there is a gap in the parties' statements of undisputed facts.

[3] Surescripts's response to the FTC's statement of material facts does not number its paragraphs but does label each paragraph with the corresponding number of the paragraph in the FTC's statement of material facts to which it is responding.  The Court uses that numbering system throughout this Opinion.

###### B.  E-Prescribing Versus Analog Methods

Electronic routing and eligibility differ in critical ways from analog methods.  Starting with routing, analog methods of routing are distinct from electronic routing on several key metrics.

- **Efficiency:** Electronic routing is less error-prone and more accurate than analog methods.  See FTC SUF ¶¶ 34–35.  Electronic routing is also more efficient than analog methods because it is associated with fewer instances of "manual follow-ups" and "adverse patient events," "causes less interruption to the pharmacy workflow," "results in increased prescription adherence," and eliminates human error associated with analog methods of transmitting prescription information.  Id. ¶¶ 36–40 (internal quotation marks omitted).

- **Cost:** Electronic routing is also more cost-effective than analog methods.  See FTC SUF ¶ 42.  It is estimated that pharmacies save between $0.89 and $1.05 per script when they use electronic routing to send prescription information instead of analog methods, which is a significant portion of the gross margin on prescription-filling.  Id. ¶¶ 43–44.  Electronic routing also yields cost-savings for prescribers due to the federal incentives to switch to e-prescribing methods.  Id. ¶ 47.

- **Pricing:** Electronic routing and analog methods of routing also feature different pricing structures.  Surescripts charges a per-transaction price to pharmacies and PTVs for using its network and either charges nothing or gives a loyalty payment to EHRs for each transaction on its network.  FTC SUF ¶¶ 50–51.  There is no analogous "price" charged for the use of analog methods.  Id. ¶ 52.

- **Customers:** Electronic routing and analog methods also have a different customer base.  EHRs do not contract with any company for prescriptions delivered by analog

methods (though may in some instances receive prescription information via analog method if the electronic method were to fail).  <u>See</u> FTC SUF ¶ 54; Surescripts's Resp. to FTC SUF [ECF No. 157-1] ("Surescripts Resp. SUF") ¶ 54; Pl. FTC's Reply to Surescripts Resp. SUF [ECF No. 118-1] ("FTC Reply SUF") ¶ 54.  Similarly, PTVs do not contract for prescriptions delivered by analog methods.  <u>See</u> FTC SUF ¶ 56; Surescripts Resp. SUF ¶ 56; FTC Reply SUF ¶ 56.

- **Vendors:** Finally, vendors typically provide electronic routing, while analog methods are not provided by a vendor, except in the case of an e-prescribing company using an analog method as a back-up in case electronic routing were to fail.  <u>See</u> FTC SUF ¶¶ 57–59; Surescripts Resp. SUF ¶ 59; FTC Reply SUF ¶ 59.

The electronic transmission of eligibility information differs from analog methods in many of the same ways.

- **Efficiency:** Electronic eligibility transactions provide "more effective communication of a patient's insurance coverage and generic alternatives, which reduces the possibility that a patient does not pick up their prescription due to a surprising high price."  FTC SUF ¶ 60.

- **Cost:** Electronic eligibility is also more cost-effective than analog methods.  It saves PBMs money by encouraging prescribers to use cheaper generic drugs and reduces insurer spending on drugs by 8 to 15%.  <u>Id.</u> ¶¶ 65–66.  These savings provide "substantial value to PBMs, delivering several times the return on investment per transaction."  <u>Id.</u> ¶ 67.  In addition, using electronic eligibility made some prescribers eligible for federal incentives.  <u>See id.</u> ¶ 68; Surescripts Resp. SUF ¶ 68; FTC Reply SUF ¶ 68.

- **Pricing:** Electronic eligibility and analog methods have different pricing structures. On Surescripts's network, PBMs are charged on a per-transaction basis and EHRs are charged nothing or given a loyalty payment on each transaction. FTC SUF ¶¶ 71–72. Analog methods, on the other hand, are not priced on a per-transaction basis. Id. ¶ 73.

- **Customers:** Electronic eligibility and analog methods also have different customers. EHRs are customers of electronic eligibility but they are not customers of analog methods because such methods entail prescribers calling PBMs directly or mailing plan information to PBMs without the use of EHRs. FTC SUF ¶¶ 74–75; see also Surescripts Resp. SUF ¶ 74; FTC Reply SUF ¶ 74.

- **Vendors:** Electronic eligibility information is transmitted by vendors over the vendor's network. In contrast, analog methods do not involve transmission of information through a vendor on a network—instead, such information is transmitted via phone calls and benefit manuals. See FTC SUF ¶¶ 76–78; Surescripts Resp. SUF ¶ 78; FTC Reply SUF ¶ 78.

Market participants—namely, Surescripts and its largest competitor, Emdeon (discussed below)—have also implied in several business documents that e-prescribing is distinct from analog methods. FTC SUF ¶¶ 85–95.

### C. The Rise of E-Prescribing

Before 2007, e-prescribing was prohibited in many states and was rarely used. Surescripts SUF ¶ 14. In 2007, e-prescribing was widely legalized, id. ¶¶ 14–16, and in 2008, Congress enacted federal legislation, the Medicare Improvements for Patients and Providers Act of 2008, Pub. L. No. 110-275, 122 Stat. 2494 ("MIPPA"), that incentivized the use of e-prescribing, see FTC SUF ¶¶ 12–15. Under that legislation, "prescribers could not receive incentive payments,

and later were subject to financial penalties, unless they met certain criteria regarding transmitting prescriptions electronically and using e-prescribing technology capable of providing eligibility checks." Id. ¶ 14.  In 2009, Congress enacted another law, the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226 (2009) ("HITECH"), that promoted physician adoption of EHRs under which "eligible prescribers could receive tens of thousands of dollars in incentive payments by meeting certain criteria for the 'meaningful use' of certified EHRs.  Eligible prescribers also faced financial penalties for not satisfying 'meaningful use' criteria." Id. ¶¶ 16–18.  One of those criteria was using e-routing.  Id. ¶ 19.

The volume of e-prescribing transactions has increased dramatically since 2007. Surescripts SUF ¶¶ 17–18.  Electronic routing has become the dominant method of transmitting prescription information, growing from 3% of all prescriptions in 2008 to more than 90% since 2018.  FTC SUF ¶ 27.  The same is true for electronic eligibility transactions: in 2007, less than 1% of all prescriptions were accompanied by an electronic eligibility transaction, and that figure has skyrocketed to over 95% since 2017.[4]  Id. ¶ 28.

### D.  Surescripts's Pricing and Loyalty Program

In routing, Surescripts charges a per-transaction price to pharmacies and PTVs for using its network to send and receive prescription information.  FTC SUF ¶ 50.  On the other hand, Surescripts charges a "zero or often negative price"—that is, it often provides a payment—to an EHR for each transaction it engages in over Surescripts's network.  Id. ¶ 51.  In eligibility, Surescripts charges PBMs a per-transaction fee, but it similarly charges EHRs a "zero or negative price" for each transaction that occurs on its network.  Id. ¶¶ 71–72.

---

[4] Although there is comprehensive data on the volume of non-electronic routing transactions, no such data exists for non-electronic eligibility transactions.  FTC SUF ¶ 28.  As a result, "quantifying eligibility adoption is 'somewhat more difficult than routing.'"  Id.

In early 2010, Surescripts began a loyalty pricing program for its routing and eligibility customers.  Surescripts SUF ¶ 20.  Under this program, Surescripts gave EHR, pharmacy, PBM, and PTV customers a discount or payment in exchange for their agreement to loyalty—i.e., their agreement not to use any e-prescribing platforms other than Surescripts for transactions with other entities on the Surescripts network—for a certain predetermined period of time.  Id. ¶ 22.  If EHRs joined the loyalty program for only one of routing or eligibility, they could earn an incentive payment of 10% of the routing fee paid by pharmacy customers for each transaction.  Id. ¶ 24.  If EHRs joined both loyalty programs, they received an incentive payment of 15% of the fee paid by the pharmacy customers for each transaction.  Id.  Customers who chose not to opt into the loyalty program were still able to access Surescripts's network—they just did not receive the discounts or payments.  See id. ¶ 23.  Customers enrolled in the loyalty program were still able to use other e-prescribing networks to connect with entities not on the Surescripts network; connecting with these outside entities did not jeopardize their ability to earn incentives for transactions with entities on Surescripts's network.  Id. ¶¶ 31–33.

The typical period of a loyalty contract was three years, see Surescripts SUF ¶ 25, although some customers successfully negotiated shorter terms, id. ¶ 26.  Most of the contracts automatically renewed for a one-year term upon expiration.  FTC SOMF ¶¶ 8–9; see Surescripts Resp. to FTC SOMF ¶¶ 8–9.  If a customer ceased participation in the program before the end of the predetermined period, it was not entitled to keep the incentive payments or discounts accrued over the course of the customer's participation in the loyalty program (known as a "claw back" provision).  See FTC SOMF ¶ 11; Surescripts Resp. to FTC SOMF ¶ 11.[5]  However, Surescripts

---

[5] Many of the assertions in the FTC's statement of material facts in dispute rely on the testimony of Dr. Evans, the FTC's economic expert.  Surescripts objects to many of those facts because "Dr. Evans's testimony is itself insufficient to create a genuine dispute of fact."  See, e.g., Surescripts Resp. to FTC SOMF ¶ 11.  In support, Surescripts cites Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993).  But that case

allowed EHRs in the loyalty program to retain the incentives and payments they earned over the course of their participation if they gave at least six months' notice before unilateral termination of participation.  Surescripts SUF ¶ 25.

Some of Surescripts's loyalty contracts also contained express exclusivity provisions requiring the customers to use Surescripts for all its transactions and limiting the customers' ability to form direct connections off the Surescripts network.  See FTC SOMF ¶¶ 10, 13–16; Surescripts Resp. to FTC SOMF ¶¶ 10, 13–16.  Specifically, Surescripts had unique exclusivity and pricing terms in its loyalty contracts with Allscripts and RelayHealth, both customers of Surescripts and potential competitors in the e-prescribing market.  FTC SOMF ¶ 12; Surescripts Resp. to FTC SOMF ¶ 12.

Some of Surescripts's customers chose not to enroll in the loyalty program.  See Surescripts SUF ¶¶ 38–39, 42–43 (listing ███████████, Kroger, and ███████████ as examples); Pl. FTC's Resps. to Surescripts SUF [ECF No. 156-2] ("FTC Resp. SUF") ¶¶ 38–39, 42–43.  Other customers enrolled in the loyalty program for some period of time before unenrolling.  See Surescripts SUF ¶¶ 40–41, 44–45 (listing ███████████████████, TDS/Rx30, and ███████████ as examples); FTC Resp. SUF ¶¶ 40–41, 44–45.

Between 2010 and 2019, Surescripts's loyalty contracts covered an average of 90% of total EHR routing volume, 80.5% of total pharmacy routing volume, 82.9% of total EHR eligibility

---

assessed a judgment notwithstanding the verdict after the jury returned a verdict in favor of one party.  See id. at 218. There, the Supreme Court upheld a district court's decision to overturn a jury's verdict because the expert's opinion was "not supported by sufficient facts to validate it in the eyes of the law."  Id. at 242–43.  Beyond making the blanket objection that "Dr. Evans's testimony is itself insufficient to create a genuine dispute of fact," Surescripts has not explained why that is the case as to each specific objection.  Moreover, the standard at summary judgment is lower than that for a judgment notwithstanding the verdict—as discussed further below, at the summary judgment stage, "[c]ourts must avoid making 'credibility determinations or weigh[ing] the evidence'" and should accept the non-movant's evidence as true and make all justifiable inferences in its favor.  Perry-Anderson v. Howard Univ. Hosp., 192 F. Supp. 3d 136, 143 (D.D.C. 2016) (second alteration in original) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  Thus, the Court will not consider Surescripts's objections on this ground as a basis to find that a fact is not genuinely in dispute.

volume, and 79.5% of total PBM eligibility volume.  FTC SOMF ¶¶ 18–21; see Surescripts Resp. to FTC SOMF ¶¶ 18–21.

At the same time that it rolled out its loyalty pricing program, Surescripts lowered transactions prices for pharmacy and PBM customers in routing and eligibility.  Surescripts SUF ¶ 21; FTC Resp. SUF ¶ 21.  Surescripts's prices for routing continued to fall from 2010 until at least 2013.  Surescripts SUF ¶ 36; FTC Resp. SUF ¶ 36.[6]

As discussed further below, in 2019, Surescripts began the process of ending its loyalty programs and has recently represented that as of March 2023, they have been fully eradicated.  See Surescripts's Position Regarding Mootness [ECF No. 172] ("Surescripts Mootness Br.") at 3–5.

**E.  Surescripts's Position in E-Prescribing**

Surescripts has held at least 95% of the electronic routing market since 2010, FTC SUF ¶ 103; see Surescripts Resp. SUF ¶ 103, and some of Surescripts's own internal documents indicate that it held at least a 95% share of all e-routing transactions since 2009, FTC SUF ¶ 104; see Surescripts Resp. SUF ¶ 104.  Most of Surescripts's customers joined its network before 2010. FTC SUF ¶ 100.  Pharmacies that ultimately accounted for more than 95% of all routing transaction volume and EHRs that ultimately accounted for more than 94% of the same joined Surescripts's network before 2010.  Id. ¶¶ 101–02.

Surescripts has also handled at least 95% of all electronic eligibility transactions since 2009.  FTC SUF ¶¶ 116–17; see Surescripts Resp. SUF ¶¶ 116–17.  PBMs that accounted for over 97% of eligibility transaction volume and EHRs accounting for over 83% of the same joined Surescripts before 2010.  FTC SUF ¶¶ 114–15.  Surescripts accounts for the "vast majority of U.S. prescription routing and eligibility checks today."  Id. ¶ 105 (internal quotation marks omitted).

---

[6] The parties dispute how large the price drop was and whether it continued from 2013 to 2020.  See Surescripts SUF ¶ 36; FTC Resp. SUF ¶ 36.

Surescripts has no comparable rivals in either routing or eligibility.  See FTC SUF ¶¶ 106, 118.  Surescripts's closest rival in electronic routing is Change Healthcare ("Emdeon"),[7] a healthcare technology company founded in 2006 that provides electronic routing services.  Id. ¶¶ 58, 107; Surescripts SUF ¶ 54.  Even as Surescripts's main competitor, Emdeon has handled less than 5% of electronic routing volume from 2009 to 2020.  FTC SUF ¶ 108.  Both Surescripts's eligibility and routing networks are viewed as "must haves" by many EHRs, pharmacies, PTVs, and PBMs, and those entities widely believe that there are no reasonable alternatives.  See id. ¶¶ 110, 112, 120–21; Surescripts Resp. SUF ¶¶ 110, 112, 120–21.

Some of Surescripts's customers have expressed a lack of interest in "multihoming"—that is, using both Surescripts's network and another e-prescribing network, such as Emdeon.  See Surescripts SUF ¶¶ 47, 49 (identifying CVS and NextGen as examples); FTC Resp. SUF ¶¶ 47, 49.  Others considered the prospect of multihoming but ultimately chose not to do so for various reasons.  See Surescripts SUF ¶¶ 50–51, 53 (identifying ████████ eClinicalWorks, and ████ as examples); FTC Resp. SUF ¶¶ 50–51, 53.  And some others still have multihomed, using both Surescripts's and Emdeon's networks.  See FTC SOMF ¶ 34 (citing ████████████ as examples); Surescripts Resp. to FTC SOMF ¶ 34.

Since 2014, Surescripts has held at least 62.4% of a routing market that includes both electronic and analog methods of routing.  FTC SUF ¶ 122; Surescripts Resp. SUF ¶ 122.  And it has held at least 61.6% of all eligibility transactions—both electronic and non-electronic—since 2014.[8]  FTC SUF ¶ 126; Surescripts Resp. SUF ¶ 126.

---

[7] Emdeon is now known as Change Healthcare following a re-branding.

[8] As discussed supra p. 7 n.4, determining the denominator for non-electronic eligibility transactions is very difficult, and the measures used to reach these statistics are imperfect ones.  See FTC SUF ¶ 28.  Surescripts's economic expert "provides two proxies" for Surescripts's share of all eligibility transactions (both electronic and non-electronic): "(1) the percentage of routing transactions accompanied by an eligibility transaction and (2) the percentage of prescriptions delivered by any method accompanied by an eligibility transaction."  Id. at ¶ 125.  And, according to

### F. Surescripts's Competitors

Emdeon is Surescripts's foremost competitor in routing but has still handled less than 5% of all electronic routing transaction volume from 2009 to 2020.  FTC SUF ¶ 108.  Emdeon had signed up few customers to its network relative to Surescripts by 2008.  Surescripts SUF ¶ 57.  In 2009, Emdeon acquired eRx Network and began strategizing to grow its presence in the routing market.  See FTC Resp. SUF ¶ 58.  By 2009, Surescripts's internal business documents and executives began identifying Emdeon, as well as Allscripts and RelayHealth, as "serious competition" in e-prescribing.  See FTC SUF ¶¶ 88–89.  In 2012, Emdeon initiated "Project Normandy," an attempt to grow its routing business.  Surescripts SUF ¶ 58.  Emdeon was able to sign contracts with EHRs including Epic, NextGen, and NewCrop through the initiative.  Id. ¶ 59.  Despite signing up these EHRs, Project Normandy was largely a failure.  Id. ¶ 62; see FTC Resp. SUF ¶ 62.  Project Normandy failed in part due to EHRs' preexisting relationships with Surescripts.  See Surescripts SUF ¶¶ 62–64 (giving EHRs eClinicalWorks and AthenaHealth as examples); FTC Resp. SUF ¶¶ 62–64.  As of April 2021, Emdeon had routing contracts with several pharmacies, including PDX and Kroger.  Surescripts SUF ¶ 56.

Emdeon also tried to enter the electronic eligibility market around late 2013 or early 2014 with an initiative titled "Project Victory."  Surescripts SUF ¶ 68; see FTC SUF ¶ 77.  Despite contracting with PBMs MedImpact and Argus, Emdeon's attempt to enter eligibility largely failed.  See Surescripts SUF ¶¶ 39, 69; FTC Resp. SUF ¶ 69.  Its efforts to develop an eligibility product

---

Surescripts's expert, "eligibility transactions have accompanied at least 61.6% of all prescriptions delivered by analog or electronic methods since 2014," meaning Surescripts has had at least a 61.6% share of all eligibility transactions since 2014.  Id. ¶ 126.  While the Court recognizes the limitations of such a proxy, the parties agree on the metrics used to reach these statistics and the statistics themselves, so the Court will adopt them for the purposes of this Opinion.  See id. ¶¶ 28, 125–26; Surescripts Resp. SUF ¶¶ 28, 125–26.

continued until around 2017, when it finally exited the market due to its inability to gain ground. Surescripts SUF ¶¶ 68, 70.

Another customer and potential competitor, Allscripts, signed a four-year express exclusivity agreement with Surescripts in 2010, which was ultimately renewed for a five-year extension in 2015.  Surescripts SUF ¶ 30; FTC SOMF ¶ 13; see also Surescripts SUF ¶ 72; FTC Resp. SUF ¶ 72; Surescripts Resp. to FTC SOMF ¶ 13.  After considering signing an exclusive contract with Emdeon instead in 2014, Allscripts ultimately decided to renew its loyalty contract with Surescripts in 2015.  See Surescripts SUF ¶¶ 28–30. And RelayHealth, another customer and potential rival, also signed an express exclusivity agreement with Surescripts in 2010, which it renewed in 2015.  FTC SOMF ¶¶ 14–16; see also Surescripts SUF ¶ 73; FTC Resp. SUF ¶ 73; Surescripts Resp. to FTC SOMF ¶¶ 14–16.

## II.    Procedural Background

On April 17, 2019, the FTC filed a civil complaint against Surescripts seeking a permanent injunction and other equitable relief, including equitable monetary relief,[9] to prevent unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits conduct proscribed under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Compl. [ECF No. 1] at 1.  The FTC alleges that Surescripts has violated Section 2 by maintaining a monopoly in both electronic routing and eligibility through anticompetitive conduct, including its loyalty program.  See id. ¶¶ 222–31.

Specifically, the Complaint alleges that Surescripts had a monopoly—more than a 95% share—in both markets by 2009 and, after facing competitive threats to its dominance, "took a

---

[9] In May 2021, the parties stipulated that the FTC can no longer seek equitable monetary relief after the Supreme Court's opinion in AMG Capital Management, LLC v. Federal Trade Commission, 141 S. Ct. 1341 (2021), and the Court approved the stipulation.  May 17, 2021 Order [ECF No. 93].

series of anticompetitive actions to protect and maintain its monopolies." Compl. ¶¶ 2–3. These anticompetitive actions included "chang[ing] its pricing policies to require long-term exclusivity from nearly all of its routing and eligibility customers." Id. ¶ 3. The Complaint alleges that this new scheme caused customers who did not agree to loyalty to pay a relatively higher price on each transaction, which protected Surescripts's monopolies because "no competitor could ever offer customers enough savings to compensate customers for the skyrocketing costs the customers would face by paying Surescripts's higher 'non-loyal' price on their remaining Surescripts transactions." Id. Thus, the loyalty pricing program prevented nascent competitors—such as Emdeon—from attaining the critical mass necessary to enter the electronic routing and eligibility markets by foreclosing at least 70% of each market. Id.

In addition to its loyalty pricing scheme, the FTC alleges Surescripts also "engaged in a long-running campaign of threats and other non-merits based competition to ensure that no other competitor could get a toehold in either market," citing Allscripts and RelayHealth as examples of potential competitors that Surescripts foreclosed from entering the markets. Compl. ¶¶ 4–5. Due to this anticompetitive conduct, the FTC contends, "there is no meaningful competition in the markets for routing or eligibility. The decade-long monopolies in these markets have produced predictable effects: higher prices, reduced quality, stifled innovation, suppressed output, and stymied alternative business models." Id. ¶ 6.

In July 2019, Surescripts filed a motion to dismiss. See Surescripts's Mot. to Dismiss Compl. [ECF No. 32]. It argued that (1) the Court lacked subject-matter jurisdiction under Section 13(b) of the FTC Act, (2) the FTC's claim that Surescripts's loyalty pricing program violated Section 2 must fail because it cannot show that the prices were "predatory," and (3) the FTC did not plead sufficient facts to show that Surescripts's loyalty contracts caused anticompetitive effects

14

or foreclosed a substantial amount of competition in either market.  Id. at 1–2.  After a hearing on

the motion, see Nov. 19, 2019 Min. Entry, and subsequent supplementary briefing, see Jan. 3, 2020

Min. Order; Def. Surescripts's Resp. to the Court's Min. Order [ECF No. 42]; Pl. FTC's Resp. to

the Court's Jan. 3, 2020 Min. Order [ECF No. 43], the Court denied Surescripts's motion to

dismiss.  See Fed. Trade Comm'n v. Surescripts, LLC, 424 F. Supp. 3d 92, 104 (D.D.C. 2020).

The Court first held that it had subject-matter jurisdiction because the FTC pleads a "proper

case" for a permanent injunction under Section 13(b).  See Surescripts, 424 F. Supp. 3d. at 96–

100.  The Court next held that the FTC stated a claim sufficient to survive the pleadings stage.  See

id. at 100–04.  Specifically, the Court held that (1) the FTC pled facts sufficient to state a claim of

monopolization based on Surescripts's loyalty contracts under Section 2, see id. at 100-02, and (2)

even under the rule of reason, the FTC has met its burden of pleading facts sufficient to raise an

inference at the pleadings stage that Surescripts's loyalty contracts and other allegedly

anticompetitive behavior substantially foreclosed competition, resulting in anticompetitive effects,

see id. at 102–04.  Surescripts then filed an answer on February 10, 2020, denying almost all the

FTC's substantive allegations.  See Answer to Compl. [ECF No. 48].

In March 2022, after over two years of discovery, both parties moved for summary

judgment.  On March 28, 2022, the FTC moved for partial summary judgment on the issues of

market definition and monopoly power.  See Pl. FTC's Mot. for Partial Summ. J. [ECF No. 103];

Pl. FTC's Mem. of Law in Supp. of Mot. for Partial Summ. J. [ECF No. 103-1] ("FTC Mot.").

The next day, Surescripts moved for summary judgment on the issue of anticompetitive effects.[10]

---

[10] Because both parties moved for summary judgment on different issues, these are not "cross" motions for
summary judgment in the common sense of the term.  Specifically, Surescripts only moves for summary judgment on
the second element of each Section 2 claim, and the FTC only moves for summary judgment on the first element of
each Section 2 claim. But Surescripts moves for complete summary judgment (rather than partial summary judgment,
like the FTC) because, if it were successful, both the FTC's claims would fail, and the case would not move forward.

See Surescripts's Mot. for Summ. J. [ECF No. 104] ("Surescripts Mot."). Both parties responded in opposition to the other party's motion, see Surescripts's Mem. of Law in Supp. of Opp'n to FTC Mot. [ECF No. 157] ("Surescripts Opp'n"); FTC's Mem. of Law in Opp'n to Surescripts Mot. [ECF No. 156] ("FTC Opp'n"), and both parties then filed replies in support of their respective motions, see Reply Mem. in Supp. of FTC Mot. [ECF No. 118] ("FTC Reply"); Surescripts Reply Mem. in Supp. of Surescripts Mot. [ECF No. 119]. The Court held a hearing on the motions on March 16, 2023, and the motions are now ripe for decision.

About a week before the hearing, on March 10, 2023, the parties filed a joint letter notifying the Court that the case may be moot. See Joint Letter Concerning Briefing of Mootness Question [ECF No. 170]. Surescripts stated that the case was moot because it had "effectively completed th[e] process [of discontinuing its loyalty program] and waived or removed loyalty provisions and obligations for substantially all of its relevant partners on both sides of its network—and expects to address the few remaining stragglers (if any) in the coming weeks" and it "is prepared to execute an irrevocable covenant stating that it will not utilize loyalty provisions in its contracts at any point in the future." Id. at 1. The FTC disagreed, arguing that Surescripts's mootness argument was not ripe because it had not yet fully ended its loyalty programs and, even if it had, the case would not be moot because "there is [still] a variety of relief the Court could order if it finds in favor of the FTC." Id. at 3–4. The Court ordered expedited briefing on the issue, and the parties submitted their opening briefs on March 17, 2023, see Surescripts Mootness Br.; Pl. FTC's Mem. of Law in Resp. to the Court's Mar. 12, 2023 Min. Order Addressing Why This Case Is Not Moot [ECF No. 171] ("FTC Mootness Br."), and responses on March 24, see Pl. FTC's Mem. of Law in Resp. to Surescripts Mootness Br. ("FTC Mootness Resp."); Surescripts's Reply to FTC Mootness Resp. ("Surescripts Mootness Reply").

The Court determines that, at this time, based on the record before it, the FTC's case against Surescripts is not moot.  At the outset, the Court has doubts that, at this time, Surescripts has eliminated all of its loyalty provisions.  See Decl. of Katie Felder [ECF No. 172-1] ("Felder Decl.") ¶ 9 ("As of today, March 17, 2023, only two PBM customers are connecting to Surescripts pursuant to legacy contracts that still contain loyalty terms and requirements."); id. ¶¶ 7, 15 (indicating contracts that still contain loyalty or exclusivity provisions that Surescripts represents it will not enforce); id. ¶ 16 (noting that a "final audit" still needs to be completed to identity any other loyalty provisions in operative contracts).  It has also taken no affirmative steps toward entering into an irrevocable covenant stating that it will not reinstate any such loyalty or exclusivity terms in its contracts in the future.  See FTC Mootness Resp. at 3 (noting that "Surescripts has not entered or even provided proposed language for such a covenant").  Both failures are independently fatal to its claim of mootness under the voluntary cessation doctrine.  See Am. Bar Ass'n v. FTC, 636 F.3d 641, 648 (D.C. Cir. 2011) ("Voluntary cessation will only moot a case if there is no reasonable expectation that the alleged violation will recur . . . ." (cleaned up)).  But even if the Court accepts Surescripts's representation that it has completed the process of discontinuing its loyalty programs—and accepts that Surescripts will execute an irrevocable covenant that it will not utilize loyalty contracts at any point in the future—the case would not be moot for two reasons.

First, Surescripts has not carried the "heavy" burden of showing that "there is no reasonable expectation that the alleged violation will recur and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  Am. Bar Ass'n, 636 F.3d at 648 (cleaned up);[11] id. ("The defendant carries the burden of demonstrating that there is no reasonable

---

[11] To the extent Surescripts's disagrees with the D.C. Circuit's standard for voluntary cessation as articulated in American Bar Association v. FTC and argues that the Supreme Court has not adopted a test that requires the

expectation that the wrong will be repeated, and the burden is a heavy one." (cleaned up)).  Even without its loyalty contracts, Surescripts still enjoys the primary alleged benefit of the contracts— its durable monopoly power.  See FTC Mootness Resp. at 5 ("Until competition takes root in the absence of exclusionary contracts, the impact of Surescripts' anticompetitive conduct will persist.").  And the new program with which Surescripts has replaced its loyalty contracts does not provide assurance that the effects of the loyalty contracts have been eradicated—in fact, it does the opposite, giving the Court cause for concern that the new volume-based discounts may have much of the same anticompetitive effect as the FTC alleges the loyalty programs have had.[12] Surescripts's statement to the contrary that "[q]uite simply, volume discounts have nothing to do with this case at all," Surescripts Mootness Reply at 4, is incorrect, as Surescripts has brought the volume discount scheme into the case by citing it as the "replacement" for the loyalty programs

---

defendant to show that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," see Surescripts Mootness Reply at 6 n.3 (collecting cases), even under Surescripts's proposed standard, it is unable to show that "there is no reasonable expectation that the alleged violation will recur."

[12] Surescripts represents that in 2022 it "sent letters to its EHR partners . . . removing all relevant loyalty provisions and replacing any applicable loyalty incentive programs with terms that pay incentives without requiring loyalty." Surescripts Mootness Br. at 4.  The new program provides that

> depending on the historical Routing Transaction volumes associated with EHR vendor, either (i) "Surescripts shall pay to Aggregator a percentage of the applicable Weighted Average Routing Transaction Fee for each Eligible Prescription Routing Transaction," . . . and "Surescripts shall pay to Aggregator fifteen percent (15%) of the applicable Weighted Average Eligibility Transaction Fee for each Eligible Prescription Eligibility Transaction;" or (ii) "Surescripts shall pay Aggregator ten percent (10%) of the applicable Weighted Average Routing Transaction Fee for each Eligible Prescription Routing Transaction, plus fifteen percent (15%) of the applicable Weighted Average Eligibility Transaction Fee for each Eligible Prescription Eligibility Transaction."

Felder Decl. ¶ 13.  While this jargon-heavy description is difficult for the Court to follow without more explanation or briefing on the matter, it seems to the Court that this replacement program heavily incentivizes EHRs to execute all their transactions on Surescripts's network by rewarding EHRs that increase their volume of routing transactions with a correlated increase in payments.  For example, if an EHR decreases its volume of routing transactions on Surescripts's network from the previous year by 10% or greater, it receives only 12% of each transaction fee, whereas if it increases its volume on the network from the previous year, its percentage of the fee increases to 30% or 35%, depending on the size of the increase in volume.  Without the benefit of more information, common sense dictates that this scheme would have a similar effect on the electronic routing and eligibility markets as the loyalty program in that it could thwart the ability of new competitors to enter the markets.

and because even a cursory review of the scheme raises questions about its potential negative impact on competition.

Second, and relatedly, there is still cognizable relief the Court could grant the FTC.  In its Complaint, the FTC asked for injunctive relief preventing Surescripts "from engaging in similar and related conduct in the future" and "other such equitable relief . . . as the Court finds necessary to redress and prevent recurrence of Defendants' violations."  Compl. at 54 (emphases added). This requested relief goes beyond just ceasing the loyalty programs.  The Court could, for example, enter an injunction preventing Surescripts from imposing "new contractual terms that have the same practical effect of blocking competition for routing or eligibility," FTC Mootness Br. at 7. Accord New York v. Microsoft Corp., 224 F. Supp. 2d 76, 109 (D.D.C. 2002) ("[F]ederal court[s] ha[ve] broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." (quoting Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 132 (1969))), aff'd, 373 F.3d 1199 (D.C. Cir. 2004). Surescripts's new volume-based discount program may be one such similar act.   See FTC Mootness Resp. at 4 (noting that under the volume-based discount scheme "if an EHR decides to multihome a significant share of its transactions to a different network, it will be penalized by forfeiting the highest incentive payments," which "may also have the practical effect of substantially foreclosing competition in the routing market and is precisely the type of 'similar and related conduct' the FTC seeks to bar").

Although the Court cannot conclude at this time that the case is moot based on the facts before it, it will nonetheless reserve judgment on Surescripts's summary judgment motion.  As the Court sees it, the complete (or near-complete) cessation of Surescripts's loyalty programs

fundamentally changes its motion for summary judgment on anticompetitive effects, as those loyalty programs are the focus of its motion as currently drafted.  The Court will, however, decide the FTC's motion for partial summary judgment now, as it focuses only on the relevant market and monopoly power—issues the Court is confident are not materially affected by Surescripts's voluntary cessation of its loyalty programs.

## Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  But summary judgment may not "be avoided based on just any disagreement as to the relevant facts; the dispute must be 'genuine,' meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant."  Etokie v. Duncan, 202 F. Supp. 3d 139, 146 (D.D.C. 2016) (quoting Anderson, 477 U.S. at 248).  Thus, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.

To support its factual positions, a party must "cit[e] . . . particular parts of materials in the record" or "show[] that the materials cited" by the opposing party "do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "Courts must avoid making 'credibility determinations or weigh[ing] the evidence'" and should accept the non-movant's evidence as true and make all justifiable inferences in its favor.  Perry-Anderson, 192 F. Supp. 3d at 143 (alteration in original) (quoting Reeves, 530 U.S. at 150).  This is so because "'[c]redibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' and are thus inappropriate at summary judgment." United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1092 (D.C. Cir. 2017) (alteration in original) (quoting Anderson, 477 U.S. at 255). Thus, "[i]f material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences," a court should not grant summary judgment. Hagan v. United States, 275 F. Supp. 3d 252, 257 (D.D.C. 2017).

Although the parties have not filed cross motions for summary judgment on the same issues—rather, they seek summary judgment on distinct legal elements—"each must carry its own burden under the applicable standard." United States ex rel. Morsell v. Symantec Corp., 471 F. Supp. 3d 257, 276 (D.D.C. 2020) (quoting Ehrman v. United States, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)). The court then reviews the motions separately to determine whether either party is entitled to summary judgment, analyzing facts and making inferences in the light most favorable to the non-moving party. See id.

## Analysis

The FTC is empowered under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to bring suit to enjoin violations of any law the FTC enforces. The FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," id. § 45(a)(1), and directs the FTC to prevent corporations "from using [such] unfair methods," id. § 45(a)(2). Here, the FTC alleges that Surescripts's conduct "violate[s] Section 2 of the Sherman Act and thus constitute[s] an unfair method of competition, in violation of Section 5(a) of the FTC Act." Compl. ¶ 226.

Section 2 of the Sherman Act prohibits, in relevant part, "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2;

see also United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (per curiam) ("Section 2 of the Sherman Act makes it unlawful for a firm to 'monopolize.'").  To prove both its claims against Surescripts under Section 2 of the Sherman Act, the FTC must show that Surescripts (1) "possess[ed] . . . monopoly power in the relevant market"—namely, the routing and eligibility markets, and (2) "willful[ly] acqui[red] or maint[ained] . . . that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966); accord Microsoft, 253 F.3d at 50 (applying the Grinnell test).

The FTC moves for partial summary judgment on the issues of market definition and monopoly power.  FTC Mot. at 2–3.  The FTC asks the Court to "enter summary judgment that (1) the relevant markets in this case are the U.S. markets for [electronic] routing and [electronic] eligibility; and (2) Surescripts has possessed monopoly power in both markets since 2010."  Id.  In the alternative, the FTC asks the Court to enter summary judgment that "Surescripts has possessed monopoly power since at least 2014, leaving for trial the questions of market definition and Surescripts' monopoly power from 2010–2013."  Id. at 3.  For the reasons explained below, the Court will grant the FTC's motion as to both issues.

## I.   Market Definition

The threshold element of a § 2 monopolization offense is "the possession of monopoly power in the relevant market."  Grinnell, 384 U.S. at 570 (emphasis added).  Accordingly, the first step in assessing monopoly power is determining the relevant market.  See Grinnell, 384 U.S. at 570–71.  "Antitrust markets have two dimensions: product and geographic area."  United States v. Aetna Inc., 240 F. Supp. 3d 1, 19 (D.D.C. 2017) (quoting FTC v. Arch Coal, Inc., 329 F. Supp. 2d

109, 110 (D.D.C. 2004)).  The parties here agree that the geographic area is the United States.

FTC SUF ¶¶ 98–99.  But they sharply dispute the relevant product market.

A relevant product market includes only those products that are "reasonably interchangeable."  United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal.").

But not every functionally interchangeable product should be included in the relevant market.  Aetna, 240 F. Supp. 3d at 23 (citing United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 54 (D.D.C. 2011)); Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218 (D.C. Cir. 1986); FTC v. Staples, Inc., 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.").  Rather, the relevant market should be construed to include only competitor products that a "significant percentage of [consumers] could substitute for [Surescripts's products] without incurring substantial costs."  United States v. Microsoft Corp., 87 F. Supp. 2d 30, 36 (D.D.C. 2000), aff'd in part, rev'd in part and remanded, 253 F.3d 34 (D.C. Cir. 2001).  Relevant to this inquiry,

> [t]he degree to which a similar product will be substituted for the product in question is said to measure the cross-elasticity of demand, while the capability of other production facilities to be converted to produce a substitutable product is referred to as the cross-elasticity of supply.  The higher these cross-elasticities, the more likely it is that similar products or the capacity of production facilities now used for other purposes are to be counted in the relevant market.

Rothery Storage & Van, 792 F.2d at 218.  The proper test is to "'look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are

similar in character or use,' and 'how far buyers will go to substitute one commodity for another.'" Aetna, 240 F. Supp. 3d at 19 (quoting Staples, 970 F. Supp. at 1074).  "Markets 'must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn.'"  Id. at 20 (quoting Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 612 n.31 (1953)).

In assessing whether competitor products belong in the relevant market, the Supreme Court identified additional "practical indicia" to consider.  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  These indicia, known as the Brown Shoe indicia, are "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  Id.

The FTC argues that the undisputed facts show that analog methods of routing and eligibility are not reasonable substitutes for electronic routing and electronic eligibility, and thus the appropriate relevant markets for both routing and eligibility exclude analog methods.  FTC Mot. at 10–11.  The FTC seeks summary judgment on this issue.  See id. at 2–3.  Surescripts disagrees.  It first argues that the FTC's request for summary judgment on only one element of a Section 2 claim is procedurally improper under Federal Rule of Civil Procedure 56(a), see Surescripts Opp'n at 1, and that, in any event, there are genuine disputes of material fact regarding market definition that can only be resolved at an evidentiary hearing or trial, which precludes the entry of summary judgment on that element, id. at 2.

For the reasons explained below, the Court agrees with the FTC and will grant summary judgment on market definition in its favor, holding that the relevant markets exclude analog methods and are thus electronic routing and electronic eligibility, respectively.

### A.  Partial Summary Judgment Is Procedurally Proper

As an initial matter, Surescripts first argues that the FTC's motion for summary judgment on only one element of a Section 2 claim is "procedurally improper" under Rule 56(a) because the FTC does not request a judgment, as contemplated under Rule 56(a), but rather a "freestanding declaration."  Surescripts Opp'n at 3–10.  The FTC disagrees, claiming that the plain text of Rule 56(a) permits courts to enter summary judgment on only one element of a claim.  See FTC Reply at 1–2.

Rule 56(a) provides, in relevant part, that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Rule 56(a) was amended in 2010 to "make clear . . . that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense."  Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment.

Surescripts primarily relies on Davis v. District of Columbia for the proposition that "[a] party may not file a motion for partial summary judgment on a fact or an element of a claim." 496 F. Supp. 3d 303, 312 n.8 (D.D.C. 2020) (quoting Carson v. Sim, Civ. A. No. 04-1641 (RWR), 2009 WL 3151335, at *1 (D.D.C. Sept. 24, 2009)).  Although Davis was decided after the 2010 amendment to Rule 56(a), the cases cited by the Davis court all predate the amendment, see id., which renders the cited proposition of little value.

Surescripts also recognizes that in United States ex rel. Landis v. Tailwind Sports Corp., a court granted summary judgment on only two elements of plaintiff's claim, see 234 F. Supp. 3d 180, 185 (D.D.C. 2017) (granting summary judgment only as to "the precise number . . . and the total amount . . . of the payment invoices" and not as to liability in a False Claims Act case alleging

fraudulent claims and statements made in connection with those payments), but argues that <u>Landis</u> is an outlier case.  <u>See</u> Surescripts Opp'n at 5 n.1.  The court in <u>Landis</u> noted that "[w]hen Rule 56(a) was amended in 2010, the accompanying commentary indicated that the [amendment] was intended to clarify that summary judgment is proper for even a portion of a claim," and hence "summary judgment can be entered on narrow, factual issues."  234 F. Supp. 3d at 191 (citing <u>Branch Banking & Tr. Co. v. Rappaport</u>, 982 F. Supp. 2d 66, 69 (D.D.C. 2013)).

Surescripts also urges that the case cited by the <u>Landis</u> court in support of its decision does not support the outcome in <u>Landis</u> because the facts of <u>Branch Banking</u> are too different.  <u>See</u> Surescripts Opp'n at 5 n.1.  The <u>Branch Banking</u> court granted summary judgment on a divisible part of a claim—that the defendants were responsible for the principal of a loan they had guaranteed—but reserved judgment as to whether the defendant must pay any interest on that loan. <u>See</u> 982 F. Supp. at 69.  Surescripts notes that "[t]hat is exactly the type of claim that is appropriate for partial summary judgment because it is wholly divisible and fully resolves a part of the claim," while the claim in <u>Landis</u> was not.  Surescripts Opp'n at 5 n.1.  It also cites four cases from other districts to support its argument, <u>see id.</u> at 6 & n.2, and notes that, from a judicial efficiency standpoint, granting the FTC's partial summary judgment motion "would not streamline the trial" because "the FTC's attempt to establish the existence of monopoly power . . . incorporates some of the same disputed evidence that the Court must consider in determining that there are no anticompetitive effects caused by Surescripts' loyalty contracts," and thus "flies in the face of Rule 56(a)," <u>id.</u> at 7–8.

The FTC disagrees, pointing to the plain language of the rule as well as other cases in this District—including cases before this Court specifically—that have granted partial summary judgment on elements of a claim.  <u>See</u> FTC Reply at 2; <u>see also</u> <u>Apprio, Inc. v. Zaccari</u>, Civ. A.

No. 18-2180 (JDB), 2021 WL 2209404, *4, *12 (D.D.C. June 1, 2021) (granting partial summary judgment on two of the four elements of a claim); Jackson v. Att'y Gen. of U.S., 456 F. Supp. 3d 62, 66–68 (D.D.C. 2020) (granting partial summary judgment on three of the four elements of a claim); Landis, 234 F. Supp. 3d at 190–92.  It also cites cases in which courts have granted partial summary judgment on market definition specifically.  See FTC Reply at 2–3 & n.3 (citing, e.g., In re Zetia (Ezetimibe) Antitrust Litig., 587 F. Supp. 3d 356, 360–66 (E.D. Va. 2022), and Remington Prod., Inc. v. N. Am. Philips Corp., 717 F. Supp. 36, 42–44 (D. Conn. 1989), rev'd on reconsideration, 755 F. Supp. 52 (D. Conn. 1991)).  The FTC lastly contends that granting partial summary judgment as requested would appreciably streamline the trial by "significantly narrow[ing] the scope of fact and expert witness testimony, decreas[ing] the number of exhibits introduced, and otherwise significantly streamlin[ing] the evidence."  FTC Reply at 4.

The Court agrees with the FTC.  Under the plain text of Rule 56(a), the Court can enter summary judgment as to some, but not all, elements of a claim, as it expressly allows summary judgment on "part of [a] claim."  Fed. R. Civ. P. 56(a) (emphasis added).   Moreover, the cases Surescripts cites to the contrary are not persuasive—the only case cited from this District, Davis, relies on pre-2010 cases, which were decided before the rule was amended to allow for summary judgment on parts of claims or defenses.  And while the Court appreciates Surescripts's argument that partial summary judgment may not streamline the subsequent proceedings as much as the FTC contends, that is not an independent basis to deny the FTC's motion as procedurally improper.

### B.  Summary Judgment on Market Definition Is Proper

Surescripts next argues that the FTC's motion for summary judgment on market definition is premature as market definition is such a fact-sensitive inquiry that it must be decided after a full evidentiary hearing or trial rather than on summary judgment.  Surescripts Opp'n at 12.  In support,

it points out that in many cases upon which the FTC relies to support its definition of the relevant market, the court did not decide the question of market definition until after a full evidentiary hearing or trial.  Id. at 12–13.  Moreover, Surescripts argues that the FTC does not "provide the type of rigorous economic evidence required to prove market definition."  Id. at 13.

The FTC disagrees, contending that "[t]here is no such rule."  FTC Reply at 5.  It then cites cases in which courts have granted summary judgment on market definition.  See id. (citing, e.g., United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, 296 F. Supp. 3d 1142 (N.D. Cal. 2017); Zetia, 587 F. Supp. 3d 356.

The Court agrees with the FTC that there is no rule prohibiting the Court from deciding market definition at the summary judgment stage.  While market definition is a fact-sensitive inquiry, that does not mean that it cannot be resolved on summary judgment so long as there is no genuine dispute of material fact—most inquiries are "fact sensitive" to some extent.  Moreover, as the FTC notes, it is not uncommon for courts to decide market definition at the summary judgment stage.  See, e.g., United Food, 296 F. Supp. 3d at 1176 (granting partial summary judgment on market definition); Zetia, 587 F. Supp. 3d at 366 (same).  And from an efficiency standpoint, the Court appreciates that were this case to go to trial, there may be some overlap between the issues of monopoly power and anticompetitive effects.  See Surescripts Opp'n at 9–10.  But this overlap can be mitigated through pretrial motions and, in any event, is not a persuasive reason to avoid deciding a ripe legal issue.  And in light of the mootness issue the parties have raised, the Court's ability to cleave this aspect of the case, which is materially unaffected by whether Surescripts has ceased its loyalty programs, certainly promotes judicial efficiency.

### C.  The Proper Time Period for Assessing the Relevant Markets Is Present Day

The parties also disagree about the proper time period for assessing the relevant markets. The FTC suggests that the Court should measure the cross-elasticity of demand in the present day; thus, the appropriate question in determining if the relevant markets include analog methods is whether consumers would switch back from e-prescribing to analog methods today.  See FTC Reply at 9–12.  In support, it cites other antitrust cases in which courts have assessed the current state of the market despite the alleged anticompetitive behavior beginning much earlier.  See id. at 10 (collecting cases).

Surescripts, however, posits that "the relevant markets must be assessed back to at least 2010—if not further back—to determine whether Surescripts' loyalty provisions allowed it to create or maintain monopoly power in properly defined markets at that time" given that the FTC alleges that the loyalty provisions have been unlawful since at least 2010.  Surescripts Opp'n at 15.  The correct inquiry then, it argues, "is whether a price increase would have stymied initial switching from analog methods to electronic methods of routing."  Id. (emphasis added).[13]

The Court agrees with the FTC's proposed framework.  Many courts have looked at present-day realities to assess the relevant market despite the alleged anticompetitive conduct having begun earlier.  In Ohio v. American Express Co., the Supreme Court assessed whether American Express's antisteering provisions violated Section 1 of the Sherman Act.  138 S. Ct. 2274, 2280 (2018).  Although the antisteering provisions were implemented in the 1950s, id. at 2282, the Court's analysis did not focus on the state of the market in the 1950s but rather on the modern market for credit card transactions, see id. at 2285–87.  And in Epic Games, Inc. v. Apple

---

[13] The FTC notes that Surescripts's proposed approach is "legally flawed" but would not change the outcome of the analysis in any event because the appropriate inquiry "is whether Surescripts is currently maintaining, or has at any time maintained, its monopoly power through exclusionary means."  FTC Reply at 9–10.

Inc., 559 F. Supp. 3d 898, 944 (N.D. Cal. 2021), the anticompetitive action challenged began over

ten years before the court's decision, id. at 944, but when assessing the relevant product market

the court "determine[d] where the actual competition lies between these platforms based on the

current state of play in the overall market," id. at 985 (second emphasis added).  Moreover, beyond

attempting to distinguish the FTC's authorities, Surescripts offers very little, if any, authority in

support of its own proposed framework.  Looking at the present-day market also makes sense when

considering what appropriate relief the Court could fashion were the FTC to succeed on its claims.

Hence, the Court concludes that focusing on the state of the market now to determine the relevant

product market is appropriate, and the Court will adopt the FTC's framework.

### D.  Analog Methods Are Not Reasonable Substitutes for E-Prescribing

On the issue of market definition, the parties' central dispute is whether the relevant

markets include both electronic and analog methods of routing and eligibility, or whether those

should be treated as separate markets.  See FTC Mot. at 9–21; Surescripts Opp'n at 10–22.  In

opposing the FTC's motion for summary judgment on this issue, Surescripts alleges numerous

disputed material facts that they claim preclude the Court from entering summary judgment on

market definition.  See Surescripts Opp'n at 14–22.  Many of these "disputes" are not really

disputes at all.  But even considering the actual disputes Surescripts raises, the Court concludes

that the undisputed facts are such that a reasonable fact finder could not conclude that analog

methods are reasonable substitutes for e-prescribing, despite being functionally similar in that they

provide the same service.  In other words, the evidence on market definition is "so one-sided" in

the FTC's favor that it "must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.

It is undisputed that e-prescribing has many benefits over analog methods, including

increased efficiency and accuracy.  See FTC SUF ¶¶ 34–41, 60; Surescripts Resp. SUF ¶¶ 34–41,

60.  It is also undisputed that e-prescribing provides significant cost-savings to pharmacies and

PBMs over analog methods.  FTC SUF ¶¶ 42–47, 60, 65–67; Surescripts Resp. SUF ¶¶ 42–47, 60,

65–67.  Surescripts does not genuinely dispute that its own executives, employees, and economic

expert have indicated that as providers have adopted e-prescribing, they have not switched back to

analog methods and are unlikely to do so.  FTC SUF ¶¶ 30–33 (citing testimony of former

Surescripts CEO stating that he could not "envision any realistic scenario under which [customers]

would go back to paper and fax prescriptions"); Surescripts Resp. SUF ¶¶ 30–33.[14]  Surescripts

also does not genuinely dispute that federal laws substantially impacted the adoption of e-

prescribing and that, as a result, losing access to electronic routing and eligibility would be a

"catastrophic failure" for EHRs.  FTC SUF ¶¶ 12–18, 20; Surescripts Resp. SUF ¶¶ 12–18, 20.[15]

These facts alone show that analog methods, while functionally similar, are less desirable than e-

prescribing on every major metric <u>and</u> more expensive, and that Surescripts's own employees and

its economic expert believe that customers are unlikely to switch back to analog methods as a

result.  Hence, the undisputed evidence suggests that e-prescribing and analog methods are not

"reasonably interchangeable" in the relevant sense.[16]  <u>Cf.</u> <u>H & R Block</u>, 833 F. Supp. 2d at 54–60

(holding that assisted tax preparation and manual tax preparation were not in the relevant product

market of digital do-it-yourself tax preparation products even though all three products provided

---

[14] Surescripts disagrees that its "economic expert does not dispute that routing and eligibility market participants are unlikely to revert to analog methods," FTC SUF ¶ 30; Surescripts Resp. SUF ¶ 30.  But this disagreement is not a genuine one, as Surescripts only points out that its economic expert predicated this opinion on the new e-prescribing technology being competitive, Surescripts Resp. SUF ¶ 30, but does not dispute that e-prescribing technology is competitive.  In fact, Surescripts's position seems to be that e-prescribing technology is very competitive.

[15] The Court does not find the purported disputes Surescripts raises on this point to be genuine because they do not cite to contradictory record evidence but instead merely create strawmen by raising additional nonmaterial facts.  <u>See</u> Surescripts Resp. SUF ¶¶ 19, 21–25, 63; FTC's Reply SUF ¶¶ 19, 21–25, 63.

[16] Any disputes as to whether analog methods were part of the market in 2010, <u>see</u> Surescripts Opp'n at 14–15, are not material because, as discussed above, the relevant inquiry is interchangeability in the present day.

the same end service of tax preparation and were in "some degree" of competition); <u>Staples</u>, 970

F. Supp. at 1074–81 (excluding consumable office supplies sold outside office supply superstores

from the relevant market even though the "products in question are undeniably the same no matter

who sells them").

Surescripts mainly objects to these undisputed facts by claiming they are not supported by

sufficient and/or adequate evidence.  Surescripts claims the FTC's cited evidence is "not supported

by any actual relevant testimony or documents by <u>customers</u>."  Surescripts Opp'n at 17 (emphasis

added).  But this argument would go to the relative weight of the FTC's evidence against any

conflicting evidence Surescripts may raise at trial—it is inapposite on summary judgment here, as

Surescripts does not provide contradictory evidence in the record or otherwise create a genuine

dispute sufficient to defeat summary judgment.  Surescripts thus does not point to "sufficient

admissible evidence for a reasonable trier of fact to find for the non-movant."  <u>Etokie</u>, 202 F. Supp.

3d at 146 (quoting <u>Anderson</u>, 477 U.S. at 248).

In the eligibility market specifically, Surescripts also attempts to raise the existence of two

"potential . . . substitutes" for electronic eligibility to broaden the relevant market: electronic prior

authorization ("EPA") and real time prescription benefits ("RTPB"), which they claim are "newer

processes that compete with eligibility," with the potential to "displace eligibility altogether."

Surescripts Opp'n at 21.  It argues that "as these newer methods improve and gain traction,

standard eligibility transactions may provide less relative value and decline in popularity."  <u>Id.</u>  But

Surescripts admits that the two potential substitutes they cite "provide[] a different service than

eligibility."  FTC SUF ¶¶ 79, 81; Surescripts Resp. SUF ¶¶ 79, 81.  And, in any event, Surescripts

only posits that these substitutes are "potential" and "may" compete with eligibility in the future,

which is irrelevant to the issue of whether there have been competitors to Surescripts in the eligibility market up to this point.  See Surescripts Opp'n at 21.

These undisputed facts alone show that the relevant markets should not include analog methods because there is little to no cross-elasticity between the products.  There is no evidence that customers would revert to analog methods to substitute for e-prescribing through electronic routing and eligibility if faced with substantial price increases.  Simply put: a fact finder could not reasonably conclude that analog methods and e-prescribing are reasonably interchangeable based on the facts in the record.

A consideration of the Brown Shoe indicia does not alter the Court's conclusion.  While the Brown Shoe factors are by no means dispositive, see Staples, 970 F. Supp. at 1075 ("Since the Court described these factors as 'practical indicia' rather than requirements, subsequent cases have found that submarkets can exist even if only some of these factors are present."), the undisputed facts related to the factors further support the FTC's definition of the relevant markets.  And even if the Court were to resolve the few factual disputes in Surescripts's favor, the Brown Shoe factors taken together would still support the FTC's definition of the markets, rendering any such disputes immaterial.

One Brown Shoe factor considers whether products have "distinct prices."  370 U.S. at 325.  Surescripts does not dispute that the pricing structure of electronic routing and eligibility is distinct from that of analog methods of prescribing.  FTC SUF ¶¶ 50–52, 71–73; Surescripts Resp. SUF ¶¶ 50–52, 71–73.  Surescripts's only argument on this point is that "free products can be substitutes for for-charge products."  Surescripts Opp'n at 18.  But that argument misses the point: the relevant inquiry when discussing Brown Shoe factors is not whether the products "can be" substitutes—the presence or absence of certain factors is meant to measure whether the products

are substitutes.  When the pricing structure of two products is different—as Surescripts concedes is the case for electronic routing and eligibility versus their analog counterparts—that is one indication that those products are not substitutes and thus should constitute different product markets.  Hence, the undisputed facts as to this Brown Shoe factor support the FTC's market definitions.

Another Brown Shoe consideration is consumer "sensitivity to price changes."  370 U.S. at 325.  Surescripts's only argument on this factor is that the FTC "presents no analysis of 'sensitivity to price changes.'"  Surescripts Opp'n at 18.  But it does not dispute that e-prescribing carries significant cost savings over analog methods.  FTC SUF ¶¶ 42–47, 60, 65–67; Surescripts Resp. SUF ¶¶ 42–47, 60, 65–67.  The FTC argues that "[b]ecause routing prices are small in comparison to these savings, pharmacies would not stop routing in favor of analog prescribing even in the face of substantial price increases" and that "EHRs are likewise unlikely to forego routing due to small price changes: EHRs that failed to provide routing services would not have been attractive alternatives to prescribers seeking to obtain incentives and avoid penalties under MIPPA and HITECH."  FTC Mot. at 17.

As for eligibility, the FTC argues that there would be little sensitivity to price changes because "EHRs regard eligibility as a must-have service," FTC Mot. at 19, and there are "no reasonable alternatives to eligibility for obtaining patient eligibility information," id. at 20. Ultimately, Surescripts may quibble with the conclusion drawn from the FTC's cited evidence, but Surescripts fails to provide any counterevidence on this point tending to show that customers would switch back to analog methods in the event of a price increase.  Surescripts's qualm that the FTC does not provide economic analysis of price sensitivity goes to the sufficiency or weight of

the FTC's evidence on this one factor but does not create a genuine factual dispute as to the application of it, and thus this factor counsels in favor of the FTC's view of market definition.

Courts also consider whether the products have "peculiar characteristics" as part of the Brown Shoe assessment.  370 U.S. at 325.  As discussed above, Surescripts does not dispute that e-prescribing has several benefits over its analog counterparts: e-routing is safer for patients and more efficient, and eligibility is a "measurable improvement" on analog methods.  FTC SUF ¶¶ 34–41; Surescripts Resp. SUF ¶¶ 34–41.  Surescripts's only argument on this point is that "the FTC does not provide any evidence showing that efficiency is the key characteristic driving switching decisions."  Surescripts Opp'n at 19.  But that is a strawman argument, as it is not necessary for the FTC to show that any Brown Shoe factor is the "driving characteristic" guiding consumer behavior.  Hence, this factor too supports the FTC's definition of the relevant markets.

Another Brown Shoe factor is whether the products have different vendors.  370 U.S. at 325.  The FTC posits that routing has unique vendors—Surescripts and Emdeon—that do not also deal in analog methods, and that Surescripts does not offer analog methods of receiving eligibility information nor do other vendors.  FTC Mot. at 17–18, 20.  Surescripts disputes this by pointing to evidence that Emdeon offers a fax method for routing when "there is not a routing number for a prescriber."  Surescripts Opp'n at 19.  But even if one company uses a fax as a back-up in the even that e-routing fails, that does not establish that the company is also a vendor of analog methods more generally, so this factor also supports the FTC's market definitions.

Courts also consider whether the products have distinct "production facilities."  Brown Shoe, 370 U.S. at 325.  Surescripts does not dispute that it and other e-prescribing companies use distinct facilities: e-prescribing involves electronic connections between specific EHRs and pharmacies/PTVs, whereas paper, phone, or fax prescriptions are transmitted by other means, and

non-electronic eligibility information is transmitted by phone calls or paper books/pamphlets.  See FTC SUF ¶¶ 7–8, 11; Surescripts Resp. SUF ¶¶ 7–8, 11; FTC Mot. at 18, 20–21.  This factor also supports the FTC's market definitions.

Another Brown Shoe consideration is whether the products have "distinct customers." 370 U.S. at 325.  Surescripts does not dispute that e-prescribing engages EHRs and PTVs, which are not involved in analog prescription delivery or the facilitation of eligibility information via analog methods absent rare exceptions.  FTC SUF ¶¶ 53–56; Surescripts Resp. SUF ¶¶ 53–56; FTC's Reply SUF ¶¶ 54, 56.  Surescripts argues instead that the end customer—the patient—is the same in both e-prescribing and analog transactions despite the "middle men" being different.  See Surescripts Opp'n at 19–20; FTC Reply at 14.  First, the Court disagrees that end patients are "customers" of e-prescribing since they do not interface with e-prescribing networks at all during transactions and may not even know of the network's existence or involvement in the transaction. But, even taking Surescripts's proposition as true, the fact that some categories of customers may be shared between analog and electronic services makes this factor at best neutral for Surescripts and does not undermine the FTC's characterization of the relevant market as excluding analog methods.

The final Brown Shoe factor is "industry or public recognition of the submarket as a separate economic entity."  370 U.S. at 325.  Surescripts does not dispute that it has routinely discussed electronic routing and eligibility markets without reference to analog methods in its ordinary-course business documents, FTC SUF ¶¶ 86, 88–90, 92, 94; Surescripts Resp. SUF ¶¶ 86, 88–90, 92, 94, as has its main competitor, Emdeon, FTC SUF ¶ 93; Surescripts Resp. SUF ¶ 93. "When determining the relevant product market, courts often pay close attention to the defendant['s] ordinary course of business documents."  H & R Block, 833 F. Supp. 2d at 52.

Regarding routing, Surescripts argues that the internal documents the FTC cites are "cherry pick[ed]" and points to an annual status report it published that "clearly compared electronic routing to analog methods." Surescripts Opp'n at 18 (citing Ex. 15–27 attached to its opposition, docketed at ECF Nos. 109-17–29). But Surescripts does not explain how those reports "clearly compare[]" the two methods, and the Court's independent review of them does not illuminate any direct comparison. Instead, as the FTC notes, "these reports merely confirm that routing eventually replaced analog methods," FTC Reply at 12, as the reports show the growth of e-prescribing. As for eligibility, Surescripts raises that there are ordinary-course business documents that group eligibility with the other products Surescripts has argued were competitors (EPAs and RTBPS). Surescripts Opp'n at 22. Even if there is a factual dispute as to the application of this factor, one factor is not dispositive, see Staples, 970 F. Supp. at 1075, and all the Brown Shoe factors viewed in totality support the FTC's definition of the relevant markets. Thus, there is no genuine dispute of material fact raised by the Brown Shoe factors that precludes summary judgment for the FTC on market definition.

*          *          *

All the evidence in the record tends to support that analog methods are not legitimate substitutes for electronic routing and eligibility and that electronic routing and eligibility are thus distinct markets. Surescripts's attempt to manufacture genuine disputes mainly takes issue with the sufficiency or weight of specific pieces of the FTC's evidence rather than marshalling counterevidence in the record. On the evidence in the record, a reasonable fact finder could not conclude that the relevant market includes analog methods. Thus, the Court will grant the FTC's motion for partial summary judgment as to the relevant markets and conclude that the relevant

markets are electronic routing and electronic eligibility, which do not include analog methods of routing and eligibility.

## II.    Monopoly Power

The next step in a Section 2 analysis is assessing whether the defendant had monopoly power in the relevant market.  "Monopoly power is the power to control prices or exclude competition."  United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).  "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level."  Microsoft, 253 F.3d at 51.  "While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge."  Id. (citations omitted).  "Because such direct proof [of profitably raising prices] is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power."  Id. "Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."  Id.; see also Fed. Trade Comm'n v. Facebook, Inc., 581 F. Supp. 3d 34, 43 (D.D.C. 2022) ("[A] plaintiff proceeding by the indirect method must also show that the firm's dominant share of the relevant market is protected by 'barriers to entry' into the market.").

At least one judge in this District has found that as low as a 60% share in the relevant market establishes dominance.  See Facebook, 581 F. Supp. 3d at 48–49.  "'Entry barriers' are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level."  Microsoft, 253 F.3d at 51.  "Any market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm should be considered a barrier to entry, regardless of who is responsible for the existence of that condition."

S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 980, 1001 (D.C. Cir. 1984).  "Plaintiffs must not only show that barriers to entry protect the properly defined . . . market, but that those barriers are 'significant.'"  Microsoft, 253 F.3d at 82.

The FTC asks the Court to enter summary judgment on Surescripts's possession of monopoly power in the relevant markets.  FTC Mot. at 8–9.  Specifically, the FTC argues that there is no genuine dispute of material fact that Surescripts "has possessed dominant shares in the routing and eligibility markets that have been protected by barriers to entry" since 2010.  Id. at 21.  Surescripts responds that the entry of summary judgment on monopoly power is precluded because "[it] has never demonstrated any market power to raise prices or reduce output" and thus this direct evidence "defeats" the FTC's claim of monopoly power.  Surescripts Opp'n at 22–23.  Moreover, Surescripts posits that even if the FTC's indirect evidence was sufficient to prove monopoly power, there are genuine disputes of material fact as to that evidence that preclude summary judgment.  Id. at 25.

For the reasons explained below, the Court agrees with the FTC and will grant summary judgment in its favor, finding that Surescripts possesses monopoly power in the relevant market.

## A.  Surescripts Possesses a Dominant Share in the Relevant Markets

Surescripts has held at least a 95% share of both the electronic routing and eligibility markets since 2010.  FTC SUF ¶¶ 103–04, 116–17 (noting that Surescripts recognized in one of its internal documents from 2011 that it had "no real competitors" in either routing or eligibility when describing its 95%+ share in each market).  This is surely dominance by any definition or metric.[17]  And Surescripts does not dispute that—its only response is that "the FTC has not proven,

---

[17] Even under Surescripts's proposed definition of the market, it has held at least 62.4% of both electronic and analog methods of routing, FTC SUF ¶ 122; Surescripts Resp. SUF ¶ 122, and at least 61.6% of all eligibility transactions—both electronic and analog—since 2014, FTC SUF ¶ 126; Surescripts Resp. SUF ¶ 126.  And as low as a 60% share in the relevant market may establish dominance.  See Facebook, 581 F. Supp. 3d at 48–49.

and cannot prove without a full trial, that any such markets exist as the FTC wants to define them," and thus the FTC cannot argue that Surescripts had a certain market share of an undefined market. Surescripts Opp'n at 25; Surescripts Resp. SUF ¶¶ 103–04, 116–17.  But this argument necessarily fails because, as discussed above, the Court agrees with the FTC's definitions of the relevant markets.  There is thus no genuine dispute that Surescripts has held a dominant share of the electronic routing and eligibility markets since at least 2010.

### B.  There Are Barriers to Entry in the Relevant Markets

It is not enough to show that Surescripts held a dominant position in the market.  Because the FTC only relies on indirect proof of monopoly power, FTC Mot. at 8–9, it must also show that Surescripts was able to protect that dominant position with barriers to entry in the relevant markets. Microsoft, 253 F.3d at 82.

The FTC argues that barriers to entry exist in the relevant markets because entry into routing and eligibility is difficult due to the "chicken-and-egg" problem caused by the indirect network effects of the electronic routing and eligibility markets—that "users on each side of a routing or eligibility network will not invest in the network until they are confident that there will be enough users on the other side."  FTC Mot. at 22–23; see also FTC SUF ¶¶ 128–29.  The D.C. Circuit recognized this "chicken-and-egg" problem as a legitimate barrier to entry in Microsoft. See 253 F.3d at 55.  As the court explained it, the barrier to entry in that case

> stem[med] from two characteristics of the software market: (1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base.  This "chicken-and-egg" situation ensures that applications will continue to be written for the already dominant Windows, which in turn ensures that consumers will continue to prefer it over other operating systems.

Id. (citations omitted).  The court found that barrier "g[ave] Microsoft power to stave off even superior new rivals."  Id. at 56.  So too here: the chicken-and-egg problem caused by the two-sided markets with indirect network effects creates a "structural barrier that protects [Surescripts's] future position."  See id. at 55.

The FTC also points to the many regulatory requirements that must be met to enter these markets, as well as the fact that any would-be entrant would have to confront Surescripts's strong first-mover advantage, resulting in the need for substantial financial investment in order to successfully enter the market.  FTC Mot. at 23; see also FTC SUF ¶¶ 130–34; Microsoft, 253 F.3d at 51 (recognizing regulatory requirements as a legitimate barrier to entry).

Surescripts does not dispute that entry into the markets is "not easy" "for a lot of reasons." FTC SUF ¶ 128; Surescripts Resp. SUF ¶ 128.  Surescripts also does not dispute that (1) entrants to routing and eligibility must solve a chicken-and-egg problem given the two-sided nature of the markets "where users on each side of a network will not invest in the network until they are confident that there will be enough users on the other side," FTC SUF ¶ 129; Surescripts Resp. SUF ¶ 129; (2) routing and eligibility entrants must comply with federal laws and regulations as well as industry standards, FTC SUF ¶¶ 130–31; Surescripts Resp. SUF ¶¶ 130–31; (3) Surescripts has a first-mover advantage in routing and eligibility, FTC SUF ¶ 132; Surescripts Resp. SUF ¶ 132; and (4) entry into routing and eligibility requires substantial investment to the order of tens of millions of dollars and may take several years, FTC SUF ¶¶ 133–34; Surescripts Resp. SUF ¶¶ 133–34 (only disputing the materiality of the facts, not the facts themselves).

But Surescripts does contest, as a matter of law, that these facts, even if true, are sufficient to constitute a barrier to entry.  See Surescripts Opp'n at 28.  The primary case on which Surescripts relies is Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995), an out-of-circuit

case standing for the proposition that "[e]ntry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," id. at 1429 (internal quotation marks omitted), which is a much narrower definition of barriers to entry than what the FTC proposes.  However, there is in-circuit precedent dictating a different standard.  The D.C. Circuit defines a barrier to entry as "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on . . . the dominant firm."  S. Pac. Commc'ns, 740 F.2d at 1001.  The D.C. Circuit re-endorsed that definition in Microsoft, adding that "'[e]ntry barriers' are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level." 253 F.3d at 51.

Surescripts also contends that the FTC raises only theoretical barriers to entry rather than evidence supporting the existence of barriers to entry in fact, Surescripts Opp'n at 26–30, and that Emdeon's ability to enter the market suggests that there are not, in fact, barriers to entry, see id. at 28–30.  Setting aside that the FTC disputes that Emdeon entered the markets successfully, see FTC Reply at 23, the standard for barriers to entry does not require the FTC to show that no competitors were able to successfully enter the market.  In the very case Surescripts cites to argue that the standard for barriers to entry is higher than what the D.C. Circuit endorses, the court noted that "[t]he fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers."  Rebel Oil, 51 F.3d at 1440.  This makes intuitive sense—the entry of a competitor does not mean the dominant firm did not have a monopoly—and here, it is undisputed that Emdeon only captured at most 5% of the relevant markets, see FTC SUF ¶¶ 103–04, 116–17; Surescripts Resp. SUF ¶¶ 103–04, 116–17.  In other words, the ability of one competitor to capture 5% of the

market does not undermine Surescripts's durable monopoly power protected and perpetuated by barriers to entry.

Thus, the undisputed facts—that there were several significant challenges faced by would-be entrants, which aided Surescripts in maintaining its dominance—establish that the relevant markets feature significant barriers to entry.

### C. Lower Prices and Increased Output Does Not Undermine Indirect Evidence

Notwithstanding the FTC's indirect evidence of monopoly power, Surescripts argues more broadly that the direct evidence of falling prices and increased output[18] during the relevant period in the electronic routing and eligibility markets "disproves" the FTC's indirect evidence. Surescripts Opp'n at 23–25.  The FTC does not dispute that prices have fallen and output has risen but rather argues that this reality "is not inconsistent with possession of monopoly power."  FTC Reply at 17.

Courts have held that the existence of so-called "calling cards" of a competitive market, such as falling prices and increased output, do not by themselves negate the existence of monopoly power as a matter of law.  In Microsoft, the court held that

> [e]ven if we were to require direct proof, moreover, Microsoft's behavior may well be sufficient to show the existence of monopoly power.  Certainly, none of the conduct Microsoft points to—its investment in R&D and the relatively low price of Windows—is inconsistent with the possession of such power . . . .  [I]f monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract a monopoly price provides no succor to the monopolist.

---

[18] While the Court recognizes that increased output is a sign of competition in many markets, it has doubts about whether that is the case here in the electronic routing and eligibility markets.  Typically, output is a function of consumer demand, which is a function of price—in competitive markets, prices are lower, which causes higher demand, which, in turn, causes higher output.  But that model does not cleanly map onto the market for prescriptions. Because prescriptions are not "consumer goods" in any ordinary sense, fluctuations in demand are likely due to factors other than lower prices, such as a decline in the health of the patient population, an increase in the availability of prescription drugs, an increase in doctors prescribing medication, or an increase in the population.  Hence, the Court has doubts that an increase in output here is as powerful a sign—if a sign at all—of a competitive market in the prescription market as it is in markets for consumer goods.

253 F.3d at 57 (cleaned up).  And the Supreme Court has noted that "the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that <u>power exists</u> to raise prices or to exclude competition when it is desired to do so."  <u>Am. Tobacco Co. v. United States</u>, 328 U.S. 781, 811 (1946) (emphasis added).

Surescripts argues that this incongruous direct and indirect evidence creates an issue of fact precluding summary judgment.  Surescripts Opp'n at 23.  Not so.  First, this is not an issue of fact—the FTC does not disagree with the facts Surescripts relies on.  FTC Reply at 17.  Instead, it is a disagreement over the law: does undisputed evidence of falling prices undermine other evidence of monopoly power?  Cases such as <u>Microsoft</u> clearly answer that question—low prices are not "inconsistent" with monopoly power.  253 F.3d at 57.  Moreover, Surescripts only points to the fact that prices fell and output increased over the relevant period—it does not attempt to show that prices fell below or output increased above the competitive level.  The FTC argues, and the Court agrees, that without an attempt to show that prices were lower and output higher than the competitive level, the "direct evidence" Surescripts offers is of little value.  Thus, that evidence is not a sufficient basis to deny summary judgment.

*    *    *

The undisputed facts are sufficient to grant summary judgment in the FTC's favor on monopoly power.  The Court is unaware of, and Surescripts was unable to point the Court to, any antitrust case in which a defendant with a 95% share of the relevant market did not hold monopoly power.  The best Surescripts could offer was <u>Tops Markets, Inc. v. Quality Markets, Inc.</u>, 142 F.3d 90 (2d Cir. 1998), where the defendant held 79% of the market but the Court found it was not a monopolist "[d]espite its high market share" because "no other evidence—such as barriers to entry, the elasticity of demand, or the nature of defendant's conduct—supports the conclusion that [it]

can control prices or exclude competition." <u>Id.</u> at 99. But that "other evidence" exists here. At bottom, Surescripts holds a supershare of the electronic routing and eligibility markets—the likes of which is rarely ever seen in antitrust cases—and there are inherent and significant obstacles to entering those markets due to their two-sided nature. Accordingly, the Court will grant the FTC's motion for partial summary judgment on element one of its Section 2 claims and hold that Surescripts held monopoly power in the electronic routing and eligibility markets since at least 2010.

## III.    Anticompetitive Effects

Once it is established that a defendant holds monopoly power, § 2 liability attaches "only when it . . . engag[es] in exclusionary conduct  . . . . to maintain its monopoly." <u>Microsoft</u>, 253 F.3d at 58. Courts use a burden-shifting framework to answer that question. <u>See</u> <u>id.</u> at 58–60. The first question in this analysis is whether the defendant "engag[ed] in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" <u>Id.</u> 58 (quoting <u>Grinnell</u>, 384 U.S. at 571); <u>see also</u> <u>Microsoft</u>, 87 F. Supp. 2d at 37 ("The threshold question in this analysis is whether the defendant's conduct is 'exclusionary'—that is, whether it has restricted significantly, or threatens to restrict significantly, the ability of other firms to compete in the relevant market on the merits of what they offer customers."). "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'" <u>Microsoft</u>, 253 F.3d at 58–59. "[H]arm to one or more <u>competitors</u> will not suffice"—plaintiff must show harm to the "competitive <u>process</u> and thereby harm [to] consumers." <u>Id.</u> at 58. "[I]f a plaintiff successfully establishes a <u>prima facie</u> case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." <u>Id.</u> at 59. "[I]f the monopolist's procompetitive justification stands

unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Id.

Surescripts moves for complete summary judgment on this element, arguing that the FTC has not presented any evidence that its loyalty pricing contracts for its routing or eligibility customers foreclosed competitors from a substantial portion of or caused anticompetitive effects in the electronic routing and eligibility markets. That would mean that summary judgment should be granted in its favor on both Counts I and II, resolving the entire case in Surescripts's favor. See Surescripts Mot. at 14–15. The FTC opposes the motion, arguing that Surescripts's loyalty contracts "leverage[] its longstanding dominant position to exploit structural features of the routing and eligibility markets," FTC Opp'n at 1, and that there are genuine disputes of fact on this issue that preclude the entry of summary judgment for Surescripts, id. at 2.

As discussed at the outset of this Opinion, the Court will reserve judgment on Surescripts's summary judgment motion pending further developments on the mootness issue given that the motion as currently written centers on the loyalty pricing program—which is the primary alleged "exclusionary conduct" producing "anticompetitive effects"—and Surescripts represents that it has since completely eliminated that program (and that if it has not yet completed that process, it will be completed soon). The Court does note, however, that as the briefing currently stands, there are several material factual disputes that may have prevented summary judgment for Surescripts on anticompetitive effects.[19] Before Surescripts raised the possibility of mootness, success on its motion was an uphill battle. And although its loyalty programs may be defunct now—a

---

[19] To give a few examples, the parties seem to dispute (1) whether Surescripts's loyalty contracts had an exclusive effect, compare Surescripts SUF ¶¶ 23, 25–27, 32, 38–46, with FTC SOMF ¶¶ 11–16, 36, 42–43, (2) whether Emdeon's failure was due to Surescripts's loyalty contracts, compare Surescripts SUF ¶¶ 62–67, with FTC SOMF ¶¶ 53–57, and (3) whether Surescripts's customers wanted to multihome, compare Surescripts SUF ¶¶ 47–53, 62, with FTC SOMF ¶ 32, and FTC Resp. SUF ¶¶ 47–53.

development which will certainly alter the focus of Surescripts's summary judgment motion—the Court is unaware of any rule that the FTC must show that the challenged conduct is still ongoing to prove anticompetitive effects in the market and for liability to accordingly attach.  The Court encourages the parties to explore these issues further and thus will refer them to mediation in an attempt to resolve the case or at least narrow the live issues.

## Conclusion

For the foregoing reasons, the Court determines that the case is not moot at this juncture and will grant the FTC's motion for partial summary judgment and reserve decision on Surescripts's motion for summary judgment.  Accordingly, the only remaining issue in this case is whether Surescripts's loyalty pricing or other conduct has caused anticompetitive effects in the electronic routing and electronic eligibility markets.  The Court will refer the parties to mediation at this juncture.  A separate Order accompanying this Memorandum Opinion will issue on this date.

/s/

JOHN D. BATES
United States District Judge

Dated:  March 30, 2023